Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, ALASKA WILDERNESS LEAGUE, ENVIRONMENT AMERICA, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY, | Case No. 3:23-cv-00058-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, U.S. FISH & WILDLIFE SERVICE, and U.S. DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 1 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 1 of 63

(National Environmental Policy Act, 42 U.S.C. §§ 4321–4347; Endangered Species Act, 16 U.S.C. §§ 1531–1544; Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101–3233; Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501–6508; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Environment America, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society file this Complaint for Declaratory and Injunctive Relief, and hereby allege:

## I. NATURE OF THE CASE

1. This action seeks declaratory and injunctive relief against the Bureau of Land Management and the U.S. Department of the Interior (collectively, BLM) for its decision to approve the Willow Master Development Plan (Willow) — a massive oil and gas development project proposed by ConocoPhillips, Alaska Inc. (ConocoPhillips). This action also seeks declaratory and injunctive relief against the U.S. Fish and Wildlife Service (FWS) for its arbitrary and unlawful biological opinion (BiOp) for Willow.

2. Willow would be located within the northeastern portion of the National Petroleum Reserve–Alaska (Reserve), in an area already under stress from rapid industrialization and climate change. Willow would result in the construction and operation of extensive oil and gas and other infrastructure in sensitive arctic habitats and will significantly impact the region's wildlife, air, water, lands, and people.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                        Page 2 of 63

3. BLM previously authorized Willow in January 2021. Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society (collectively, SILA Plaintiffs) challenged those approvals. This Court vacated BLM's record of decision (ROD) and Environmental Impact Statement (EIS) and FWS's BiOp approving the project due to critical flaws in the agencies' analyses. BLM subsequently prepared a Supplemental Environmental Impact Statement (SEIS) and issued a new ROD on March 13, 2023.

4. BLM's new decision, along with the related SEIS, violates the National Environmental Policy Act (NEPA), the Naval Petroleum Reserves Production Act (NPRPA), the Alaska National Interest Lands Conservation Act (ANILCA), and the Administrative Procedure Act (APA). These statutes and their implementing regulations impose important protections for the lands and resources in the Reserve. These laws require consideration of alternatives and thorough, transparent, and careful analysis of the impacts of ConocoPhillips' proposal by BLM. BLM violated these laws by failing to consider reasonable alternatives that would lessen the impacts to the Reserve, thereby violating BLM's obligations under NEPA, the NPRPA, and ANILCA Section 810. BLM also failed to take a hard look at the impacts of Willow, violating NEPA. BLM's failure to comply with these laws threatens the lands, waters, wildlife, and people of the northeastern Reserve.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 3 of 63

5. Following formal consultation, FWS issued a BiOp on January 13, 2023, considering on the effects of Willow to listed species and designated critical habitats protected by the Endangered Species Act (ESA). FWS determined that Willow will not jeopardize the continued existence of threatened polar bears or destroy or adversely modify the species' designated critical habitat. In making this determination, FWS failed to articulate a rational connection between the facts found and its no-jeopardy conclusion. FWS violated the ESA and the APA because its determinations in the BiOp are arbitrary and capricious.

6. Plaintiffs seek remand and vacatur, declaratory, and injunctive relief against Defendants. The agencies' actions and decisions fail to comply with applicable law, are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in excess of statutory authority, and without observance of procedure required by law. 5 U.S.C. § 706(2).

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel mandatory duty), 2201 (declaratory relief), and 2202 (injunctive relief).

8. Defendants' sovereign immunity is waived pursuant to the APA, 5 U.S.C. § 702.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 4 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 4 of 63

9. Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the BLM Alaska State and Arctic District Offices, and the FWS North Alaska Field Office; because many Plaintiff groups are primarily located in or maintain offices in Alaska; and because the public lands at issue in the case are located in Alaska.

10. BLM's final SEIS and ROD, and FWS's BiOp are final agency actions for which Plaintiffs have a right to judicial review under the APA. 5 U.S.C. §§ 701–706.

## III. PARTIES

### Plaintiffs

11. Plaintiff Sovereign Iñupiat for a Living Arctic (SILA) is an Alaska-based grassroots organization made up of Iñupiat Peoples and community members. SILA's mission is "to create space for healthy communities, spiritually, mentally, and physically; fostering the connection between people, culture and land. We are empowered as frontline communities and those who have inherent connection with the land and what it provides." SILA seeks to accomplish its mission through community and shareholder engagement, knowledge-sharing events, political advocacy, and revitalizing Iñupiaq intergenerational culture and language. SILA's major focus is uplifting the voices of communities in Arctic Alaska, including a focus on the western Arctic and development near the community of Nuiqsut. SILA actively works to empower Arctic communities to protect their interests by engaging in administrative processes with the goal of ensuring

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 5 of 63

meaningful involvement for these communities. This includes advocacy and outreach around the Willow project, including at public hearings.

12. Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with over 900 members, sixty percent of whom are located throughout Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy. One of the Northern Center's major focus areas is its Arctic program. The Northern Center actively works to protect the Arctic, its communities, and vital wildlife habitats and wildlands, including areas like Teshekpuk Lake in the Reserve, from the harms associated with oil and gas development. The Northern Center also works to amplify the voices of local populations impacted by development. The Northern Center participates in agency decision-making processes related to oil and gas development in the Arctic, including the challenged action. The Northern Center provides its members and the public with information about the impacts of oil and gas on the Arctic, enabling members to participate as well.

13. Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993, with offices in Washington, D.C. and Alaska. The mission of the organization is to protect Alaska's wild lands and waters by inspiring broad support for federal policy action, so that Alaska's wild landscapes endure to support vibrant communities and abundant wildlife. On top of their focus on Alaska's Arctic ——

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG

including both the Reserve and Arctic National Wildlife Refuge — the organization has a long history of focus in Southeast Alaska, and has worked to secure protections for the Arctic Ocean, Chugach National Forest, and BLM lands statewide over the decades. AWL is committed to honoring the human rights and traditional values of Alaska's Indigenous communities, while simultaneously ensuring Alaska is part of our nation's climate solution. The organization has 130,000 active members and supporters nationwide that it mobilizes to make federal policy change.

14. Plaintiff Environment America, Inc. (Environment America) is an advocacy group comprised of twenty-nine affiliate organizations and members and supporters in every state, including Alaska. Environment America works to protect air, water, and open spaces. Environment America engages in independent environmental research and advocates for policies by lobbying and mobilizing the public. Environment America has worked to raise awareness about the harmful impacts of oil and gas on public lands, including in Arctic Alaska, the need to protect our natural heritage over fossil fuel extraction, and the urgency of protecting threatened and endangered species.

15. Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 733,600 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 7 of 63

quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,800 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, and the organization has long been active on issues related to oil and gas activities in America's Arctic, including in the Reserve, such as polar bear conservation.

16.    Plaintiff The Wilderness Society is a national nonprofit organization whose mission is to unite people to protect the nation's wild places. Founded in 1935, The Wilderness Society is headquartered in Washington, D.C., with offices throughout the country, including a seven-person staff in Alaska. The Wilderness Society has more than one million members and supporters, many of whom are in Alaska. Its Alaska program works to build relationship with communities, co-create resilient conservation models, and permanently protect special places in the Arctic and sub-Arctic, including in the Reserve. The Wilderness Society has been engaged in Reserve conservation efforts for decades and has consistently participated in public processes associated with Reserve land use decisions. Staff have visited the Northeast region of the Reserve on numerous occasions to assess conservation values, conduct scientific research, and meet with community members. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou and fish resources that utilize much of the landscape during their life cycles.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                    Page 8 of 63

17.    Plaintiffs' members and supporters live in and around the northeastern Reserve (the area impacted by Willow). Plaintiffs' members and supporters also work, visit, and recreate in and around the northeastern Reserve and plan to return. Plaintiffs' members and supporters use the northeastern Reserve and depend on the health of the subsistence resources in the Reserve to support their subsistence way of life. Plaintiffs' members and supporters enjoy or use wildlife that inhabit these areas, in particular caribou, polar bears, and birds. Plaintiffs' members and supporters use the public lands in the Arctic and Reserve for quiet recreation, aesthetic pursuits, and spiritual renewal. Plaintiffs' members and supporters have health, subsistence, cultural, economic, recreational, scientific, environmental, aesthetic, educational, conservation, and other interests in the northeastern Reserve, and they enjoy or use wildlife that inhabit the Reserve.

18.    These interests, and the members' and supporters' use and enjoyment of the northeastern Reserve, are threatened by BLM's approvals for Willow and FWS' arbitrary and unlawful BiOp. Willow's extensive oil and gas activities and associated pollution and industrialization will destroy, degrade, and diminish the wild and natural state of this area, will kill, injure, harm, harass, and displace wildlife (including, but not limited to caribou and threatened polar bears) and adversely affect the habitats on which these species depend, and will thus harm the interests of Plaintiffs and their members and supporters. Willow's infrastructure and increased traffic and noise will also impede

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                      Page 9 of 63

members' and supporters' ability to access subsistence resources in the region. The project's greenhouse gas emissions will significantly and negatively impact the Arctic as well as have impacts on the global climate. Willow will adversely affect the natural environment and wildlife used and enjoyed by Plaintiffs' members and supporters and harm the interests of the groups and their members and supporters.

