Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>Defendants,<br><br>and<br><br>CONOCOPHILLIPS ALASKA, INC.,<br><br>Intervenor-Defendant. | Case No. 3:23-cv-00058-SLG |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
(Fed. R. Civ. P. 65)

Plaintiffs Sovereign Iñupiat for a Living Arctic *et al.* (collectively, SILA) request a temporary restraining order and preliminary injunction (TRO/PI) to preclude construction activities for the Willow Master Development Plan (Willow) until the merits are resolved. The Bureau of Land Management (BLM) previously authorized Willow in January 2021.[1] SILA challenged those approvals and obtained injunctive relief from the Ninth Circuit Court of Appeals to preclude winter construction while this Court decided the merits.[2] In August 2021, this Court vacated BLM's first record of decision (ROD) and environmental impact statement (EIS) and the U.S. Fish and Wildlife Service's (FWS) biological opinion (BiOp) due to critical flaws in the agencies' analyses.[3] On remand, BLM prepared a supplemental EIS (SEIS) and released a new ROD on March 13, 2023.

Rather than comprehensively address the numerous flaws in its prior analysis, BLM's SEIS and ROD still fail to comply with the law. BLM again approved Willow without considering a reasonable range of alternatives consistent with the agency's obligations under the National Environmental Policy Act (NEPA) and its mandate to

---

[1] *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (SILA I), 555 F. Supp. 3d 739 (D. Alaska 2021).
[2] *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (SILA II), 2021 U.S. App. LEXIS 28468 (9th Cir. Feb. 13, 2021).
[3] *SILA I*, 555 F. Supp. 3d at 804–05.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 1

protect surface resources under the Naval Petroleum Reserves Production Act (NPRPA). BLM also failed to consider alternatives that would reduce impacts to subsistence users as required by Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA).

On March 13, 2023, BLM reissued a 30-year right-of-way, executed a mineral materials sale contract, and authorized ConocoPhillips Alaska, Inc. (ConocoPhillips) to begin gravel mining and road construction this winter.[4] ConocoPhillips will proceed with ground-disturbing activities as soon as April 4, 2023.[5] This winter's activities will irreparably harm wetlands, tundra, wildlife, and the community of Nuiqsut. A TRO/PI is necessary to prevent irreparable harm to resources, as well as SILA's members' interests, before the Court issues a decision on the merits.

BACKGROUND

Willow would be within the National Petroleum Reserve–Alaska (Reserve), the largest and one of the wildest expanses public lands. Stretching across the Western Arctic, it provides important habitat for wildlife, including threatened polar bears and migratory birds, and is home to the Western Arctic and Teshekpuk Lake Caribou Herds, which are key subsistence resources for communities across northwest Alaska. BLM is required to provide maximum protection for the Reserve's Special Areas — including the

---

[4] B. Psarianos Decl. ¶ 5 (ECF No. 22-1) [hereinafter Expedite Decl.].
[5] *Id*. ¶ 9.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 2

Teshekpuk Lake Special Area (TSLA) and Colville River Special Area (CRSA) — which were designated because of their important resource values.[6]

The Reserve is a mosaic of tundra wetlands, characterized by continuous permafrost and numerous lakes, ponds, slow-moving streams, and wide rivers.[7] The Ublutuoch River and Fish Creek, two significant coastal rivers important for subsistence use, would be impacted by Willow.[8] Subsistence is a critical part of life for communities.[9]

As proposed, Willow would include an extensive oil production facility, including a spiderweb of gravel roads connecting to ConocoPhillips' Alpine field, a central processing facility, up to five drill pads, an airstrip, 300+ miles of pipelines, an ice bridge over the Colville River for module transport, and bridges over important subsistence waterways.[10] It also includes two gravel mine sites adjacent to the Ublutuoch River.[11] All action alternatives considered in the SEIS would require waivers of previously

---

[6] National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 2, 1977); *see* 42 U.S.C. § 6504(a).
[7] Ex. 2 at 16–18.
[8] *Id*. at 28–29 (explaining subsistence-access boat ramps would be constructed on these waterbodies).
[9] *Id*. at 26.
[10] *Id*. at 8–9, 19.
[11] *Id*. at 4.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                     Page 3

Case 3:23-cv-00058-SLG    Document 23-1    Filed 03/16/23    Page 4 of 28

established river setbacks intended to protect subsistence,[12] and would place drilling pads and infrastructure in the Reserve's designated Special Areas.[13]

BLM began its first NEPA process for Willow in 2018, resulting in a ROD adopting Alternative B, ConocoPhillips' proposal, in October 2020.[14] In the 2020 ROD, BLM did not approve the Bear Tooth (BT) 4 and BT5 drill sites.[15] Two lawsuits challenged Willow's approval and, in August 2021, this Court vacated BLM's and FWS's approvals due to serious deficiencies in the agencies' analyses under NEPA and the Endangered Species Act (ESA).[16] Relevant here, the Court held BLM acted contrary to law by failing to consider the NPRPA's directive that BLM provide "maximum protection" for surface values within the TLSA, and by limiting alternatives based on the erroneous belief that ConocoPhillips had the right to extract all oil and gas from its leases.[17] No party appealed the District Court's decision.

