

February 23, 2023

Hon. Deb Haaland
Secretary of Interior
1849 C Street, N.W.
Washington, DC 20240

*Submitted by e-mail*

      Re:    Kuukpik Corporation Comments on the
                 Final Supplemental EIS on the Willow Master Development Plan

Dear Secretary Haaland:

This letter follows up on Kuukpik's meeting with you in January and provides additional information regarding Kuukpik's support for Alternative E of the Willow Project. We want to thank you again for meeting with us and for the careful attention that you, your staff, and BLM Alaska have paid to Kuukpik's concerns and proposals throughout this process. We appreciate the opportunity to provide our perspective again as you prepare the Record of Decision.

**I.    Kuukpik and the people we represent support Alternative E with only one drill site deferred.**

Kuukpik is the Alaska Native village corporation for Nuiqsut, the community closest to the Willow Project. As the local village corporation, Kuukpik's twin goals are protecting the subsistence lifestyle and culture of the Native residents of Nuiqsut while also providing for the long-term economic needs of our shareholders. Kuukpik also owns thousands of acres of land between Nuiqsut and the future Willow Project. That land is the birthright of the Alaska Natives of Nuiqsut and an important part of Nuiqsut's subsistence culture. Under ANCSA, Kuukpik has a duty to use these lands to carry on the subsistence way of life that has sustained our people for generations—a duty that Kuukpik has defended vigorously ever since oil was discovered on and around our lands decades ago.

P.O. Box 89187 • Nuiqsut, AK 99789-0189 • TEL: (907) 480-6220 • FAX: (907) 480-6126
582 E. 36th Avenue, Suite 600 • Anchorage, AK 99503 • TEL: (907) 279-6220 • FAX: (907) 279-6216

Case 3:23-cv-00058-SLG   Document 35-3   Filed 03/20/23   Page 1 of 19

EXHIBIT C

The Willow Project is the next chapter in that history. Although Willow will not be constructed *on* Kuukpik-owned land, Kuukpik's lands are the gateway to the Project. The gravel roads and pipelines that will connect Willow to existing infrastructure will cross Kuukpik's private property, as will the more than 3 million vehicle trips that are anticipated under Alternative E.[1] That infrastructure and traffic will be six miles or so north of the Nuiqsut city limits (*not* within the city itself where the local city government would have jurisdiction) on land owned by Kuukpik or the federal government. If Willow proceeds, no other entity in Nuiqsut or elsewhere will experience such direct and tangible impacts to their property or way of life as Kuukpik and its shareholders.

The weight of these responsibilities has informed everything Kuukpik has said and done during the process of planning, analyzing, and evaluating the Willow Project. Kuukpik has historically been able to support only balanced and responsible oil and gas development in and around our community and ANCSA lands. We have opposed development that did not meet that high standard.

Kuukpik has taken that approach with every proposed oil and gas project in our region over the past twenty-five years. When the Clinton administration agreed to conduct lease sales in NPR-A in 1998 (to placate critics of the administration's actions stifling development in ANWR), Kuukpik understood that development west of Nuiqsut, on and around Kuukpik lands in the NPR-A, was at that point essentially inevitable. We have watched annual lease sales occur every year since. So it came as no surprise when ConocoPhillips approached Kuukpik and BLM during the Obama administration to discuss development plans for the area that would become the Willow Project. At that time (around 2014-2016), President Obama's BLM instructed ConocoPhillips to prepare a Master Plan of Development describing its full field development scenario for Willow. ConocoPhillips did so, resulting in the Project proposal now described in Alternative A.

Kuukpik, BLM, and other stakeholders have since used BLM's analysis of that proposal to develop an alternative with broad support in Nuiqsut, the North Slope Borough, and the State of Alaska. That required a lot of hard conversations and decisions to be made over the past five years. Since 2018, few entities have been more vocal and detailed in their position on this Project than Kuukpik. We did not support Conoco's original proposal or any of the original alternatives. When the process floundered during the covid-19 pandemic, we criticized the decision to plow forward in the face of community opposition. After the process got back on track, we engaged with BLM to find solutions, not just criticize. Through it all, Kuukpik's goal was to find ways to reduce impacts, increase long term benefits, and develop a project alternative that we and most of the affected community of Nuiqsut could support.

---

[1] 2023 Final Supplemental EIS (2023 FSEIS); Vol. 1, Table ES-1, p. ES-13.

