TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

RICKEY D. TURNER, JR. (CO Bar No. 38353)
Senior Attorney
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1373
rickey.turner@usdoj.gov

PAUL A. TURCKE (ID Bar No. 4759)
Trial Attorney
Natural Resources Section
c/o U.S. Attorney's Office
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (202) 532-5994
paul.turcke@usdoj.gov

*Counsel for Defendants*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>BUREAU OF LAND MANAGEMENT, et al.,<br><br>       Defendants,<br>  and<br><br>CONOCOPHILLIPS ALASKA, INC., et al.,<br><br>       Intervenor-Defendants. | Case No. 3:23-cv-00058-SLG |

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

        Plaintiffs,

    v.

BUREAU OF LAND MANAGEMENT, et
al.,

        Defendants,
  and

CONOCOPHILLIPS ALASKA, INC., et al.,

        Intervenor-Defendants.

Case No. 3:23-cv-00061-SLG

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 2 of 46

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................. 2

    I.    Legal Background ................................................................................ 2

        A.    NPRPA ....................................................................................... 2

        B.    NEPA ......................................................................................... 4

        C.    ANILCA .................................................................................... 5

    II.    Factual and Procedural Background .................................................. 6

LEGAL STANDARDS ........................................................................................ 9

    I.    A Preliminary Injunction is an Extraordinary Remedy .................... 9

    II.    Administrative Procedure Act Review of Agency Action .......................... 10

ARGUMENT ..................................................................................................... 11

    I.    Plaintiffs Are Not Likely to Succeed on the Merits .................................... 11

        A.    BLM Considered a Reasonable Range of Alternatives .................. 12

            1.    BLM Appropriately Considered Plaintiffs' Alternative While Declining to Separately Evaluate It in Detail............ 13

            2.    BLM Considered a Reasonable Range of Alternatives ........ 19

        B.    BLM Robustly Analyzed Climate Change and Greenhouse Gas Emissions ........................................................................ 21

            1.    The FSEIS Took a Hard Look at GHG Emissions and Climate Impacts ...................................................... 21

            2.    BLM Addressed Liberty ...................................................... 23

            3.    Plaintiffs' Novel Downstream Emissions Argument Fails .................................................................................. 24

        C.    BLM's ANILCA Section 810 Analysis was Not Arbitrary or Capricious............................................................................. 27

II.    Plaintiffs Do Not Demonstrate Imminent, Irreparable Injury ..................... 32

III.   The Public Interest and Balance of Equities Favor Defendants ................. 36

CONCLUSION ............................................................................................. 37

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
Defs.' Mem. in Opp'n to Pls.' Mots. for Prelim. Inj.    ii

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 4 of 46

Page(s)

**Cases**

*Alaska Conservation Council v. U.S. Forest Serv.*,
443 F. Supp. 3d 995 (D. Alaska 2020) .................................................................. 5, 6, 27

*Alaska Env't Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) .......................................................................... 3, 13

*All. For The Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................................ 9

*All. for the Wild Rockies v. Pena*,
865 F.3d 1211 (9th Cir. 2017) .......................................................................... 11

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ............................................................................. 5

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ........................................................................... 32

*Center for Biological Diversity v. Bernhardt*,
("*Liberty*"), 982 F.3d 723 (9th Cir. 2020) ............................................................ 23, 24

*Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*,
399 F. Supp. 3d 888 (D. Alaska 2019) ................................................................ 25, 26

*City of Davis v. Coleman*,
521 F.2d 661 (9th Cir. 1975) ........................................................................... 26

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .......................................................................... 17

*ConocoPhillips Alaska, Inc. v. Alaska Oil and Gas Conserv. Comm'n*,
No. 3:22-cv-00121-SLG, 2023 WL 2403720 (D. Alaska Mar. 8, 2023) ........................ 4

*Conservation. Cong. v. U.S. Forest Serv.*,
720 F.3d 1048 (9th Cir. 2013) ........................................................................... 9

*Ctr for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ........................................................................... 21

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
No. 3:20-cv-00195-SLG, 2020 WL 6786899 (D. Alaska Nov. 18, 2020) ....................... 9

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......................................................................... 36

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ........................................................................ 36

*Earth Island Inst. v. Evans*,
    256 F. Supp. 2d 1064 (N.D. Cal. 2003) ...................................................... 10

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ..................................................................................... 36

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ..................................................................................... 10

*Friends of Animals v. Haaland*,
    997 F.3d 1010 (9th Cir. 2021) ...................................................................... 10

*Gwich'in Steering Comm. v. Bernhardt*,
    No.3:20-cv-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021) ............. 35

*Headwaters, Inc. v. BLM*,
    914 F.2d 1174 (9th Cir. 1990) ...................................................................... 13

*In re Big Thorne Project*,
    857 F.3d 968 (9th Cir. 2017) ........................................................................ 11

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ................................................................................. 5, 26

*Kunaknana v. Clark*,
    742 F.2d 1145 (9th Cir. 1984) ........................................................... 4, 27, 28

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
    42 F.3d 517 (9th Cir. 1994) .......................................................................... 21

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ...................................................................... 25

*Ltd., Inc. v. Robertson*,
    35 F.3d 1300 (9th Cir. 1993) ........................................................................ 13

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ..................................................................................... 31

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ....................................................................................... 9

*Montana Wilderness Ass'n v. Connell*,
    725 F.3d 988 (9th Cir. 2013) ........................................................................ 20

*Morongo Band of Mission Indians v. F.A.A.*,
    161 F.3d 569 (9th Cir. 1998) ................................................................. 13, 19

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.    iv

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 6 of 46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................. 11

*Nat. Res. Def. Council, Inc. v. EPA*,
   822 F.2d 104 (D.C. Cir. 1987) ............................................................................. 4

*Network v. U.S. Dep't of Commerce*,
   878 F.3d 725 (9th Cir. 2017) ............................................................................. 11

*Nw. Env't. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
   817 F. Supp. 2d 1290 (D. Or. 2011) ................................................................. 33

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
   117 F.3d 1520 (9th Cir. 1997) ........................................................................... 13

*Ocean Advoc. v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2005) ............................................................................. 26

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) ........................................................................... 10

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ......................................................................................... 4, 5

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
   516 F. Supp. 3d 943 (D. Alaska 2021) ........................................................ 2, 3, 8

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
   555 F. Supp. 3d 739 (D. Alaska 2021) ................. 2, 14, 18, 19, 23, 25, 26, 29

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
   Nos. 21-35085 and -35095, 2021 WL 4228689 (9th Cir. Feb. 13, 2021) .................... 35

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
   Nos. 3:20-cv-00290-SLG, 2021 WL 454280 (D. Alaska Feb. 6, 2021) ................. 2, 35

*W. Watersheds Proj. v. Bernhardt*,
   468 F. Supp. 3d 29 (D.D.C. 2020) ..................................................................... 34

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ......................................................................... 13, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................... 9, 10, 32

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................... 34

**Statutes**

16 U.S.C. § 3112(1) .................................................................................................... 5

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*        Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                              v

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 7 of 46

16 U.S.C. § 3120(a)(1)-(3) ............................................................... 6, 27

16 U.S.C. § 3120(b) ............................................................................ 29

42 U.S.C. § 4332(2)(C) ........................................................................ 4

42 U.S.C. § 6504(a) ............................................................................. 3

42 U.S.C. § 6506a(b) ........................................................................... 3

42 U.S.C. §§ 6501-6508 ...................................................................... 3

5 U.S.C. §§ 701-06 ............................................................................ 10

Pub. L. No. 96-514, 94 Stat. 2964 (1980) ......................................... 3

**Regulations**

40 C.F.R. § 1502.14(a) .................................................................. 12, 18

40 C.F.R. § 1502.9(c)(4) ...................................................................... 7

40 C.F.R. § 1506.13 ........................................................................... 12

43 C.F.R. § 3137.71(b)(1) ............................................................. 17, 18

43 Fed. Reg. 55,978 (Nov. 29, 1978) ............................................... 12

51 Fed. Reg. 15,618 (Apr. 25, 1986) ............................................... 12

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                              vi

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 8 of 46

## INTRODUCTION

These cases seek review of the U.S. Bureau of Land Management ("BLM") March 2023 Record of Decision ("ROD") for the Willow Master Development Plan that authorizes oil production on leases held by Defendant-Intervenor ConocoPhillips Alaska, Inc. ("ConocoPhillips") in the National Petroleum Reserve – Alaska ("NPR-A").

