Jonathan W. Katchen, ABA No. 0411111
William Crowther, ABA No. 2211097
HOLLAND & HART LLP
420 L Street, Suite 550
Anchorage, Alaska 99501
Telephone:    (907) 865-2600
Facsimile:    (907) 865-2680
jwkatchen@hollandhart.com
wrcrowther@hollandhart.com

*Attorneys for United States Senator Lisa Murkowski, Senator Dan Sullivan, Representative Mary Sattler Peltola, and the Alaska State Legislature*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN INUPIAT FOR A LIVING ARCTIC, et al., <br> Plaintiffs, <br> v. <br> BUREAU OF LAND MANAGEMENT, *et al.*, <br> Defendants, <br> and <br><br> CONOCOPHILLIPS ALASKA, INC., *et al.* <br> Intervenor-Defendants | No. 3:23-cv-00058-SLG |

**ALASKA CONGRESSIONAL DELEGATION'S AND ALASKA STATE LEGISLATURE'S *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS' AND INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 1

I.  THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY AGAINST AN INJUNCTION. ................................................................................. 3

   A.  The Broad Support for the Willow Project from Nearly All of Alaska's Elected Officials and Key Stakeholders Weighs Heavily Against an Injunction. ................. 4

   B.  The Enhanced Energy Security and National Security Provided by the Willow Project Weigh Heavily Against an Injunction. ........................................................... 8

   C.  The Willow Project's Socioeconomic Benefits Weigh Heavily Against an Injunction. ................................................................................................................. 10

CONCLUSION ....................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
 596 F.3d 1098 (9th Cir.2010) ...................................................................................................3

*California Co. v. Udall*,
 296 F.2d 384 (D.C. Cir. 1961) ..................................................................................................7

*ConocoPhillips Alaska, Inc v. Alaska Oil and Gas Conservation Commission*,
 2023 U.S. Dist. LEXIS 39110 (D. Alaska Mar. 8, 2023) .......................................................2, 9

*Lands Council v. McNair*,
 537 F.3d 981 (9th Cir. 2008) ....................................................................................................4

*Macdonald v. Univ. of Alaska*,
 2020 U.S. Dist. LEXIS 90125 (D. Alaska 2020) .....................................................................3

*N. Alaska Env't Ctr. v. Norton*,
 361 F. Supp. 2d 1069 (D. Alaska 2005) ................................................................................2, 9

*Nken v. Holder*,
 556 U.S. 418 (2009) ..................................................................................................................3

*Sawtooth Mt. Ranch LLC v. United States Forest Serv.*,
 2019 U.S. Dist. LEXIS 100378 (D. Idaho 2019) .....................................................................4

*Shell Offshore Inc. v. Greenpeace, Inc.*,
 864 F. Supp. 2d 839 (D. Alaska 2012) .....................................................................................3

*Sovereign Inupiat for a Living Arctic et al v. BLM, et al.*,
 516 F. Supp. 3d 943 (D. Alaska Feb. 2, 2021) .........................................................................9

*Sturgeon v. Frost* (*Sturgeon II*),
 139 S. Ct. 1066 (2019) ..............................................................................................................2

*W. Watersheds Project v. Salazar*,
 692 F.3d 921 (9th Cir. 2012) ................................................................................................3, 10

*Winter v. NRDC, Inc.*,
 555 U.S. 7, 24 (2008) ................................................................................................................4

*Wyoming v. United States DOI*,
 136 F. Supp. 3d 1317 (D. Wyo. 2015) ....................................................................................10

## STATUTES

42 U.S.C. § 6506a(k)(1)(A) ...................................................................................................9

42 U.S.C. § 6231(a) ...............................................................................................................8

43 U.S.C. § 1332(3) ...............................................................................................................8

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, preamble., 121 Stat. 1492, 1492 (2007)..................................................................................................8

Energy Policy Act of 2005, Pub. L. No. 109-58, § 961, 119 Stat. 594, 889 (2005) ..............8

Pub. L. 93–153, Title IV, §410, Nov. 16, 1973, 87 Stat. 594 ...............................................8

Pub. L. No. 96-514, 94 Stat. 2964 (1980) (codified at 42 U.S.C. § 6506a)..........................9

