Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al*., | Case No. 3:23-cv-00058-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendants. | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION
(Fed. R. Civ. P. 65)
[EXPEDITED RULING REQUESTED BY APRIL 3, 2023]**

<u>INTRODUCTION</u>

In arguing against Plaintiffs Sovereign Iñupiat for a Living Arctic's (SILA) requested injunction, Federal Defendants (collectively, BLM) offer justifications that are conclusory, largely belied by the agency's own record, and misunderstand the Bureau of Land Management's (BLM) legal authority and statutory mandates under the National Petroleum Reserve-Alaska (Reserve) and Alaska National Interest Lands Conservation Act (ANILCA). SILA meets the test for injunctive relief.

<u>ARGUMENT</u>

**I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

Plaintiffs are likely to succeed and raised serious questions on the merits.[1] BLM's, Intervenor-Defendants', and amicis' arguments do not refute the fact that BLM again developed its alternatives and made its decision approving the Willow Master Development Plan (Willow) under the same unlawful interpretation of its authority and improper view of ConocoPhillips Alaska, Inc.'s (ConocoPhillips) lease rights. This error violates NEPA, the Naval Petroleum Reserves Production Act (NPRPA), and ANILCA.

---

[1] Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj. at 8–21, ECF No. 23-1 [hereinafter SILA Mem.]. Citations to exhibits previously attached to SILA's memorandum are "SILA Mem. Ex. ##" and begins numbering its reply exhibits at "13," such that its exhibits are consecutive.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 1

### A. BLM Failed to Consider a Reasonable Range of Alternatives and Arbitrarily Limited Its Statutory Authority.

Defendants' attempts to differentiate BLM's current decision and alternatives development process from its prior, unlawful environmental impact statement (EIS) process are unavailing. The record demonstrates BLM again approved Willow without considering a reasonable range of alternatives as required by the National Environmental Policy Act (NEPA) and consistent with BLM's mandate to protect surface resources under the NPRPA. The decision to adopt Alternative E does not save the agency's faulty analysis.

#### 1. BLM's Alternatives Analysis and Screening Criteria Violate NEPA, the NPRPA, and the Court's Prior Order.

BLM and ConocoPhillips make much of the fact that BLM purported to evaluate a new range of alternatives in the supplemental EIS (SEIS) to comply with the District Court's order.[2] But BLM committed the same fundamental failure this Court previously identified: failing to consider more protective alternatives based on erroneous assumptions about the scope of ConocoPhillips' lease rights and BLM's statutory obligations.[3]

---

[2] Defs.' Mem. in Opp'n to Pls.' Mots. for Prelim. Inj at 22, ECF No. 43 [hereinafter Feds.]. ConocoPhillips Alaska, Inc.'s Opp. to Mots. for Prelim. Inj. at 19, ECF No. 48 [hereinafter CPAI].

[3] *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*SILA*), 555 F. Supp. 3d 739, 770 (D. Alaska 2021).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 2

BLM attempts to sidestep SILA's arguments regarding the agency's misinterpretation of its statutory authority and the Court's prior decision in a footnote, asserting that because ConocoPhillips holds leases, it possesses development rights and BLM cannot preclude development altogether.[4] This argument misses the point. The issue is not whether BLM can or should forbid all development in the Reserve or on ConocoPhillips' leases, or prohibit all infrastructure in the Teshekpuk Lake Special Area (TLSA). Rather, BLM improperly eliminated alternatives from consideration on the ground that it cannot strand an "economically viable quantity of recoverable oil," contrary to its other legal obligations.[5] BLM thus unlawfully constrained its analysis and failed to consider alternatives under NEPA consistent with its mandate to mitigate adverse effects on surface resources and provide maximum protection for Special Areas.[6]

---

[4] Feds. at 25 n.8; *see also id.* at 9 (noting BLM required mitigation in Special Areas where development "cannot be avoided altogether"). ConocoPhillips similarly argues BLM cannot forbid all development. CPAI at 25–26.

[5] SILA Mem. at 10–14. BLM does not explain the distinction between its previous unlawful elimination of alternatives based on ConocoPhillips' purported "right to extract all the oil and gas possible within the leased areas," *SILA*, 555 F. Supp. 3d at 768, and its present view that it cannot "strand an economically viable quantity of recoverable oil." Indeed, the draft SEIS intended the term "fully develop" to mean the same as not "strand[ing] an economically viable quantity of oil" and in the final SEIS, BLM stated it could only consider alternatives that allow "full field development." Ex. 20; Ex 13 at 4.

[6] 42 U.S.C. § 6504(a). While the District Court previously observed that infrastructure is permissible in TLSA, these statements do not absolve BLM of the duty to consider alternatives that would provide maximum protection to Special Areas or comply with NEPA. *See* Feds. at 26; North Slope Defs.' Resp. in Opp'n to Mots. for Prelim. Inj. at 14, ECF No. 47 [hereinafter NSB]; CPAI at 24.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 3

Case 3:23-cv-00058-SLG    Document 63    Filed 03/28/23    Page 4 of 29

Defendants' assertion that BLM lacks authority to deny a development proposal is inconsistent with the plain language of the NPRPA and its implementing regulations, which allow BLM to restrict and prohibit activities on existing leases,[7] including by denying drilling permits.[8] It is also inconsistent with ConocoPhillips' leases, which do not override BLM's protective statutory mandates.[9] Defendants do not rebut SILA's arguments on this point, instead claiming BLM must allow some development. This attacks an argument that SILA did not make. Simply put, Defendants' assertion that they were legally required to permit some amount of development does not address BLM's failure to consider a reasonable range of alternatives.