19.     Plaintiffs and their members have procedural interests in Defendants' full compliance with planning and decision-making processes under NEPA, the NPRPA, ANILCA, and the ESA and in Defendants' duties to substantiate their decisions because full legal compliance and rational decision making protects Plaintiffs' underlying interests described above.

20.     BLM's adoption of the ROD and final SEIS violates NEPA, the NPRPA, ANILCA and the APA, and threatens imminent, irreparable harm to the interests of Plaintiffs and their members and supporters. These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to the Defendants' approval of Willow in violation of the substantive and procedural protections of the law and would be redressed by the relief sought in this case.

21.     FWS's issuance of the BiOp violates the ESA and APA, and threatens imminent, irreparable harm to the interests of Plaintiffs and their members and supporters to the Southern Beaufort Sea (SBS) stock of ESA-listed polar bears. These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                   Page 10 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 10 of 63

traceable to FWS's deficient BiOp and would be redressed by the relief sought in this case.

Defendants

22. Defendant BLM is an agency within the U.S. Department of the Interior and is responsible for managing federal lands and the subsurface mineral estate underlying federal lands in the Reserve. BLM served as the lead agency for preparation of the Willow SEIS and is responsible for issuing a right-of-way for BLM-managed lands, authorizing Willow's gravel mines, and approving applications for permits to drill, among other authorizations.

23. Defendant FWS is an agency within the U.S. Department of the Interior and is charged with administering the ESA and Marine Mammal Protection Act (MMPA) for polar bears.

24. Defendant U.S. Department of the Interior is an agency of the United States responsible for oversight of BLM and FWS.

**IV. STATUTORY AND REGULATORY BACKGROUND**

National Environmental Policy Act

25. NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 11 of 63

role in both the decision-making process and the implementation of the decision. *Id.* § 1502.1. By focusing the agency's attention on the environmental consequences of its proposed action, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

26.    NEPA requires that agencies evaluate the environmental consequences of a project, beginning at an early stage of the planning process. Agencies can prepare a high-level programmatic EIS with sufficient detail to foster informed decision-making, and to defer the in-depth evaluation of the site-specific impacts when it proposes to make an irreversible and irretrievable commitment of the availability of resources. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800–01 (9th Cir. 2003).

27.    NEPA requires federal agencies to prepare a detailed EIS for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332. Such a statement is required to "provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA requires the use of "high quality" information. *Id*. § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implement NEPA." *Id*.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                      Page 12 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 12 of 63

28.    NEPA requires that agencies take a "hard look" at the direct, indirect, and cumulative environmental effects of the alternatives, including the proposed action, as well as the means to mitigate against those adverse environmental consequences. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.16, 1508.7. "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

29.    NEPA requires BLM to consider mitigation measures in an EIS, including measures outside the jurisdiction of the action agency. 40 C.F.R. §§ 1502.14(c), (f), 1502.16(h), 1505.2(c). An agency must evaluate the effectiveness of any mitigation measures it adopts and relies on in approving an agency action. *Neighbors of Cuddy Mountain*, 137 F.3d at 1381.

30.    NEPA requires federal agencies to include alternatives to the proposed action within an EIS. 42 U.S.C. § 4332(2)(C)(iii). The alternatives analysis is the "heart" of a NEPA document, and NEPA's implementing regulations direct BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives," including appropriate mitigation measures to reduce the potential impacts of the action on the environment. 40 C.F.R. § 1502.14.

31.    In defining a "reasonable" range of alternatives, NEPA requires consideration of alternatives "that are practical or feasible" and not just "whether the

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                     Page 13 of 63

proponent or applicant likes or is itself capable of carrying out a particular alternative."
Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act
Regulations, 46 Fed. Reg. 18,027 (Mar. 23, 1981).

32. The Council on Environmental Quality (CEQ) recently released new
guidance on assessing greenhouse gas (GHG) emissions and climate change impacts
under NEPA, effective January 9, 2023. National Environmental Policy Act Guidance on
Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196
(Jan. 9, 2023). The guidance instructs agencies to "evaluate reasonable alternatives that
may have lower GHG emissions, which could include technically and economically
feasible clean energy alternatives to proposed fossil fuel-related projects." *Id.* at 1204.
According to the guidance, agencies are to evaluate the connected actions of a project in
addition to considering the proposed action's cumulative climate change effects. The
guidance also amplifies the need to assess the effects of climate change on proposed
projects. CEQ places emphasis on the agencies need to consider mitigation, encouraging
agencies to mitigate emissions "to the greatest extent possible." *Id.* at 1206.

Naval Petroleum Reserves Production Act

33. The Naval Petroleum Reserves Production Act of 1976 (NPRPA) governs
BLM's management of the surface values and subsurface resources in the Reserve. 42
U.S.C. §§ 6501–6508. The NPRPA requires BLM to consider and protect the ecological
and other values of the Reserve. 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 14 of 63

34.     Under the NPRPA, Congress instructed the Secretary of the Interior to designate as Special Areas any areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value." *Id.* § 6504(a). The Secretary is required to ensure "maximum protection" for Teshekpuk Lake, and other areas designated as having these significant values. *Id.*

35.     The Secretary is also required to adopt conditions, restrictions, and prohibitions necessary to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the Reserve from any activities. *Id.* § 6506a(b).

36.     The NPRPA provides that BLM "shall include or provide for such conditions, restrictions, and prohibitions" on activities within the Reserve as it determines necessary to protect the Reserve's surface resources. *Id.* § 6506a(b). The statute places no limitation or conditions on this authority.

37.     BLM has considerable discretion to suspend operations and production on existing leases or units. *Id.* § 6506a(k)(2). Under the NPRPA regulations, BLM may suspend operations and production "in the interest of conservation of natural resources" or to mitigate "reasonably foreseeable and significantly adverse effects on surface resources." 43 C.F.R. § 3135.2(a). BLM also has the authority to deny or delay an application for a permit to drill. *Id.* § 3162.3-1(h)(2) (stating BLM has authority to "[r]eturn the application and advise the applicant for the reasons of disapproval"); *id.* § 3162.3-1(h)(3).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 15 of 63

38.     Under ANILCA Section 810, if an agency is going to withdraw, reserve, lease, or otherwise allow the use, occupancy, or disposition of public land, the agency conducts what is often referred to as a "tier-1 analysis" to determine the proposed action's impact on subsistence uses. 16 U.S.C. § 3120(a). The agency "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* In doing so, the agency must also consider cumulative impacts.

39.     If the agency conducts the tier-1 analysis and determines that the activities will not "significantly restrict subsistence uses," then the agency issues a Finding of No Significant Restriction and Section 810's requirements are met. *Id; see also Hanlon v. Barton*, 740 F. Supp. 1446, 1448 (D. Alaska 1988).

40.     If the action may significantly restrict subsistence uses, the agency must provide public notice and hold hearings in potentially affected communities. 16 U.S.C. § 3120(a)(2), *see also Hanlon*, 740 F. Supp. at 1448.

41.     If the agency finds that the proposed action would "significantly restrict subsistence uses," the agency then conducts a "tier-2 analysis." In that analysis, the agency can only move forward if it finds that the restriction on subsistence is necessary

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                        Page 16 of 63

and consistent with sound public land management principles; involves the minimum amount of public lands necessary to accomplish the purpose of the proposed action; and the agency takes reasonable steps to minimize the adverse impacts to subsistence uses and resources. *Id.* § 3120(a)(1)–(3).

42. Where an EIS is required for a proposed action, the agency "shall include" the findings required Section 810(a) as part of the EIS. *Id.* § 3120(b); Bureau of Land Mgmt., *Compliance with ANILCA Section 810*, at 8–10, *available at* https://www.blm.gov/sites/default/files/policies/im_ak_2011_008_Policy.pdf.

<u>Endangered Species Act</u>

43. Congress enacted the ESA to protect and conserve threatened and endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b), (c)(1).

44. The goal of the ESA is not only to save endangered and threatened species from extinction but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection. *Id*. §§ 1531(b), 1532(3).

45. The National Marine Fisheries Service and FWS jointly administer the ESA, with jurisdiction over different species. FWS has responsibility for administering the ESA and performing consultations for polar bears. 50 C.F.R. § 402.01(b).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                   Page 17 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 17 of 63

46.     The ESA prohibits any "person," including private parties as well as local, state, and federal agencies, from committing or causing others to commit unauthorized "take" of individual members of an endangered species, as well as threatened species protected from such take by species-specific regulations or a "special rule." 16 U.S.C. §§ 1538(a)(1)(B), (G), 1538(g). For polar bears, the "special rule" prohibits unauthorized incidental take from an activity unless the taking has been authorized or exempted under the MMPA. 50 C.F.R. § 17.40(q)(2); *see also* 16 U.S.C. § 1371 (prohibiting take of marine mammals unless specifically permitted).

47.     Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" or any attempt to do the above actions. *Id*. § 1532(19). "Harm" means an "act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id*.

48.     Section 7(a)(2) of the ESA obligates federal agencies to ensure "that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 18 of 63

continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

49.    To fulfill this substantive duty, Section 7(a)(2) imposes procedural obligations on federal agencies to consult with FWS. *Id.*

50.    The ESA prescribes a multi-step process to ensure compliance with its substantive provisions by federal agencies. A federal agency proposing to take an action, i.e., the "action agency," must inquire of the Secretary of Interior whether any threatened or endangered species "may be present" in the area of the proposed action. *Id.* § 1536(c)(1); 50 C.F.R. § 402.14(a). BLM is the action agency for purposes of Willow. If the answer is affirmative, the agency shall conduct a biological assessment to determine whether such species "is likely to be affected" by the action. 16 U.S.C. § 1536(c)(1).