Shortly thereafter, BLM began preparing an SEIS. BLM released a draft SEIS in July 2022, which considered only one new alternative not included in the prior analysis — Alternative E.[18] Alternative E included four drill sites instead of five; it eliminated the

---

[12] *Id*. at 27.
[13] *Id*. at 7.
[14] *SILA I*, 555 F. Supp. 3d at 753.
[15] *Id*.
[16] *Id.* at 804–05.
[17] *Id*. at 770.
[18] Ex. 3 at 1.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                              Page 4

Case 3:23-cv-00058-SLG    Document 23-1    Filed 03/16/23    Page 5 of 28

drill site at BT4 within the TLSA and deferred approval of BT5.[19] Alternative E

otherwise largely included the same infrastructure, mitigation, and design features as the

other action alternatives.[20]

SILA questioned BLM's failure to consider a reasonable range of alternatives and

its failure to properly address the legal issues identified by this Court.[21] They also

questioned the agency's failure to take a hard look at Willow's impacts to a range of

resources, including subsistence, and consider adequate mitigation measures.[22]

On February 1, 2023, BLM released its final SEIS. Like the draft, the final SEIS

did not analyze a reasonable range of alternatives, impacts, or potential mitigation, or

address deficiencies in the agency's prior analysis.

BLM finalized its ROD on March 12, 2023, and publicly released the document

the next day.[23] BLM adopted Alternative E with additional modifications.[24] BLM

approved drill sites BT1, BT2, and BT3 as discussed in the final SEIS, but purported to

disapprove rather than defer BT5.[25]

---

[19] *Id*. at 2.
[20] *Id*.
[21] Ex. 9 at 4–24.
[22] *Id*. at 25–31, 32–40.
[23] Ex. 1.
[24] *Id*. at 11.
[25] *Id*. at 11–12.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                             Page 5

BLM publicly released FWS's BiOp on March 13.[26] BLM also issued an amended 30-year right-of-way, executed a mineral materials sale contract for gravel mining, and authorized ConocoPhillips to proceed with construction activities this winter.[27] ConocoPhillips' activities this winter include gravel mining and road building.[28]

<u>LEGAL STANDARDS</u>

The standards for a temporary restraining order and preliminary injunction are essentially the same.[29] Plaintiffs must establish: (1) likely success on the merits; (2) likely irreparable harm without preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.[30] A plaintiff can obtain a TRO/PI by showing "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," as long as the other factors are met.[31] Serious questions are "substantial, difficult, and doubtful," and require "more deliberative investigation."[32] This is a lower bar than demonstrating likely success on the merits.[33]

---

[26] Ex. 12.

[27] Expedite Decl. ¶ 5.

[28] *Id*. ¶ 8.

[29] *See, e.g.*, *Wash. v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

[30] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[31] *All. for the Wild Rockies v. Cottrell* (*Alliance*), 632 F.3d 1127, 1131–32 (9th Cir. 2011).

[32] *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991).

[33] *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 413 F. Supp. 3d 973, 979 (D. Alaska 2019).

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                     Page 6

Courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if adopted "without observance of procedure required by law."[34] Courts undertake a "thorough, probing, in-depth review" to ensure that the agency made a "rational connection between the facts found and the conclusions made."[35]

## ARGUMENT

I.    **SILA IS LIKELY TO SUCCEED ON THE MERITS.**[36]

A.    **BLM Violated NEPA and the NPRPA By Failing to Consider a Reasonable Range of Alternatives and Arbitrarily Limiting Its Authority.**

BLM violated NEPA's core mandate to study and disclose a reasonable range of alternatives.[37] In particular, BLM failed to consider any alternatives that avoid placing infrastructure within Special Areas or otherwise limit ConocoPhillips' activities based on a misinterpretation of its statutory authority and directive under the NPRPA, asserting that its authority restricts it from stranding an economically viable quantity of recoverable oil.[38]