Alternative E achieves that. After years of discussion and changes to the Project, Kuukpik supports the Willow Project as described in Alternative E because it strikes an appropriate balance between the need to develop oil and gas resources and ensuring that Nuiqsut residents can continue to practice subsistence for generations to come. Alternative E, with three drill sites constructed now and a fourth deferred, achieves this balance in part because it incorporates many changes that Kuukpik has long advocated for:

- Eliminated one drill site entirely and deferred consideration of another
- The eliminated drill site was in the Teshekpuk Lake Special Area (TLSA)
- Reduced the gravel footprint, especially in the TLSA
- Relocated the northernmost drill site farther south to less sensitive caribou habitat
- Relocated the southernmost drill site to reduce impacts and road and pipeline length
- Seven fewer miles of gravel road and pipelines (from 37 miles to 30 miles)
- Eliminated one bridge (over Willow Creek)
- Eliminated the proposed gravel island in Harrison Bay
- Reduced runway length and received commitments not to use largest and most disruptive cargo planes
- Reduced road footprint and ground traffic
- Reduced freshwater use
- Provided up to 3 boat launches for subsistence-use
- Guaranteed road access for Nuiqsut residents for subsistence use
- Subsistence ramps for hunters to get on and off gravel roads
- Reduced speed limits for health and safety of residents and to reduce dust impacts
- Commitments to conduct environmental studies, reduce road height, review airstrip design, draft vehicle and aircraft use plans and a Diesel Use Plan for Willow
- Adopted a Good Neighbor Policy to assist hunters if caribou harvests are impacted
- Use of Tier 4 engines for drill rigs prior to highline power being available
- Improvements to a Nuiqsut subsistence trail

These changes substantially reduce the Project's risks and impacts while nevertheless allowing ConocoPhillips to access and develop 97.5% of the oil that was accessible under its original proposal.[2] That's an extraordinary achievement. In fact, we doubt there is any other resource development project that has changed so dramatically in response to local concerns while still maintaining economic viability. That doesn't mean Willow is perfect; but if Alternative E is selected and appropriate mitigation measures are implemented, then Willow can proceed safely and provide enough benefits to offset its likely impacts.

---

[2] 2023 FSEIS, Appendix D.1, Table D.4.8, p. 114 (613.5 mmbo under Alternative E compared to 628.9 mmbo under Alternative B (Proponent's Project)).

Kuukpik does not speak for everyone in the community; no single person or entity does. But we write today on behalf of our organization, which has over three decades of experience balancing subsistence and oil development on our privately held land and in our region. We write on behalf of our board of directors, most of whom helped re-settle Nuiqsut in 1973 or are the children of those who did. And we write on behalf of our shareholders, which today number nearly 700 Alaska Natives, many of them residing in Nuiqsut. <u>We support responsible resource development.</u>

<u>The people claiming to oppose Willow on behalf of Nuiqsut do not speak for everyone in this community.</u> They do not represent us. In fact, they sound nothing like us or the elders who came before us. Thomas Napageak—one of our most respected elders, a re-settler of Nuiqsut, Kuukpik officer, whaling captain, and the elder who some have recently claimed opposed oil development around Nuiqsut—sounded like us: "So far people in Nuiqsut have supported responsible development of oil and gas on our lands."[3]

So it remains today. As a landowner and caretaker of Nuiqsut's birthright and subsistence lifestyle, Kuukpik understands perhaps better than anyone the balance that must be struck between development and the long-term health of the people of Nuiqsut, the Kuukpikmiut. Oil development on our traditional lands has heated our homes, built schools for Nuiqsut and our neighboring villages, and provided road access to hundreds of square miles of subsistence lands that were otherwise difficult to reach. These benefits are not without cost, but Kuukpik has worked tirelessly for decades to ensure that the balance ultimately tilts in favor of Nuiqsut, the Kuukpikmiut, and the long term health and well-being of our community and shareholders.

With those goals in mind, we want to be very clear: <u>Kuukpik, our board, and many of the shareholders who elected them support Alternative E</u> because it will provide sufficient benefits to outweigh the impacts to the Alaska Natives who this Project affects the most. Kuukpik therefore urges you to approve Alternative E with only one drill site deferred. Any other decision risks upsetting a balance that has been in the works for over five years, long before outside interest groups swooped in to make this Project a posterchild for a policy fight that is far removed from day to day life in Nuiqsut. We urge you to listen to the people who are closest to the Project, the people who have lived with these issues all their lives—the people who are telling you they want to see this Project move forward.

---

[3] Comments by Thomas Napageak, Scoping Meeting, 2003 NE NPR-A Integrated Activity Plan.

## II. Kuukpik only supports mitigation measures that are justified and supported by science.

Supporting the Project doesn't mean Kuukpik is blind to the impacts it will have; rather, it means we—perhaps more than anyone else—understand those impacts and can accept them as long as they are managed and offset by countervailing benefits. The best way to accomplish that is to focus on the plans and proposals that have been studied extensively for the past several years and are supported by local residents. Some of those proposals would provide tangible victories and benefits to groups who might otherwise oppose Willow. For example, Kuukpik agrees with a number of conservation groups that Teshekpuk Lake and the important caribou habitat around it should be permanently protected if Willow moves forward. Accomplishing that would be a tremendous achievement for the conservation community and Alaska Natives alike—but it won't happen if the Project does not go forward. We support compensatory mitigation measures like this that will offset Willow's unavoidable impacts in proportional, rational, and justifiable ways while still allowing the Project to proceed.