Willow does not come to this Court on a blank slate. The same Plaintiff groups succeeded on several claims challenging the October 2020 Willow Master Development Plan ROD ("2020 ROD") issued under the prior administration. But BLM's latest effort resolves the Court's earlier concerns and approves a substantially scaled-back plan for development that builds in protective stipulations for designated Special Areas where development cannot be avoided altogether, and is consistent with the statutory scheme and sound policy.

Plaintiffs remain dissatisfied and have repackaged some of their earlier claims or shifted to different ones in filing new lawsuits seeking to have Willow declared unlawful. The instant motions invoke the Naval Petroleum Reserves Production Act ("NPRPA"), the National Environmental Policy Act ("NEPA"), and the Alaska National Interest Lands Conservation Act ("ANILCA"), and ask this Court to preliminarily enjoin certain work on the project scheduled to occur in the remaining few weeks of this winter. But this second round of preliminary injunction motions should be denied because the challenged decision dutifully addresses the Court's August 2021 ruling and contains significant protections for the NPR-A's wildlife and natural resources and associated subsistence uses. BLM's latest solution to Willow is based in science and consistent with

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                      1

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 9 of 46

all legal requirements.

Moreover, Plaintiffs fail to establish irreparable injury that would support a preliminary injunction. They fail to connect their allegations of injury to the limited work that ConocoPhillips seeks to perform in the remaining winter season. Allowing the modest proposed work to proceed for the remaining few weeks will best preserve a possible future for Willow without risking irreparable injury.

## BACKGROUND

The Court is quite familiar with the NPR-A and Willow, which involves ConocoPhillips's proposed development of oil and gas leases issued to it between 1999 and 2017. *See Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.* ("*SILA I*")*,* 516 F. Supp. 3d 943 (D. Alaska 2021) (denying motions for preliminary injunction); *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.* ("*SILA II*")*,* Nos. 3:20-cv-00290-SLG and -00308-SLG, 2021 WL 454280 (D. Alaska Feb. 6, 2021) (granting limited injunction pending appeal); *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.* ("*SILA III*"), 555 F. Supp. 3d 739 (D. Alaska 2021) (granting motions for summary judgment). Defendants therefore summarize their efforts following remand of certain aspects of the 2020 ROD and the 2020 Environmental Impact Statement ("EIS") it relied upon, resulting in issuance of the January 2023 Final Supplemental Environmental Impact Statement ("FSEIS") and 2023 ROD.

### I.     Legal Background

A.     NPRPA

The 23.6 million acre NPR-A was originally established by executive order in

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                             2

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 10 of 46

1923 as the Naval Petroleum Reserve. *SILA I*, 516 F. Supp. 3d at 946. Congress through the 1976 NPRPA, 42 U.S.C. §§ 6501-6508, placed management authority with the Secretary of the Interior, and through a 1980 appropriations rider directed the Secretary "to conduct 'an expeditious program of competitive leasing of oil and gas in the' NPR-A." *SILA I*, 516 F. Supp. 3d at 946 (quoting Pub. L. No. 96-514, 94 Stat. 2964 (1980) (codified at 42 U.S.C. § 6506a(a)); *see also N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006). In a section entitled "administration of reserve," the NPRPA requires that exploration activities within certain designated areas of the Reserve provide "maximum protection" of surface values to the extent consistent with oil and gas exploration:

> Any *exploration* within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the *maximum protection of such surface values to the extent consistent with the requirements of this Act for the <u>exploration</u> of the reserve*.

42 U.S.C. § 6504(a) (emphasis added). In a separate section, the NPRPA, as amended, includes a similar standard, but affording broader agency discretion, articulating a duty to mitigate for "activities" beyond those covered in Section 6504:

> *Activities* undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions *as the Secretary deems necessary or appropriate* to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A].

42 U.S.C. § 6506a(b) (emphasis added).[1] These provisions exist within the broader

---

[1] Plaintiffs conflate these two statutory provisions and thus erroneously suggest that the "maximum protection" language for Special Areas applies to all "activities" when, in

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*      Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                              3

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 11 of 46

context of Congress's intent "to open the NPR-A to private leasing and exploration and production in order to increase domestic oil supply[.]" *ConocoPhillips Alaska, Inc. v. Alaska Oil and Gas Conserv. Comm'n*, No. 3:22-cv-00121-SLG, 2023 WL 2403720, at *9 (D. Alaska Mar. 8, 2023); *see also Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984).

B.    NEPA

NEPA establishes procedures for federal decision-making that significantly affects the human environment.  NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to members of the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To meet these dual purposes, NEPA requires that an agency prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).  NEPA imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987). "Other statutes may impose substantive environmental obligations on federal agencies,

---

fact, section 6504(a), enacted prior to the 1980 appropriations rider opening NPR-A to competitive leasing, only addresses exploration. *See* Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. 8, ECF No. 23-1 in No. 3:23-cv-00058-SLG ("SILA Br."); Pls.' Mot. for Prelim. Inj. 2-3, ECF No. 24 in No. 3:23-cv-00061-SLG ("CBD Br.").

but NEPA merely prohibits uninformed – rather than unwise – agency action."

*Robertson*, 490 U.S. at 351. "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

C.      ANILCA

ANILCA Title VIII addresses subsistence management and use, advancing a policy that "the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands[.]" 16 U.S.C. § 3112(1). ANILCA Section 810:

> imposes procedural requirements upon federal decisionmakers; pursuant to its terms, an agency proposing an action resulting in the "use, occupancy, or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs," the availability of other lands for the same purpose, and "other alternatives" that would reduce the impacts to subsistence uses.

*Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1015 (D. Alaska 2020) (quoting 16 U.S.C. § 3120(a)). As a threshold matter, described by Plaintiffs as "Tier-1," the agency must determine whether "the action 'would significantly restrict subsistence uses[.]'" *Id.* If so, before proceeding with the relevant "withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands," the agency conducts what Plaintiffs call "Tier-2," and must:

> provide notice to the affected communities, hold public hearings, and make three findings: "[T]hat (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the

minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions."

*Id*. (quoting 16 U.S.C. § 3120(a)(1)-(3)).

## II.    Factual and Procedural Background

The challenged agency actions here are reflected in, and supported by, BLM's

FSEIS.  *See* FSEIS ES-1 through ES-26.[2]  The ROD was signed on March 12, 2023.  *See*

ROD 25, 27, ECF No. 24-15 in No. 3:23-cv-00061-SLG.  The ROD describes the

background for Willow, starting with publication of the August 2020 Final

Environmental Impact Statement ("2020 EIS") and 2020 ROD.  *Id*. 1-2.  The ROD also

summarizes the deficiencies of the 2020 EIS identified in the Court's prior ruling:

In August 2021, the U.S. District Court for Alaska (District Court) vacated the [2020] ROD and remanded the matter to the BLM, finding that the BLM: 1) improperly excluded analysis of foreign greenhouse gas emissions, 2) improperly screened out alternatives from detailed analysis based on BLM's misunderstanding of leaseholders rights (i.e., that leases purportedly afforded the right to extract "all possible" oil and gas from each lease tract), and 3) failed to give due consideration to the requirement in the NPRPA to afford "maximum protection" to significant surface values in the Teshekpuk Lake Special Area (TLSA).

*Id*. 1.  BLM prepared a Supplemental EIS ("SEIS") to address these deficiencies, with the

assistance of multiple cooperating agencies including the North Slope Borough, Native

Village of Nuiqsut, City of Nuiqsut, Iñupiat Community of the Arctic Slope, and the U.S.

---

[2]    Defendants are filing as exhibits to this brief the relevant sections of the FSEIS and appendices, which are available and have been downloaded from the BLM ePlanning website at https://eplanning.blm.gov/eplanning-ui/project/109410/510 (last visited March 24, 2023).  Defendants cite to these materials using the FSEIS page numbers.  These citations and page ranges are further identified in the accompanying Table of Exhibits.