Trans-Alaska Pipeline Authorization Act of 1973, 43 U.S.C. § 1652 ..................................8

## OTHER AUTHORITIES

A. Sears, A. Lindholm & P. Christian, *ANILCA: A Perspective from Boots on the Ground. Alaska Park Science* 21(1), 2022..........................................................................3

David W. Kreutzer & Paige Lambermont, *The Environmental Quality Index: Environmental Quality Weighted Oil and Gas Production* (2023) ..........................................2

# INTRODUCTION

The Alaska Congressional Delegation and the Alaska State Legislature jointly file this brief because the injunction sought by Plaintiffs would do considerable harm to the public interest – including at the local, state, and national levels. After years of environmental review and litigation, it is time to let the Willow Project proceed.

# BACKGROUND

A unanimous Alaska Legislature[1] and the Alaska Congressional Delegation believe the Willow Project advances the public interest for four primary reasons. *First,* Alaska's economy would atrophy without responsible resource development.[2] *Second,* preventing this Project will deprive state and local governments of the revenue to provide essential services to Alaskans.[3] *Third*, energy development in the NPR-A strengthens national security and decreases dependence on foreign energy.[4] *Fourth,* if Willow is rejected, a

---

[1] Ex. A (Joint Resolution of the Legislature of the State of Alaska, H.J.R. Res. 6, 33rd Leg., 1st Sess. (Alaska 2023)).

[2] Final Supplemental Environmental Impact Statement (FSEIS), Vol. 1 at 294 ("Alaska's economy is also tied closely to the oil and gas industry. . . . For each job in Alaska's oil industry, there are 15 additional jobs in the Alaska economy connected to the industry. Given this, the oil industry is estimated to account for one-quarter of Alaska jobs and about one-half of the overall economy when the spending of state revenues from oil production is considered (McDowell Group 2020)").

[3] Ex. A at 2:6-9 (noting that the federal government has estimated that the "potential annual government revenue, including local, state, and federal taxes and royalties, of $730,000,000 to $4,750,000,000 from oil and gas development in the National Petroleum Reserve in Alaska"); FSEIS, Vol. 1 at 293-295.

[4] Ex. A at 3:16-20.

AMICUS BRIEF
*Sovereign Inupiat For a Living Arctic, et al. v. BLM, et al.* Case No. 3:23-cv-00058-SLG
Page 1 of 12

Case 3:23-cv-00058-SLG   Document 49-1   Filed 03/24/23   Page 5 of 16

majority of the hydrocarbons from the project will be sourced from foreign countries, many with weaker environmental standards.[5]

Broad bipartisan support for resource development is nothing new to Alaska. This support flows, in part, from three statutes, the Statehood Act, Alaska Native Claims Settlement Act (ANCSA), and Alaska National Interest Lands Conservation Act (ANILCA), where Congress expected that certain lands, like those designated here by Congress and the Secretary for oil development in the NPR-A,[6] would be managed to generate economic opportunities and revenue, while development would be precluded on other lands.[7] In these landmark statutes, Congress recognized that Alaska's socio-economic well-being, along with the viability of ANCs and state and local governments, depends in

---

[5]  *See* FSEIS, Vol. 11 at 23 ("52% of Willow's production under the Alternative B, C, D and E displaced oil that would have otherwise been imported via tankers or pipelines from foreign producers"); Ex. B (David W. Kreutzer & Paige Lambermont, *The Environmental Quality Index: Environmental Quality Weighted Oil and Gas Production*, 6-8 (2023) (ranking oil-producing countries by their environmental standard scores)).

[6]  *See ConocoPhillips Alaska, Inc v. Alaska Oil and Gas Conservation Commission*, 2023 U.S. Dist. LEXIS 39110 at *2-3 (D. Alaska Mar. 8, 2023) (citing *N. Alaska Env't Ctr. v. Norton,* 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005) (discussing how the National Petroleum Reserve Protection Act recognizes the NPR-A "as a potential source for oil and gas exploration and production while simultaneously assuring that environmental concerns would not be overlooked")).

[7]  *See, e.g., Sturgeon v. Frost* (*Sturgeon II*), 139 S. Ct. 1066, 1075-1076 (2019) (discussing the balance in ANILCA between "sufficient protection for the national interest in the scenic, natural, cultural and environmental values" and "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people"); FSEIS, Vol. 1 at 302 ("The desire to develop oil and gas resources on the North Slope was a major factor in passage of the ANCSA and creation of ANCSA Native corporations").