The fact that there is an oil and gas program in the Reserve does not override NEPA's requirements or the NPRPA's protective mandates. The North Slope Borough's (Borough) argument that the protection of Special Areas is subservient to the oil and gas program ignores that the statute uses the mandatory term "shall" in the protection provision and applies that mandate broadly to all activities.[10] BLM failed to consider the full scope of its authority to restrict or prohibit activities to mitigate adverse effects on surface resources in developing alternatives, violating this mandate.[11] ConocoPhillips'

---

[7] 42 U.S.C. § 6506a(n)(2); 43 C.F.R. § 3135.2(a)(1), (3); *see id.* § 3162.3-1(h)(2); *see also* SILA Memo at 9.

[8] *Infra* nn.38–39.

[9] SILA Mem. at 14 n.65.

[10] NSB at 14; 42 U.S.C. § 6505a(b); *Portland Adventist Medical Ctr. v. Thompson*, 399 F.3d 1091, 1098 (9th Cir. 2005) (stating "shall" is mandatory).

[11] SILA Mem. at 9–15.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 4

similar argument misses the point; the problem is not that BLM considered generally what might be economically recoverable for purposes of the oil and gas program, but that BLM relied on that factor to eliminate more protective alternatives from consideration, despite its broad statutory obligations and authority.[12]

ConocoPhillips' argument that, unlike the prior EIS, BLM's current analysis considered "economically viable quantities of recoverable oil" as simply one factor in developing alternatives is belied by the record.[13] BLM's record demonstrates that at the outset of its NEPA process, the agency eliminated alternatives that would strand economically viable quantities of oil.[14] This Court previously rejected similar arguments, finding that "[w]hile BLM's asserted lack of authority may not have been the primary reason for refusing to consider certain alternatives, … it certainly appears to have been a significant reason."[15] BLM's assertions that it lacked authority to consider alternatives that would strand economically recoverable amounts of oil or disallow full-field development once again violate NEPA and the NPRPA. Merely asserting that it screened

---

[12] *See* CPAI at 25.

[13] *Id.*

[14] SILA Mem. Ex. 2 at 37–38, ECF No. 23-14 (rejecting alternatives placing infrastructure entirely outside TLSA or Fish Creek setback because doing so would strand an economically viable quantity of recoverable oil); *see also* SILA Mem. Ex. 10 at 5–6, ECF No. 23-22 (rejecting alternatives that would preclude full-field development).

[15] *SILA*, 555 F. Supp. 3d at 769.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 5

alternatives based on the Court's decision does not make it so. This conclusory assertion is contrary to the record and fails.[16]

Defendants' arguments that BLM was not obligated to consider alternatives unrelated to the project purpose also mischaracterize SILA's point.[17] BLM's purpose and need does not preclude the agency from considering alternatives that would shift infrastructure out of the TLSA or avoid placing infrastructure in sensitive ecosystems like the Fish Creek setback.[18] "NEPA requires an EIS to describe and analyze every reasonable alternative within the range dictated by the nature and scope of the proposal."[19] SILA argued that BLM failed to explain its determinations in the final SEIS that such alternatives would be outside the scope of BLM's stated purpose of allowing for

---

[16] Feds. at 21–22, 26; CPAI at 19–21; NSB at 14. Agency decisions must be supported by the record. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[17] Feds. at 20–21, 24; CPAI 21–22, 25; NSB at 12–13.

[18] SILA Mem. at 14. Defendants also argue that BLM's modification of its purpose and need statement to include language about providing maximum protection to the Reserve's surface resources consistent with statutory requirements demonstrates its range of alternatives was adequate. Feds. at 24; NSB 13; CPAI 21. This argument also fails because BLM still improperly screened alternatives based on the availability of recoverable oil even under the revised purpose and need.

[19] *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013) (quoting *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)) (internal quotation marks omitted).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                          Page 6

oil and gas development consistent with its mandates under the NPRPA.[20] Defendants do not address this argument.

Finally, BLM also attempts to defend its flawed interpretation limiting its authority by arguing that the mandate to provide "maximum protection" for Special Areas is limited to the exploration stage.[21] But this argument is contrary to the statute,[22] BLM's interpretation of that provision in the SEIS,[23] and the District Court's prior decision.[24] BLM also misunderstands SILA's argument regarding 43 C.F.R. § 3137.71(b)(1).[25] SILA agrees that this provision deals with ConocoPhillips' obligations and therefore does not limit BLM's authority to restrict or condition activities to protect surface resources.[26] Hence, BLM's reliance on it in the final SEIS to justify its decision to eliminate alternatives was improper.[27]

---

[20] SILA Mem. at 14; *see also W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 983 (D. Idaho 2021) (finding BLM failed to consider reasonable alternatives in part because development of oil and gas and protection of other values were not "mutually exclusive" or "contrary to the purpose and need").

[21] Feds. 11–12 & n.1.

[22] 42 U.S.C. § 6506a(n)(2) (making the maximum protection provisions applicable to both exploration and production).

[23] SILA Mem. Ex. 2 at 35.

[24] *SILA*, 555 F. Supp. 3d at 768–69.

[25] Feds. at 25 n.8.

[26] SILA Mem. at 10–11.

[27] SILA Mem. Ex. 3 at 3–4, ECF No. 23-15; SILA Mem. Ex. 2, at 33, 46–47 (explaining BLM could not evaluate alternatives which would preclude ConocoPhillips from "fully develop[ing]" reservoir).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                      Page 7

## 2. *Alternative E Does Not Redeem BLM's Flawed Analysis.*

Despite its reduced footprint, Alternative E and the elimination of the Bear Tooth (BT) 4 drillsite and disapproval of BT5 in the ROD does not redeem BLM's failure to consider a reasonable range of alternatives. BLM points to the purported environmental benefits of Alternative E as adopted in the ROD but fails to account for the fact that BLM's prior approval likewise authorized only three drill sites and deferred BT5.[28] As before, it does not follow that the agency de facto complied with its statutory mandates or considered a reasonable range of alternatives.[29] Even to the extent that BLM asserts in the ROD that Alternative E as adopted results in reduced impacts to wildlife, climate, and subsistence users and reduced impacts in TLSA,[30] that does not alter that BLM improperly limited its consideration to alternatives allowing for nearly full-field development of the Willow reservoir.[31] This limitation precluded BLM from considering alternatives that were meaningfully different from those analyzed in the final SEIS. And ConocoPhillips' post-ROD action voluntarily relinquishing some of its leases has no

---

[28] Feds. at 23; Ex. 14; SILA Mem. at 13.