51.    If the action agency determines that the action "is likely to adversely affect" the listed species, formal consultation with the Secretary is required. *Id.* § 1536(a)(3); 50 C.F.R. § 402.14(a), (b). Formal consultation concludes with FWS's issuance of a biological opinion under Section 7(b)(3) of the ESA. 50 C.F.R. § 402.02. FWS and the action agency must each utilize the "best scientific and commercial data available" during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

52.    In a biological opinion, FWS must determine whether the federal action subject to the consultation is likely to jeopardize the continued existence of the listed species or destroy or adversely modify its designated critical habitat. 16 U.S.C. §

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 19 of 63

1536(b)(4). A likelihood of jeopardy is found when "an action . . . reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

53.    The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of the status of the listed species, the effects of the action, and the cumulative effects. *Id*. § 402.14(g)(2)–(3), (h)(1)(i)–(iii). The "effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id* § 402.02. Cumulative effects are "effects of future State or private activities . . . that are reasonably certain to occur within the action area of the Federal action . . . ." *Id*.

54.    If the biological opinion concludes that an action is likely to result in jeopardy to a listed species, the biological opinion must set forth the reasonable and prudent alternatives, if any, that would avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(h)(2). The biological opinion must consider the relevant factors and articulate a rational connection between the facts found and the choice made. *See Ctr. for Biological Diversity v. U.S. BLM*., 698 F.3d 1101, 1121 (9th Cir. 2012).

_____

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                          Page 20 of 63

55.   Recognizing that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities," Congress passed the MMPA in 1972 to ensure that marine mammals are "protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(1), (6). The central purpose of the MMPA is to prevent marine mammal stocks from falling below their "optimum sustainable population" levels, defined as the "number of animals which will result in the maximum productivity of the population or the species . . . ." *Id*. §§ 1361(2), 1362(9).

56.   To promote these objectives, the MMPA establishes a general moratorium on the "taking" of marine mammals. *Id*. § 1371(a). Prohibited takings include actions that kill or injure marine mammals or disrupt behavioral patterns, such as migration, breathing, breeding, or feeding. *Id*. § 1362(13), (18).

57.   The MMPA contains several narrow exceptions to the moratorium on take. The exception relevant here allows FWS, upon request, to promulgate regulations authorizing incidental take of small numbers of marine mammals for a period up to five years, provided such take will: (1) have a negligible impact on such species or stock, and (2) will not have an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses or pursuant to a cooperative agreement. *Id*. § 1371(a)(5)(A)(i)(I).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                   Page 21 of 63

58.     Within the context of the MMPA, "take" is broadly defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id*. § 1362(13). Harassment is further defined as any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal (Level A harassment) or has the potential to disturb a marine mammal (Level B harassment). *Id*. § 1362(18).

59.     A Letter of Authorization is required to conduct activities pursuant to an Incidental Take Regulation. 50 C.F.R. § 18.27(f)(1).

## Administrative Procedure Act

60.     Courts review final agency actions for which no specific judicial review mechanism is prescribed by statute under the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704.

61.     Under the APA, courts "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in excess of statutory authority, or made "without observance of procedure required by law." *Id*. § 706(2)(A), (C), (D).

62.     While agency determinations are entitled to deference, an agency must articulate a satisfactory explanation for its conclusions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

_____
COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 22 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 22 of 63

## V.    FACTS

### The Exceptional Values of the Reserve

63.    At approximately 22.8 million acres — an area roughly the size of Indiana — the Reserve is the largest single public land unit in the country. The Reserve provides rich habitat for caribou, grizzly and polar bears, wolves, and a range of migratory birds and waterfowl. It is also home to the Western Arctic and Teshekpuk Lake Caribou Herds, which provide key subsistence resources to numerous communities in the Reserve and across northwest Alaska.

64.    President Warren G. Harding originally set aside the Reserve in 1923 as a petroleum reserve for the U.S. Navy. In 1976, it was re-designated and Congress passed a new law recognizing the exceptional ecological values in the Reserve. The law instructed the Secretary of the Interior to designate any areas containing significant subsistence, recreational, fish and wildlife, or historical or scenic values as special areas and to provide "maximum protection" for those values. 42 U.S.C. § 6504(a).

65.    Based on this authority, the Secretary designated multiple Special Areas — including the Teshekpuk Lake and Colville River Special Areas — to ensure maximum protection of the environment, fish and wildlife, and historical or scenic values. The Colville River Special Area was initially designated to protect peregrine falcons and their nesting habitat, and the Teshekpuk Lake Special Area was designated to protect "important nesting, staging, and molting habitat" for waterfowl and other migratory birds.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 23 of 63

National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977).

66. Teshekpuk Lake is one of the most productive wetland complexes in the Arctic and provides vital nesting habitat for hundreds of thousands of migratory birds. The Teshekpuk Lake area, along with the neighboring Smith Bay marine habitat, supports the highest density of shorebirds in the circumpolar Arctic, including threatened spectacled eiders, Steller's eiders, yellow-billed loons, dunlins, and American golden-plovers. As many as 35,000 greater white-fronted geese and 37,000 brant molt in the area, as do thousands of Canada geese and Snow geese. This region is also the primary calving grounds for the Teshekpuk Lake Caribou Herd.

67. The Colville River Delta is the largest and most ecologically rich river delta in northern Alaska. The cliffs along the Colville River provide critical nesting sites and adjacent hunting areas for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

68. The northeastern Reserve and Colville River (Kuukpik River in Iñupiaq) Delta are lands that have sustained the Iñupiat people since time immemorial. Teshekpuk Lake is a spiritual hunting ground that has had stories passed down for generations of the rich lands filled with caribou, fish, and freshwater. The Iñupiat have relied and continue to rely on the health and wellness of the land in the Western Arctic.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                              Page 24 of 63

69.     In 2008, FWS listed the polar bear as a threatened species under the ESA. FWS, Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range, 73 Fed. Reg. 28,212 (May 15, 2008). Polar bears are also federally protected under the MMPA. 50 C.F.R. § 17.40(q).

70.     America's Arctic — including the Reserve — provides onshore denning habitat for polar bears. FWS designated critical habitat for polar bears in Alaska in 2011, including barrier islands, sea ice, and terrestrial denning habitat. Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76,086, 76,088–91 (Dec. 7, 2010). The Willow project area contains designated critical habitat, characteristic polar bear terrestrial denning habitat, and locations where polar bears have historically denned.

71.     The proportion of females denning on land has increased significantly as sea ice diminishes due to climate change. Polar bears are particularly vulnerable to sea ice melt given their life history and specialized habitat needs. The Southern Beaufort Sea (SBS) population is among the most imperiled polar bear populations in the world, having declined dramatically since the 1990s.

72.     The SBS stock is in decline but data and information on the population dynamics for the SBS polar bears are outdated and incomplete. The most recent SBS stock assessment relied on data from 2001–2010 and estimated the population at

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                      Page 25 of 63

approximately 900 bears, representing a 50 percent decline since the 1980s. U.S. Fish & Wildlife Serv., *Polar Bear: Southern Beaufort Sea Stock Assessment* 6, 8 (2021). The minimum population estimate for the SBS stock is considerably lower: 782. *Id*. at 8. The most recent estimate of the number of polar bears in the Alaska portion of the SBS stock, which encompasses 77.8% of the total range of this stock, was 573 bears in 2015, with a fairly stable trend from 2006–2015, noting a sharp decline in 2013. Todd C. Atwood et al., U.S. Geological Survey Wildlife Program, *Analyses on Subpopulation Abundance and Annual Number of Maternal Dens for the U.S. Fish and Wildlife Service on Polar Bears (Ursus maritimus) in the Southern Beaufort Sea, Alaska*, Open-File Report 2020-1087 at 11 (2020).

73. The startling evidence of adverse impacts from climate change on SBS polar bears is mounting and studies indicate that this stressed species is increasingly incapable of absorbing continued disturbance from industrial activities. Research also demonstrates that oil and gas activities pose a multi-faceted threat to polar bears and suggests climate change will likely lead to reduced populations or even extirpation of SBS polar bears.

74. The evidence also indicates that oil and gas activities on the North Slope will exacerbate the threat of climate change to SBS polar bears. Noise and visual disturbance from human activity and operation of equipment, especially aircraft and vehicle traffic, have the potential to disturb polar bears nearby. Disturbance of maternal females during the winter denning period can result in premature den abandonment, or earlier den

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                      Page 26 of 63

emergences and departures, adversely affecting polar bear cub survival. They are also subject to subsistence hunting and mortality due to interactions with humans where there is a perceived threat to life and property.

75.    A 2020 study by FWS and the United States Geological Survey (USGS) stated that the current level of lethal takes for SBS polar bears "does not allow any additional lethal take under the MMPA from other sources," such as oil and gas activities. Wilson *et al.*, *Seismic Survey Design and Effects on Maternal Polar Bear Dens*, 84(2) Journal of Wildlife Management 201, 209 (2020) [hereinafter "Wilson 2020"]. The study further states that due to the negative effects to cub survival from early den emergence, nearly all dens must remain undisturbed for oil and gas activities to meet MMPA requirements. *Id*.