---

[34] 5 U.S.C. § 706(2)(A), (D).
[35] *Native Ecosystems Council v. U.S.*, 418 F.3d 953, 960 (9th Cir. 2005).
[36] SILA's motion presents a subset of claims and does not waive any claims or allegations in the complaint.
[37] 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1508.1(z).
[38] Ex. 3 at 4; Ex. 2 at 33, 46–47.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 7

The analysis of alternatives is the "heart" of an EIS.[39] "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice."[40] "The existence of a viable but unexamined alternative renders an [EIS] inadequate."[41]

The NPRPA mandates that BLM "shall include or provide for such conditions, restrictions, and prohibitions" on activities within the Reserve as it determines necessary to protect surface resources and requires "maximum protection" of surface values in Special Areas.[42] This authority is extremely broad. Indeed, BLM has considerable discretion to suspend all operations on existing leases or units,[43] and may do so "in the interest of conservation of natural resources" or to mitigate "reasonably foreseeable and significantly adverse effects on surface resources."[44]

BLM once again failed to fulfill its mandate and act in accordance with its broad authority to protect the Reserve's surface resources when evaluating alternatives. BLM

---

[39] 40 C.F.R. § 1502.14.

[40] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995)) (internal quotation marks omitted).

[41] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 575 (9th Cir. 1998)).

[42] 42 U.S.C. §§ 6506a(b), 6504(a).

[43] *Id.* § 6506a(k)(2).

[44] 43 C.F.R. § 3135.2(a)(1), (3).

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 8

largely retained the prior EIS's alternatives and faulty framework for screening alternatives.[45] As a result, the agency improperly limited its consideration of reasonable alternatives.[46] BLM added an additional criterion to purportedly address this Court's decision in its screening of alternatives.[47] Specifically, BLM interpreted this Court's decision in its new criterion to mean ConocoPhillips does not have a right to extract "all possible" oil under its leases and that it must consider alternatives that "would reduce infrastructure and impacts relative to [ConocoPhillips'] initial proposal (i.e., Alternative B)," particularly within the TLSA.[48]

However, when screening alternatives in the draft SEIS, BLM still erroneously limited its authority by disregarding alternatives it deemed inconsistent with ConocoPhillips' lease rights or that failed to allow ConocoPhillips to "fully develop" the Willow reservoir.[49] Citing 43 C.F.R. § 3137.71(b)(1), BLM defined "fully develop" to mean it could not consider an alternative that would strand an economically viable quantity of oil — meaning, a quantity that warrants an additional drilling pad.[50] In other

---

[45] Ex. 2 at 35("All screening criteria from the previous Willow [] EIS were retained[.]").
[46] *SILA I*, 555 F. Supp. 3d at 769 ("To the extent BLM relied on [the flawed assertion that [ConocoPhillips] has a right to develop all oil on its leases] to not examine other alternatives, its alternatives analysis was inadequate.").
[47] Ex. 2 at 35.
[48] *Id*.
[49] Ex. 3 at 3–4.
[50] *Id*. at 3; Ex. 2 at 46–47, 33.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 9

words, BLM limited its consideration of alternatives to only those that would still allow ConocoPhillips to fully develop its leases.[51] BLM did not explain how it generated this definition or why this regulatory provision is applicable. In fact, 43 C.F.R. § 3137.71 imposes requirements on lessees — not BLM — and governs their contractual obligations regarding continued development within oil and gas units.[52] Nothing in this provision confers a development guarantee to lessees or limits BLM's statutory or regulatory authority to restrict or condition activities to protect the Reserve's surface resources. BLM's assumption that it cannot limit ConocoPhillips' access to economically viable quantities of oil disregards the plain language in the NPRPA and its implementing regulations and is contrary to this Court's previous decision.[53]

The addition of Alternative E in the final SEIS and BLM's adoption of it as modified does not save BLM's faulty analysis. All action alternatives still included infrastructure in the TLSA and CRSA and presented only small variations on

---

[51] Ex. 2 at 36.

[52] 43 C.F.R. § 3137.71(b)(1) ("If you have drilled a well that meets the productivity criteria, your plan must describe the activities to fully develop the oil and gas field.").

[53] *Supra* nn.42–44; *SILA I*, 555 F. Supp. 3d at 769–70. *But see* Ex. 2 at 36 (BLM explaining pad was required in the TLSA because "there is an economically viable quantity of recoverable oil in this area based on [BLM's] review of the available geologic data and because there is enough resource accessible from BT4 that [ConocoPhillips] has proposed constructing a gravel road and drill pad to access it").