On the other hand, Kuukpik opposes conditions and last-minute changes that are based on inaccurate or exaggerated information. We understand that passions run high among a few vocal critics and the NGOs that speak through them. But facts matter; truth matters. And the process matters. Kuukpik has always insisted that development decisions be based on science and analysis, not misinformation, political agendas, or public relations calculations. That cuts both ways: we have consistently opposed efforts to weaken environmental protections that were not supported by science, just as today we oppose arbitrary decisions that have not been analyzed or proven to benefit local stakeholders.

### 1. Kuukpik supports approval of three drill sites and deferral of one.

Kuukpik only recently became aware that a team in Washington D.C. was considering deferring approval of two drill sites.[4] <u>After much deliberation among our board and shareholders, Kuukpik does not support deferring more than one drill site</u>. We have already explained why approving three drill sites now (with a fourth deferred) strikes an acceptable balance between risk, impacts, and benefits. Nothing in the FSEIS causes us to question that conclusion. In fact, the FSEIS does not include *any* analysis explaining whether deferring two drill sites would reduce impacts or provide enough benefits to Nuiqsut and the North Slope to justify the impacts. Without any such analysis, there is no scientific basis to conclude that deferring two drill sites is "more environmentally protective" than deferring one. Instead, you

---

[4] 2023 FSEIS, Vol. 1, p. ES-6 ("BLM is also considering, and may select from, variations on Alternative E that would be more environmentally protective, such as deferring more than one drill site pad. To help inform such consideration, Tables D.4.9 and D.4.10 in Appendix D.1, *Alternatives Development*, provide the daily and cumulative oil production for each individual drill site pad in the Alternative E configuration.").

would simply have to assume that conclusion is true (*i.e.*, that building two drill sites <u>must</u> result in lower impacts because two is less than three). And while that assumption may be appealing in the abstract, it has at least two significant problems.

First, there is no evidence that deferring two drill sites would decrease impacts. In fact, the consensus among Kuukpik's board of directors was that extending major construction impacts over a longer period of time would *increase* impacts, not reduce them. Our experience is that fish in particular tend to disperse away from construction activities in the short-term but return within 1-2 years after construction is complete. Kuukpik therefore believes that deferring two drill sites will disrupt fish and wildlife activity for a longer period of time, which would negatively impact subsistence users, not help them. We therefore do not support deferring two drill sites because we do not believe it will decrease impacts.

Second, choosing at this late date to defer two drill sites instead of one ignores the reality of that decision. A project like Willow is designed holistically. The components and logistics are meticulously planned to maximize efficiencies and streamline transportation and construction, among other things. Kuukpik is no expert in that field, but it doesn't take an expert to understand that arbitrarily requiring ConocoPhillips to delay another significant piece of that logistical puzzle (with no assurance it will be approved in the future) would require significant changes to the construction and execution strategy.[5] Yet none of those changes have even been identified, much less evaluated in the FSEIS. So we don't even know that the impacts would be reduced (and, again, Kuukpik questions that conclusion). Nor is there any analysis of how benefits would be delayed or decreased if multiple drill sites are deferred.[6] Stakeholders and decision makers cannot make an informed decision without that information.

Not only is that a problem in terms of *actually* reducing impacts, it may lead to a successful lawsuit. A decision to defer two drill sites would not be based on the FSEIS; rather, it would be an arbitrary decision based on an assumption that deferring two drill sites must reduce

---

[5] See 2023 FSEIS, Vol. 1, pp. 300 and 366, which confirms that deferring drill sites affects the transportation and construction schedules and impacts. Kuukpik's analysis doesn't even consider the economics of the Project because that is not our area of expertise. But we do understand that much of the infrastructure to support a two-drill site project (such as the processing facility, operations center and many of the roads and pipelines) would be the same whether two, three, or four drill sites are approved. In other words, the investment and impacts from those common facilities would not meaningfully decrease if two drill sites are deferred, whereas the tangible and known benefits would decrease substantially due to reduced recovery of the resource.

[6] For example, deferring a second drill site would result in tens of millions of barrels of oil not being produced for several years (at least). Because half the federal royalties on that oil would otherwise be dispersed to affected North Slope communities through NPR-A Impact Mitigation Funds grants, those communities would lose out on millions of dollars in the short term, or may never receive it if the two other drill sites are later denied. The time value of money—or losing it entirely—may not mean much to the well-funded national groups that seem to support a second deferral, but it means a lot to North Slope communities who depend on these funds for basic services.

impacts more than deferring one (an assumption we have already shown is at best debatable). The Secretary's decision cannot be based on assumptions if it is to withstand the inevitable lawsuits that will challenge the forthcoming ROD. Despite whatever abstract appeal there may be in deferring two drill sites, BLM would be inviting yet another successful lawsuit if it selects an option that has not been analyzed in the FSEIS.