Environmental Protection Agency ("EPA").  *Id.*

Recognizing it to be "an integral part of the NEPA process," BLM sought out significant public involvement in its supplemental analysis, starting with publication of a Notice of Intent to prepare an SEIS and conduct scoping in February 2022.  *Id.* 13.[3] BLM published a Draft SEIS in July 2022, held numerous public meetings, and ultimately received a total of 218,931 submissions during the public comment period, including 4,440 unique comments.  *Id.* 14.

BLM and the cooperating agencies considered several new alternative concepts and ultimately analyzed five alternatives in detail in the SEIS, consisting of the required no-action alternative and four action alternatives, as well as three "sealift module delivery options" for delivery of construction modules that could be paired with any of the action alternatives.  *Id.* 7-8.  The ROD selects Alternative E, with modifications, and the Colville River Crossing module delivery option, explaining that this selection "would result in fewer overall environmental impacts – including impacts to important surface resources, subsistence uses and resources, and the climate – than the other action alternatives and module delivery options and therefore is considered by BLM to be the environmentally preferred alternative."  *Id.* 8-9.  "This alternative was developed by BLM and cooperating agencies to reduce impacts to surface resources, particularly in the TLSA, in response to the Alaska District Court's remand decision."  *Id.* 9.  The ROD further explains that the selected alternative "reflects careful consideration of the

---

[3]     Scoping is optional for a supplemental EIS.  *See* 40 C.F.R. § 1502.9(c)(4) (2019).

Secretary's statutory directive to provide maximum protection to significant surface values within the NPR-A (i.e., Special Areas)" by requiring "less surface infrastructure, primarily within the TLSA," resulting in reduced "impacts to wetlands and vegetation, hydrology, gravel resources, and wildlife" and diminishing "potential impediments to the movement of caribou and subsistence users." *Id.* These benefits largely occur because:

> As compared to the Proponent's proposed project (Alternative B in the Final Supplemental EIS – proposing five drill sites: BT1, BT2, BT3, BT4 and BT5), the project approved in this Decision (BT1, BT2 and BT3 approved; BT4 and BT5 disapproved) significantly reduces the footprint of project infrastructure and the level of construction and operational activities, both within and outside of the sensitive TLSA, and thereby substantially reduces impacts to a broad range of surface resources.

*Id.* 11; *compare* SEIS Fig. ES.2 and ROD Fig. 1 (maps).

BLM posted the ROD to its ePlanning website on March 13, 2023. On that day, the project proponent ConocoPhillips informed counsel for the parties that it intends, in the limited time remaining in the winter work season, to build ice roads to a gravel mine site, where it will extract gravel that will be used to extend a road from the existing Greater Mooses Tooth-2 road "up to 3.1 miles toward the future location" of Willow. Stipulated Mot. to Expedite and Set Schedule for Mots. for Prelim. Inj. ¶¶ 2-4, ECF No. 26 in No. 3:23-cv-00058-SLG; *see also SILA I*, 516 F. Supp. 3d at 947-48 (describing largely the same construction activities planned for late winter 2021 following issuance of the 2020 ROD). The SILA and CBD Plaintiffs thereafter filed their complaints on March 14 and 15, respectively, and on March 16 each filed motions for preliminary injunction seeking to enjoin ground disturbing activity until this Court can adjudicate the merits of these cases. Pursuant to the parties' stipulated schedule adopted by the Court,

Defendants file this combined response in opposition to the motions.

## LEGAL STANDARDS

### I.     A Preliminary Injunction is an Extraordinary Remedy.

A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conserv. Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)).  Alternatively, the Ninth Circuit has stated that "'serious questions going to the merits' [rather than a likelihood of success on the merits] and a hardship balance that tips sharply toward the plaintiff can support issuance of a preliminary injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).[4]  Under either test, the plaintiff must "establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction[,]" *id.* at 1131, and a deficiency in any one of the required elements precludes extraordinary relief.  *Winter*, 555 U.S. at 24; *see also Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-cv-00195-SLG, 2020 WL 6786899, at *4 (D. Alaska Nov. 18, 2020).  Because a "preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted), the party seeking such an injunction must

---

[4]     Defendants do not concede the validity of *Cottrell*'s reasoning that the Ninth Circuit's historical "sliding scale" test for issuing a preliminary injunction survives *Winter*.

make "a clear showing that [it] is entitled to such relief." *Winter,* 555 U.S. at 22.

## II.   Administrative Procedure Act Review of Agency Action.

Courts review agency decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06.[5]   In such review the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." *Id*. § 706(2).   Under the arbitrary and capricious standard, the scope of review is deferential and narrow, and the court is not to substitute its judgment for the agency's judgment. *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (the APA "does not allow the court to overturn an agency decision because it disagrees with the decision").   An agency must "articulate a satisfactory explanation for its action," and the Court will find an agency decision arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

---

[5]      Under the APA "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (internal citation omitted).   Defendants have not yet produced an administrative record and Plaintiffs have filed voluminous exhibits with their motions.   Defendants do not concede that all of these materials are properly before the Court.   Any consideration of the extra-record submissions, particularly declarations, should be limited to evaluating "the equitable and public interest considerations that plaintiffs must address in order to obtain preliminary injunctive relief." *Earth Island Inst. v. Evans*, 256 F. Supp. 2d 1064, 1078 n.16 (N.D. Cal. 2003).

agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Turtle Island Restor. Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 732-33 (9th Cir. 2017); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is "not the role of a reviewing court to weigh competing scientific analyses." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1221 (9th Cir. 2017) (citation omitted). The judgments of land management agencies, like BLM, "often require trade-offs among worthy objectives . . . Congress left such judgments to a politically responsive agency with relevant expertise." *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017).

## ARGUMENT

Plaintiffs fail to meet their burden in seeking preliminary injunctive relief. They do not raise serious questions on the merits, let alone show that they are likely to succeed. Nor have Plaintiffs shown a likelihood of irreparable injury given the transient and localized impacts associated with the modest scope of work that Plaintiffs seek to enjoin. Finally, the balance of harms and public interest favor withholding injunctive relief. Many North Slope residents and subsistence users, including some who opposed the 2020 ROD, now support the 2023 ROD, because it contains meaningful protections to avoid or otherwise mitigate impacts to the TLSA and subsistence uses and will provide a net benefit to their communities. For all of these reasons, the Court should deny the motions for preliminary injunction.

### I. Plaintiffs Are Not Likely to Succeed on the Merits

In their preliminary injunction motions Plaintiffs raise a subset of the broader

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.    11

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 19 of 46

array of claims in their complaints. None of these claims are likely to succeed or even raise serious questions.

A.     BLM Considered a Reasonable Range of Alternatives

Both Plaintiff groups lead with the argument that BLM has again violated NEPA by failing to consider a reasonable range of alternatives. *See* SILA Br. 7-14; CBD Br. 6-13. But these arguments distort the record and fail to credit BLM's attention to the Court's ruling. The 2023 FSEIS and ROD contain significant elements designed to avoid, reduce, or otherwise mitigate impacts to the TLSA and Plaintiffs are left to argue that BLM was required, as a matter of law, to evaluate their "no infrastructure in Special Areas" alternative in detail. NEPA imposes no such requirement.

NEPA's implementing regulations direct an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (2019).[6] Under this requirement, an agency's choice of alternatives is governed by a "rule of reason," under which it "need not consider an infinite range of alternatives, only reasonable or

---

[6]     The Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, the Council published a new rule, effective September 14, 2020, substantially revising some provisions in the 1978 regulations. Citations here are to the 2019 Code of Federal Regulations because the SEIS is a continuation of the NEPA process underlying the 2020 decision – it supplements the corresponding 2020 FEIS. The 2020 NEPA regulations provide that an agency may choose to apply either the 1978 or 2020 regulations to analyses begun prior to September 14, 2020. *See* 40 C.F.R. § 1506.13 (2020). Consistent with this provision, BLM determined that since the 2020 Willow Final EIS was developed under the 1978 regulations "the 2022 Supplemental EIS will comply with the 1978 CEQ regulations as they concern a reasonable range of alternatives." FSEIS Appx. D.1 at 1.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                                    12

feasible ones." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted). An agency's consideration of alternatives is governed by the "nature and scope of the proposed action." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) (citation omitted). NEPA does not require an agency to discuss "[a]lternatives that are unlikely to be implemented," *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993) (quotations omitted), alternatives that are "inconsistent with the [agency's] basic policy objectives," *see id.*, or "alternatives similar to alternatives actually considered[.]" *N. Alaska Envtl. Ctr.*, 457 F.3d at 978 (quotation and citation omitted). "Thus, an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990). The "touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) (citation and quotations omitted).