AMICUS BRIEF
*Sovereign Inupiat For a Living Arctic, et al. v. BLM, et al. Case No. 3:23-cv-00058-SLG*
Page 2 of 12

Case 3:23-cv-00058-SLG   Document 49-1   Filed 03/24/23   Page 6 of 16

large part on resource development. But mindful of the need to protect vital ecological and cultural values, Congress also placed many public lands in conservation units.[8] For their part, Plaintiffs ignore the policy choices made by Congress and seek judicial intervention to mandate that lands designated by Congress for resource development be instead managed as a *de facto* conservation unit.

## ARGUMENT

### I. THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY AGAINST AN INJUNCTION.

When the government is the opposing party to a preliminary injunction motion, it is appropriate for a court to jointly consider the balance of harms and public interest.[9] In undertaking the public interest inquiry, the district court "primarily addresses impact on non-parties rather than parties, and takes into consideration the public consequences in employing the extraordinary remedy of injunction."[10] The Ninth Circuit has upheld denials of injunctive relief where the public interest in allowing an energy project to continue

---

[8] A. Sears, A. Lindholm & P. Christian, *ANILCA: A Perspective from Boots on the Ground*. *Alaska Park Science* 21(1), 2022, at 35 (noting that 148 million acres of federal acreage in Alaska is designated for conservation).

[9] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[10] *Macdonald v. Univ. of Alaska*, 2020 U.S. Dist. LEXIS 90125 at *17 (D. Alaska 2020) (internal quotation marks omitted); *see also Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 853 (D. Alaska 2012) (the public interest analysis for the issuance of a preliminary injunction "requires us to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief") (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1114-15 (9th Cir.2010)).

outweighed the alleged environmental injury asserted by plaintiffs.[11] In the case of Willow it's clear—regardless of what Plaintiffs argue—that the public interest and balance of the equities tip so far in favor of the Defendants and the Intervenor-Defendants that a preliminary injunction is not warranted.

### A. The Broad Support for the Willow Project from Nearly All of Alaska's Elected Officials and Key Stakeholders Weighs Heavily Against an Injunction.

The Supreme Court has stated that courts should pay "particular regard for the public consequences" of an injunction.[12] Thus, the views of elected officials and key local stakeholders affected by the Willow Project should carry considerable weight.

Every statewide-elected official in Alaska supports the Willow Project.[13] The Alaska Legislature also voted *unanimously* on a joint resolution supporting the Project.[14]

---

[11] *See, e.g., W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (upholding a denial of a preliminary injunction where the district court properly weighed the environmental harm posed by the project against the possible damage to project funding, jobs, and the state and national renewable energy goals that would result from an injunction halting project construction, and concluded that the balance favored defendants); *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (upholding the lower court's determination that the public interest in reducing fire risk and aiding the local economy outweighed possible environmental harms in the context of a timber harvesting project).

[12] *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger* 456 U.S. at 312); *see Sawtooth Mt. Ranch LLC v. United States Forest Serv.*, 2019 U.S. Dist. LEXIS 100378 at *63-64 (D. Idaho 2019) (noting broad public support for a project in a denial of a preliminary injunction).

[13] *See* Ex. C (September 20, 2022 Letter from Senator Lisa Murkowski, Senator Dan Sullivan, and Representative Mary Sattler Peltola to Secretary of Interior Deb Haaland).

[14] Ex. A at 3:11-27.

Willow has also received nearly universal support from every government and entity affected by the Project on the North Slope.[15] In particular, one important regional group supporting the Willow Project is the Voice of the Arctic Iñupiat ("The Voice"), whose membership consists of 24 tribes, Alaska Native Corporations, local governments, and tribal nonprofits whose future relies on the development of the Willow Project.[16] Alaska State Representative Josiah Patkotak, who represents the entire North Slope area, explained that the Project "represents an opportunity, really, of a lifetime for the citizens of the state of Alaska and more directly to citizens of the North Slope."[17]

It is extremely rare that Alaska's elected officials throughout the state unanimously support anything. But the Willow Project is an exception that unites all state-wide elected officials. Alaska's elected officials and leaders, including those on the North Slope who will be most impacted by this Project, believe shutting down this Project is antithetical to the public interest.