[29] *SILA*, 555 F. Supp. 3d at 753.

[30] SILA Mem. Ex. 1 at 21, ECF No. 23-13; Feds. at 23–24; NSB at 15; CPAI at 24. SILA does not concede that Alternative E as adopted results in fewer impacts.

[31] SILA Mem. Ex. 10 at 6–7; SILA Mem. Ex. 2 at 31–32; *see also NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (agency improperly failed to consider alternatives that allocated less than 50% of roadless areas in planning area to land use designations allowing development); *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (rejecting alternative analysis where agency "uncritically assumes that a substantial portion of the [] areas should be developed and considers only those alternatives with that end result").

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                          Page 8

relevance to the legal question of whether BLM's alternatives analysis complied with applicable law.[32]

Despite Defendants' assertions, SILA did identify other reasonable alternatives that BLM failed to consider. Defendants mischaracterize SILA's argument as a limited complaint that BLM should have considered an alternative eliminating all infrastructure in TLSA.[33] Not so. SILA identified additional reasonable alternatives for BLM to carry forward for analysis, such as eliminating additional pads or further limiting greenhouse gas emissions,[34] but the agency refused to do so based on its flawed reading of its statutory authority.

Defendants cite cases for the proposition that SILA's suggested alternatives are outside NEPA's "rule of reason" or that that BLM was not required to consider an additional "middle ground" alternative because the existing range was adequate.[35] The cited cases are inapposite because SILA suggested reasonable alternatives consistent with the project's purpose and the NPRPA's requirements to mitigate impacts on surface

---

[32] CPAI at 23, 35. SILA does not concede that these post-decision documents are properly part of the administrative record.
[33] Feds. at 20, 28–29; CPAI at 24.
[34] Ex. 18 at 1–7 (comments suggesting alternatives).
[35] Feds. at 28–29; NSB at 13; CPAI at 23, 25.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 9

resources.[36] ConocoPhillips' reliance on *Kempthorne* is off-base.[37] There, the Ninth Circuit was determining whether BLM considered an adequate range of leasing alternatives at the Reserve's management plan stage and noted that BLM could not entirely forbid all oil and gas activities.[38] That holding is irrelevant to the present issue: that BLM should not have limited its consideration of alternatives to only those that would not strand an economically viable quantity of oil.[39] Moreover, the Court in *Kempthorne* recognized BLM's ability to accept, reject, or modify applications for future activities and assumed the agency could deny applications altogether.[40] BLM's argument

---

[36] *See, e.g.*, *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004–05 (9th Cir. 2013) (finding no NEPA violation from rejecting additional middle ground alternative where Plaintiff did not explain why another alternative would foster informed decision-making); *Alaska Survival*, 705 F.3d at1086–87  (holding range of alternatives reasonable where agency considered twelve action alternatives and proposed alternative was not technically feasible); *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 871–72 (9th Cir. 2004) (agency not required to consider additional middle ground alternatives that would not meet project purpose); *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1175, 1180–82 (9th Cir. 2000) (agency not required to consider alternatives limiting recreational use to historic levels where use had increased substantially, making lower use unrealistic); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994) (rejecting alternatives for consideration that were not "reasonable or obvious" because suggested alternatives would not meet purpose of reducing traffic congestion).

[37] CPAI at 23.

[38] *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 976–77 (9th Cir. 2006).

[39] BLM must include or provide conditions and restrictions on oil and gas activities and may prohibit activities to protect the Reserve's surface resources. 42 U.S.C. § 6506a(b). This includes activities on existing leases. 42 U.S.C. § 6506a(k)(2); *see also* 43 C.F.R. §§ 2361.1(a), (e)(1), 3162.3-1(h)(2).

[40] *Kempthorne*, 457 at 976–77.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 10

that the no action alternative provided "meaningful variations" to the alternatives

considered is belied by BLM's own statements that it could not select this alternative.[41]

Finally, BLM points to its screening and elimination process to argue it satisfied

its duty to consider reasonable alternatives and reasonably explained its decision not to

consider additional alternatives.[42] The fact that BLM provided some explanation for

rejecting reasonable alternatives does not make its substantive explanations legally

compliant.[43] Defendants point to BLM's consideration of multiple alternative components

to purportedly show they adequately considered a range of alternatives in the draft SEIS

prior to eliminating them, but that difference from what BLM previously did in 2020 is

immaterial.[44] BLM's error in 2020 was not "categorically refusing" or ignoring Plaintiffs'

suggested alternative.[45] It was that its explanation for rejecting alternatives was

unlawful.[46] While the agency may have provided a lengthier explanation now, because it

---

[41] Feds. at 28; SILA Mem. at 15 & nn.69–72; *see Rocky Mt. Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1186 (D. Utah 2020) (rejecting BLM's argument that considering an action and no action alternative and selecting a middle ground decision rendered its range of alternatives reasonable because "BLM's position confuses the power to act with the requirement to analyze").

[42] Feds. at 24–26.

[43] SILA Mem. 10–11.

[44] Feds. at 25–26; CPAI at 20, 22–23; NSB at 15.