76.    In its role as the management agency for polar bears, FWS approved the incidental take by harassment of SBS polar bears from oil and gas activities in the 2016–2021 Beaufort Sea Incidental Take Regulation (ITR). Marine Mammals; Incidental Take During Specified Activities; North Slope, Alaska 86 Fed. Reg. 42,982 (Aug. 5, 2021); 50 C.F.R. § 18.119–18.129. The Beaufort Sea ITR enables companies, groups, or individuals conducting onshore and offshore oil and gas exploration, development, and production activities on the North Slope to request a letter of authorization (LOA) to take polar bears via nonlethal, incidental, Level B harassment.

77.    The Willow project is within the scope of the Beaufort Sea ITR.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                        Page 27 of 63

78.     BLM adopted the first-ever comprehensive management plan covering the entire Reserve in 2013. This plan, called the Integrated Activity Plan (IAP), set out broad decisions for how BLM would manage resources and the values in the Reserve. As part of the process for adopting the management plan, BLM prepared an EIS that evaluated various management and land-allocation alternatives for the Reserve.

79.     In issuing the 2013 ROD for the IAP, BLM protected many of the wildlife, habitat, and subsistence values of the Reserve. BLM also made approximately 11.8-million acres — approximately 52% — of the Reserve available for oil and gas leasing and development. The ROD also incorporated stipulations and best management practices (BMP) applicable to oil and gas and other activities in the Reserve.

80.     The IAP expanded the Teshekpuk Lake Special Area from 1.75-million acres to 3.65-million acres and expanded its purposes to include protecting caribou and shorebird habitat. The IAP closed approximately 3.1 million acres of the Teshekpuk Lake Special Area to oil and gas leasing because of the area's importance to subsistence users and wildlife, including the Teshekpuk Lake Caribou Herd. It also established protective best management practices in the Teshekpuk Lake Caribou Habitat Area. BLM deemed this area essential for all-season use by caribou, including calving and rearing, insect-relief, and migration, and thus afforded it heightened protections.

---

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 28 of 63

81.    The IAP expanded environmental protections for the Colville River Delta by prohibiting permanent oil and gas facilities within two miles of the Colville River, among other waterways. BLM also expanded the purpose of the Colville River Special Area to protect all raptor species.

82.    After adoption of the IAP, in 2015, BLM approved ConocoPhillips' drilling permit for the Greater Mooses Tooth 1 (GMT-1) development. The project included a drilling pad and 7.6-mile road that extended ConocoPhillips' existing oil and gas infrastructure at Alpine (on adjacent lands east of the Reserve) and Colville Delta-5 (on private land within the Reserve) further west into the Reserve. In making the decision, BLM waived a protective provision in the IAP that would have kept oil and gas infrastructure out of an established buffer around Fish Creek, an important subsistence use area for the community of Nuiqsut.

83.    In its GMT-1 decision, BLM recognized that there would be significant impacts to subsistence users and other values from the project — a single gravel pad with one road connection — that could not be fully mitigated by the BMPs and stipulations in the IAP. BLM also acknowledged that there would be significant environmental justice issues raised by GMT-1, and that these impacts were likely to continue to occur and to be exacerbated by future development in the Reserve.

84.    To address those impacts, including major impacts to subsistence uses, BLM required compensatory mitigation funding of $8 million from ConocoPhillips. Those

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 29 of 63

funds were used in part to develop a regional mitigation strategy (RMS), which was intended to set out a plan to address the major impacts to subsistence uses occurring from development in the northeastern region of the Reserve that were not adequately addressed by the IAP. BLM issued the final RMS in August 2018. To date, no action has been taken to implement the RMS.

85.     Shortly after finalizing the RMS, BLM issued a decision authorizing ConocoPhillips' Greater Moose's Tooth 2 (GMT-2) project in the Reserve. The GMT-2 project constructed an additional gravel pad west of GMT-1, with an 8.2-mile-long gravel road connection to Alpine via GMT-1. GMT-2 extended ConocoPhillips' footprint of development into the Reserve and further exacerbated impacts to subsistence and other values from oil and gas activities.

86.     In early 2017, ConocoPhillips announced a major discovery at the Willow site. Willow is estimated to produce approximately 600 million barrels of oil, with production projected to be over 180,000 barrels of oil per day at its peak.

87.     There have been a number of significant discoveries and development activities since the adoption of the IAP in 2013 in addition to Willow that have the potential to significantly expand development activities and the cumulative impacts of development within and around the Reserve. Caelus Energy announced a substantial find in state waters off the coast of the Reserve in Smith Bay in 2016. Armstrong Energy, Inc. (Armstrong) also upgraded its resource estimates at the Nanushuk development to a

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 30 of 63

billion-plus-barrel oil prospect in 2017. Nanushuk, which Armstrong states is the largest onshore oil discovery in three decades, lies on state lands immediately adjacent to the Reserve and the community of Nuiqsut. The Pikka project will entail hundreds of miles of seasonal ice roads in the area and over 20 miles of new permanent gravel roads, in addition to over 20 miles of infield pipelines, a new Central Processing Facility, and a 22-mile export pipeline. Oil Search, which is now merged with Santos and took over Armstrong's interest in the Pikka project, is moving forward with its development plans for the Nanushuk reservoir and estimates first production in 2026.

88.    In addition, ConocoPhillips plans to potentially develop a new drill site south of Nuiqsut (CD-8) and has plans to move west of the Willow Project with two exploration wells, Greater Willow 1 (GW1) and Greater Willow 2 (GW2). GW1 and GW2, under current estimates, have the resource potential of approximately 75 million barrels. As the EPA, a cooperating agency in the NEPA process, explained in comments on the DSEIS, ConocoPhillips stated that since the Willow discovery, it has discovered an additional 500 million barrels of oil equivalent since 2016. ConocoPhillips' leadership has also made public statements to investors that the company identified up to 3 billion barrels of oil at nearby prospects that could leverage the Willow infrastructure, and that Willow's design was intended for expansion.

89.    In 2017, Secretary of the Interior Zinke signed Secretarial Order 3352, which called for revising the IAP and opening additional areas in the Reserve to oil and gas

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 31 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 31 of 63

development. BLM subsequently initiated the environmental review process to revise the IAP. Following a NEPA process, BLM released its revised IAP decision on December 31, 2020. BLM's decision adopted Alterative E, which opened the vast majority of the Reserve to oil and gas leasing, with minimal protective measures.

90.     In January 2021, President Biden issued Executive Order 13990 – *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, which called for the Department of the Interior's review of policies and instructions that may be inconsistent with Executive Order 13990. In response, the Department of the Interior noted that the 2020 IAP warranted review and directed BLM to reevaluate that decision.

91.     In April 2022, BLM prepared a Determination of NEPA Adequacy (DNA) for the evaluation and adoption of a new ROD for the IAP. In the DNA, BLM determined that the 2020 IAP/EIS remained adequate under NEPA, allowing BLM to choose another alternative within those analyzed in the 2020 IAP/EIS. In BLM's new ROD, BLM adopted Alternative A, which re-implemented the Reserve's management plan as approved in the 2013 IAP.

92.     Following BLM's adoption of the new IAP ROD in 2022, Plaintiffs in *Northern Alaska Environmental Center v. Haaland*, No. 3:20-cv-00207-SLG (D. Alaska 2021) settled their pending litigation challenging the Trump-era IAP/EIS. In settling that

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                   Page 32 of 63

lawsuit, BLM and Interior represented that the 2013 IAP/EIS was programmatic, not site-specific, and would not serve as the NEPA analysis for future lease sales.

<u>The Willow Master Development Plan: Prior Process & 2020 Permit Approvals</u>

93.    In May 2018, after Interior Secretary Zinke announced his intent to expand oil and gas leasing in the Reserve, ConocoPhillips requested that BLM approve its proposed Willow Master Development Plan.

94.    Willow requires BLM approvals for applications for permits to drill, right-of-way grants, and gravel mining authorizations. Willow also requires a permit from the U.S. Army Corps of Engineers (Corps) for the discharge of fill into wetlands and waters of the United States under Clean Water Act (CWA) Section 404.

95.    BLM released the draft EIS for public review in August 2019. 1 Bureau of Land Mgmt., Draft Environmental Impact Statement for the Willow Master Development Plan (2019) [hereinafter 2019 draft EIS].

96.    The 2019 draft EIS considered four alternatives — one no action alternative (A) and three action alternatives. ConocoPhillips' proposal (Alternative B) would construct a new central processing facility and infrastructure pad in the Reserve, up to five satellite drill pads connected to the central processing facility via infield gravel roads, up to fifty wells on each pad, an airstrip, gravel roads connecting back to the GMT-1 and GMT-2 developments, and two gravel mine sites within the Reserve, just west of Nuiqsut.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                      Page 33 of 63

97. The other two action alternatives were nearly identical to ConocoPhillips' proposal in all respects except for the absence of one infield road connection, a second airport, use of a diesel pipeline in Alternative C, and the absence of a road connection between Willow and GMT-2 under Alternative D. All of the action alternatives allowed for ConocoPhillips to construct a new offshore gravel island in Harrison Bay, north of the proposed development, to allow ConocoPhillips to barge in project infrastructure in "modules," or large storage containers, to the project area.