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                      Page 10

ConocoPhillips' proposed project.[54] Regarding its decision to forgo analyzing an alternative that precluded drilling and infrastructure in TLSA, BLM acknowledged "this alternative concept would theoretically address the District Court's directive to provide maximum protection to important surface resources in the TLSA," but stated "it would not meet the Project's purpose and need and would strand an economically viable quantity of recoverable oil."[55] BLM offered the same justifications for its refusal to consider alternatives that would fully eliminate both the originally proposed BT4 and BT5 drill sites or that would place the BT2 site south of Fish Creek, outside of the protective setback.[56]

BLM's elimination of BT4 and disapproval of BT5 in the ROD did not remedy these problems. Alternative E relocated the BT2 pad to allow recovery of a portion of the oil captured by BT4.[57] BLM claimed it reduced impacts by eliminating BT5's potential for overlapping construction with development, and that a reduction in facilities would benefit surface resources and subsistence uses compared to other action alternatives.[58]

---

[54] Ex. 2 at 7; *see also id.* at 3 ("Alternative E evaluates the full development of the Willow reservoir with up to four drill site pads[.]").
[55] *Id*. at 37.
[56] *Id*. at 37–38; *see also* Ex. 10 at 5–6 (chart deeming these alternatives "technologically and logistically feasible" and consistent with the District Court's decision, but contrary to ConocoPhillips' lease rights and full field development).
[57] Ex. 2 at 3.
[58] Ex. 1 at 19.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                            Page 11

But BLM did not prohibit BT5 or explain how its decision would affect future development connected to Willow.[59] As such, the decision is substantially similar to BLM's 2020 approval, which did not authorize BT4 and BT5, but nonetheless failed to consider a reasonable range of alternatives.[60] Indeed, even without BT5, the ROD allows for 94% of the oil production from Alternative E identified in the final SEIS.[61]

BLM's statements demonstrate it arbitrarily limited its consideration of alternatives based on an erroneous interpretation of its own statutory authority and ConocoPhillips' lease rights.[62] The directives to condition, restrict, or prohibit activity to protect surface resources and "assure the maximum protection" of surface values within Special Areas are mandated by the NPRPA.[63] BLM failed to explain how considering any project that would strand an economically viable quantify of recoverable oil is inconsistent with its mandate to mitigate adverse effects on surface resources. And it did not justify how precluding infrastructure in the TLSA is inconsistent with the NPRPA's requirement for exploration of the Reserve.[64] ConocoPhillips' leases do not, and legally

---

[59] *Id*. at 21.
[60] *SILA I*, 555 F. Supp. 3d at 753.
[61] Ex. 1 at 22.
[62] *SILA I*, 555 F. Supp. 3d at 768–69.
[63] 42 U.S.C. § 6504(a).
[64] *Id*.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                      Page 12

could not, override BLM's statutory obligations.[65] BLM's flawed screening criteria severely curtailed the agency's ability to consider reasonable alternatives that address Willow's significant impacts to climate, wildlife, subsistence, and other natural values. As with its prior decision, BLM's framework for considering alternatives was again "inconsistent with its own statutory responsibility to mitigate adverse effects on the surface resources."[66]

Further, BLM failed to explain how it made the determination that rejected alternatives as inconsistent with the project's purpose and need. The agency's purpose and need is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir … while providing maximum protection to significant surface resources within the NPR-A."[67] BLM never explained, and it is unclear on its face, why alternatives that would reduce infrastructure or locate it outside of sensitive areas would be inconsistent with this purpose.[68] Nor could that purpose override BLM's statutory obligations to protect areas like the TSLA.

---

[65] ConocoPhillips' leases reflect that the rights granted are subject to applicable laws, which include the suspension authority in the NPRPA. *See, e.g.*, Ex 11 at 1.

[66] *SILA I*, 555 F. Supp. 3d at 769.

[67] Ex. 2 at 1–2.

[68] *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) ("[R]eview of an agency decision is based on the administrative record and the basis for the agency's decision must come from the record.").

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 13

Finally, the draft SEIS contained numerous statements espousing BLM's limited view of its authority to restrict development. In describing the no action alternative, the agency stated: "BLM does not have the authority to select this alternative because [ConocoPhillips'] leases are valid and provide the right to develop the oil and gas resources therein."[69] BLM stated that it could not delay permitting Willow because "BLM is required by the NPRPA to administer an 'expeditious' program of oil and gas leasing" and may not deny development.[70] The final SEIS did not clarify BLM's position in responses to comments questioning BLM's limited view of its authority or consider any additional alternatives.[71] Instead, BLM affirmed that it screened alternatives based on the assumption that it must not strand economically viable quantities of recoverable oil and explained that Alternative E evaluated the "full development potential of the Willow Reservoir."[72]

In sum, BLM violated NEPA by failing to consider a reasonable range of alternatives due to its misinterpretation of its authority and obligations under the NPRPA.