Unfortunately, a ROD that prompts a lawsuit by ConocoPhillips—even a successful one—may serve some people's political agenda and therefore be viewed as an acceptable outcome. But this decision isn't about politics. It's about listening to the people with the most at stake and respecting that we have decided Willow will benefit Nuiqsut more than it will hurt.

Kuukpik supports approving BT1, BT2, and BT3 now and re-visiting BT5 later. Alternative E, with the mitigation measures we describe below, adequately balances impacts and benefits. Kuukpik therefore continues to support Alternative E, with only one drill site deferred.[7]

### 2. Reasonable air quality monitoring and reporting is appropriate.

Kuukpik has long supported efforts to minimize air pollution and emissions near Nuiqsut. Over the past decade, for example, Kuukpik routinely persuaded oil companies to use Tier 4 generators for mobile power near Nuiqsut even when that was not required by regulation. We have also encouraged air quality modeling prior to major projects to make sure the emissions would not violate standards or harm Nuiqsut residents. We have supported air quality monitoring for the same purpose. These efforts may not have been perfect, but they have provided an enormous amount of data for stakeholders to objectively analyze if they choose to.

These studies, models, and monitoring stations continue to show that the air in Nuiqsut is not dangerous. In fact, the most comprehensive human health study related to air quality in Nuiqsut that we are aware of was sponsored by one of the two entities that has recently been blaming air quality for all kinds of ailments. That study found the opposite: that pollutants normally associated with oil and gas production were not detected in Nuiqsut or were only found in "very low concentrations" far below standards and screening levels established by the United States government.[8] It is unclear why the entity that sponsored this study declines to rely on it

---

[7] Kuukpik also opposes the mitigation measure that would require a pause after 65% of the project is developed for multiple reasons, but mainly because it would effectively act as even more arbitrary version of deferring two drill sites instead of one.

[8] See Attachment 1, Executive Summary of *Independent Evaluation of Ambient Air Quality in the Village of Nuiqsut, Alaska;* prepared for the Native Village of Nuiqsut by Alaska Native Tribal Health Consortium, Department of Environmental Health and Engineering, Environmental Health Support; Executive Summary, pp. 5-6. Full report is available from Kuukpik upon request.

and instead insists that the air quality in Nuiqsut is poor despite its own evidence to the contrary. The FSEIS and its technical appendices provide similar information, if Project opponents choose to read it.[9]

The bottom line is this: the <u>scientists</u> who perform these studies have consistently found that Nuiqsut's air is within norms and not likely to cause negative health impacts. As far as we can tell, the <u>laypeople</u> arguing otherwise do not have scientific evidence to support their <u>opinions</u> otherwise. Rather, they have hyperbole, anecdotes, and a willingness to ignore existing science to pursue a different agenda. They also remain willing to connect unrelated events no matter what the evidence has come to prove, such as a headache in Nuiqsut to a natural gas seep that took place nine miles away even though it is physically impossible for the two events to be connected—the gas didn't even escape the CD1 Pad in measurable amounts.[10] Claims like those should be measured against objective scientific evidence when deciding what actions and mitigation measures are appropriate.

Don't misunderstand: the CD1 gas leak was troubling and, for some, frightening. However, like many of the overwrought stories being circulated recently, it was not a paradigm-shifting event that should cause us to entirely re-evaluate the risks associated with development. Rather, it was a concerning reminder that operators need to remain vigilant, learn and adapt to new information, and always aim to improve. As displeased as Kuukpik was with many aspects of the CD1 gas leak, it is only fair to acknowledge that ConocoPhillips seems to have exhaustively studied the event, learned from it, and intends to use that information at Willow (even though the risk of similar occurrence there is even lower than it was at CD1).[11]

We point this out because the Willow FSEIS contains a host of potential mitigation measures regarding air quality and monitoring. Kuukpik supports common sense mitigation measures, just as we have for many years. But we also believe mitigation measures should be based on science and a realistic assessment of risks. Some proposed mitigation measures that would demand things like absolute real time reporting, or automatic consequences for certain

---

[9] See 2023 FSEIS, Vol. 11B, specifically at pp. 1-13 to 1-15; 2-87 to 2-93; Chapter 3 (multiple models for impacts in Nuiqsut); 3-12 to 3-18; 5-1 ("The air concentrations modeled in the DEIS due to all cumulative sources were below applicable air quality thresholds. The modeled air concentrations due to Project sources alone were well below the ambient air quality standards anywhere in the modeling domain and the cumulative concentrations are primarily due to other regional sources rather than Project emissions."); 5-3 to 5-6 (showing even in worst case scenario (Alt. B) air quality is well below applicable thresholds); and 5-30 to 5-31.

[10] 2023 FSEIS, Vol. 1, p. 429.