1.  *BLM Appropriately Considered Plaintiffs' Alternative While Declining to Separately Evaluate It in Detail*

Plaintiffs primarily argue that BLM repeated the flaw of the 2020 EIS by failing to evaluate an alternative in detail "that [would] avoid placing infrastructure within Special Areas[.]" SILA Br. 7; CBD Br. 7 ("Commenters requested that BLM consider an alternative that would prohibit infrastructure in the Teshekpuk Lake and Colville River Special Areas and eliminate construction of permanent roads"). According to Plaintiffs,

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                    13

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 21 of 46

BLM reverted to the same "faulty framework for screening alternatives" that "erroneously limited its authority" to consider Plaintiffs' desired alternative. SILA Br. 9; CBD Br. 6 (contending "BLM took essentially the same approach on remand and eliminated from consideration reasonable alternatives"). In fact, BLM rectified the flaw identified by the Court, made significant changes to what became the selected alternative to address Plaintiffs' concerns, provided a lengthy explanation of its formulation of the range of alternatives, and reasonably explained why, even though it considered Plaintiffs' proffered alternative, it declined to evaluate that alternative in detail.

Plaintiffs' arguments do not align with the Court's 2021 ruling. A key BLM error in the 2020 decision was the determination "that ConocoPhillips has the right 'to extract *all the oil and gas possible* within the leased areas[,]'" which had caused BLM to conclude that it was "*precluded* from considering alternatives concerning the configuration or location of the drill pads." *SILA III*, 555 F. Supp. 3d at 768 (emphasis added). In essence, BLM's 2020 position prevented it from considering drill site configurations different from those proposed by ConocoPhillips, since doing so might limit the ability to reach and potentially extract "all" the oil sought by the proponent. The Court found this interpretation – that "the lessee [has] the unfettered right to drill wherever it chooses [that] categorically preclude[s] BLM from considering alternative development scenarios" – was inconsistent with BLM's authority under the NPRPA and lease stipulations to mitigate adverse effects, and thus held that BLM's reliance on this rationale "to not examine other alternatives . . . was inadequate." *Id*. at 768-69.

In the 2023 FSEIS and ROD BLM addressed these mistaken assumptions. At the

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                    14

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 22 of 46

outset, this is most simply demonstrated by the fact that BLM did not approve

ConocoPhillips's proposal as presented, but instead approved a substantially scaled-back

version authorizing only three drilling pads and denied ConocoPhillips's request for a

fourth and fifth pad as well as several miles of associated road and pipeline segments.

*See* ROD 11.  BLM not only considered, but instituted, an array of protections for the

TLSA and elsewhere – the selected alternative "significantly reduces the footprint of

project infrastructure and the level of construction and operational activities, both within

and outside of the sensitive TLSA, and thereby substantially reduces impacts to a broad

range of surface resources."  *Id*.; *see also* ROD 9 ("Alternative E requires less surface

infrastructure, primarily within the TLSA, than would be required under Alternatives B,

C, or D due to the elimination of BT4 and its associated infrastructure").  Moreover, these

changes work in concert with broader lease stipulations adopted in the programmatic

2022 NPR-A Integrated Activity Plan ("IAP").  *See* ROD 2, Appx. A 1-5; FSEIS Appx.

I.1 1.[7]  These include specific measures to eliminate or reduce adverse effects within the

TLSA.  *See*, *e.g*., FSEIS Ch. 3.20 419 ("under BLM's 2022 NPR-A IAP/EIS ROD, BLM

selected Alternative A which prohibits new oil and gas leasing and new infrastructure

---

[7]      As the Court is aware, during a stay of litigation brought by some of the same
Plaintiff organizations challenging the 2020 IAP ROD, BLM issued the 2022 IAP ROD
"that selected an alternative nearly identical to the 2013 NPR-A IAP ROD."  FSEIS
Appx. I.1 1.  Many of the Plaintiff organizations supported the 2013 ROD and supported
its reinstitution through the 2022 ROD.  *See* Decl. of Benjamin Greuel ¶¶ 13-14 ("In
response to our litigation, the Biden administration decided to review the IAP/EIS and
ultimately reinstated the protections provided under the 2013 IAP").  This represents
another significant difference between the present challenge to the Willow 2023
decisions and litigation challenging the 2020 decisions.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                          15

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 23 of 46

associated with oil and gas development within the core calving area for the [Teshekpuk Caribou Herd], important insect relief habitat north of Teshekpuk Lake, and key migration corridors around Teshekpuk Lake"); *see also* FSEIS Appx. I.1 16 (LS K-9, requiring special project design elements and seasonally restricting various types of construction and operational activities in the Teshekpuk Lake Caribou Habitat Area). In the 2023 FSEIS and ROD, BLM not only recognized but also vigorously applied its authority to reduce infrastructure and otherwise mitigate impacts to resources and subsistence uses in Special Areas.

BLM considered an extensive range of alternative concepts in generating the final range of alternatives evaluated in detail. Appendix D.1 to the FSEIS consists of 266 pages discussing BLM's process of developing the 2023 alternatives. That discussion begins by noting BLM's "purposes of addressing NEPA deficiencies found by the District Court and to ensure compliance with applicable law." FSEIS Appx. D.1 1. BLM developed a modified "purpose and need" that specifically includes "providing maximum protection to significant surface resources within the NPR-A, consistent with BLM's statutory directives." *Id*. 6. BLM also "began the alternatives development process for the 2022 Supplemental EIS with a hard look at the NPR-A Special Areas, particularly the TLSA and [Colville River Special Area], and the protections outlined in both the 2020 NPR-A IAP and the 2022 NPR-A IAP." *Id*. 27. This included consideration of prior comments and updated information about the need for surface protections. *Id*. For example, BLM considered "drilling reach polygons" that reflect the ability to access subsurface resources from a distance "to evaluate whether, in BLM's expert opinion, an

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                   16

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 24 of 46

alternative concept met the Project's purpose and need and addressed the Court's instruction to provide maximum protection to important surface resources, particularly in NPR-A Special Areas." *Id*.

BLM and the cooperating agencies generated and considered an extensive list of alternative components, and reasonably explained why it ultimately included some components but declined to include others within the action alternatives analyzed in detail. *See generally id*. 32-57. Among the numerous new alternative components considered by BLM for the first time in the SEIS were alternative components number 36 and 44, which would reroute the Project's access road outside of the Colville River Special Area ("CRSA") (leaving no facilities in the Special Area), and prohibit all infrastructure in the TLSA, respectively. *See id*. 32. Together, these two alternative components would effectively prohibit all infrastructure in special areas, the very alternative that Plaintiffs argue BLM failed to consider. SILA Br. 7; CBD Br. 7-8.[8]

_____

[8] Plaintiffs contend that BLM was wrong to assume an NPR-A lease "confers a development guarantee," and to assume on that basis that it "could not limit ConocoPhillips' access to economically viable quantities of oil[.]" SILA Br. 10. Plaintiffs are incorrect. The Willow leases, issued between 1999 and 2017, are "non-NSO" leases; they contain stipulations that "authorize the government to impose reasonable conditions on drilling, construction, and other surface-disturbing activities . . . [but] they do not authorize the government to preclude such activities altogether." *See Conner v. Burford*, 836 F.2d 1521, 1524 (9th Cir. 1988), reprinted as amended at 848 F.2d 1441. ConocoPhillips therefore does possess development rights in its leases, subject to a certain level of reasonable regulation. Plaintiffs also conflate ConocoPhillips's lease rights with its development obligations, contending that BLM "erroneously limited its authority" by citing 43 C.F.R. § 3137.71(b)(1), *see* FSEIS Appx. B.5 27, as an additional basis for not evaluating Plaintiffs' alternative in detail. SILA Br. 9-10; CBD Br. 11. BLM makes no such claim. That provision speaks to ConocoPhillips's development obligations, not its lease rights, and requires, for the Willow development plan to be approved, that it "must describe the activities to fully