---

[15]     Ex. A at 2:29-31, 3:1-2; Ex. D (Joint Statement of the Iñupiat Community of the Arctic Slope, North Slope Borough, and Arctic Slope Regional Corporation (Feb. 1, 2023)). This support includes the North Slope Borough, Iñupiat Community of the Arctic Slope ("ICAS"), the City of Wainwright, the City of Atqasuk, the City of Utqiagvik, the Arctic Slope Regional Corporation, and the Kuukpik Corporation. The Project also has the support of other prominent statewide Alaska Native organizations, including the Alaska Federation of Natives, the Alaska Native Village Corporation Association, and the ANCSA Regional Association.

[16]     https://voiceofthearcticinupiat.org/members/

[17]     Ex. E (March 1, 2023 Press Conference Transcript (remarks of State Representative Josiah Patkotak)).

The Willow Project also enjoys a remarkable and broad-based coalition of support from virtually every economic, business, and labor organization in Alaska and across the United States. This includes the Alaska branch of the American Federation of Labor and Congress of Industrial Organizations, the Associated General Contractors of Alaska, Laborer's International Union of North America, North America's Building Trades Union, the International Union of Operating Engineers.[18] These organizations in Alaska represent tens of thousands of Alaskans, and including national organizations, this support encompasses several millions of hardworking Americans.

On the other side of the ledger, the Mayor for the Village of Nuiqsut personally opposes Willow largely due to concerns about how the Project may impact subsistence. These concerns were extensively analyzed during repeated environmental reviews conducted by the Department of the Interior, and, as a result, the Project was modified.[19] As the Kuukpik Corporation noted, "we doubt there is any other resource development

---

[18]   *See, e.g.,* Ex. A at 3:3-7.

[19]   FSEIS, Vol. 1 at 2 (summarizing all the environmental reviews since the 1990s); *id.* at 286 (discussing compensatory mitigation measures that will provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the Project on that Herd); at 11-12, 25 (noting the creation of subsistence boat ramps); at 438-40 (Discussing mitigation measures); at 310-18 (discussing ROPs that minimize impacts); Ex. F (February 23, 2023 Letter from Kuukpik Corporation to Secretary of Interior Deb Haaland at 3 ("After years of discussion and changes to the Project, Kuukpik supports the Willow Project as described in Alternative E because it strikes an appropriate balance between the need to develop oil and gas resources and ensuring that Nuiqsut residents can continue to practice subsistence for generations to come."))

AMICUS BRIEF
*Sovereign Inupiat For a Living Arctic, et al. v. BLM, et al. Case No. 3:23-cv-00058-SLG*
Page 6 of 12

project that has changed so dramatically in response to local concerns while still maintaining economic viability."[20]

Others also oppose Willow due to concerns related to greenhouse gas emissions. What concerns over Willow's emission profile ignore is, first, the undisputed fact that America, and the world, will continue to rely on oil for decades to come – if this Project does not proceed, the nation will simply replace Willow's production with hydrocarbons from domestic and foreign producers.[21] And second, the FSEIS found that approval of the Willow Project would lead to a relatively negligible net CO2e increase of 69.395 million metric tons over a thirty-year duration, which equates to an annual net increase of about .0036 percent of the CO2e equivalent emissions emitted by the United States in 2021.[22]

---

[20] Ex. F at 3; *see also* Ex. D ("We know our lands and our communities better than anyone, and we know that resource development and our subsistence way of life are not mutually exclusive. Contrary to the coordinated attacks of outside activists, we are partnered with ConocoPhillips in the design of the Willow Project to protect our ancestral lands and local animal migratory routes, and we have diligently used all official channels with the Interior Department to communicate and advocate for this critical economic stimulus.").

[21] FSEIS, Vol. 1 at 45 (noting that, if the Willow project does not go forward, approximately 82% of the substitute energy will come from other sources of domestic or imported oil, with only .5% of the substitute energy being electricity from renewable sources).

[22] *Id.* at 49. *See* Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021, Environmental Protection Agency, available at shorturl.at/luOU0 (noting that "[i]n 2021, U.S. greenhouse gas emissions totaled 6,347.7 million metric tons of carbon dioxide equivalents").