[45] Feds. at 26; Ex. 15 at 1–2 (2020 final EIS alternatives appendix); *SILA*, 555 F. Supp. 3d at 758.

[46] *SILA*, 555 F. Supp. 3d at 770.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                      Page 11

offered similar substantive reasons for rejecting alternatives and failed to consider a reasonable range of alternatives, its conclusions are still arbitrary.[47]

## B.   BLM Violated ANILCA Section 810.

BLM failed to consider alternatives that would reduce impacts to subsistence users as required by ANILCA Section 810. Contrary to BLM's argument, SILA relied on ANILCA's plain language, which requires BLM to evaluate alternatives that minimize the use of public lands needed for subsistence.[48] ANILCA imposes specific requirements for agencies to evaluate "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes," in addition to evaluating the effects of a project and the availability of other lands.[49] The case law further reinforces that ANILCA requires consideration of alternatives, similar to but also distinct from NEPA's requirements.[50] Ultimately, the label of whether it is Tier 1 is irrelevant and does not negate the fact that the statute requires consideration of alternatives that would reduce or eliminate the use of public lands needed for subsistence.

---

[47] *See id.* at 764–65 (noting agency's longer explanation does not render the explanation legally compliant); 5 U.S.C. § 706(2)(A), (D).

[48] Feds. at 36–37; SILA Mem. at 16. Defendants' argument is also inconsistent with BLM's established practices. Although BLM's guidance for Section 810 analyses has expired, BLM treated its evaluation of alternatives as distinct from the Tier 2 findings required by Section 810(a)(3). Ex. 19 at 4.

[49] 16 U.S.C. § 3120(a).

[50] *See, e.g.*, *Tenakee Springs v. Clough*, 750 F. Supp. 1406, 1422 (D. Alaska 1990); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison* (*Alaska Wilderness*), 67 F.3d 723, 731 (9th Cir. 1995).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                          Page 12

And, under the plain language of Section 810, that analysis is distinct from the specific

findings agencies must make prior to making a decision that would significantly restrict

subsistence uses (i.e., Tier 2 findings).[51]

Defendants' arguments that the Tier 1 analysis was sufficient because BLM found

there may be significant restrictions to subsistence ignore that BLM is statutorily required

to analyze alternatives. And, that alternatives analysis is not per se satisfied if the agency

finds there may be significant restrictions to subsistence for those alternatives or limited

to those alternatives that result in a positive impacts finding.[52] This court recognized that

a core purpose of Section 810 is to ensure not only that impacts to subsistence are

adequately considered, but also that adverse effects are minimized.[53] Defendants'

arguments would eviscerate the statutory requirement to look at alternatives by seemingly

allowing agencies to concede a proposal would result in significant restrictions to

subsistence and move on to Tier 2. But this analysis is required independent of Tier 2,

and directly informs whether the agency at Tier 2 can make non-arbitrary findings that

impacts have been minimized.[54]

---

[51] *Compare* 16 U.S.C. § 3120(a), *with id.* § 3120(a)(3).

[52] 16 U.S.C. § 3120(a); Feds. at 36–37; CPAI at 33 & n.116; NSB at 18.

[53] *Se. Alaska Conservation Council v. U.S. Forest Serv.* (*SEACC I*), 443 F. Supp. 3d 995, 1017 (D. Alaska 2020).

[54] 5 U.S.C. § 706(2) (directing courts to set aside agency actions taken without observance of the procedures required by law); *cf. SEACC I*, 443 F. Supp. 3d at 1017 (indicating adequate information is needed to ensure Section 810's purposes are fulfilled).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 13

Here, BLM improperly limited the scope of its alternatives by relying on the erroneous assumption that it could not strand economically viable quantities of recoverable oil.[55] ConocoPhillips' dismissal of *Tenakee Springs v. Clough* ignores the core holding of that and other relevant cases: where an agency confines itself in how it interprets the scope of its authority under a statute or contract, and thereby limits its consideration of alternatives, it acts contrary to the substantive purpose of Section 810 to minimize impacts to subsistence.[56]

ConocoPhillips' and the Borough's reliance on *Kunaknana v. Clark* for the proposition that BLM's obligations under Section 810 are limited by the Reserve's oil and gas program is also misplaced.[57] While *Kunaknana* considered that question at the leasing stage, the court recognized the agency had the authority and obligation to protect subsistence at later stages as well.[58] Whether BLM is required to issue leases in the Reserve does not negate BLM's obligations to comply with Section 810 when making decisions for a site-specific development.[59] *Native Village of Nuiqsut v. BLM* (*NVN*), cited by ConocoPhillips, is also inapposite because that case involved preparation of only

_____

[55] SILA Mem. Ex. 2 at 36, 51.
[56] CPAI at 35–36; *Tenakee Springs*, 915 F.2d at 1311–12; *Alaska Wilderness*, 67 F.3d at 731.
[57] CPAI at 34; NSB at 20.
[58] 724 F.2d 1145, 1152 (9th Cir. 1984).
[59] 16 U.S.C. § 3120(a).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 14

Case 3:23-cv-00058-SLG   Document 63   Filed 03/28/23   Page 15 of 29

an environmental assessment and major impacts were not likely to occur to subsistence — unlike Willow's expected significant and permanent subsistence impacts.[60]

ConocoPhillips' and the Borough's reliance on *Amoco Production Co. v. Village of Gambell* is also misplaced because SILA is not arguing that all actions that would adversely affect subsistence are prohibited under Section 810.[61] Rather, SILA argues that BLM failed both procedurally and substantively to consider an adequate range of alternatives because it arbitrarily limited the scope of what it would consider, and as a result failed to ensure it adequately minimized impacts to subsistence — a substantive obligation under ANILCA.[62]

Given BLM arbitrarily limited the scope of alternatives under consideration, its findings under Tier 2 that Alternative E adequately incorporated protections to reduce impacts were arbitrary.[63] BLM's statements that its decision would involve the minimum amount of public lands necessary and includes reasonable steps to minimize adverse impacts to subsistence are unsubstantiated and not entitled to deference where BLM

---

[60] 432 F. Supp. 3d 1003 (D. Alaska 2020), *vacated as moot*, 432 F. Supp. 3d 1003 (9th Cir. 2020); CPAI at 34.