98. Willow's proposed access road and pipeline would cross through a mile of the Colville River Special Area raptor protection area. BLM would also approve two gravel mine sites within the half-mile setback for infrastructure of the Ublutuoch (Tiŋmiaqsiuġvik) River, which would require waiving protections established in the IAP. As originally proposed, Willow would have constructed infield roads, pipelines, and two drill sites (Bear Tooth (BT) 2 and BT4, which is also within the Teshekpuk Lake Caribou Habitat Area) within the Teshekpuk Lake Special Area. None of the action alternatives considered placement of infrastructure outside the boundaries of designated Special Areas or avoiding infrastructure and activities in and around sensitive areas, such as river setbacks and the Teshekpuk Lake Caribou Habitat Area.

99. BLM issued a draft SEIS on March 30, 2020, that addressed a limited number of ConocoPhillips' proposed changes to the Willow project. 1 Bureau of Land Mgmt., Supplemental Draft Environmental Impact Statement for the Willow Master

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                          Page 34 of 63

Development Plan 1 (2019). The Corps published its Public Notice for Willow on March 26, 2020.

100.    On August 14, 2020, BLM released the final EIS for Willow, identifying ConocoPhillips' proposed action, including its proposed Colville River crossing, as the agency's preferred alternative. 1 Bureau of Land Mgmt., Willow Master Development Plan: Final Environmental Impact Statement 8 (2020) [hereinafter 2020 final EIS].

101.    The 2020 final EIS provided only a cursory list of mitigation measures without adequately analyzing whether such measures would be effective at mitigating impacts to resources. The 2020 final EIS also contained only a cursory and general discussion of cumulative impacts resulting from Willow and other past, present, and reasonably foreseeable future actions.

102.    The 2020 final EIS did not consider any new alternatives or components of alternatives. In dismissing the no action alternative, BLM stated that it would not meet the project's purpose and need, and that BLM cannot preclude ConocoPhillips from developing its leases. 4 *id*. app. B.2 at 87. BLM stated that it did not consider an alternative that precluded infrastructure in the Teshekpuk Lake Special Area because "[a]ll else being equal, the [Teshekpuk Lake Special Area] is only an administrative boundary." *Id*. app. B.2 at 36, 101, 121

103.    On October 27, 2020, Secretary Bernhardt and former BLM State Director Chad Padgett signed the BLM's decision for Willow, "approv[ing] the development of

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 35 of 63

Project Alternative B with Module Delivery Option 3." U.S. Dep't of the Interior &

Bureau of Land Mgmt., Willow Master Development Plan Record of Decision 2 (2020)

[hereinafter 2020 BLM ROD]. Alternative B with Module Delivery Option 3 consists of

gravel road access to five drill sites and infrastructure barged to Oliktok Dock via

modules and trucked over the Colville River ice bridge.

104.    In its decision, BLM approved Willow and the associated issuance of

permits and rights-of-way for the construction and operation of the Project but did not

approve two of ConocoPhillips' drill sites — BT4 and BT5. BLM indicated those drill

sites could be approved at a later time, and the BLM ROD would be amended. *Id*. at 3.

The 2020 BLM ROD also approved development of two gravel mines on BLM-managed

lands within the Ublutuoch (Tiŋmiaqsiuġvik) River half-mile setback. *Id*. at 3.

105.    The 2020 BLM ROD determined that Willow's effects on subsistence,

sociocultural systems, and public health "may be highly adverse and disproportionately

borne by the Nuiqsut population." *Id*. at 17–18. Willow would increase air and noise

emissions and human activity in Nuiqsut's subsistence use area, which could increase

stress and cause anxiety and depression. *Id*. Regarding Nuiqsut, the 2020 BLM ROD also

acknowledged that "rapid modernization and development, as well as other multiple

stressful conditions, including significant changes in diet, housing, and traditional culture,

has led to negative health outcomes, including suicide." *Id*. at 18. The 2020 BLM ROD

further determined that "the cumulative effects of the Project . . . on subsistence,

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                          Page 36 of 63

sociocultural systems, and public health may be highly adverse and would be disproportionately borne by populations from Nuiqsut, Utqiagvik, Anaktuvuk Pass, Atqasuk, Point Lay, and Wainwright," and such effects would be "long term and of high intensity." *Id*. at 18.

106.     On October 16, 2020, FWS issued the BiOp for Willow analyzing impacts to polar bears and other ESA-listed species under FWS's jurisdiction. U.S. Fish & Wildlife Serv., Biological Opinion for Willow Master Development Plan (2020) [hereinafter 2020 BiOp]. The 2020 BiOp analyzed the Willow project as proposed by ConocoPhillips and concluded that BLM's decision to approve Willow would not jeopardize the survival and recovery of polar bears or result in the destruction or adverse modification of the species' designated critical habitat. *Id*. at 130, 132.

107.     Despite acknowledging that hazing and other incidental take from disturbance was reasonably certain to occur, the 2020 BiOp did not authorize incidental take of polar bears in an ITS "because such take has not yet been authorized under the MMPA . . . ." *Id*. at 133.

108.     For purposes of analyzing the effects of the action with respect to den disturbance and human-polar bear interactions — and reaching its no-jeopardy conclusion — FWS relied heavily on future MMPA compliance to assert that project impacts to the polar bear will be minimized. *Id*. at 113, 116–118, 124.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                        Page 37 of 63

109.    On December 2, 2020, the Corps finalized its ROD and associated CWA Section 404 permit for Willow. Dept. of the Army, Record of Decision and Permit Evaluation, Alaska District, Willow Development Project 85 (2020) [hereinafter 2020 Corps ROD]. The 2020 Corps ROD approved all five drill sites, including the two drill sites BLM did not previously authorize in the 2020 BLM ROD. *Id*. at 2–3. The Corps was a cooperating agency on the 2020 final EIS and adopted the 2020 final EIS for purposes of its own NEPA compliance. *Id*. at 1–2. The 2020 Corps' ROD relied solely on the BLM's 2020 final EIS for purposes of identifying and comparing project alternatives to meet its legal obligations under both NEPA and the CWA. *Id*. at 8.

<u>Prior Litigation on the First Willow Decision</u>

110.    SILA Plaintiffs filed a lawsuit raising challenges to BLM's approval of Willow under NEPA, the APA, the Federal Lands Policy and Management Act, the ESA, and the CWA. SILA Plaintiffs sought declaratory and injunctive relief.

111.    Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc. (collectively, CBD Plaintiffs) also filed a challenge to BLM's approval of the Willow project seeking declaratory and injunctive relief.

112.    The District Court found that both Plaintiffs' claims were time-barred since neither sought judicial review within 60 days of the publication of the notice of availability of the 2020 final EIS as required by the NPRPA's judicial review provisions and denied preliminary injunctive relief. *Sovereign Iñupiat for a Living Arctic v. BLM*,

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                             Page 38 of 63

516 F. Supp. 3d 943, 955 (D. Alaska 2021). Both groups of Plaintiffs appealed the District Court order to the Ninth Circuit, and the District Court granted a temporary injunction pending the appeal. *Sovereign Iñupiat for a Living Arctic v. BLM*, 2021 U.S. Dist. LEXIS 22809 (D. Alaska 2021).

113.    The Ninth Circuit found that the Plaintiffs raised serious questions in their appeals regarding the meaning of the NPRPA judicial review provision. *Sovereign Iñupiat for a Living Arctic v. BLM*, 2021 U.S. App. LEXIS 28468, *5–6 (9th Cir. 2021). The Ninth Circuit concluded the plain text of the statute supports the Plaintiffs' contention that the 60-day time-bar only applies to the sale or issuance of the leases themselves, not to all activities that are associated with oil and gas development in the Reserve. *Id.* Accordingly, the Ninth Circuit found that the Plaintiffs would suffer irreparable harm without an injunction and that at least one of the NEPA claims was likely to succeed and granted injunctive relief. *Id.* at *7.

114.    The parties jointly dismissed the appeal and briefed the merits of Plaintiffs' respective cases in District Court via motions for summary judgment.

115.    SILA Plaintiffs alleged that BLM and the Corps violated NEPA by failing to take hard look at the direct, indirect, and cumulative impacts of the Willow project and by failing to adequately evaluate the effectiveness of mitigation measures. SILA Plaintiffs further alleged that BLM and the Corps violated NEPA by failing to obtain

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 39 of 63

sufficient information regarding baseline environmental conditions necessary to evaluate the impacts to resources potentially affected by the project.

116. Both SILA Plaintiffs and CBD Plaintiffs argued that BLM violated NEPA by failing to adequately disclose and analyze the effects of the Willow project's greenhouse gas emissions. CBD Plaintiffs further argued that BLM failed to consider a reasonable range of alternatives in its EIS.

117. SILA Plaintiffs and CBD Plaintiffs alleged that FWS failed to prepare a legally sufficient BiOp required by the ESA when determining whether Willow was likely to jeopardize the continued existence of endangered or threatened species. Both SILA and CBD Plaintiffs argued that FWS violated the ESA by relying on uncertain mitigation measures when coming to its findings regarding Willow's potential to "take" polar bears.