---

[69] Ex. 3 at 6.

[70] *Id*. at 5.

[71] Ex. 2 at 31–32 (comment response stating "[t]he Supplemental EIS does not state that BLM's legal authority to condition or reject the Willow Project is constrained, or that BLM cannot select Alternative A (No Action)").

[72] *Id.* at 36, 51.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 14

ANILCA's purposes include preserving and maintaining wildlife habitat and populations, and protecting subsistence resources and uses.[73] Congress declared that the "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands."[74] Title VIII provides the framework for agency protection and consideration of subsistence uses in decision making.[75] When contemplating an action to permit a use of public lands, ANILCA Section 810 requires the agency to first consider effects on subsistence, the availability of other lands for the proposed use, and "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[76] This is referred to as a Tier-1 evaluation. If the agency determines the proposed action significantly restricts subsistence uses, the agency is required to make further findings, called a Tier-2 evaluation.[77] Specifically, the agency must determine whether such a restriction is necessary and consistent with sound public lands management; that the activity will involve the minimal amount of public lands necessary to accomplish its purposes; and require reasonable steps to minimize adverse

---

[73] 16 U.S.C. § 3101(b)–(c).
[74] *Id.* § 3112(1); *see id.* §§ 3101(c), 3111(4).
[75] *Id.* §§ 3111–3126.
[76] *Id.* § 3120(a).
[77] *Id.*

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                            Page 15

impacts on subsistence.[78] These findings must be included in an EIS where one is required.[79]

In the draft SEIS, BLM concluded that all action alternatives would cause significant restrictions to subsistence.[80] In the final SEIS, BLM claimed that it considered ways to reduce impacts to subsistence users under Alternative E.[81] But none of the action alternatives — as BLM acknowledges —meaningfully reduced ConocoPhillips' use and occupancy of public lands needed for Nuiqsut's subsistence purposes. Although Alternative E purportedly reduced infrastructure in the TLSA to lessen impacts to caribou hunting, BLM admitted the benefits to subsistence users from doing that would be "minimal."[82] BLM recognized that "[t]he reduction in infrastructure in the TLSA under Alternative E will not result in a substantial reduction in direct impacts on Nuiqsut subsistence harvesters compared to the other action alternatives."[83] BLM provided only a conclusory sentence in the final SEIS that deferring BT5 would reduce the intensity and severity of impacts because all construction activity would not occur simultaneously.[84]

---

[78] *Id*. § 3120(a)(3).

[79] *Id*. § 3120(b); *Tenakee Springs v. Clough*, 750 F. Supp. 1406, 1422 (D. Alaska 1990).

[80] Ex. 3 at 7–10.

[81] Ex. 2 at 9.

[82] Ex. 2 at 41 (explaining Alternative E would impact subsistence use areas in the TLSA for 67% of Nuiqsut harvesters, versus 73% under Alternative B).

[83] *Id*. at 30.

[84] *Id*. at 4; *supra* n.68 (explaining agency findings must be supported by the record).

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                        Page 16

BLM's statements in the ROD that there will be fewer impacts without BT5 are also conclusory.[85] The likelihood that denying BT5 would reduce impacts is also called into question because the agency leaves the door open for future approvals.

BLM did not seriously consider any alternatives which would "reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[86] Indeed, BLM found that only "a slightly smaller percentage of Nuiqsut harvesters (88%) would potentially be affected under Alternative E compared to Alternative B (91%)."[87] In its ANILCA Section 810 analysis, BLM explained that it eliminated a number of alternatives from analysis "due to economic, or technological feasibility or practicability, or because they did not meet the purpose of the proposed action to produce the oil discovered on [ConocoPhillips'] leases."[88] As explained, BLM's exclusion of feasible alternatives was based on the agency's misinterpretation of the law as requiring it to authorize nearly full-field development under ConocoPhillips' leases.[89]

In *Tenakee Springs v. Clough*, the Ninth Circuit considered and rejected arguments that an agency's contractual obligation with industry should preempt laws

---

[85] Ex. 1 at 18–22.
[86] 16 U.S.C. § 3120(a).
[87] Ex. 2 at 42 (noting slight difference is limited to goose hunting).
[88] *Id*. at 40; *see also supra* n.53.
[89] Ex. 10 at 6–7; *see also supra* Argument I.A.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 17

designed to protect subsistence and the environment, including ANILCA Section 810.[90]

In granting plaintiffs' requested injunctive relief, the Court found the agency's "failure

seriously to consider any alternative to the rigid application of its own interpretation of []

contract requirements raises serious questions of compliance with applicable law."[91]

Similarly, BLM's interpretation of ConocoPhillips' lease rights and associated failure to

consider alternatives that would reduce the use and occupancy of public lands needed for

subsistence purposes is contrary to BLM's obligations under ANILCA Section 810.