[11] *Id.*: "All studies indicate the absence of shallow hydrocarbon intervals in the Willow MDP area. Regardless, because of the shallower depth, all of the planned Willow MDP wells would necessarily be fully cemented across the C10 interval, something that was not done for the WD-03 Alpine well. This would further reduce the already very low risk of a shallow-gas leak as a result of Willow MDP well drilling."

pre-defined events, may simply not be possible to implement and wouldn't necessarily be justified even if they were. Moreover, much of this information is already available online from the Alaska Department of Environmental Conservation in either near real-time or as close as reasonable practicable.[12] Kuukpik regularly monitors this information and encourages people who are truly interested in that data to do so as well. If, in the future, air quality is shown to have deteriorated, Kuukpik will be the first to call for immediate action. However, as things currently stand, Kuukpik encourages the Department to focus on mitigation measures that are reasonable and provide sufficient data to achieve the long-term goal of ensuring that Nuiqsut's air quality remains within healthy standards, as it is now.

### 3. Road access issues

Finally, Kuukpik is concerned that proposed mitigation measures related to gravel and ice road access could inadvertently create conflicts with Kuukpik as a landowner. Certain proposals would require Conoco to allow various people or entities to use ice and gravel roads associated with Willow.[13] But many of the roads that these mitigation measures might apply to are located on Kuukpik-owned private property. So while Kuukpik does not necessarily oppose the goals underlying these proposals, a requirement that ConocoPhillips provide access to third parties is more complicated than it may seem at first glance. ConocoPhillips may not even have the legal authority to grant the kind of access to third parties that these mitigation measures seem to contemplate. Kuukpik therefore asks that, if these mitigation measures are carried forward at all, they be written in a way that acknowledges that any use of roads, ice roads, or snow trails is subject to the permission and approval of any affected private landowners.

Having said that, we want to remind stakeholders and decision makers that Kuukpik has already secured commitments from ConocoPhillips that Nuiqsut residents and Kuukpik shareholders will be allowed to access and use <u>all</u> roads associated with Alternative E. The ability to use that network of gravel and ice roads for subsistence, recreation, or for employment at the Project provides a significant benefit to help offset impacts. Even if Nuiqsut residents do not routinely drive all the way out to the Willow Project or its farthest flung drill sites, the community will ultimately benefit from the combination of open road access, numerous subsistence ramps, and multiple boat ramps to access hard to reach rivers.

### III. Kuukpik supports strong compensatory mitigation measures.

Despite Kuukpik's support for Alternative E, we understand that Willow will impact Nuiqsut and other North Slope communities. Alternative E reduces the likelihood of extreme

---

[12] https://dec.alaska.gov/air/air-monitoring/alaska-air-quality-real-time-data.

[13] *Id.,* Vol. 16, p. 47, 49-50, numbers 55 (Table I.4.1) and 5 and 13 (Table I.5.1).

negative impacts, but it won't eliminate impacts entirely. Kuukpik therefore supports additional mitigation measures to offset unavoidable impacts.

Kuukpik has focused on three main compensatory mitigation concepts: (i) long-term, durable protections for Teshekpuk Lake and nearby critical caribou habitat; (ii) establishing cooperative management for caribou near Nuiqsut; and (iii) fostering and supporting new economic opportunities for local residents. Kuukpik's discussions with BLM on these proposals has been productive and resulted in proposed mitigation measures that Kuukpik supports.

### 1. Durable protections for Teshekpuk Lake

Because Willow will affect the Teshekpuk Lake Caribou Herd (TLCH) more than any other subsistence resource, Kuukpik strongly supports BLM's proposal to "develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Lake Caribou Herd to fully offset impacts of the Project on that Herd…."[14] Successfully implementing this mitigation measure will virtually eliminate the risk of further development in the most important caribou habitat areas—areas that will become even more important after Willow is constructed.

For clarity, we offer two recommendations. First, we ask that the ROD clearly state that "durable and long-term protection" means something more than administrative restrictions against leasing or surface activities (such as those included in recent IAPs). Our discussions with BLM have focused on legal or contractual instruments, such as preservation leasing,[15] conservation easements,[16] or some other bi-lateral (or multi-lateral) agreement that cannot be

---

[14] *Id.,* Vol. 1, p. 286: "BLM will develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the Project on that Herd, to include protecting the surface area of Teshekpuk Lake, a buffer along all shores of the lake, and the LS K-10 Caribou Movement Corridors/K-16 Deferral Areas (under Alternative E in the 2020 National Petroleum Reserve in Alaska Integrated Activity Plan Final Environmental Impact Statement) using existing statutory, management, or administrative authorities, with a focus on restricting future leasing or surface development in those areas." We particularly appreciate the stated goal of "fully" offsetting Willow's impacts.