Since BLM avoided its 2020 error of categorically refusing to even consider Plaintiffs' alternative, the question in 2023 is whether BLM reasonably explained why it declined to evaluate a standalone "no infrastructure in Special Areas" alternative in detail.  The NEPA regulations require the agency, "for alternatives which were eliminated from detailed study, [to] *briefly* discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a) (2019) (emphasis added).  Plaintiffs' framing of this inquiry is misleading because it suggests that Plaintiffs provided a fully developed alternative that was rejected outright by BLM.  *See* SILA Br. 9-10; CBD Br. 9 (both emphasizing BLM's reference to considering whether an alternative would "strand an economically viable quantity of oil").  This oversimplifies and fails to properly credit BLM's analysis.  BLM reasonably considered eliminating all infrastructure from the TLSA in its process of screening alternative components.  *See* FSEIS Appx. B.5 Responses to Comments 29 (explaining that BLM "considered over 50 alternative concepts in developing the range of alternatives"), 30 ("BLM considered an alternative concept that eliminated all infrastructure" with the TLSA and CRSA).  And BLM did provide reasonable explanations for not carrying alternative components 36 and 44 forward for further analysis in a new action alternative.  *See* FSEIS Appx. D.1 36-37, 40 (§ 3.5.5.1, citing Figure D.3.3), 44 (§ 3.5.5.9, citing Figure D.3.9); *see also SILA III*, 555 F. Supp. 3d at 769 ("The Court agrees with ConocoPhillips that infrastructure is allowed, and indeed anticipated, within the TLSA").  Furthermore, BLM instituted numerous

develop the oil and gas field."  43 C.F.R. § 3137.71(b)(1).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                              18

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 26 of 46

protective measures in the TLSA and beyond. In these ways, BLM adequately considered and addressed Plaintiffs' "no infrastructure" comments in formulating alternatives – the record reflects "informed decision-making and informed public participation." *Morongo Band*, 161 F.3d at 575 (citation and quotations omitted).

BLM explained that it established Alternative E "to reduce impacts to surface resources, particularly in the TLSA, in response to the Alaska District Court's remand decision." ROD 9, ECF No. 24-15 in No. 3:23-cv-00061-SLG; *compare id.* ("the selected alternative is specifically designed to comply with two sections [§§ 6506a(b), 6504(a)] of the NPRPA") *with SILA III*, 555 F. Supp. 3d at 769 (relying on the same sections in noting BLM's authority to mitigate effects or impose conditions on activities). And Alternative E, as slightly modified in the ROD, reflects assertion of the statutory authority that the Court found BLM unlawfully failed to consider in 2020. Plaintiffs, therefore, are plainly mistaken when they accuse BLM of taking "essentially the same approach" to the analysis of alternatives that was rejected in litigation concerning the 2020 FEIS/ROD. CBD Br. 6; SILA Br. 9 ("BLM still erroneously limited its authority"). The Court should reject Plaintiffs' argument that BLM arbitrarily and capriciously failed to consider an alternative that would avoid any infrastructure in Special Areas.

## 2.    *BLM Considered a Reasonable Range of Alternatives*

The record squarely rebuts any suggestion that BLM failed to consider a sufficient number or range of action alternatives. Plaintiffs suggest that BLM should have considered additional action alternatives because "[t]he alternatives presented in the [FSEIS] are variants of the same project ConocoPhillips proposed, as in the prior EIS."

CBD Br. 8; SILA Br. 10-11 ("[a]ll action alternatives . . . presented only small variations on ConocoPhillips' proposed project"). Plaintiffs are incorrect.

There are meaningful variations between the action alternatives. *See* FSEIS 26-31 (Table 2.7.1 comparison of action alternatives). These differences include the number and total surface area of drill site gravel pads (ranging from 62.8 to 88.3 acres), infield pipelines (ranging from 30.2 to 47.0 miles), gravel roads (ranging from 27.2 to 37.4 miles), ice roads (ranging from 431.2 to 962.4 miles), and infrastructure in special areas (ranging in the TLSA from 61.2 acres/4.9 miles of pipeline to 179.6 acres/12.2 miles of pipeline). *See id*. Again, these variations, and the alternatives development process used to define them, clearly reflect informed decision-making and meaningful public involvement. More fundamentally, Plaintiffs overlook the fact that BLM considered a no-action alternative that would not have allowed any development. *See* FSEIS Exec. Summ. ES-4.

What Plaintiffs really argue is that BLM should have performed detailed analysis of additional, unspecified, variants somewhere between the no action alternative and the selected Alternative E. But where courts have considered similar arguments, they have rejected Plaintiffs' suggestions. *See*, *e.g.*, *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (rejecting argument that BLM was required to consider additional "mid-range alternative[s]"); *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871-72 (9th Cir. 2004) (reversing district court ruling finding range of alternatives to be inadequate, holding that "[t]he EIS was not required to consider more mid-range alternatives to comply with NEPA"); *Laguna Greenbelt, Inc. v. U.S. Dep't of*

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.           20

Case 3:23-cv-00058-SLG    Document 43    Filed 03/24/23    Page 28 of 46

*Transp.*, 42 F.3d 517, 524 (9th Cir. 1994) ("there is no minimum number of alternatives that must be discussed").

The 2023 FSEIS reflects a meaningful range of alternatives that was generated through an extensive process including cooperating agency and public involvement. Plaintiffs have failed to show that BLM's formulation of the range of alternatives was arbitrary and capricious.

> B.     BLM Robustly Analyzed Climate Change and Greenhouse Gas Emissions

The CBD Plaintiffs, but not SILA, present an argument on climate change and greenhouse gas ("GHG") emissions. *See* CBD Br. 13-17. More specifically, and although they could have raised the same claim in their earlier Willow lawsuit but did not, they now contend that Willow will "catalyze future oil development" and that BLM must analyze "the full climate impacts" of such future development according to the standards laid out in *Center for Biological Diversity v. Bernhardt* ("*Liberty*"), 982 F.3d 723 (9th Cir. 2020). CBD Br. 13. In fact, the 2023 FSEIS fully satisfies NEPA by providing a hard look at the potential GHG emissions and climate impacts associated with Willow, and further satisfies the requirements articulated in *Liberty* and this Court's 2021 ruling. Plaintiffs' effort at a novel second-bite argument on this topic is rebutted by the record and lacks a sound basis in law.

> 1.     The FSEIS Took a Hard Look at GHG Emissions and Climate Impacts

BLM took a hard look at GHG emissions and climate impacts in the 2023 FSEIS, and amply resolved the Court's concerns about the corresponding analysis in the 2020 EIS. Plaintiffs apparently do not contend otherwise, but a quick summary is appropriate

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                                21

and provides context for the new climate change argument that CBD Plaintiffs now attempt.

Chapter 3.2 of the FSEIS contains an entirely new discussion (reflected by highlighted text) acknowledging at the outset that "[c]limate change is a global phenomenon caused by the release of greenhouse gases (GHGs) into the atmosphere." FSEIS Ch. 3.2 at 36. This is followed by discussions of observed, *id*. 37-38, and projected, *id*. 38-39, climate trends in the Arctic and North Slope. Chapter 3.2.2 extensively discusses the effects of the Project on climate change. *Id*. 40-57. BLM also identified lease stipulations and required operating procedures "intended to mitigate climate change impacts from development activity." *Id*. 41.