AMICUS BRIEF
*Sovereign Inupiat For a Living Arctic, et al. v. BLM, et al. Case No. 3:23-cv-00058-SLG*
Page 7 of 12

Case 3:23-cv-00058-SLG    Document 49-1    Filed 03/24/23    Page 11 of 16

## B. The Enhanced Energy Security and National Security Provided by the Willow Project Weigh Heavily Against an Injunction.

Congress has repeatedly made clear the public has an important interest in safe and environmentally responsible oil and gas development on public lands.[23] Ensuring affordable energy has animated U.S. policy for decades.[24] For Alaska's North Slope, Congress declared in the Trans-Alaska Pipeline Authorization Act of 1973[25] "that the crude oil on the North Slope of Alaska is an important part of the Nation's oil resources, and that the benefits of such crude oil should be equitably shared, directly or indirectly, by all regions of the country."[26]

---

[23] *See, e.g., California Co. v. Udall*, 296 F.2d 384, 388, (D.C. Cir. 1961) ("The public does not benefit from resources that remain undeveloped, and the Secretary must administer the [Mineral Leasing Act] so as to provide some incentive for development."); Outer Continental Shelf Lands Act, 43 U.S.C. § 1332(3) ("the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs").

[24] *See, e.g.,* Energy Policy and Conservation Act, 42 U.S.C. § 6231(a); Energy Policy Act of 2005, Pub. L. No. 109-58, § 961, 119 Stat. 594, 889 (2005) ("The Secretary shall carry out . . . programs in fossil energy [and] take into consideration the following objectives . . . . (4) Decreasing the dependence of the United States on foreign energy supplies. (5) Improving United States energy security."); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, preamble., 121 Stat. 1492, 1492 (2007) (providing that the purpose of the Act is "To move the United States toward greater energy independence and security").

[25] 43 U.S.C. § 1652.

[26] Pub. L. 93–153, Title IV, §410, Nov. 16, 1973, 87 Stat. 594. (a) ("The purpose of this chapter is to insure that, because of the extensive governmental studies already made of this project and the national interest in early delivery of North Slope oil to domestic markets, the trans-Alaska oil pipeline be constructed promptly without further

Directly relevant to this suit, Congress amended the National Petroleum Reserves Production Act (NPRPA) [27] in 1980 to expressly authorize oil and gas leasing,[28] and put in place provisions designed to incentivize the leasing of lands within the NPR-A that the Secretary determines to be suitable for oil development.[29] Congress also included provisions to encourage the greatest ultimate recovery of oil or gas on these lands.[30] To this end, the BLM unitized the Willow leases in 2009 with the expectation that these lands

---

administrative or judicial delay or impediment. To accomplish this purpose it is the intent of the Congress to exercise its constitutional powers to the fullest extent in the authorizations and directions herein made and in limiting judicial review of the actions taken pursuant thereto.").

[27] The NPR-A was renamed and its management authority was transferred to the Secretary of the Interior in 1976 by the Naval Petroleum Reserves Production Act ("NPRPA"), 42 U.S.C. § 6501 et seq. *See ConocoPhillips Alaska, Inc v. Alaska Oil and Gas Conservation Commission*, 2023 U.S. Dist. LEXIS 39110 at *1-3 (D. Alaska Mar. 8, 2023).

[28] Pub. L. No. 96-514, 94 Stat. 2964 (1980) (codified at 42 U.S.C. § 6506a).

[29] *See* 42 U.S.C. § 6506a; *see generally N. Alaska Env't Ctr. v. Norton,* 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005). Under the authority granted to it in the NPRPA, the Biden Administration issued a ROD dictating that "approximately 11.8 million acres (52 percent) of the NPR-A's subsurface estate are available for oil and gas leasing. The remaining approximately 11 million acres (48 percent) of the NPRA, including the majority of lands within Special Areas and much of the coastal area of the NPR-A along the Beaufort Sea, are closed to oil and gas leasing under this plan in order to protect and conserve important surface resources and uses in these areas." 2022 IAP ROD at 1.