[61] 480 U.S. 531, 544 (1987), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); NSB at 17; CPAI at 34. The Borough's reliance on *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223 (9th Cir. 1999), is similarly misplaced because SILA is not arguing that subsistence impacts necessarily override all other uses and interests. NSB at 18–19.

[62] SILA Mem. at 19–20; *Amoco Prod. Co.*, 480 U.S. at 544 (recognizing Section 810 advances both procedural and substantive policies to preserve subsistence resources).

[63] Feds. at 38; NSB at 18.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                          Page 15

operated under the assumption it could not limit access to economically recoverable oil.[64] Had BLM not operated under that assumption, it could have considered other alternatives and measures to further minimize the impacts to subsistence.

Defendants' focus on Alternative E as reducing the deflection of caribou ignores that the agency still found Alternative E would only marginally reduce the impacts to subsistence users.[65] Their arguments also ignore that, even with the mitigation measures added to Alternative E, BLM still found there would be significant impacts to subsistence, regardless of whether those impacts were direct or indirect.[66] Indeed, while the final SEIS recognized Alternative E could reduce indirect impacts, it did not alter BLM's final findings that there would be significant impacts to subsistence and that those impacts were not meaningfully reduced by any alternatives.[67] The Borough focuses on the benefits of the reduced footprint of Alternative E as being sufficient for BLM to meet its obligations, but Section 810 is not just about the footprint of development — it also requires consideration of alternatives and measures to reduce the scope and intensity of an activity in a given area.[68]

Further, Defendants' contention that there are Tier 2 findings in the final SEIS is directly contradicted by the cited final SEIS page, which states the findings required by

---

[64] SILA Mem. at 17; Feds. at 38–39; NSB at 19–20.
[65] Feds. at 39–40; NSB at 18, 20; SILA Mem. at 18.
[66] SILA Mem. Ex. 1 at 119; SILA Mem. Ex. 2 at 43; Feds. at 39–40; NSB at 18, 20.
[67] SILA Mem. Ex. 1 at 119; SILA Mem. Ex. 2 at 43.
[68] NSB at 17–18; *NVN*, 432 F. Supp. 3d at 1045–46.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 16

Section 810(a)(3) "will be made available in the Willow [ROD]."[69] Contrary to

Defendants' assertions, Section 810(b) requires those findings be included in the EIS.[70]

The exclusion of those findings deprived the public of their opportunity to understand

and weigh in on those determinations in advance of a final decision.[71] The fact that there

was no formal comment period for the final SEIS is irrelevant, and ignores that the public

— including affected community members — weighed in heavily during that pivotal

period before the final decision.[72] Depriving the public of that key information prior to

the final decision was not harmless.

## II.   SILA DEMONSTRATED IT WILL SUFFER IRREPARABLE HARM FROM THIS WINTER'S ACTIVITIES.

Defendants are incorrect that SILA only alleged vague harm or unfounded worries

and, therefore, did not demonstrate it will suffer imminent, irreparable harm from this

winter's activities.[73] It is undisputed that ConocoPhillips has imminent plans to construct

the gravel mine and a gravel road this winter.[74] SILA demonstrated that ConocoPhillips'

plans to begin blasting, gravel mining, and road construction will cause permanent harm

---

[69] Feds. at 37; SILA Mem. Ex. 2 at 44.

[70] 16 U.S.C. § 3120(b); *see also SEACC I*, 443 F. Supp. 3d at 1015 (noting the requirement to include the 810 findings in the EIS); Feds. at 37; CPAI at 36.

[71] Feds. at 37–38; CPAI at 36.

[72] *See, e.g.*, SILA Mem. Ex. 5 (raising concerns about mitigation measures not being sufficient to protect the community); Ex. 16 (requesting additional tribal consultation).

[73] *See, e.g.*, Feds. at 40–42; CPAI at 38.

[74] CPAI at 17.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                     Page 17

to the Reserve and SILA's members and supporters.[75] Harm that is "permanent or at least of long duration" is irreparable.[76] Defendants assert that the Ninth Circuit's prior finding of irreparable harm is inapplicable but do not explain how this Court's finding that the same activities would cause irreparable harm two years ago would not cause irreparable harm now.[77]

SILA's factual allegations of harm are not vague or conclusory, or tied to harm from the full Willow project; they are specific and result directly from this winter's activities.[78] Sam Kunaknana specifically states that he uses the part of the Ublutuoch River where the mine will be constructed for hunting and fishing and that once mining starts "this area will never be the same."[79] He explains that he no longer hunts or fishes in areas that ConocoPhillips has developed and that Willow's construction will make it

---

[75] SILA Mem. at 21–23.

[76] *Amoco Prod. Co.*, 480 U.S. at 545.

[77] Feds. at 42–43; SILA Mem. at nn.104–06 and accompanying text.