118. SILA Plaintiffs argued that the Corps' failure to obtain sufficient information to determine whether Willow would cause or contribute to significant degradation of aquatic resources violated the CWA. In addition, SILA Plaintiffs alleged that the Corps failed to consider secondary and cumulative impacts of Willow on aquatic resources in violation of the CWA.

119. The District Court found that BLM acted arbitrarily and capriciously by not providing a quantitative estimate of the downstream greenhouse gas emissions from foreign oil consumption in the Willow 2020 final EIS. *Sovereign Iñupiat for a Living*

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 40 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 40 of 63

*Arctic v. BLM*, 555 F. Supp. 3d 739, 767 (D. Alaska 2021). In addition, the Court held

that BLM acted contrary to law by failing to consider the statutory directive that

"maximum protection" be given to surface values within the Teshekpuk Lake Special

Area and by developing its alternatives analysis based on the belief that ConocoPhillips

had the right to extract all oil and gas on its leases. *Id.* at 770.

120.    Regarding FWS's 2020 BiOp, the District Court concluded that the FWS's

ITS improperly relied on future unspecified mitigation measures to comply with ESA

requirements. *Id.* at 800–01. The District Court also held that FWS acted arbitrarily and

capriciously under the APA when, after contemplating some biologically significant

disturbances to polar bears distinct from hazing, FWS quantified non-lethal take of polar

bears at zero. *Id.* at 802. For hazing, the District Court found that FWS impermissibly

authorized a take automatically upon MMPA approval. Since the District Court

concluded that portions of FWS's 2020 BiOp were legally flawed, the Court held that

BLM's reliance on the BiOp was unlawful. *Id.* at 803.

121.    The District Court vacated BLM's approval of the Willow project under

NEPA. *Id.* at 805. The District Court also vacated FWS's 2020 BiOp. *Id.* The District

Court remanded to BLM to reassess its analysis. *Id.*

122.    No party appealed the District Court's decision.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 41 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 41 of 63

123.    Following the District Court's decision, BLM conducted an informal

scoping process in February 2022. BLM released the Willow Draft Supplemental EIS

(DSEIS) for public comment in July 2022. Bureau of Land Mgmt., Draft Supplemental

Environmental Impact Statement for the Willow Master Development Plan (June 2022)

[hereinafter DSEIS]. BLM issued the DSEIS before ConocoPhillips reapplied for any of

the permits that were vacated by the District Court. The Corps was a cooperating agency

in the supplemental NEPA process.

124.    In the DSEIS, BLM considered a no-action alternative and four action

alternatives. The DSEIS contained only one new alternative that was not in the prior EIS

— Alterative E. *See* 1 DSEIS at ES-4.

125.    Alternative E included four drill sites instead of five, with no drill site at

BT4 and a deferred approval of BT5. For BT5, nothing expressly limited or set

parameters for whether or when that pad would be constructed; the DSEIS still assumed

that pad would be constructed in the future. To accommodate eliminating BT4,

Alternative E added approximately 100 feet to the BT1 and BT2 gravel pads. Alternative

E otherwise included essentially all of the same infrastructure as the other action

alternatives. It involved construction and operation of the Willow Processing Facility

[hereinafter WPF], Willow Operations Center, four valve pads, four pipeline pads, five

water source access pads, gravel roads connecting to GMT-2 development and the four

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG

drill sites to the WPF, an airstrip, and three subsistence-use boat ramps. BLM stated that the intent of Alternative E was to reduce the amount of surface infrastructure within the Teshekpuk Lake Special Area. *See* 1 DSEIS at ES-5. BLM illustrated Alternative E in the map below:



1 DSEIS at Figure ES.3B.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                      Page 43 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 43 of 63

126.    In finding that Alternative E would reduce the environmental and social impacts of the Willow project, BLM relied on conclusory statements throughout the DSEIS. For example, in arguing that deferring BT5 construction would lessen environmental impacts, BLM stated, "[T]he anticipated impacts related to BT5 would be delayed, resulting in extended temporal impacts, but reducing the severity or intensity of the impacts due to there being less overall Project activity (i.e., other construction activity) occurring simultaneously." 1 DSEIS at 10–11.

127.    The four action alternatives BLM considered contain the same core project elements and did not significantly vary from ConocoPhillips' proposed development design. Generally, the action alternatives involved the same placement of roads and/or pipeline alignment, same amount of infrastructure at the WPF, and two gravel mines inside the Ublutuoch (Tiŋmiaqsiuġvik) River 0.5-mile setback. Every action alternative placed infrastructure within the Colville River Special Area and the Teshekpuk Lake Special Area.

128.    BLM failed to consider selecting the no-action alternative in the DSEIS, repeatedly arguing that it must allow for the development of any economically viable oil on each lease. BLM stated that the no-action alternative was included in the DSEIS to act as a baseline comparison only. *See* 8 DSEIS app. G, at 4. Additionally, BLM failed to clarify in the DSEIS which alternatives were discarded due to economic considerations.

_____
COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 44 of 63

129.   Under the ANILCA Section 810 findings in the DSEIS, BLM failed to identify an action alternative that would lessen the impacts on subsistence and subsistence users. Overall, only a slightly smaller percentage of Nuiqsut harvesters (88 percent) would potentially be affected under Alternative E as compared to Alternative B (91 percent). 1 DSEIS at 277, tbl.3.16.5. BLM failed to consider alternatives that would reduce impacts to caribou migration from Willow's infrastructure layout running north to south, across an important migratory corridor. BLM acknowledged that deferring BT5 under Alternative E would not reduce or eliminate the disposition of these lands, it merely delayed the impacts. *Id*. at 10.

130.   Plaintiffs and other groups submitted extensive comments on BLM's DSEIS raising various concerns about the alternatives considered for the Willow project. Some of the concerns raised in the comments included BLM's failure to consider alternatives that avoided placing infrastructure in the Colville River or the Teshekpuk Lake Special Area. Commenters also noted that BLM failed to consider a roadless alternative that provided for drilling only during the winter season. Commenters suggested consideration of alternatives that considered a different gravel mine location, alternatives that considered a substantially reduced infrastructure footprint and reduced total oil production, or alternatives that would mitigate greenhouse gas emission impacts and the cumulative effects of climate change.

---

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                        Page 45 of 63

131.    Plaintiffs and others also noted the extensive climate-related risks posed by the project. Commenters explained that Willow's impacts would be significant given that the Arctic warms at four times the rate of the rest of the planet. They further explained that every ton of greenhouse gas emitted melts three square meters of Arctic sea ice, which among other things, is critical for marine mammal habitat. Commenters also explained that climate change is already causing Alaskan villages to erode, permafrost thaw threatens infrastructure and gravel roads, and that further development and GHG emissions from Willow will only and accelerate climate feedback effects. They further pointed out that BLM failed to adequately quantify and analyze the cumulative GHG emissions from reasonably foreseeable future actions, and the related failure to compare cumulative emissions to national and statewide emissions. Commenters explained such information was necessary to accurately consider the GHG emissions from future development and Willow's direct and indirect emissions in context.

132.    Commenters also provided an expert report prepared regarding the insufficiencies in BLM's air quality analysis in the DSEIS.

133.    EPA, a cooperating agency in the NEPA process, issued comments critiquing the DSEIS. EPA recommended that the Willow project's final SEIS identify a preferred alternative that mitigates the climate impacts to better align with the national, state, and local GHG emission reduction goals. EPA also recommended that the final SEIS avoid expressing the overall project-level GHG emissions as a percentage of the

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 46 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 46 of 63

state or national GHG emissions, as such comparisons tend to minimize project-level emissions impacts. Additionally, EPA recommended that the final SEIS address and mitigate Willow's environmental justice impacts, particularly on the people of Nuiqsut, and that the NEPA process provide a meaningful opportunity for community involvement in the decision-making process.

134.    FWS indicated in its comments on the DSEIS that Alternative D (Disconnected Access) with Module Transfer Option 3 (Colville River Crossing) had the fewest potential impacts on the Service's trust resources. FWS further pointed out that there is "no reason to connect the development to the GMT road system . . . and Alpine developments" given Willow's proposed airstrip and because there is no all-season road access from the Alpine developments to the oilfields east of the Colville River Delta. 8 Bureau of Land Mgmt., Final Supplemental Environmental Impact Statement for the Willow Master Development Plan app. B.5, at 23 (2023) [hereinafter Final SEIS].

## BLM's 2023 Willow Final SEIS

135.    BLM issued its final SEIS on February 1, 2023, and identified Alternative E as its preferred Alternative. 1 Final SEIS at ES-6.

136.    BLM assumed construction would start either in the winter of 2022/2023 or 2023/2024. *Id.* at 2.

137.    Alternative E would allow ConocoPhillips to construct four drill pads, including one pad in the Teshekpuk Lake Special Area. It would defer the southernmost

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 47 of 63

pad, which would be constructed at a later date. This would mean only approximately a two-year delay in construction of that pad, to Year 7; the other pads would be constructed in Years 4–5. *Id.* at 23.

138.    Although BLM stated that it might defer one or multiple drill pad approvals under Alternative E, BLM never explained what criteria it would use to determine whether to approve the deferred pads. However, BLM stated that a determination on the deferral would "require any appropriate additional analysis and a separate future decision." *Id.* at 55.