The NPRPA's general mandate to conduct a leasing program does not lessen

BLM's duties under ANILCA Section 810;[92] BLM was still obligated to consider

alternatives at this project-approval stage that would reduce or eliminate the use and

occupancy of lands needed for subsistence.[93] Importantly, the NPRPA expressly requires

that activities undertaken pursuant to the Reserve's leasing program "provide for such

conditions, restrictions, and prohibitions … necessary or appropriate to mitigate

reasonably foreseeable and significantly adverse effects on [] surface resources."[94]

---

[90] 915 F.2d 1308, 1312 (9th Cir. 1990).

[91] *Id*.

[92] 42 U.S.C. § 6506a(a).

[93] *See Kunaknana v. Clark*, 742 F.2d 1145, 1150–51 (9th Cir. 1984). This Court also recognized the distinction between leasing and development drawn in 42 U.S.C. § 6506(a). *SILA I*, 555 F. Supp. 3d at 755–62.

[94] 42 U.S.C. § 6506a(b).

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                          Page 18

Because ANILCA Section 810 imposes "substantive limitations" on an agency's discretion to consider and select alternatives, "an agency proceeds at its peril where it fails to include within the set of alternatives to be considered one which can be implemented in conformity with ANILCA's substantive mandate."[95] Here, BLM's failure to evaluate alternatives to Willow that would minimize the use of public lands needed for subsistence purposes violated BLM's Tier-1 obligations.[96]

As a result of its limited range of alternatives and misinterpretation of its own statutory authority, BLM also failed to meet its Tier-2 obligations in determining that Alternative E "will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition" and in failing to take reasonable steps to minimize subsistence impacts.[97] These are distinct statutory requirements, and BLM failed to comply with both.[98] Moreover, the final SEIS failed to include BLM's Tier-2 findings, which is a procedural violation.[99]

---

[95] *Tenakee Springs*, 750 F. Supp. at 1421.

[96] 16 U.S.C. § 3120(a).

[97] 16 U.S.C. § 3120(a)(3)(B); Ex. 1 at 119–20.

[98] *Tenakee Springs*, 750 F. Supp. at 1428–29.

[99] 16 U.S.C. § 3120(b); *supra* n.79; *cf.* Ex. 2 at 44 (noting the final SEIS did not contain Tier-2 findings).

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                      Page 19

In sum, BLM failed to comply with ANILCA Section 810 by failing to consider alternatives that reduce impacts to subsistence, also rendering its final findings arbitrary and capricious.

## II. SILA WILL SUFFER IRREPARABLE HARM.

"Environmental injury, by its nature, . . . is often permanent or at least of long duration, *i.e.*, irreparable."[100] The Reserve, specifically its aquatic, wildlife, and subsistence resources, and SILA's and their members' and supporters' interests in the Reserve, will be irreparably harmed by ConocoPhillips' imminent gravel mining and road building.[101] An injunction is necessary to preserve the status quo while the Court decides this case.

ConocoPhillips proposes to excavate and fill wetlands with 4.4 million cubic yards of gravel, including the construction of approximately 30 miles of gravel roads, with gravel mining beginning on April 4, 2023.[102] This winter's activities include developing one gravel mine (the excavated pit would total 115 acres surrounded by a 5 foot tall by 15 foot wide berm), including using explosives to remove tundra and soil layers, excavating

---

[100] *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) ("[O]nce the desert is disturbed, it can never be restored.").

[101] Because of these harms, Plaintiffs have standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000) (standing test); *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 341–45 (1977) (same).

[102] Ex. 2 at 9 (total road miles); *id.* at 10 (total gravel fill); Ex. 4 at 2; Expedite Decl.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 20

gravel, gravel hauling, and placing gravel for permanent roads.[103] The Ninth Circuit

previously found that SILA and their members "will suffer irreparable harm in the

absence of an injunction" from similar construction activities.[104] Likewise, in entering a

limited injunction pending an emergency motion, this Court found that "there is a strong

likelihood of irreparable environmental consequences once blasting operations

commence."[105] ConocoPhillips proposes substantially similar construction activities this

winter,[106] making irreparable harm once again imminent.