[15] All of these concepts involve compensatory mitigation that would permit a third-party, on behalf of the permittee, to manage surface activities in the NPRA for preservation in order to offset impacts of the permitted activities elsewhere in NPRA. Preservation leasing, for example, is a concept Kuukpik has described for years in which CPAI or a designee, as a condition of developing resources elsewhere, would enter into a surface lease for an area to be protected. The lease would limit allowable activities on the land for the life of the Willow Project to ensure "protection of environmental, fish and wildlife, and historical or scenic values." 43 C.F.R. § 2361.1(e)(1); NPRA-PA, Sec. 103(b) (42 USC 6503); *see also* 42 USC 6506a(b) ("Activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A].")

[16] We urge BLM not to discount its authority to create non-perpetual conservation easements. 2023 FSEIS, Vol. 8, Appx. B.5, p. 135. BLM presumably believes that 42 USC 6502's prohibition against "disposition" of land in the NPR-A under public land laws precludes creation of conservation easements. But that is not necessarily true.

terminated during the life of the Willow Project, but Kuukpik is open to all options that will achieve long-term protection.

Second, the general reference to the "buffer" should be clarified to help all stakeholders understand that this is a mitigation measure that everyone should be able to support. Conservation and subsistence-minded stakeholders should be assured that a sufficiently large area will be protected, while development-oriented stakeholders should be able to accept restrictions that are justified and not excessive. Kuukpik suggests an area that includes the Lake itself, the K-10/K-16 areas, and a "buffer" of about one township in each direction (depicted on Attachment 2 to this letter). Although the ROD need not be that specific, clarifying the size of the referenced "buffer" should allow stakeholders on all sides to support this proposal.

## 2. Alaska Eskimo Caribou Commission

Kuukpik strongly supports the formation of a local caribou commission to engage in cooperative management near Nuiqsut and Teshekpuk Lake.[17] Kuukpik previously described some of the benefits of local caribou management, and we appreciate that BLM sees the value of this approach as well.[18] Our only concern with the language of this proposed mitigation measure is that limiting the geographic scope to "the Teshekpuk Lake Special Area" may be too definitive or narrow for this early stage of the process. Kuukpik agrees that cooperative management

---

"Disposition" is not defined in the NPRA-PA or FLPMA, meaning the Secretary has broad authority to interpret the word. Moreover, conservation easements are not commonly created under "public land laws," but rather are creatures of state statute. The Secretary could therefore lawfully conclude that creating a non-perpetual conservation easement is not a "disposition" of land under public land laws because a conservation easement does not convey title, ownership, or a possessory interest in the land. It is merely a use restriction, not a "disposal." Such a use restriction is also consistent with BLM's statutory authority to "limit, restrict, or prohibit use of and access to lands within the Reserve" and the Secretary's responsibility over "activities related to the protection of environmental, fish and wildlife, and historical or scenic values." 43 C.F.R. § 2361.1(e)(1); NPRA-PA Sec. 103(b) (42 USC 6503). We hope the ROD will acknowledge that BLM may have more flexibility here than the Final SEIS currently suggests.

[17] 2023 FSEIS, Vol. 8, p. 134: "BLM will engage in cooperative management with local entities of caribou habitat in the Teshekpuk Lake Special Area to ensure the impacts to the herd are identified and minimized. That cooperative management will include local Tribal and governmental entities along with any organization subsequently established for a purpose that includes the cooperative management of the Teshekpuk Caribou Herd. BLM is committed to consulting with other federal agencies and Tribal entities regarding the formation of such a cooperative management organization for caribou, which could include representatives of pertinent communities and organizations in the North Slope of Alaska, including those near the Teshekpuk Lake Special Area."

[18] See Kuukpik's August 29, 2022 letter, pp. 15-16. An added benefit of the Caribou Commission is that it may be able to facilitate and implement long-term protection of Teshekpuk Lake by serving as a lessee, caretaker, or easement holder if the mitigation measure discussed above is implemented. Thus, long-term land protection and a Caribou Commission would provide additive and cumulative benefits to each other, making them even more valuable. Moreover, the Caribou Commission could assist with and be responsible for many other mitigation measures described in the FSEIS, such as Numbers 21, 22, 23, 27, 34, 37, 45, 48, and 52 (Table I.4.1).

should focus on areas around Nuiqsut and Teshekpuk Lake, but it's not yet clear whether that would include <u>only</u> areas within the TLSA.  We recommend the mitigation measure not presuppose or limit the geographic scope, but instead, allow the scope to be determined when the cooperative management agreements are negotiated.  Kuukpik supports the proposed mitigation measure but suggests the final mitigation measure refer more generally to the TLCH and/or its most important habitat areas rather than the TLSA specifically.