The FSEIS explains that "[a]ll GHG emissions were quantified for $CO_2$ [carbon dioxide], $CH_4$ [methane], and $NO_2$ [nitrogen dioxide]." *Id*. 40. And it presents BLM's predicted climate effects of each of the alternatives, starting with quantified GHG emissions for the no action alternative using an energy substitution model. *Id*. 45-46. BLM then analyzed the "social cost of greenhouse gases" for each action alternative, first by presenting calculated direct and indirect GHG emissions per alternative, *id*. 49-51, and then translating this to social cost comparisons (in dollars) per alternative, *id*. 51-57. Appendix E.2A to the FSEIS is a technical report describing BLM's methodology and data used in performing this detailed analysis.

The FSEIS contains a state-of-the-art analysis of climate change, including a thorough examination of Willow's downstream GHG emissions. In providing cooperating agency feedback on a preliminary version of the FSEIS, EPA stated that "[i]t

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                      22

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 30 of 46

was helpful that the [preliminary] SEIS provided the stream of emissions of each GHG as well as the spreadsheets that showed how BLM calculated the SC-GHG for each alternative. This is the most transparent analysis EPA has seen to date." Pre-Final SEIS Comment Matrix EPA, dated Jan. 20, 2023, (filed as Exhibit 21 hereto). This state-of-the-art analysis more than satisfies NEPA's hard look requirement.

### 2. BLM Addressed Liberty

In the prior litigation the Court found that BLM's 2020 analysis was unlawful because it failed "to estimate foreign greenhouse gas emissions" caused by eventual production of oil from Willow, or failed to provide a reasonable explanation why producing such an estimate was not possible. *SILA III*, 555 F. Supp. 3d at 763-65. The Court therefore concluded that "BLM's greenhouse gas emissions analysis suffers from the same flaws the Ninth Circuit identified in *Liberty*." *Id*. at 765; *see also Liberty*, 982 F.3d at 737.

The 2023 FSEIS fills that gap; indeed producing this "analysis of foreign greenhouse gas emissions" was a primary purpose for developing the SEIS. FSEIS Exec. Summ. at ES-1. The FSEIS presented quantified predictions for multiple GHG emissions streams related to Willow for each action alternative. This analysis builds off of data from the Intergovernmental Panel of Climate Change Fourth Assessment Report showing total gross and net GHG emissions over the life of the project. *See* FSEIS 49, Table 3.2.6. Next, the FSEIS quantifies downstream combustion GHG emissions resulting from the predicted change in foreign oil consumption. *See id*., Table 3.2.7. BLM then provided quantified estimates of total GHG emissions addressing domestic and foreign

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*   Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.   23

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 31 of 46

impacts. FSEIS 50, Table 3.2.8. This discussion further addresses BLM's evaluation of the "climate test tool" developed and submitted in comments by Plaintiff Natural Resources Defense Council. *Id*.

BLM, in sum, amply addressed the Court's remand order concerning the proper application of *Liberty*, as evidenced by the fact that Plaintiffs no longer assert a claim challenging BLM's failure to quantify Willow's downstream GHG emissions or its consideration of GHG emissions from foreign markets.

### 3. *Plaintiffs' Novel Downstream Emissions Argument Fails*

Changing tack, Plaintiffs now argue for the first time that Willow will have "growth-inducing indirect effects" and that BLM was required to "disclose the downstream [GHG] consequences of that growth." CBD Br. 14-15. In particular, they point to "Greater or West Willow" as the most probable of "reasonably foreseeable future actions" that BLM failed to adequately address. *Id*. 14. This novel argument is flawed on many levels.

Plaintiffs seem to be arguing that BLM failed to adequately analyze potential future emissions from development of Greater Willow as an indirect or cumulative effect of Willow.[9] But any BLM NEPA obligations here focus on whether Greater Willow was a "reasonably foreseeable future action" when the FSEIS was prepared. *See Liberty*, 982 F.3d at 737 ("[t]he agency need consider only indirect effects that are 'reasonably

---

[9]    It is incumbent on Plaintiffs to articulate and apply the legal basis for their diffuse "downstream emissions from catalyzed projects" theory. Despite their failure to do so in their opening brief it is apparent that none of the plausible bases – i.e. indirect effects, cumulative effects, or connected actions – provides a sufficient basis for their claim.

foreseeable'") (quoting 40 C.F.R. § 1508.8(b) (2019)).  And "reasonably foreseeable"

"include[s] only proposed actions."  *Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th

Cir. 2005) (internal quotation marks and citation omitted).  The Ninth Circuit has

explained that the analysis of projects "not yet proposed" and that are "more remote in

time" is "both speculative and premature."  *Id*.  By contrast, "any future project, once

proposed, becomes more concrete and less speculative."  *Id*.

  Greater Willow is not a proposed action and thus does not meet the technical

definition of a reasonably foreseeable action; it "is an oil and gas discovery with two

exploration wells" in "areas [that] represent the general potential for future activity, but

there is no certainty as to whether, how, or when this discovery could be developed."

FSEIS Ch. 3.20 Cumulative Effects 403.  This Court has flatly rejected a similar

argument that some potential future action falling below the "proposed action" threshold

required an indirect or cumulative impacts analysis.  *See Chilkat Indian Vill. of Klukwan

v. Bureau of Land Mgmt.*, 399 F. Supp. 3d 888, 920 (D. Alaska 2019), *aff'd,* 825 F.

App'x 425 (9th Cir. 2020).

  Even if there were a duty to examine potential impacts from Greater Willow

(which BLM did), this new argument would fail because CBD Plaintiffs similarly

attempted to leverage Greater Willow in their challenge to the 2020 EIS and ROD.  And

this Court was not persuaded.  There, the CBD Plaintiffs argued that BLM failed to

adequately address the cumulative impacts of Greater Willow.  *SILA III*, 555 F. Supp. 3d

at 781.  But the Court noted the 2020 EIS discussed Greater Willow and found "that the

information's inclusion in the EIS is sufficient for the decision maker and the public to

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*  Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.      25

Case 3:23-cv-00058-SLG Document 43 Filed 03/24/23 Page 33 of 46

understand the potential scope and impacts of Greater Willow." *Id*. The same conclusion should follow here, especially because the current record – which includes both the 2020 FSEIS and the 2023 FSEIS – presents an even more thorough discussion of Greater Willow. *See* FSEIS Ch. 3.20 Cumulative Effects 408 (including West Willow in the discussion of reasonably foreseeable future actions considered for air quality). The FSEIS discloses the "[p]rojected cumulative GHG emissions from all of the cumulative sources described above and potential future development resulting from the BLM Coastal Plain Oil and Gas Leasing Program . . . and the NPR-A" and provides quantification of those projected cumulative emissions. *Id*. 405.

Finally, Plaintiffs' cited cases are readily distinguishable. *See* CBD Br. 15 (citing *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005), and *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975), for the proposition that "[i]t is well-settled that an agency must evaluate a project's growth-inducing effects"). Most fundamentally, the cases have no bearing here because the growth induced by the proposed actions at issue in those cases was deemed "reasonably foreseeable." By contrast, Greater Willow is not reasonably foreseeable for the reasons explained above, and this Court has found "inapposite" an attempt to extend *City of Davis* in the manner now attempted by CBD Plaintiffs. *See Vill. of Klukwan*, 399 F. Supp. 3d at 920 (distinguishing *City of Davis* and concluding that a NEPA document need not forecast impacts stemming from potential future actions that are not themselves proposed). Even putting that aside, however, the cases CBD Plaintiffs cite involve consideration of "growth-inducing effects" in the wholly different context of assessing whether the

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*   Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.   26

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 34 of 46

impacts of the proposed action at issue were *significant* and therefore rendered unlawful the agency's decision to prepare an Environmental Assessment rather than an EIS. Because BLM prepared an EIS here, the holdings of *Ocean Advocates* and *City of Davis* do not apply. For all of these reasons, CBD Plaintiffs have no likelihood of success on their new climate-related claim.

    C.    BLM's ANILCA Section 810 Analysis was Not Arbitrary or Capricious

SILA Plaintiffs contend that BLM violated ANILCA Section 810 by failing to adequately address its Tier-2 duties or include an alternative that would have fewer impacts on subsistence uses. *See* SILA Br. 15. However, this argument fares no better than Plaintiffs' NEPA argument and the record amply shows that BLM complied with Section 810.