[30] 42 U.S.C. § 6506a(k)(1)(A) ("To encourage the greatest ultimate recovery of oil or gas or in the interest of conservation, the Secretary may waive, suspend, or reduce the rental fees or minimum royalty, or reduce the royalty on an entire leasehold (including on any lease operated pursuant to a unit agreement), whenever . . . in the judgment of the Secretary it is necessary to do so to promote development, or whenever in the judgment of the Secretary the leases cannot be successfully operated under the terms provided therein."); *see generally Sovereign Inupiat for a Living Arctic et al v. BLM, et al.,* 516 F. Supp. 3d 943, 946 (D. Alaska Feb. 2, 2021).

AMICUS BRIEF
*Sovereign Inupiat For a Living Arctic, et al. v. BLM, et al. Case No. 3:23-cv-00058-SLG*
Page 9 of 12

would be brought into production.[31] As the Secretary found, "by making these lands available for leasing, the decision adopted in this ROD fulfills BLM's responsibility under the NPRPA to manage NPR-A to conduct oil and gas leasing *and development*."[32]

If Plaintiffs ultimately prevail, however, Congressional objectives in advancing energy security would be stymied because the nation would be forced to import a majority of the oil that Willow would have provided.[33] This outcome is contrary to the public interest.[34]

### C. The Willow Project's Socioeconomic Benefits Weigh Heavily Against an Injunction.

Aiding the local economy and preventing job loss are valid public interest concerns. It is uncontested that an injunction would kill many Alaskan jobs and deprive Alaskans of direct and indirect economic benefits associated with imminent development activities. But more importantly, the Willow Project will generate up to $17 billion over the life of the

---

[31] Bear Tooth Unit Agreement, Agreement No: AA-091675, BLM (2009).

[32] 2022 IAP ROD at 9 (emphasis added).

[33] FSEIS, Vol 1. at 45.

[34] *See, e.g., Wyoming v. United States DOI*, 136 F. Supp. 3d 1317, 1349-50 (D. Wyo. 2015) ("the generation of revenue and employment from mineral development projects serves the public interest"); *W. Watersheds Project* 692 F.3d at 923 (affirming the denial of a preliminary injunction for a renewable project because it advanced California's policy goals and energy security).

AMICUS BRIEF
*Sovereign Inupiat For a Living Arctic, et al. v. BLM, et al. Case No. 3:23-cv-00058-SLG*
Page 10 of 12

Case 3:23-cv-00058-SLG   Document 49-1   Filed 03/24/23   Page 14 of 16

Project with up to $10 billion going to state and local governments and foster wide ranging socio-economic benefits.[35]

Plaintiffs simply have no answer for how Alaska, the North Slope Borough, ANCs, and the nation are expected to replace the economic opportunities, energy security, and revenue that will be generated by this Project. Nor can they reconcile how stripping Alaska Natives of the autonomy and economic self-determination promised to them in ANCSA and ANILCA is consistent with the public interest.

## CONCLUSION

For the foregoing reasons, the Court must deny the Plaintiffs' motion for an injunction.

DATED at Anchorage, Alaska this 24th day of March, 2023.

> HOLLAND & HART LLP
> Attorneys for United States Senator Lisa Murkowski, Senator Dan Sullivan, Representative Mary Sattler Peltola, and the Alaska State Legislature
>
> By: */s/ Jonathan W. Katchen*
> Jonathan W. Katchen, AK Bar No. 0411111
> William R. Crowther, AK Bar No. 2211097
> 420 L Street, Suite 550
> Anchorage, AK 99501
> Phone: (907) 865-2600
> Facsimile: (907) 865-2680
> Email: jwkatchen@hollandhart.com
> wrcrowther@hollandhart.com

---

[35] FSEIS, Vol. 1 at 298; *see also id*. at 293-94 (detailing how the North Slope Borough receives nearly all revenue for government services from oil development).

# CERTIFICATE OF SERVICE

I hereby certify on March 24, 2023, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification and electronic service of the same to all counsel of record.

HOLLAND & HART LLP

*/s/ Jonathan W. Katchen*

AMICUS BRIEF
*Sovereign Inupiat For a Living Arctic, et al. v. BLM, et al. Case No. 3:23-cv-00058-SLG*
Page 12 of 12

Case 3:23-cv-00058-SLG   Document 49-1   Filed 03/24/23   Page 16 of 16