[78] *Cf.* CPAI at 37–38; NSB at 21–22; Kuukpik Corp.'s Resp. in Opp'n to Mot. for TRO and Prelim. Inj. at 17, ECF No. 53 [hereinafter Kuukpik]; Feds. at 42. Because SILA presented specific facts that this winter's activities would harm its members and supporters, Defendant's reliance on *Northwest Environmental Defense Center v. U.S. Army Corps of Engineers*, 817 F. Supp. 2d 1290 (D. Or. 2011) is misplaced. Feds. at 41–42. In that case, the complained-of harm was from future activities that had not been authorized. 817 F. Supp. 2d at 1314. Here, BLM authorized ConocoPhillips to proceed this winter and ConocoPhillips plans to start construction April 4. Mot. to Expedite at 3, ECF No. 22. Defendants' reliance on *Western Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29 (D.D.C. 2020), to assert that SILA makes "bare allegations" of harm also fails because SILA provided member declarations and identified record evidence to demonstrate harm will occur from ConocoPhillips' winter activities. Feds. at 42.

[79] Decl. of S. Kunaknana ¶ 10. This refutes ConocoPhillips assertion that Mr. Kunaknana does not allege that he uses the mine site. CPAI at 41.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                      Page 18

harder for him to hunt and fish at his current location.[80] Mr. Kunaknana also explains

how his ability to hunt caribou will be impacted by gravel mine blasting and road

building — two activities planned for this winter.[81] Given these harms, Kuukpik concedes

that Mr. Kunaknana will be injured.[82] Similarly, Daniel Ritzman explains that the gravel

mine would harm his recreational use of the area and his ability to view wildlife.[83] These

specific allegations of irreparable harm caused by imminent activities warrant an

injunction.[84]

BLM is incorrect that the final SEIS's discussion of permanent harm relates only

to the complete Willow project.[85] BLM's conclusions in the final SEIS that gravel mining

and road building would cause permanent damage and significant impacts are not so

limited. For example, BLM stated, "Project activities that would permanently remove or

alter wetlands and wetland functions are the placement of gravel fill … and gravel

mining."[86] Specific to roads, BLM stated that roads result in the permanent loss of habitat

---

[80] Decl. of S. Kunaknana ¶¶ 9, 27–28, 32.

[81] Decl. of S. Kunaknana ¶¶ 16–18, 25.

[82] Kuukpik at 17.

[83] Decl. of D. Ritzman ¶¶ 26, 29, 32–33. There is no basis in caselaw to ignore irreparable harm to individuals that do not live near projects. *Cf.* CPAI at 38; Kuukpik at 14–15.

[84] *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (explaining that harm to members' "ability to view, experience, and utilize the areas in their undisturbed state" is irreparable harm) (internal quotation marks omitted).

[85] Feds. at 42.

[86] SILA Mem. Ex. 2 at 20; *see also id.* at 11–12, 19 (explaining gravel placement kills vegetation and the impacts to permafrost around mine are "permanent").

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                      Page 19

and displacement of caribou; in reaching this conclusion, no exception was made for the

road segment to be constructed this winter and no party argues those actions can be

undone once they occur.[87] BLM also found that there would be large impacts to

subsistence harvest near the mine site — i.e., impacts from one of the project components

that will be constructed this winter.[88]

Regarding arguments that roads are beneficial to subsistence,[89] SILA presented

specific evidence that gravel roads will harm its members. Mr. Kunaknana explained how

development has changed caribou migration, how he no longer hunts in developed areas,

and how it is difficult to hunt from the roads.[90] Additionally, BLM explained that roads

---

[87] *Id.* at 23–25. Although ConocoPhillips argues that not all Nuiqsut hunters use the proposed mine site area, CPAI 39–40, BLM's record and SILA's declarations make clear that a number of hunters do use this area. Indeed, in finding Willow "would result in extensive interference with Nuiqsut hunter access," BLM noted "[n]one of [Willow's] impacts is expected to affect all subsistence hunters equally." Ex. 13. at 6. ConocoPhillips does not cite any authority for the proposition that irreparable harm must befall every member of a community to warrant injunctive relief. *See infra* n.94.

[88] SILA Mem. Ex. 2 at 42. ConocoPhillips' reliance on *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 39–40 (D.D.C. 2013), is misguided and supports an injunction. CPAI at 43. Unlike the agency analysis in that case, BLM made multiple findings of permanent and significant harm from Willow, including this winter's activities, and SILA provided declarations explaining the harm to SILA's members.

[89] CPAI at 40–41; NSB at 21–22; Kuukpik at 23–26. Defendants' arguments implying that all hunters believe that the roads are beneficial is not supported by BLM's analysis or conclusion that there will be significant impacts to subsistence. *See* SILA Mem. Ex. 1 at 32, 119 (noting that some hunters use roads but some avoid them); SILA Mem. Ex. 2 at 43.

[90] Decl. of S. Kunaknana ¶¶ 16–19, 27–28; *see also* Ex. 13 at 5 (explaining increased use to west of Nuiqsut correlates to increased development and reduced use to east) & 6–7 (explaining key harm to subsistence users from development is avoidance of traditional use areas).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                               Page 20

deflect caribou, particularly during construction, and that female caribou do not habituate to roads during calving.[91] BLM's subsistence analysis also explained that roads will harm subsistence use access.[92] The fact that some people may not experience harm from an action does not negate the harm that SILA's members and supporters will suffer, which BLM acknowledged will occur.[93] As the Ninth Circuit explained "[w]hen a project may significantly degrade some human environmental factor, injunctive relief is appropriate."[94]

Finally, ConocoPhillips improperly focuses on the number of acres from this winter's activities in relation to the overall acreage of the Reserve to downplay the irreparable harm to SILA's members.[95] The relevant focus is the severity of the harm, not the magnitude.[96] The Ninth Circuit has rejected ConocoPhillips' theory.[97]

---

[91] Ex. 13 at 2–3.

[92] SILA Mem. Ex 2 at 42; Ex 13 at 6.

[93] Cf. *M.R. v Dreyfus*, 697 F.3d 706, 729–32 (9th Cir. 2012) (explaining irreparable injury was established when plaintiffs submitted detailed evidence of how challenged action will individually impact them).