139.    BLM asserted that constructing the fourth drill pad site (BT5) for Alternative E three years after construction of the other drill sites would allow for "observation of the Project's impacts and changes to environmental baseline conditions" and for "an adaptive management plan prior to the construction of the fourth drill site." *Id.* at 161.

140.    In response to the District Court decision, BLM adopted new screening criteria in the final SEIS for alternatives. The new screening criteria in the final SEIS recognized that ConocoPhillips does not have the right to extract all possible oil and gas from its leases; rather, BLM may condition Project approval to protect surface resources, even if doing so reduces the amount of oil and gas that can be profitably produced. 9 *id.* app. D.1, at 27. However, BLM further stated in the final SEIS that 43 C.F.R. § 3137.71(b)(1) requires that BLM allow lessees to "fully develop" the oil and gas field,

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                    Page 48 of 63

meaning that BLM may not evaluate an alternative which could strand such a large quantity of oil and gas that, standing alone, is economic to develop (i.e., that would warrant construction of an additional drill pad). 8 *id.* app. B.5, at 27.

141. All action alternatives contained in the final SEIS included infrastructure in the Teshekpuk Lake and Colville River Special Areas. 1 *id.* at 24.

142. BLM stated that it considered an alternative concept that eliminated all infrastructure within the Teshekpuk Lake Special Area and Colville River Special Area but rejected analyzing it as an alternative. 9 *id.* app. D.1, at 37, 44. Regarding its failure to analyze that alternative, BLM stated that designation as a Special Area does not preclude development. *Id.* at 30. BLM acknowledged that, while "this alternative concept would theoretically address the District Court's directive to provide maximum protection to important surface resources in the [Teshekpuk Lake Special Area], it would not meet the Project's purpose and need and would strand an economically viable quantity of recoverable oil." *Id.* at 44. BLM further acknowledged that "there is an economically viable quantity of recoverable oil in this area based on its review of the available geologic data and because there is enough resource accessible from BT4 that [ConocoPhillips] has proposed constructing a gravel road and drill site pad to access it." *Id.*

143. In addition to BLM dismissing the alternative that would have no infrastructure in the Teshekpuk Lake Special Area, BLM dismissed other alternatives such as eliminating BT4 and BT5 entirely. BLM dismissed another alternative that would

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                      Page 49 of 63

have moved development south of Fish Creek, despite recognizing it addressed the District Court's decision. BLM argued such alternatives would not meet the Project's purpose and need and would strand viable amounts of oil. BLM also explained that it based its decision on the fact that ConocoPhillips proposed constructing a gravel road and pad to extract oil in the Teshekpuk Lake Special Area. *Id*. at 44, 45.

144. BLM responded to public comments in the final SEIS by stating that, "[t]he Supplemental EIS does not state that BLM's legal authority to condition or reject the Willow Project is constrained, or that BLM cannot select Alternative A (No Action)." 8 *id.* app. B.5, at 55, 57.

145. In its ANILCA Section 810 findings in the final SEIS, BLM admitted that Alternative E "may result in a significant restriction of subsistence uses;" although, "the analysis found that it would also reduce impacts to caribou relative to Alternative B." 15 *id.* app.G, at 34–35. However, BLM acknowledged that the reduction in impacts to caribou would not necessarily result in reduced impacts to subsistence users: "the reduction in infrastructure in the [Teshekpuk Lake Special Area] under Alternative E will not result in a substantial reduction in direct impacts on Nuiqsut subsistence harvesters compared to the other action alternatives." 1 *id.* at 341.

146. BLM acknowledged that much of the Teshekpuk Caribou Herd remains on the Arctic Coastal Plain during winter, making predicting impacts to these animals difficult. *Id.* at 239.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                          Page 50 of 63

147.    BLM failed to include any Tier-2 subsistence determinations in its
ANILCA Section 810 analysis in the final SEIS. Instead, BLM said, "[d]eterminations
will be made available in the Willow MDP Record of Decision." 15 *id.* app. G, at 66.

148.    Regarding climate impact analysis in the final SEIS, the total gross
domestic and foreign GHG emissions over the 30-year project duration for Alternative E
were estimated at about 337 million metric tons of $CO_2$ equivalent. 1 *id.* at 49.

149.    BLM noted that every ton of $CO_2$ emitted results in roughly 0.3 square
meters of sea-ice loss. BLM also acknowledged the relationship between rising
temperatures and thawing permafrost, releasing GHGs into the atmosphere and creating a
feedback loop. *Id.* at 37.

150.    BLM claimed to have incorporated the recent CEQ climate guidance in its
alternatives analysis. However, none of the action alternatives analyzed result in
meaningfully different climate impacts. *Id.* at 49, tbl.3.2.6. For example, "under
Alternative E, the elimination of BT4 results in 15.4 million barrels (2.45%) less
production relative to Alternative B." *Id.* at 56. The final SEIS also notes that "[u]nder
Alternative E, total production . . . without the contribution of the deferred drill site pad
BT5 . . . is 52.9 million barrels (8.41%) less production relative to Alternative B. *Id.*

FWS's 2023 BiOp

151.    FWS publicly released its BiOp for the Willow project in support of the
SEIS on March 13, 2023. The BiOp was issued and finalized on January 13, 2023. U.S.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 51 of 63

Fish & Wildlife Serv., Biological Opinion for Willow Master Development Plan (2023) [hereinafter 2023 BiOp].

152.   The 2023 BiOp concluded that BLM's decision to authorize Alternative E as described in the final SEIS would not jeopardize the survival and recovery of polar bears or result in the destruction or adverse modification of the species' designated critical habitat. *Id.* at 2 (proposed action description), 149–52 (jeopardy and adverse modification determinations).

153.   The BiOp does not consider the impacts of the direct or indirect greenhouse gas emissions from Willow or how these emissions would exacerbate climate change related impacts on polar bears. The BiOp fails to address existing scientific and technical information that has become available in the last decade that demonstrates such an analysis can indeed be conducted for polar bears.

154.   The BiOp found that, based on FWS's quantitative modeling, there would be a 70% cumulative probability of Level A take (defined under the MMPA) or lethal take over the 30-year life of the Willow project. *Id.* at 142. FWS deemed such take as not reasonably certain to occur for purposes of assessing incidental take from Willow. *Id.*

<u>BLM's 2023 Willow ROD</u>

155.   BLM finalized its ROD on March 12, 2023, and publicly released the document the next day, March 13. Bureau of Land Mgmt., Willow Master Development Plan Final Supplemental Environmental Impact Statement Record of Decision

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                             Page 52 of 63

[hereinafter 2023 ROD]. In the 2023 ROD, BLM adopted Alternative E with additional modifications. BLM approved drill sites BT1, BT2, and BT3 as discussed in the final SEIS, but disapproved rather than deferred drill site BT5. *Id.* at 1–2. BLM also approved Module Delivery Option 3, with access allowed across the Colville River. *Id.* The BT2 drill site was still located within the boundaries of the Teshekpuk Lake Special Area, as it was in the final SEIS.

156. In disapproving BT5, BLM claimed it reduced impacts by eliminating the potential for overlapping construction times for the different pads during ongoing production activities. *Id.* at 11. The decision did not explain what the disapproval of BT5 would mean for purposes of future development. There is nothing in the decision expressly restricting BT5 or further development from being proposed in the future within the Bear Tooth Unit or that would limit future developments from connecting to Willow.

157. BLM also indicated that disapproving BT4 and BT5 would reduce Willow's direct and indirect greenhouse gas emissions. However, even without BT5, the 2023 ROD still allows for 94% of the oil production from Alternative E as originally laid out in the final SEIS and the release of over 239 million metric tons of $CO_2$ equivalent.

158. The 2023 ROD included BLM's final Tier-2 subsistence determination required under ANILCA Section 810. *See generally* 2023 ROD Appendix B.

---

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 53 of 63

159.     BLM found that under Alternative E as analyzed in the final SEIS, Willow

"may significantly restrict subsistence uses for the community of Nuiqsut" and that the

cumulative effects of Willow and other "current and future activities, may also

significantly restrict subsistence uses for Nuiqsut." *Id.* at 1. The impact identified is the

reduction in availability of caribou and furbearers because of altered wildlife distribution

and limitations or restrictions on subsistence user access to wildlife within and near the

Project area. *Id.* at 1.

160.     BLM made affirmative Tier-2 findings that Willow's significant restriction

on subsistence use and access is "necessary, consistent with sound management

principles for the utilization of public lands; [t]hat the proposed activity will involve the

minimal amount of public lands necessary to accomplish the purposes of such use,

occupancy, or other such disposition; and [t]hat reasonable steps will be taken to

minimize adverse impacts upon subsistence uses and resources resulting from such

action." *Id.* at 1–4.

161.     The 2023 ROD states that ConocoPhillips may relinquish some of its leases

within the northern and southern areas of the Bear Tooth Unit not targeted by the

approved drill sites at BT1, BT2, and BT3. 2023 ROD app. A, at 67 n.4. The proposed

relinquishment areas do not overlap with any of the areas ConocoPhillips originally

proposed for Willow's infrastructure, including BT4 and BT5. The leases proposed for

relinquishment also do not include any of the leases planned for ConocoPhillips' future

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                      Page 54 of 63

expansion areas outside of the Bear Tooth Unit, including in the Greater Willow area. *See* Willow Development: Bear Tooth Unit Map (2023), https://eplanning.blm.gov/projects/109410/200258043/20075032/250081214/Lease%20 Map.pdf.