BLM acknowledged gravel mining and road building would irreparably harm

wetlands, wildlife, and subsistence use. In the final SEIS, BLM explained that "[g]ravel

fill would cover soils and kill existing vegetation, alternating the thermal active layer

indefinitely" and stated impacts to the permafrost from the gravel mine "would be

irreversible" and "permanent."[107] BLM also acknowledged the placement of gravel fill

"would permanently remove or alter wetlands and wetlands functions."[108] BLM

explained Willow's roads and infrastructure would visually impact subsistence users and

---

[103] Ex. 2 at 4 (mine site description); *id.* at 5–6 (mine and gravel road construction description)); Expedite Decl. ¶ 5, 8.

[104] *SILA II*, 2021 U.S. App. LEXIS 28468, at *6.

[105] *Id.* at *9.

[106] Expedite Decl. ¶ 8.

[107] Ex. 2 at 11–12, 19.

[108] *Id.* at 20, 22.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                     Page 21

visitors for the life of the project and would be irreversible without reclamation.[109]

Regarding impacts to wildlife, BLM stated there would be 543 acres of permanent caribou habitat loss from gravel fill with another nearly 2,800 acres of caribou habitat loss because of dust shadow, and caribou would be displaced from nearly 98,000 acres of habitat as a result of Willow.[110] The gravel roads also have "a high potential" to disturb caribou and impact caribou hunting activities.[111] BLM also found Willow is "likely to deflect caribou from where Nuiqsut hunters harvest them" near the mine site and the altered distribution and deflection of caribou could have "large impacts to hunter success."[112] BLM also specifically found Willow "would constitute a substantial restriction on subsistence access for Nuiqsut residents," particularly during construction.[113] BLM acknowledged these findings in the ROD.[114]

SILA's interests in subsistence hunting, gathering, and fishing; recreation; research; wildlife viewing and protection; and aesthetic enjoyment of the area's natural

---

[109] Ex. 2 at 13–14, 16.

[110] *Id*. at 23–25. In the ROD, BLM states that there will be less impacts overall but does not otherwise provide updated acreage. Ex. 1 at 18–22.

[111] Ex. 2 at 39; *see also id*. at 45 (showing project overlain by all Nuiqsut subsistence use areas with majority of project within high-use areas); *id*. at 53 (showing Alternative E over caribou subsistence use areas).

[112] *Id*. at 42.

[113] *Id*. at 43.

[114] Ex 1 at 32–33 (finding "effects on subsistence and sociocultural systems may be highly adverse and disproportionately borne by the Nuiqsut population"); Ex. 1 at 119.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 22

setting will be harmed by gravel mining and road construction.[115] As Sam Kunaknana

states, he currently fishes on the Ublutuoch River, where ConocoPhillips will blast the

gravel mine, permanently impacting the area he relies on and deterring his use.[116] Mr.

Kunaknana also explained that caribou used to come through the area in large numbers,

but caribou use of the area around Nuiqsut has decreased as oil and gas development

increased; he is concerned he will not be able to successfully hunt caribou due to gravel

mine blasting and road building for Willow.[117] For Mr. Kunaknana, the subsistence

resources he relies on and his subsistence way of life are threatened by Willow.[118] As

Siqiñiq Maupin explains, the infrastructure and activities are in important subsistence use

areas, including for caribou, and threaten people's ability to hunt and obtain traditional

foods.[119] These injuries are irreparable.[120]

---

[115] Brown Decl. ¶¶ 17–18; Dabney Decl. ¶¶ 14–15, 20, 22–24; Greuel Decl. ¶¶ 22, 24–25, 28–29, 31–33, 37; Montgomery Decl. ¶¶ 13–14, 20; Ritzman Decl. ¶¶ 23, 26, 28, 33–35, 37, 40; Miller Decl. ¶¶ 16–17, 20–21, 23.

[116] Kunaknana Decl. ¶¶ 9–10, 27.

[117] Kunaknana Decl. ¶¶ 16–18, 25. As the President of the Native Village of Nuiqsut and the Mayor of the City of Nuiqsut explained, the extension of roads from Willow into undeveloped areas harms caribou habitat, deflecting caribou and making hunting more difficult. Ex. 7 at 1, 6; *see also* Ex. 5 at 4, 6 (local residents explaining oil and gas infrastructure drives caribou away from traditional hunting areas, making hunters less successful).

[118] Kunaknana Decl. ¶¶ 32, 35.

[119] Maupin Decl. ¶¶ 18–21, 23.