### 3. Economic Development Opportunities

Kuukpik also supports mitigation measures that would expand economic opportunities for local residents, particularly small business and other opportunities that may be more consistent with Nuiqsut and Inupiat culture than oilfield work.  Despite common misconceptions, Nuiqsut lags behind much of the North Slope economically in many respects.[19]  Kuukpik has worked for decades to increase access to jobs for <u>all</u> North Slope residents (not just Nuiqsut residents or Kuukpik shareholders), with some success.  But not everyone wants to work in an oilfield.  Kuukpik therefore continues to look for ways to foster economic opportunities that don't depend on or involve the oil industry, and which will help build a new economy to sustain Nuiqsut long after the oil is gone.  As part of that effort, we support BLM's proposal to require ConocoPhillips to "materially support economic development workshops focused on identifying and developing small business ideas that are not dependent on the extraction industry."[20]

**CONCLUSION**

Alternative E is a significant improvement over the project ConocoPhillips put forward five years ago.  The Project has been changed extensively in response to stakeholder concerns.  The process to get to this point hasn't been easy.  Neither Kuukpik nor any other stakeholder achieved everything they wanted.  But ultimately, the process succeeded in reducing unnecessary impacts while still allowing the North Slope and its communities to benefit from the Project.  Kuukpik is under no illusions that this Project is without risk or impacts; but the changes to the Project and many of the proposed mitigation measures in the FSEIS sufficiently reduce them.  Kuukpik wants to see Willow move forward.

We urge you, Madam Secretary, to approve Alternative E with the mitigation measures and conditions identified in this letter and the technical attachment that we intend to send to BLM Alaska staff this week.  We look forward to continuing to work with you to ensure that this Project succeeds and that Nuiqsut remains a thriving community for generations to come.

---

[19] See 2023 FSEIS, Vol. 1, p. 292, showing that Nuiqsut is currently experiencing higher unemployment rates, lower per capita wage income, and lower household wage income than most other NSB communities.

[20] *Id.*, Vol. 1, p. 296.

Sincerely,

KUUKPIK CORPORATION

By: /s/ Joe Nukapigak

Joe Nukapigak
President

cc: Kuukpik Board of Directors
U.S. Senator Lisa Murkowski, Alaska
U.S. Senator Dan Sullivan, Alaska
U.S. Representative Mary Peltola
Raina Thiele, Senior Advisor for Alaska Affairs and Strategic Priorities
Tommy Beaudreau, U.S. Deputy Secretary of the Interior
Tracy Stone-Manning, Director of Bureau of Land Management
Steve Cohn, Alaska Director
Mayor Harry Brower Jr., North Slope Borough
Rex Rock Sr., President and CEO, Arctic Slope Regional Corporation

# INDEPENDENT EVALUATION OF AMBIENT AIR QUALITY IN THE VILLAGE OF NUIQSUT, ALASKA





*ALASKA NATIVE TRIBAL HEALTH CONSORTIUM*

*DIVISION OF ENVIRONMENTAL HEALTH AND ENGINEERING*

*ENVIRONMENTAL HEALTH CONSULTATION*

*ANCHORAGE, ALASKA*

Prepared for the Native Village of Nuiqsut

By

Alaska Native Tribal Health Consortium

Department of Environmental Health and Engineering

Environmental Health Support

# Contents

EXECUTIVE SUMMARY ................................................................................................................. 5

INTRODUCTION .......................................................................................................................... 6

METHODS ................................................................................................................................... 9

RESULTS and DISCUSSION ........................................................................................................ 12

RECOMMENDATIONS ............................................................................................................... 32

CONCLUSION: ........................................................................................................................... 33

WORKS CITED ........................................................................................................................... 35

APPENDIX 1 .............................................................................................................................. 37

APPENDIX 2 .............................................................................................................................. 43

APPENDIX 3 .............................................................................................................................. 45

APPENDIX 4 .............................................................................................................................. 47

# List of Tables and Figures

Table 1. ANTHC VOC sample collection locations detecting VOCs in the air. .............................. 14

Table 2. ANTHC VOCs detected in the air, no. of occurrences, and average concentrations. ..... 14

Table 3. ANTHC VOC sample concentrations compared to NIOSH and OSHA exposure limits. .. 15

Table 4. ANTHC-identified 10 highest VOC concentrations in the air. ....................................... 16

Table 5. ANTHC VOC sample concentrations for pollutants commonly associated with oil development and their respective concentrations and health implications. .............................. 17

Figure 1. Map of ANTHC VOC sample locations ......................................................................... 10

Figure 2. ConocoPhillips monitoring site's PM10 maximum 24-hour average compared to the EPA NAAQS .................................................................................................................................. 22

# EXECUTIVE SUMMARY

The North Slope of Alaska is home to Prudhoe Bay, the largest oil field in North America. The Alaska Native village of Nuiqsut is located 56 miles from Prudhoe Bay and 6 miles from the Alpine oil field. Oil has been extracted at this site since 2000. The oil industry funds and operates an air monitoring station in Nuiqsut. Data is collected by industry representatives and then shared with the community. Nuiqsut is an Inupiat Eskimo community of 424 people, many of whom follow a traditional subsistence lifestyle. Community members have expressed concerns about the nearby oil development and potential for air pollution and negative health effects. There has been no independent assessment of the impact of oil industry activities on the environment or health of Nuiqsut residents. As such, the Alaska Native Tribal Health Consortium (ANTHC) has partnered with the Native Village of Nuiqsut to achieve the following objectives:

- To determine levels of airborne pollution in and near the village.
- To identify major air pollution sources in the community.
- To determine residents' perceptions of air pollution hazards.