It is relatively well settled that Section 810 establishes a two-step process, starting with Tier-1 in which the agency must determine whether "the action 'would significantly restrict subsistence uses[.]'" *Se. Alaska*, 443 F. Supp. 3d at 1015. If so, the agency proceeds to Tier-2, and must:

> provide notice to the affected communities, hold public hearings, and make three findings: "[T]hat (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions."

*Id.* (quoting 16 U.S.C. § 3120(a)(1)-(3)); *see also Kunaknana*, 742 F.2d at 1151. BLM's Section 810 analysis is reflected in FSEIS Appendix G, which starts with an overview of

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.    27

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 35 of 46

the Section 810 process, *id*. 1-3, and then provides a detailed discussion of subsistence impacts for every alternative and "the cumulative case," *see id*. 3-66. Appendix G presents BLM's determination that the action alternatives would significantly restrict subsistence uses and explains that the Tier-2 determinations will be made available in the ROD. *Id*. In turn, Appendix B of the ROD summarizes the Section 810 evaluation, and presents BLM's Tier-2 determinations specific to the alternative selected by the ROD. *See* ROD 16-17, ECF No. 24-15 in No. 3:23-cv-00061-SLG.[10]

Plaintiffs suggest they are making a Tier-1 argument, contending that "BLM's failure to evaluate alternatives to Willow that would minimize the use of public lands needed for subsistence purposes violated BLM's Tier-1 obligations." SILA Br. 19. But BLM documented its "Evaluation of Other Alternatives that Would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence Purposes" for each alternative. *See* FSEIS Appx. G 4, 27, 30, 32, 35. Additionally, the functional purpose of Tier-1 is to determine whether the proposed action crosses the "significantly restrict subsistence uses" threshold so as to necessitate further action under Tier-2. BLM made that affirmative finding here, stating that while all action alternatives are "not expected to result in a large reduction in the abundance (population level) of caribou or any other subsistence resource," the Project "may significantly restrict subsistence uses for the community of Nuiqsut due to a reduction in the availability of resources caused by

---

[10]     Again, Defendants' ROD citations are to the CBD Plaintiffs' "Exhibit 12," which is ECF No. 24-15 in No. 3:23-cv-00061-SLG. Appendix B to the ROD is found at pages 115-124 of that Exhibit.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                                28

Case 3:23-cv-00058-SLG     Document 43     Filed 03/24/23     Page 36 of 46

the alteration of their distribution and the limitation on subsistence user access to the area." ROD 16, ECF No. 24-15 in No. 3:23-cv-00061-SLG. Plaintiffs cite no authority that Tier-1 involves, let alone imposes, a requirement to "evaluate alternatives . . . that would minimize the use of public lands needed for subsistence purposes." SILA Br. 19.

The heart of Plaintiffs' argument seemingly addresses Tier-2, where they dispute the adequacy of BLM's findings on the "minimal amount of public lands" and "reasonable steps to minimize adverse impacts" prongs of the Tier-2 analysis. SILA Br. 19. They also raise a procedural challenge, asserting that the FSEIS "failed to include BLM's Tier-2 findings." *Id*. Both arguments fail.

Starting with the procedural argument, BLM plainly presented Tier-2 findings. *See* FSEIS Appx. G 3-66 (providing the Section 810 evaluations and findings for all alternatives, module delivery options, and the cumulative case); *see also* 66 (stating that Tier-2 findings will be made available in the ROD); ROD Appx. B, ECF No. 24-15 in No. 3:23-cv-00061-SLG at 119-22. ANILCA's text indicates that where an EIS is required it shall "provide the notice and hearing and include the findings required by subsection (a)" but this language does not address, let alone prescribe, the manner of presenting the "determin[ations]" under subsection (a)(3). *See* 16 U.S.C. § 3120(b); *cf. SILA III*, 555 F. Supp. 3d at 781 (noting that "'[i]t is not for this court to tell [BLM] what specific evidence to include, nor how specifically to present it' so long as the evidence in the record is sufficient to support the agency's conclusion"). Regardless, to the extent Tier-2 determinations (separate from the findings) were somehow required to be published in the FSEIS itself, any failure to do so here would be harmless error. There is

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                              29

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 37 of 46

no dispute that BLM made the required Tier-2 determinations as a part of the SEIS

process, included as a prominent part of the ROD.  A final EIS is not typically subject to

a public comment period and ANILCA does not contemplate a process for public

comment on Section 810 Tier-2 findings or determinations.  Thus, even if there were

procedural error here, the NEPA/ANILCA dual purposes were served as the

determinations still informed BLM's decision and the interested public's opportunity to

participate in the decision-making process remained unchanged.

Plaintiffs' challenge to the substance of the Tier-2 findings is also easily rejected.

BLM addressed the first inquiry under Tier-2, explaining that significant restriction of

subsistence use is necessary.  *See* ROD Appx. B 1-2.  BLM stated that Alternative E, as

modified and approved in the ROD, "best fulfills the purpose and need of the proposed

action while also incorporating protective measures and Project features to reduce

impacts to important subsistence uses and resources."  *Id*. 2.  BLM further explained

"that the significant restrictions that may occur under Alternative E as modified and

approved in this Decision . . . are necessary and consistent with sound management

principles for the use of these public lands and BLM's obligations as established under

the statutory directives in the [NPRPA] . . . and other applicable laws."  *Id*.

Similarly, BLM reasonably explained how Alternative E "will involve the

minimal amount of public lands necessary to accomplish the purpose of such use,

occupancy, or other disposition" under Section 810.  ROD Appx. B 2-3.  While

Alternative A "would involve the least amount of public lands, it would not accomplish

the purpose and need of the proposed action."  *Id*. 2.  Alternative E, as modified and

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                        30

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 38 of 46

selected in the ROD, involves fewer public lands and less infrastructure "than any of the other action alternatives" and would also include beneficial design features such as construction "of up to three boat ramps for subsistence uses." *Id*. 2-3.

Finally, BLM appropriately addressed its Tier-2 duty to take "reasonable steps . . . to minimize adverse impacts upon subsistence uses." *Id*. 3-4. Again, BLM made substantial changes to address these considerations, as reflected in the 2022 IAP ROD and FSEIS Alternative E, described *supra* and summarized in ROD Appendix B. *Id*. Plaintiffs disagree, but offer nothing that surmounts their burden of showing that BLM's approach or conclusions were arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 361 (1989) (recognizing that a reviewing court "must defer to the informed discretion of the responsible agency"). For example, Plaintiffs attempt to downplay BLM's steps to mitigate impacts on resources and subsistence uses by claiming that "BLM admitted the benefits to subsistence users from doing that would be 'minimal.'" SILA Br. 16 (quoting FSEIS Appx. G at 34), ECF No. 23-14 in No. 3:23-cv-00058-SLG). And in their footnote, they characterize the record as "explaining that Alternative E would impact subsistence use areas in the TLSA for 67% of Nuiqsut harvesters, versus 73% under Alternative B." SILA Br. 16 n.82. But closer reading reveals that they cite only a discussion of *direct* impacts. BLM explained that the benefit of TLSA design features and stipulations is primarily "a lessening of *indirect* impacts (e.g. impacts related to resource availability resulting from deflection of caribou.)" FSEIS Appx. G at 34 (emphasis added); *see also id*. ("Alternative E would reduce infrastructure within the TLSA by 43% and move infrastructure (including roads, pipelines, and the nearest drill

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*       Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                          31

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 39 of 46

site) farther from high-density calving areas and mosquito-relief habitat"). Properly

understood, the FSEIS explains that the difference between Alternative E and B when

such indirect impacts are taken into account is much more significant than Plaintiffs

portray. *See* FSEIS 34 (explaining that a key "difference" would be that Alternative E's

reduction of infrastructure in the TLSA "could lessen the frequency or severity of

deflection of caribou migrating toward Nuiqsut subsistence harvesting areas").

In sum, BLM performed all procedures required under ANILCA Section 810 and

its conclusions are reasonable and supported by the FSEIS and ROD. Plaintiffs have

neither raised serious questions nor shown a likelihood of succeeding on their Section

810 claims.