[94] *Env't. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020); *see also W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1258 (D. Or. 2019) (explaining that finding of harm combined with finding of NEPA violation supports injunction).

[95] CPAI at 43.

[96] *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999); *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir 1989). ConocoPhillips' reliance on the unpublished *National Parks Conservation Ass'n*, 2016 WL 420470, at *10, (D.D.C. 2016), and *Earth Island Institute v. Elliott*, 290 F. Supp. 3d 1102, 1124 (E.D. Cal. 2017), cases is misplaced because both improperly focus on magnitude, not severity. CPAI at 43–44.

[97] *All. for the Wild Rockies*, 632 F.3d at 1135.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 21

Case 3:23-cv-00058-SLG   Document 63   Filed 03/28/23   Page 22 of 29

## III.  THE PERMANENT HARM TO SILA AND THE RESERVE TIPS THE BALANCE OF EQUITIES AND PUBLIC INTEREST IN FAVOR OF AN INJUNCTION.

Defendants' economic arguments fail to overcome the conclusion that because irreparable environmental harm is likely, the balance of equities and public interest favor an injunction.[98] ConocoPhillips' primary argument that the balance of equities does not favor an injunction is that its leases will expire if it does not produce oil by September 1, 2029, and that if the project is enjoined now, it will not be able meet that production date.[99] This concern is easily dismissed because ConocoPhillips has multiple avenues available to ensure its leases do not expire. Under the NPRPA, BLM cannot terminate leases that are capable of production but not yet producing for reasons beyond the control of the lessee.[100] ConocoPhillips can also request a lease suspension to delay lease expiration.[101] In the final SEIS, BLM assumed that construction could begin in either winter 2022/2023 or winter 2023/2024 "to account for potential delays,"[102] and there were no red flags from BLM or ConocoPhillips regarding a fatal lease-expiration date. This is logical, given BLM's ability to address this issue. Despite this same potential

---

[98] SILA Mem. at 25–26.

[99] CPAI at 48–49.

[100] 42 U.S.C. § 6506a(i)(6); *see also id.* § 6506a(i)(3) (directing renewal of leases that are not producing if the Secretary finds diligence by lessee); CPAI Ex. 9, Decl. of Stephen V. Bross ¶ 7, ECF No. 48-10 (explaining Willow is a discovered resource); *id.* at 15 (ConocoPhillips' lease noting that it can be renewed or extended in accordance with law).

[101] 43 C.F.R. §§ 3135.1-5(b), 3135.2(b), (c); *cf.* CPAI Ex. 9, Bross Decl. ¶¶ 20–21.

[102] Ex. 13 at 1.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                              Page 22

timeframe being presented in the draft SEIS, ConocoPhillips' comment letter also did not

mention that beginning construction in winter 2023/2024 would doom the project.[103]

When this newly alleged concern is removed from consideration, the remainder of

Defendants' arguments against an injunction are temporary economic concerns that do

not overcome the permanent environmental harm to SILA.

ConocoPhillips cites the $758 million it spent on Willow, as well as contracts for

this winter's work and project materials, to assert that an injunction is improper.[104] To the

extent that ConocoPhillips invested money overall and entered into procurement or

service contracts for this winter's work prior to securing approval and permits to proceed,

it took that risk knowingly. Courts have rejected similar arguments.[105] And

ConocoPhillips' prior expenditures will not be lost; the company maintains its leases and

exploration information as well as purchased materials. ConocoPhillips' assertions that a

---

[103] SILA Mem. Ex. 3 at 1; CPAI Mot. Ex. 19, ECF No. 48-21.

[104] CPAI at 50; *see also* CPAI Ex. 9, Decl. Stephen A. Bross ¶¶ 25–26.

[105] *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014)
(explaining companies that presume permitting outcomes assume the risk); *Envtl.
Democracy Project v. Green Sage Mgmt., LLC*, 2022 U.S. Dist. LEXIS 183387, at *9–10
(N.D. Cal. 2022) ("Regardless of [the magnitude of economic harm], the Court would
still find the balance of equities favors Plaintiffs because Defendant's alleged harms are
self-inflicted."). Additionally, ConocoPhillips' concern that it will be unable to move
forward with other development decisions without greater certainty regarding this
winter's activities rings hollow given its committed $758 million as of January 2023
without permits, including an additional $258 million in expenditures since opposing an
injunction in the prior litigation. *Compare* CPAI Ex. 9, Bross Decl. ¶ 26, *with* CPAI Ex.
1, Decl. of Connor A. Dunn ¶ 23, Case No. 3:20-cv-00290-SLG, ECF No. 27-3 (Jan. 15,
2021).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                                Page 23

year delay may prevent the project from moving forward on schedule or potentially at all should be rejected because the company has not made a final investment decision.[106] The fact that one still must be made demonstrates that the economic gains and losses complained of are speculative based on an uncertain future business decision.

Intervenor-Defendants' remaining arguments focus on economic benefits that will come from full development at some point in the future, largely based on overall royalties and revenues that may be generated and distributed to the State of Alaska and the Borough.[107] This is not the proper inquiry; only the harms during the period the injunction would be in place are considered, not total project expenditures or all future revenues and benefits.[108] Critically, possible future benefits would not be lost, only delayed while the case is resolved.[109] The ability of some hunters to benefit from road and boat ramps would also not be lost, but potentially enjoyed in the future.[110] Similarly, local

---

[106] CPAI at 48–49; State of Alaska's Combined Opp. to Mot. for Prelim. Inj. and TRO at 6–7, ECF No. 52 [hereinafter SOA].

[107] CPAI at 49; NSB at 22, 24–25; SOA at 8–9; Kuukpik at 22; Arctic Slope Reg'l. Corp.'s Combined Opp. to Pl.'s Mot. for Prelim. Inj. at 7–8, ECF No. 50 [hereinafter ASRC].