162. The 2023 ROD indicates that it is not the final approval for all actions, including individual authorizations such as the permits to drill and rights-of-way. 2023 ROD at 2.

163. BLM issued an amended right-of-way on March 13, 2023, in tandem with an official notice authorizing ConocoPhillips to proceed with activities for this winter season. BLM, Amended Right-of-Way Grant FF097428 Issued (Mar. 13, 2023). On the same day, BLM also issued an amended Mineral Material Sale Contract allowing ConocoPhillips to mine gravel for the project. BLM, Decision: Mineral Material Sale Contract Royalty Rate Adjustment and Amended Stipulations for Mineral Material Disposal, Willow Gravel Mine (Mar. 13, 2023).

## CLAIMS FOR RELIEF

### Count I

*(Violation of NEPA; Failure to Consider a Reasonable Range of Alternatives)*

164. Plaintiffs incorporate by reference all preceding paragraphs.

165. NEPA requires agencies to consider a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1500.2(b), (e), 1502.2(d)–(f), 1502.14, 1505.1(e).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 55 of 63

Agencies must, to the fullest extent possible, include "reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e). The EIS must also state how the alternatives considered will meet both NEPA and other environmental laws and policies, including the NPRPA, and must discuss the reasons for eliminating any alternatives from detailed study. *See id.* §§ 1502.2(d), 1502.14(a).

166. BLM failed to consider a reasonable range of alternatives in the SEIS that would adequately protect the Reserve's resources and avoid or minimize adverse impacts from Willow.

167. BLM failed to consider a reasonable range of alternatives in the Willow SEIS because BLM failed to consider an alternative or alternatives that had the potential to reduce the adverse effects on the Reserve, particularly within designated Special Areas, and better protect the surface values and resources of the Reserve. Viable, unconsidered alternatives or components of alternatives include, but are not limited to, alternatives that would preclude infrastructure and drilling in Special Areas, otherwise reduce or eliminate infrastructure in sensitive ecosystems, allow less than full-field or nearly full-field development of the Willow reservoir, or meaningfully reduce the greenhouse gas emissions and climate impacts from Willow.

168. Consideration of a more protective alternative or alternative components is consistent with BLM's and Department of the Interior's statutory mandates under the

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                         Page 56 of 63

NPRPA and other statutes, the purpose and need of the Willow SEIS, and the nature and scope of the proposed project.

169.     To the extent BLM provided any explanation for failing to consider viable alternatives that would reduce the impacts to the Reserve and provide more protections for its natural resources and values, that explanation was arbitrary and capricious.

170.     BLM failed to consider a reasonable range of alternatives, including viable alternatives proposed by the Plaintiffs, rendering the final SEIS and ROD arbitrary, capricious, and not in accordance with the law, and its adoption of the final SEIS and ROD was done without observance of the procedures required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## **Count II**

*(Violation of the NPRPA; Failure to Comply with the NPRPA's Maximum Protection Mandates)*

171.     Plaintiffs incorporate by reference all preceding paragraphs.

172.     Under the NPRPA and its implementing regulations, the Secretary is required to ensure "maximum protection" for wildlife, subsistence, and other resources and uses in designated Special Areas. *See, e.g.*, 42 U.S.C. § 6504(a); 43 C.F.R. § 2361.1(c). The Secretary is also required to adopt conditions, restrictions, and prohibitions necessary to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the Reserve from any activities. 42 U.S.C. § 6506a(b).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 57 of 63

173.     BLM failed to consider or adopt alternatives or other measures to provide maximum protection for wildlife, subsistence, and other resources and uses in Teshekpuk Lake Special Area and the Colville River Special Area in its decision on Willow. BLM arbitrarily limited its consideration of protections for those values and areas by assuming that it needed to allow ConocoPhillips to develop economically viable oil resources under the terms of its leases.

174.     BLM's failure to comply with the NPRPA by providing maximum protection or to adopt appropriate mitigation measures was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by the NPRPA and its implementing regulations. 5 U.S.C. § 706(2).

## Count III

*(Violation of ANILCA; Failure to Comply with Section 810 Subsistence Resources, Use and Access Protections)*

175.     Plaintiffs incorporate by reference all preceding paragraphs.

176.     Pursuant to ANILCA Section 810, agencies must consider effects and restrictions upon subsistence resources and uses. Actions that would significantly restrict subsistence uses may only be undertaken if BLM finds that such actions are necessary, involve the minimal amount of public lands necessary, and if the adverse effects to subsistence are minimized. 16 U.S.C. § 3120(a).

---

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                             Page 58 of 63

177. BLM's ANILCA Section 810 evaluation fails to comply with the law for multiple reasons, including but not limited to, the fact that BLM did not adequately analyze alternatives or take steps in the final SEIS to reduce ConocoPhillips' use and occupancy of public lands and resources that are important for key subsistence resources and uses. BLM's analysis of subsistence impacts in the final SEIS, which provided the basis for its ANILCA Section 810 Final Evaluation in the ROD, was also legally flawed.

178. BLM further failed to include in the final SEIS its findings under ANILCA Section 810, as required by the statute.

179. Because BLM's analysis of alternatives and impacts was flawed, BLM's Tier-2 findings failed to comply with ANILCA Section 810's mandates.

180. For the above reasons, BLM's ANILCA Section 810 evaluation was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by ANILCA and the APA. 5 U.S.C. § 706(2).

## **Count IV**

*(Violation of NEPA; BLM's Failure to Take a Hard Look at Direct, Indirect, and Cumulative Impacts and Mitigation Measures)*

181. Plaintiffs incorporate by reference all preceding paragraphs.

182. Pursuant to NEPA, agencies must take a "hard look" at the consequences, environmental impacts, and adverse effects of their proposed actions and evaluate mitigation measures. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14, 1502.16.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                          Page 59 of 63

NEPA requires that an EIS include a detailed analysis of the direct, indirect, and cumulative impacts of the proposed action together with the impacts of past, present, and reasonably foreseeable activities. *Id.* § 1508.1(g)(3).

183.    NEPA's implementing regulations require that an EIS discuss the means to mitigate adverse environmental consequences. *Id*. §§ 1502.14(e), 1502.16(a)(9). Mitigation includes, but is not limited to, avoiding, minimizing, rectifying, or compensating for adverse project impacts to the environment. *Id*. § 1508.1(s).

184.    BLM violated NEPA and its implementing regulations in its evaluation of Willow in the final SEIS and adoption of the ROD because BLM failed to take a hard look at the potential direct, indirect, and cumulative impacts of Willow. These violations include, but are not limited to, BLM's evaluation of the impacts on greenhouse gas emissions and climate change, air quality, polar bears, caribou, wetlands, and subsistence uses and resources. BLM also failed to take a hard look at impacts from the design of Willow and impacts from deferring approvals of future drilling sites.

185.    BLM's failure to take a hard look at the direct, indirect, and cumulative impacts of Willow, and failure to adequately evaluate the effectiveness of mitigation measures renders the SEIS and 2023 BLM ROD arbitrary, capricious, and not in accordance with the law. BLM's issuance and adoption of the SEIS and 2023 ROD were done without following the procedures required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                Page 60 of 63

## Count V

*(Violation of ESA Section 7 and the APA; FWS's Failure to Prepare a Legally Sufficient BiOp)*

186.    Plaintiffs incorporate by reference all preceding paragraphs.

187.    The ESA requires FWS to prepare a BiOp that uses the best scientific and commercial data available to evaluate whether Willow is likely to jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). FWS must make a rational connection between the facts found and the conclusions it draws. 5 U.S.C. § 706(2)(A).

188.    FWS arbitrarily failed to consider the impacts to the SBS polar bear population from reasonably likely incidental take under the ESA.

189.    FWS failed to address impacts to polar bears as a result of greenhouse gas emissions produced from Willow and those emissions' contribution to exacerbating or hastening climate change effects on SBS polar bears.

190.    FWS's failure to consider the best available science and its failure to consider impacts from increased greenhouse gas emissions each render the 2023 BiOp arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and without observance of the requirements of the ESA and its implementing regulations, and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706.

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 61 of 63

Case 3:23-cv-00058-SLG    Document 1    Filed 03/14/23    Page 61 of 63

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1.      Declare that BLM violated NEPA, ANILCA, the NPRPA, and the APA;

2.      Declare that in issuing the BiOp the U.S. Department of the Interior and FWS violated the ESA and the APA;

3.      Declare that the invalid SEIS, ROD, and BiOp cannot serve as the basis for any future actions or authorizations;

4.      Declare that the actions as set forth above are arbitrary, capricious, an abuse of discretion or not in accordance with law, and without observance of procedure required by law;

5.      Vacate and set aside as unlawful the SEIS, ROD, BiOp, and any decisions that rely on these documents;

6.      Enter appropriate injunctive relief;

7.      Award Plaintiffs all reasonable costs and fees as authorized by law; and

8.      Grant such other relief as this Court deems just and proper.

Respectfully submitted this 14th day of March, 2023,

        s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                                    Page 62 of 63

*Attorneys for Plaintiffs*

_____
COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
Case No. 3:23-cv-00058-SLG                                    Page 63 of 63

Case 3:23-cv-00058-SLG   Document 1   Filed 03/14/23   Page 63 of 63