[120] *See SILA III*, 2021 U.S. Dist. LEXIS 22809, at *6–9 (finding gravel mining and road construction would harm Plaintiffs' use and enjoyment of the project area); *see also*

cont…

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                         Page 23

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION.

In cases against the government, the balance of equities and public interest factors merge.[121] Where environmental injury is "sufficiently likely, the balance of harms will usually favor" an injunction.[122] There is a well-established "public interest in preserving nature and avoiding irreparable environmental injury."[123] The Ninth Circuit previously found the balance of equities and public interest favored an injunction.[124]

Gravel mining and road construction will irreparably harm vital habitat for fish and wildlife, including important subsistence resources. Polar bears, caribou, and wildlife of the northeastern Reserve are resources used and enjoyed by SILA's members and supporters, as well as Alaskans and citizens across the United States.[125] There is a significant public interest in protecting the Reserve while this case is decided.

---

*Alliance*, 632 F.3d at 1135 (finding harms to use of an area are "actual and irreparable injury" showing "likelihood of irreparable injury"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) ("[I]n this case, irreparable harm to the environment necessarily means harm to the plaintiffs' specific aesthetic, educational and ecological interests."); *see also S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior* (*W. Shoshone*), 588 F.3d 718, 728 (9th Cir. 2009) ("The likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high.").

[121] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[122] *Save Our Sonoran, Inc.*, 408 F.3d at 1125 (quoting *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988)).

[123] *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc).

[124] *SILA II*, 2021 U.S. App. LEXIS 28468, at *6–7.

[125] Dabney Decl. ¶¶ 14, 18, 22–23; Miller Decl. ¶¶ 15, 17, 21–23; Greuel Decl. ¶¶

cont…

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                                 Page 24

Economic interests do not overcome the irreparable environmental harm favoring an injunction.[126] Any economic benefits to the government or permittees based on violations of the law are outweighed by environmental concerns.[127] This is especially so given that ConocoPhillips would only be enjoined from completing 21 days of construction this winter[128] and the parties could complete summary judgment briefing prior to next year's construction season. Additionally, ConocoPhillips has yet to make final investment decisions, rendering economic interests speculative.[129] Enjoining the project "comports with the public interest."[130]

---

20, 22, 25–26, 28; Kunaknana Decl. ¶¶ 7–10, 12–14, 25, 33; Maupin Decl. ¶¶ 18–19; Ritzman Decl. ¶¶ 23, 25–32, 35, 37; Brown Decl. ¶¶ 6, 15–16; Montgomery Decl. ¶¶ 8, 13–14, 22.

[126] *Lands Council*, 537 F.3d at 1005; *Nat'l Parks Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001).

[127] *See Or. Natural Res. Council v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2007) ("[T]he risk of permanent ecological harm outweighs the temporary economic harm that [the permittee] may suffer."); *League of Wilderness Defs./Blue Mountain Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (describing delay in revenues and jobs as "marginal harm").

[128] Expedite Decl. ¶ 11.

[129] Ex. 6 at 1; Ex. 8 at 1.

[130] *W. Shoshone*, 588 F.3d at 728; *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1033–34 (9th Cir. 2007) (same).

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 25

## IV.    THE COURT SHOULD WAIVE ANY BOND REQUIREMENT.

There is a well-established "public interest" exception to imposing a bond; courts can decline to impose bonds to avoid frustrating public interest litigation.[131] Plaintiffs are non-profit organizations that seek to further the strong public interest in preventing irreparable harm and ensuring compliance with the law.[132] SILA meets the criteria for bond waiver.[133]

<u>CONCLUSION</u>

The Court should grant SILA's Motion for a TRO/PI and waive the bond requirement.

Respectfully submitted this 16th day of March, 2023.

 s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

Attorneys for Plaintiffs

---

[131] Fed. R. Civ. P. 65(c); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

[132] Dabney Decl. ¶ 28; Isherwood Decl. ¶¶ 4–11; Miller Decl. ¶ 24; Greuel Decl. ¶ 39; Maupin Decl. ¶ 27; Montgomery Decl. ¶ 24.

[133] The Ninth Circuit Court of Appeals did not impose a bond in the previous litigation. *SILA II*, 2021 U.S. App. LEXIS 28468.

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                            Page 26

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this memorandum complied with the type-volume limitation of 7.4(a)(1) and contains 5,924 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4) in compliance with the word limits requested in Plaintiffs' Unopposed Motion to File Overlength Brief, filed concurrently.

_s/Bridget Psarianos_
Bridget Psarianos

Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 27