Data collection and analysis of this study included the following:

- *Industry air monitoring data:* We reviewed air monitoring data collected by industry at the Nuiqsut site between January 2008 and December 2010. Air monitoring at this site includes particulate matter ($PM_{10}$), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), ozone ($O_3$), and carbon monoxide.
- *ANTHC air samples:* We collected Volatile Organic Compound (VOC) samples as an indicator of air pollution. Over a one-year period, 45 VOC air samples were collected in stainless steel canisters at four locations around the perimeter of Nuiqsut. Samples were analyzed for a VOC profile consisting of 61 compounds.
- *Water samples:* Water samples were collected to assess the impact of air pollutants on water supplies. We collected 40 VOC samples from water bodies in and around Nuiqsut and near the oil platforms. Samples were analyzed for a VOC profile consisting of 62 compounds.
- *Key informant interviews:* We conducted semi-structured interviews with 11 community members during September 2010. Questions focused on residents' perceptions of air quality issues, sources, and potential solutions.
- *Community Air Quality Assessment:* In partnership with a local Tribal Air Quality Technician, we conducted a Community Air Quality Assessment in Nuiqsut during September 2010. The assessment characterized community-specific threats posed by seven common air pollution sources in rural Alaska.

## ANTHC Findings
- 28 of the 45 samples contained VOCs. Of the 28 samples that contained VOCs, none of the VOC concentrations exceeded the EPA, ATSDR, NIOSH, or OSHA standards and screening levels.
- VOCs specifically associated with crude oil development (BTEX) were non-detects or were found at very low concentrations. Concentrations found were not above EPA, NIOSH, and OSHA standards and screening levels.
- Three of the 40 water samples contained VOCs and of the three samples that contained VOCs,

5

- none of the VOC concentrations exceeded the ADEC water quality standards.
- Community concern over air pollution was prevalent. The most frequent air pollution source identified by key informants was oil and gas development.
- The ConocoPhillips Nuiqsut air monitoring site recorded three National Ambient Air Quality Standard (NAAQS) exceedances between 2008 and 2010. Two exceedances occurred in the summer of 2009 (one Particulate Matter 10 [PM10] and one Particulate Matter 2.5 [PM2.5]) and one in the summer of 2010 (PM 10).
- A discrepancy between the monitored air pollution data and air pollution perceptions in Nuiqsut.

*ANTHC Recommendations*
- *Pollution Mitigation.* Dust palliative application is recommended for the roads within the village and the roads immediately surrounding Nuiqsut. Additional mitigations, including the application of water prior to high wind events, are also recommended.
- *Further Studies.* Village resident perceptions, a determination of pollution's impacts on substance foods, an analysis of air pollution transport (modeling), further BTEX sampling and snow sampling will help to better understand and address the concerns of Nuiqsut.
- *Stakeholder communication.* ANTHC recommends that community meetings be conducted to educate the general public on air pollution, potential air pollution sources around Nuiqsut, and monitored air pollution concentrations.

## INTRODUCTION

In 2009, the Alaska Native Tribal Health Consortium (ANTHC) was contacted by the Alaska Native Village of Nuiqsut to request an independent evaluation of ambient air quality in the village of Nuiqsut, Alaska. ANTHC was asked to evaluate the levels of airborne pollution in and surrounding the village. This evaluation's purpose was to identify major air pollution sources in the community, assess residents' exposure to ambient (outdoor) air pollution, and identify any health risks associate with air pollution exposure.

Outdoor, or "ambient," air pollution can come from a range of sources. These sources may be man-made or occur naturally in the environment. The emissions from these sources can consist of many different chemical compounds. Exposure to air pollution is associated with numerous effects on human health, including pulmonary, cardiac, vascular, and neurological impairments. The health effects vary greatly from person to person. **High-risk groups** such as the elderly, infants, pregnant women, and sufferers from chronic heart and lung diseases are more susceptible to air pollution. Children are at greater risk because they are generally more active outdoors and their lungs are still developing. Exposure to air pollution can cause both acute (short-term) and chronic (long-term) health effects. **Acute effects** are usually immediate and often reversible when exposure to the pollutant ends. Some acute health effects include eye irritation, headaches, and nausea. **Chronic effects** are usually not immediate and tend not to be reversible when exposure to the pollutant ends. Some chronic health effects include decreased lung capacity and lung cancer resulting from long-term exposure to toxic air

# Kuukpik Proposed Caribou Habitat Mitigation Buffer