## II.  Plaintiffs Do Not Demonstrate Imminent, Irreparable Injury

To obtain a preliminary injunction, Plaintiffs must show a "likelihood of

irreparable injury." *Winter*, 555 U.S. at 21. Plaintiffs bear the burden of

"*demonstrat[ing]* immediate threatened injury[,]" and mere "[s]peculative injury does not

constitute irreparable injury sufficient to warrant granting a preliminary injunction."

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in

original) (citations omitted). Plaintiffs do not meet their burden of demonstrating a

likelihood of irreparable injury.

A primary flaw in Plaintiffs' argument is their failure to connect their allegations

of irreparable injury to the limited work that ConocoPhillips seeks to perform in the

remaining winter season. *See* SILA Br. 21-22. This flaw is made more apparent by

Plaintiffs' declarations. Insofar as the declarations are provided to establish standing,

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                                 32

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 40 of 46

they largely present background on the various Plaintiff organizations and their long-term advocacy against any oil and gas development on the North Slope. *See*, *e.g.*, Greuel Decl. ¶¶ 10-19 (describing Wilderness Society's efforts to be "heavily involved" in all NPR-A projects); Decl. of Kristen Miller ¶ 9, ECF No. 23-8 in No. 3:23-cv-00058-SLG (describing advocacy of Alaska Wilderness League against NPR-A processes since at least 2013). The declarations are substantially the same as those submitted in the prior litigation, or make clear that the declarants are broadly opposed not only to Willow, but to other oil and gas development in entirely different areas. *See* Decl. of Rosemary Ahtuangaruak ¶ 45, ECF No. 24-23 in No. 3:23-cv-00058-SLG ("I have raised [my concerns] in written and oral comments on the Willow Project, the revised IAP, and the Peregrine Project . . . and regarding the [Arctic Refuge Coastal Plain Oil and Gas Leasing Program]"); *see also* Decl. of Daniel Ritzman ¶ 29, ECF No. 24-24 in No. 3:23-cv-00061-SLG (describing experiences in TLSA and Arctic National Wildlife Refuge and testifying that "[i]f the Willow project and Peregrine [exploration] program continue to move forward, I would reconsider my plans to visit the [NPR-A]").

These generalized expressions of opposition are not persuasive evidence of imminent, irreparable injury. Even accepting Plaintiffs' generalized allegations that full development of Willow will have long-term impacts to wetlands, wildlife habitat and other NPR-A resources, it does not follow that the relatively modest work proposed to be completed this winter will cause irreparable injury to Plaintiffs. *See Nw. Env't. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1314-15 (D. Or. 2011) (finding plaintiffs failed to demonstrate irreparable harm to the environment where the project

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*  Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.  33

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 41 of 46

proponent's "extraction plan is much narrower in scope than generalized mining that may be authorized under the [Corps' permit] in the future," and plaintiffs "proffered no evidence of what effect [this] limited proposal will have, much less clear evidence of irreparable harm").

Plaintiffs mistakenly rely on the FSEIS impacts analysis to demonstrate imminent, irreparable injury. *See* SILA Br. 21-22; CBD Br. 18. Again, these discussions address impacts of the entire project. Moreover, an important purpose of an EIS is to provide a frank assessment of the potential adverse effects of the proposed action to provide full disclosure and promote informed public participation in the decision-making process. The agency's analysis of the full development in the FSEIS discussion of overall potential Project impacts is of limited value in determining whether this winter's particularized, minor aspects of the Project are likely to cause imminent, irreparable injury. Plaintiffs "must substantiate the claim that irreparable injury is likely to occur. Bare allegations of what is likely to occur are insufficient because the court must decide whether the harm will in fact occur." *W. Watersheds Proj. v. Bernhardt*, 468 F. Supp. 3d 29, 47 (D.D.C. 2020) (internal quotation marks omitted) (citing *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Additionally, the course of proceedings in the prior litigation is not necessarily predictive of the outcome here. Plaintiffs assert that "the Ninth Circuit previously found that SILA and their members 'will suffer irreparable harm in the absence of an injunction' from similar construction activities" at issue in February 2021. SILA Br. 21 (quoting *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.,* Nos. 21-35085

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.                                      34

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 42 of 46

and -35095, 2021 WL 4228689, at *2 (9th Cir. Feb. 13, 2021)).  However, the motions panel did not explain its conclusion, which was on a different record in any event.  And while this Court concluded that the planned 2021 gravel mining and road building was likely to result in irreparable injury, it did so largely based on what was essentially unrebutted testimony of Rosemary Ahtuangaruak that the gravel mine site itself was used as a caribou hunting and traditional use area.  *See* SILA II, 2021 WL 454280, at *3.  The Court will need to consider the record in the instant cases in deciding the pending motions and make an independent determination whether it supports a finding of irreparable injury sufficiently connected to the 2023 winter activities.

Finally, the CBD Plaintiffs further assert, as they have before, that denial of the preliminary injunction motions will "set in motion a bureaucratic steam roller that commits BLM to a particular outcome and may foreclose or diminish the prospect for an open-minded examination of alternatives down the road[.]"  *See* CBD Br. 21 (internal quotation marks and citations omitted).  This Court has correctly rejected this purported basis for a preliminary injunction before, noting the possibility "that the Court may have to make a complicated decision at a later time does not establish irreparable harm on behalf of Plaintiffs."  *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-00204-SLG, 2021 WL 46703, at *9 (D. Alaska Jan. 5, 2021).  And it seems likely these cases are poised for a similar procedural track as with the 2020 ROD, where the parties will seek a ruling on the merits in advance of next winter's work season.  Whether or not the proposed modest work proceeds this season will not interfere with the remedial options the Court might deem appropriate after reaching the merits.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*  Nos. 3:23-cv-00058; -61-SLG
Defs.' Mem. in Opp'n to Pls.' Mots. for Prelim. Inj.  35

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 43 of 46

Plaintiffs shoulder the burden of demonstrating a likelihood of suffering irreparable injury in order to obtain preliminary injunctive relief. They have failed to satisfy this burden, and this factor alone compels denial of Plaintiffs' motions.

## III.   The Public Interest and Balance of Equities Favor Defendants

Plaintiffs must finally prove that a preliminary injunction would serve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the analyses of the public interest and balance of equities merge, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). Absent the necessary showing on the first two elements a court "need not dwell on the final two factors" and, "when considered alongside the [movant's] failure to show irreparable harm, the final two factors do not weigh in favor of a stay." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778-79 (9th Cir. 2018).

Nonetheless, any public interest evaluation in this case should consider the ways that Willow is supported by, and will benefit, the North Slope communities and Alaska more generally. And these considerations are starkly different than they were in the 2021 litigation. *See*, *e.g.*, Aff. of Joe Nukapigak ¶¶ 10-14, ECF No. 35-1 in No. 3:23-cv-00058-SLG (describing benefits to subsistence use of roads constructed to support oil and gas development, and concluding that Alternative E as selected in the 2023 ROD "would reduce impacts from the Project, increase long-term benefits to local residents and Kuukpik shareholders, and . . . be supported by as many people in Nuiqsut as possible"). BLM has considered such views of local residents and concluded that there are strong public interests supporting the possibility of further progress on Willow that outweigh

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*   Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.   36

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 44 of 46

Plaintiffs' institutional opposition to any version of Willow.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny each of Plaintiffs' motions for temporary restraining order or preliminary injunction.

Respectfully submitted.

DATED:  March 24, 2023.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

RICKEY D. TURNER, JR., Senior Attorney
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1373
rickey.turner@usdoj.gov

*/s/ Paul A. Turcke*
PAUL A. TURCKE
Trial Attorney, Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
202-532-5994 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Counsel for Defendants*

Of Counsel:

MIKE GIERYIC
Office of the Regional Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, AK 99508
907-271-1420
mike.gieryic@sol.doi.gov

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.     37

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 45 of 46

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum contains 10,188 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4), which is within the limit requested in Defendants' Unopposed Motion to File Overlength Memorandum filed contemporaneously herewith. This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font.

*/s/ Paul A. Turcke*
Paul A. Turcke

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2023, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR PRELIM. INJ.     38

Case 3:23-cv-00058-SLG   Document 43   Filed 03/24/23   Page 46 of 46