[108] *League of Wilderness Defs./Blue Mountain Biodiversity Project v. Connaughton*, 752 F.3d 755, 765–66 (9th Cir. 2014); *Se. Alaska Conservation Council v. U.S. Forest Serv.* (*SEACC II*), 413 F. Supp. 3d 973, 985 (D. Alaska 2019). For this reason, the State's hope that Willow will support development on state lands and its concerns about the efficient running of TAPS, SOA at 10, and ASRC's concerns about future service contracts, jobs, or shareholder dividends, ASRC at 7–9, should be rejected.

[109] *See S. Fork Band Council of W. Shoshone v. U.S. DOI*, 588 F.3d 718, 728 (9th Cir. 2009) (explaining economic harm of lost employment is mostly temporary).

[110] *Cf.* CPAI at 45–47; NSB at 23–24; ASRC at 10–11; Kuukpik at 23–25.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 24

Case 3:23-cv-00058-SLG   Document 63   Filed 03/28/23   Page 25 of 29

residents may still benefit from future construction and contract jobs. In sum, economic concerns, especially temporary ones, do not overcome the permanent harm to SILA from this winter's activities, and the balance of equities favors an injunction.[111]

Regarding the public interest, Intervenor-Defendants' arguments that Willow should proceed because oil leasing is allowed in the Reserve[112] fail to recognize that the NPRPA also mandates protection of Reserve values and uses.[113] Further, "Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward."[114]

---

Importantly, not all hunters believe this infrastructure is beneficial; some find it harmful. *Supra* nn.89–92 and accompanying text.

[111] *See League of Wilderness Defenders*, 752 F.3d at 765–66 (describing delay in moving revenues and jobs to future year as "marginal harm" and concluding irreparable injury to plaintiffs outweighs temporary delay in achieving economic benefits of project); *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006) ("Although the public has an economic interest in the mine, there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the mine's operation."); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (finding economic injury to cruise industry "does not outweigh" irreparable environmental harm); *Indigenous Envtl. Network v. U.S. Dep't of State*, 369 F. Supp. 3d 1045, 1051–52 (D. Mont. 2018) (finding environmental harms outweigh "pecuniary interest" and citing Ninth Circuit cases that hold that environmental injury outweighs economic interests). *Cf.* ASRC at 12; Kuukpik at 19.

[112] NSB at 25–26; CPAI at 50; Kuukpik at 28–30.

[113] 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b).

[114] *S. Fork Band*, 588 F.3d at 728. Kuukpik Corporation raises arguments relating to the Alaska Native Claims Settlement Act, but that statute does not direct drilling on federal lands. Kuukpik at 26–27.

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                           Page 25

It also ignores the public interest in ensuring compliance with the law.[115] An injunction will also not halt any other oil projects on the North Slope, maintaining oil and gas revenues for entities that rely on them.[116]

Finally, Defendants cite support for Willow from elected officials as tipping the public interest against an injunction.[117] This ignores the significant concerned raised by the Native Village of Nuiqsut and the City of Nuiqsut.[118] It also ignores that there was enormous public opposition to Willow: lawmakers and millions of people weighed in against the project.[119]

---

[115] SILA Mem. at 25–26; *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) (explaining agency compliance with the law "invokes a public interest of the highest order: the interest in having government officials act in accordance with law"), *aff'd in relevant part*, 952 F.2d 297 (9th Cir. 1991).

[116] *See SEACC II*, 413 F. Supp. 3d at 986 (recognizing other projects offset economic impacts from injunction).

[117] *See, e.g.*, Feds. at 44–45; CPAI at 49; Kuukpik at 29–30; Alaska Cong. Delegation and Alaska State Legislature's Amicus Br. in Opp. to Pl.'s Mot. for TRO and Prelim. Inj. at 8–10, ECF No. 49-1. BLM's insistence that the equities have shifted since 2021 because of greater support is perplexing given that the only known entity that now publicly supports Willow that did not before is Kuukpik Corporation. Feds. at 44. Relatedly, Kuukpik's reliance on *Golden Gate Restaurant Association v. City of San Francisco*, 512 F.3d 1112 (9th Cir. 2008), is misplaced. Kuukpik at 30. In that case, the court considered whether to enjoin an ordinance that was adopted by the local government. 512 F.3d at 1126–27. Here, the challenged decision was made by the federal land management agency, not Congress, the Alaska Legislature, or any local government.

[118] SILA Mem. Ex. 7.

[119] SILA Mem. Ex. 9 at 1, ECF No. 23-21 (comments from groups — including non-Plaintiff groups — opposing Willow submitted on behalf of millions of members and supporters); Ex. 17 (letter to President Biden opposing Willow signed by 22 members of Congress); Lisa Friedman, *Biden Administration Expected to Move Ahead on a Major Oil Project in Alaska*, NEW YORK TIMES, Mar. 10, 2023,

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                      Page 26

CONCLUSION

SILA respectfully requests the Court grant its motion.

Respectfully submitted this 28th day of March, 2023.

 s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

---

https://www.nytimes.com/2023/03/10/climate/biden-willow-oil-alaska.html (noting
Change.org petition opposing Willow had more than 3 million signatures as of March 10,
2023).

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 27

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this memorandum complied with the type-volume limitation of 7.4(a)(1) because it contains 7,460 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). Plaintiffs' Unopposed Motion to File Overlength Reply is submitted concurrently.


s/ Bridget Psarianos
Bridget Psarianos

Reply in Supp. of Pls.' Mot. for TRO & Prelim. Inj.
*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                              Page 28

Case 3:23-cv-00058-SLG   Document 63   Filed 03/28/23   Page 29 of 29