William J. Snape, III (D.C. Bar No. 455266)*
David B. Hunter
AMERICAN UNIVERSITY
WASHINGTON COLLEGE OF LAW
4300 Nebraska Avenue, NW
Washington, D.C. 20016
Telephone: 202-536-9351 (cell)
Telephone: 202-274-4443 (land)
wsnape@wcl.american.edu
dhunter@wcl.american.edu

*(*Pro Hac Vice* Motion Pending)

*Attorneys for Amici, U.N. Special Rapporteurs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al., <br><br> Plaintiffs, <br> v. <br><br> BUREAU OF LAND MANAGEMENT, et al., <br> Defendants, <br> and <br><br> CONOCOPHILLIPS ALASKA, INC., <br><br> Intervenor-Defendant. | Case No. 3:23-cv-00058-SLG |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br> v. <br><br> BUREAU OF LAND MANAGEMENT, et | Case No. 3:23-cv-00061-SLG |

al.,

Defendants,

and

CONOCOPHILLIPS ALASKA, INC., et al.,

Intervenor-Defendants.

**AMICUS BRIEF OF UNITED NATIONS SPECIAL RAPPORTEURS IN SUPPORT OF PLAINTIFFS ON THE MERITS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………iii

INTRODUCTION..................................................................................................1

BACKGROUND ..................................................................................................2

ARGUMENT .......................................................................................................4

   I.   Approving the Willow Project is contrary to U.S. obligations under international law. ..................................................................................................4

     A. Approving the Willow Project is contrary to U.S. obligations under the UNFCCC and the Paris Agreement and would significantly undermine global efforts to avoid dangerous impacts from an unsafe climate. .............4

     B.  Approval of the Willow Project is inconsistent with U.S. obligations under customary international environmental law to prevent transboundary environmental harm. ...........................................................9

     C.  All Countries, including the U.S., are under an obligation to Prevent Human Rights Infringements, including those resulting from Climate Change Impacts. ...........................................................................................11

  II.  The best available science demonstrates that it is no longer possible to achieve the Paris Agreement's 1.5°C temperature goal and avoid dangerous climate consequences unless States reject major fossil fuel developments such as the Willow Project. ..................................................................................17

i

**III.** **The Court should vacate the agency's approval of the Willow Project..19**

**CONCLUSION**........................................................................................................**23**

# TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. art. 1 § 8 .................................................................................... 9

**Federal Statutes**

42 U.S.C. § 4332(2)(F). ................................................................................ 3

42 U.S.C. § 4321 ........................................................................................... 2

5 U.S.C. § 706(2)(A) ..................................................................................... 21

**Federal Cases**

*Alaska Conservation Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148 (D. Alaska 2020) ...... 27

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146 (D.C. Cir. 1993) ..... 28, 30

*Calif. Communities Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012) .................................. 29

*Califano v. Sanders*, 430 U.S. 99, 105 (1977) ............................................................. 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................... 28

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ........................................... 29

*Latta v. Otter*, 779 F.3d 902 (9th Cir. 2015) .................................................................. 27

*Thompson v. Oklahoma*, 487 U.S. 815 (1988) ................................................................ 26

*Trop v. Dulles*, 356 U.S. 86 (1958) ........................................................................... 26

*Twining v. New Jersey*, 211 U.S. 78 (1908) .................................................................. 26

*WildEarth Guardians v. U.S. Bureau of Land Management*, 870 F.3d 1222 (10th Cir., 2017) ... 10

**State Cases**

*In re Hawai'i Elec. Light Co*., Haw., No. SCOT-22-0000418 (Mar. 13, 2023) ........................... 21

**Legislative Materials**

138 Cong. Rec. S4781-01 (1992) ................................................................................. 19

**International Treaties and Agreements**

Paris Agreement, Dec. 12, 2015, T.I.A.S. No. 16-1104. .......................................... 3, 5

Rio Declaration, Principles 2, 7, 15, 16, UN Doc A/CONF.151/26 (vol. I), 31 I.L.M. 874 (1992).

............................................................................................................................ 13

Statute of the International Court of Justice, art. 38 .................................................. 11

Stockholm Declaration on the Human Environment, United Nations Conference on the Human

Environment, Stockholm, June 5 to 16, 1972, UN Doc. A/CONF.48/14/Rev.1, Principle 21. 11

United Nations Framework Convention on Climate Change (UNFCCC), S. Treaty Doc. No. 102-

38, 1771 U.N.T.S. 107 (1992) .................................................................................. 3, 5

United Nations, International Covenant on Civil and Political Rights, Dec. 1966, 999 U.N.T.S.

171 ............................................................................................................................ 19

**International Cases**

*Billy v. Australia*, (2019) CCPR/C/135/D/3624/2019 ................................................. 14

*Case of Pulp Mills on the River Uruguay (Arg. v. Uru.)*, Judgment, 2010 I.C.J. Rep. 14 (Apr. 20)

............................................................................................................................ 10

*Certain Activities and Construction of a Road* (Costa Rica v. Nicar.), Judgment, 2015 I.C.J. Rep.

665 (Dec. 16); ......................................................................................................... 10

*Corfu Channel (U.K. v. Alb.),* Judgment I.C.J. Rep. 4 (Apr. 9) ................................... 10

Inter-American Court of Human Rights, Advisory Opinion 23/17 .............................. 15

*Sacchi v. Argentina*, (2019) CRC/C/88/D/104/2019 .................................................... 14

iv

*Trail Smelter Arbitration*, 3 R.I.A.A. 1905 (1941) ........................................................ 11

**Foreign Cases**

*Gloucester Resources Limited v Minister for Planning* [2019] NSWLEC 7 ............................... 7

*Waratah Coal Pty Ltd v. Youth Verdict Ltd &* Ors (No 6) [2022] QLC 21 ................................. 8

**Other Materials**

Carbon Brief, *Which Countries are historically responsible for climate change* (Oct. 2021). ...... 8

David Hunter et al., *International Environmental Law and Policy* (6th ed. 2022). .................... 13

Dirk-Jan van de Ven et al., A multi-model analysis of post-Glasgow climate targets, 13 *Nature
   Climate Change* 570-78 (2023). ............................................................................... 7

G.A. Res. 76/300, U.N. Doc. A/76/L.75 (July 28, 2022) ......................................................... 20

Human Rights Committee, General Comment No. 36 (2018) on article 6 of the ICCPR, on the
   right to life, CCPR/C/GC/36 (Oct. 30, 2018) ............................................................... 20

Intergovernmental Panel on Climate Change (IPCC), Climate Change 2022 Mitigation of
   Climate Change: Working Group III Contribution to the Sixth Assessment Report of the
   Intergovernmental Panel on Climate Change, *Technical Summary*, TS.5.1 (Priyadarshi R.
   Shukla et al eds., 2022) ............................................................................ 8, 24, 25

International Energy Agency, 2020, *The Oil and Gas Industry in Energy Transitions* .............. 25

International Energy Agency, 2021, *Net Zero by 2050: A Road Map for the Global Energy
   Sector* ...................................................................................................... 25

International Energy Agency, *World Energy Outlook 2012* ........................................................ 25

International Law Commission, Report of the International Law Commission: Draft Guidelines
   on the Protection of the Atmosphere, with commentaries, U.N. Doc. A/76/10, Guideline 3
   (2021). ...................................................................................................... 13

Case 3:23-cv-00058-SLG   Document 100-1   Filed 07/26/23   Page 7 of 34

IPCC, Climate Change 2014 Impacts, Adaptation, and Vulnerability, Part A: Global and Sectoral Aspects, Working Group II Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (Christopher B. Field et al eds., 2014) .............. 23

IPCC, Climate Change 2022: Impacts, Adaptation and Vulnerability, Working Group II Contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, *Summary for Policymakers*, B.1, B.1.3-1.5 (Hans-Otto Pörtner et al eds., 2022) 14, 15, 23

IPCC, Climate Change 2023: Synthesis Report. A Report of the Intergovernmental Panel on Climate Change, *Summary for Policymakers*, sec. A.2, fig. SPM.1 (Hoesung Lee & José Romero eds., 2023) ................................................................................................... 14, 15, 24

IPCC, Global Warming of 1.5°C: An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emissions pathways, in the context of strengthening the global response to the threat of climate change, sustainable development and efforts to eradicate poverty, *Technical Summary*, TS.5 (Valérie Masson-Delmotte et al eds., 2019) ...................................................................................................... 15

*Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion*, 1996 I.C.J. Rep. 226 (July 8) ...................................................................................................................................... 11

Report of the Special Rapporteur on the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy and sustainable environment, U.N. Doc. A/74/161 (July 15, 2019) .................................................................................................................................... 19

Report of the Special Rapporteur on the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy and sustainable environment, U.N. Doc. A/HRC/31/52 (Feb. 1, 2016) ......................................................................................................................... 18

vi

Report of the Special Rapporteur on the promotion and protection of human rights in the context of climate change, U.N. Doc. A/77/226 (July 26, 2022)........................................................... 19

Special Rapporteur on human rights and the environment, "A Safe Climate," U.N. Doc. A/74/161 (July 2019) .............................................................. 22

*The United States of America Nationally Determined Contribution*, *Reducing Greenhouse Gases in the United States: A 2030 Emissions Target*, Nationally Determined Contributions Registry, United Nations Framework Convention on Climate Change...................................................... 6

Tsvetana Paraskova, *Alaska Exports Double Amid Strong Chinese Demand*, OilPrice.Com (Dec. 3, 2020)........................................................................................................................ 4

U.N. General Assembly, Human Rights Council, Report of the Office of the United Nations High Commissioner for Human Rights on the relationship between climate change and human rights, U.N. Doc. A/HRC/10/61, (Jan. 15, 2009)................................................................. 18, 22

U.N. Human Rights Council Res. 32/33: Human rights and climate change, U.N. Doc. A/HRC/RES/32/33 (July 18, 2016) ............................................................................. 16

U.N. Human Rights Council, Res, 37/8: U.N. Doc. A/HRC/RES/37/8 (Mar. 22, 2018)............... 1

U.N. Human Rights Council, Res. 18/22: Human rights and climate change, U.N. Doc. A/HRC/RES/18/22 (Oct. 17,2011)............................................................................ 16

U.N. Human Rights Council, Res. 26/27: Human rights and climate change, U.N. Doc. A/HRC/RES/26/27 (July 15, 2014)............................................................................ 16

U.N. Human Rights Council, Res. 29/15: Human rights and climate change, U.N. Doc. A/HRC/RES/29/15 (July 22, 2015)............................................................................ 16

U.N. Human Rights Council, Res. 35/20: Human rights and climate change, U.N. Doc. A/HRC/RES/35/20 (July 7, 2017)............................................................................. 17

Case 3:23-cv-00058-SLG   Document 100-1   Filed 07/26/23   Page 9 of 34

U.N. Human Rights Council, Res. 38/4: Human rights and climate change, U.N. Doc.
A/HRC/RES/38/4 (July 16, 2018) ............................................................................ 17

U.N. Human Rights Council, Res. 41/21: Human rights and climate change, U.N. Doc.
A/HRC/RES/41/21 (July 12, 2019) .......................................................................... 17

U.N. Human Rights Council, Res. 44/7: Human rights and climate change, U.N. Doc.
A/HRC/RES/44/7 (July 6, 2020) .............................................................................. 17

U.N. Human Rights Council, Res. 45/17, U.N. Doc. A/HRC/RES/45/17 (Oct. 6, 2020) .............. 1

U.N. Human Rights Council, Res. 47/24: Human rights and climate change, U.N. Doc.
A/HRC/RES/47/24 (July 14, 2021) .......................................................................... 17

U.N. Human Rights Council, Res. 48/13: Resolution adopted by the Human Rights Council,
U.N. Doc. A/HRC/RES/48/13 (Oct. 8, 2021) .......................................................... 21

U.N. Human Rights Council, Res. 48/14, U.N. Doc. A/HRC/RES/48/14 (Oct. 8, 2021) .............. 1

U.N. Human Rights Council, Res. 50/9: Human rights and climate change, U.N. Doc.
A/HRC/RES/50/9 (July 7, 2022) .............................................................................. 17

U.N. Human Rights Council, Res. 51/7: U.N. Doc. A/HRC/RES/51/7 (Oct. 12, 2022) ................ 1

U.N. Human Rights Council, Res. 7/23: Human rights and climate change, U.N. Doc.
A/HRC/RES/7/23 (Mar. 28, 2008) ............................................................................ 16

U.N. News, "Gueterres calls for phasing out fossil fuels to avoid climate 'catastrophe'" (June 15,
2023) ........................................................................................................................ 26

U.N. Office of the High Commissioner for Human Rights, *A new climate change agreement
must include human rights protections for all* (Oct. 17, 2014) ................................. 18

UNFCCC, *Nationally determined contributions under the Paris Agreement: Synthesis report by
the Secretariat*, Doc. FCCC/PA/CMA/2022/4, para. 15 (Oct. 26, 2022), ................................ 7

UNFCCC, Updated Climate Commitments Ahead of COP 26 Still Fall Far Short (Oct. 26, 2021)

......................................................................................................................................... 7

World Meteorological Organization (WMO), State of the Global Climate in 2022, Key Messages

......................................................................................................................................... 14

# INTRODUCTION

The United Nations (UN) Special Rapporteurs on Human Rights and

Climate Change (Dr. Ian Fry)[1], Toxics and Human Rights (Dr. Marcos Orellana)[2],

Human Rights and the Environment (Dr. David Boyd)[3], and the Right to

Development (Prof. Surya Deva)[4] (together "UN Rapporteurs") hereby submit this

amicus brief to advise the Court on the implications of U.S. obligations under

international human rights and environmental law.[5]  The UN Rapporteurs are

uniquely qualified to explain that the U.S. federal approval of the massive "Willow

Project" would significantly impair the U.S. and others countries' ability to meet

---

[1]  U.N. Human Rights Council, Resolution adopted by the Human Rights Council on 8 October 2021, U.N. Doc. A/HRC/RES/48/14, Special Rapporteur on the promotion and protection of human rights in the context of climate change.

[2]  U.N. Human Rights Council, Resolution adopted by the Human Rights Council on 6 October 2020, U.N. Doc. A/HRC/RES/45/17, Special Rapporteur on the implications for human rights of the environmentally sound management and disposal of hazardous substances and wastes. Dr. Orellana is also a professor at American University, Washington College of Law.

[3]  U.N. Human Rights Council, Resolution adopted by the Human Rights Council on 22 March 2018, U.N. Doc. A/HRC/RES/37/8, Special Rapporteur on the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy and sustainable environment.

[4]  U.N. Human Rights Council, Resolution adopted by the Human Rights Council on 12 October 2022, U.N. Doc. A/HRC/RES/51/7, Special Rapporteur on the right to development.

[5]  This submission does not constitute a waiver, express or implied, of the privileges and immunities of the United Nations and its officials and experts pursuant to the 1946 Convention on the Privileges and Immunities of the United Nations.

1

their international law obligations to mitigate greenhouse gas (GHG) and particulate (GHG) emissions.  They ask this Court to support Plaintiffs, and vacate the U.S. government's decision.

## BACKGROUND

As the Plaintiffs have already explained, the proposed approval of the Willow Project contravenes the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., NEPA's regulations, and other U.S. statutes.  Further, the Amici UN Rapporteurs believe the U.S. agencies also failed to evaluate the total impacts of this project on maintaining and achieving a safe climate system. Furthermore, U.S. agencies failed to look at alternatives to the Willow Project more aligned with U.S. obligations under international law.

Implementation of the massive Willow Project, when analyzed from cradle to grave, is inconsistent with global efforts to meet the Paris Agreement's goal of limiting planetary warming to 1.5 degrees Celsius.  As such, U.S. approval of the project will significantly impair the U.S.'s ability to meet its international obligations, including its commitments under the Paris Agreement[6] to the United Nations Framework Convention on Climate Change (UNFCCC), S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (1992), as well as its obligations under both customary international human rights and environmental law as well as treaties

---

[6]  Paris Agreement to the UNFCCC, Dec. 12, 2015, T.I.A.S. No. 16-1104.

pertaining to the human rights to life, health, a healthy environment, participation in governmental processes, and the right not to be subjected to arbitrary or unlawful interference with privacy, family, and home, among others.

NEPA itself expressly commands that the federal agencies here "recognize the worldwide character of environmental problems and, where consistent with the foreign policy of the U.S., lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment." 42 U.S.C. § 4332(2)(F). Contradicting this mandate, a significant amount of the oil produced by the Willow Project will likely be exported.[7] The U.S. is, in effect, continuing both foreign and domestic attachment to oil, thus leading not only to the U.S. potentially missing its own Paris commitments, but also simultaneously undermining the ability of other nation-states to meet their respective commitments. These downstream consumption issues were simply not analyzed by Defendant agencies.

Because the U.S. did not adequately review the massive Willow Project's profound direct and indirect impacts on maintaining a safe global climate system,

---

[7] *See, e.g.*, Tsvetana Paraskova, *Alaska Exports Double Amid Strong Chinese Demand*, OilPrice.Com (Dec. 3, 2020), https://oilprice.com/Latest-Energy-News/World-News/Alaskas-Oil-Exports-Double-Amid-Strong-Chinese-Demand.html#:~:text=According%20to%20data%20from%20commodities,from%20Alaska%20in%2020%20years.

which raises profound questions about U.S. compliance with international environmental and human rights law, the Court should vacate the agency action and require the agency to restart its review of the project. It is crucial that the U.S. agencies broaden their analysis of alternatives when revising their inadequate environmental analysis.

## ARGUMENT

I. **Approving the Willow Project is contrary to U.S. obligations under international law.**

Both the global community of nations and every individual person on this planet share a common interest in a safe climate system. The interests of the global community of nations to maintain a safe climate system are expressed in the international climate regime, including the Paris Agreement, and in international human rights and environmental law more generally. The basic human interests in a safe climate system are defined and protected by U.S. commitments under international law. Each of these commitments is addressed below.

**A. Approving the Willow Project is contrary to U.S. obligations under the UNFCCC and the Paris Agreement and would significantly undermine global efforts to avoid dangerous impacts from an unsafe climate.**

The U.S. and global community's interest has been defined by the Parties to the UNFCCC in their collective objective to "prevent dangerous anthropogenic interference with the climate system" (Article 2). The Parties, including the U.S., further defined their collective goal in the Paris Agreement, which indicates that a

4

temperature increase above 2.0°C or 1.5°C would increase the risks of dangerous impacts from an unsafe climate system (Art. 2.1.a).

The primary mechanism for meeting the temperature goal under the Paris Agreement is through submission of "Nationally Determined Contributions" (NDCs), under which each Party identifies what steps it agrees to take toward the achievement of the overall temperature goal of 1.5°C. These NDCs represent an international commitment by each of the Parties toward the collective effort to avoid a climate catastrophe. The U.S. in its NDC set "an economy-wide target of reducing its net greenhouse gas emissions by 50-52 percent below 2005 levels in 2030."[8] The Willow Project is a prime example of large-scale fossil fuel development that makes it increasingly difficult to meet the 1.5°C temperature goal, thus avoiding dangerous impacts from climate change, as well as meeting the targets of the U.S. NDC (and other nation-states' NDCs).

According to the United Nations Environment Programme (UNEP) projections, nation-states' current commitments are not sufficient to achieve the 1.5°C temperature goal. Even in the unlikely event that all current NDCs are

---

[8] *The United States of America Nationally Determined Contribution*, *Reducing Greenhouse Gases in the United States: A 2030 Emissions Target*, Nationally Determined Contributions Registry, United Nations Framework Convention on Climate Change, https://unfccc.int/sites/default/files/NDC/2022-06/United%20States%20NDC%20April%2021%202021%20Final.pdf.

fulfilled, the world faces warming of at least 2.7°C.[9]  The "ambition gap" between

countries' commitments and what is needed to avoid devastating climate

consequences requires further action in the short term to *reduce* GHG emissions.

Current pledges, if fulfilled, will reduce global emissions only 7.5% by 2030, well

short of the 45% reduction required by 2030 to meet the 1.5°C goal.[10]

In accordance with the principle of common but differentiated

responsibilities and respective capabilities endorsed by the U.S. and all other

Parties in both the UNFCCC and the Paris Agreement, nation-states bear different

responsibilities toward meeting the Paris Agreement's temperature goal.  Those

nation-states that have benefitted from larger emissions over time are more

responsible for today's climate crisis and thus have agreed to bear increased

responsibility.  Leading the list among all historic emitters, the U.S. has emitted

---

[9]  Dirk-Jan van de Ven et al., A multi-model analysis of post-Glasgow climate targets, 13 *Nature Climate Change* 570-78 (2023), https://www.nature.com/articles/s41558-023-01661-0.

[10]  UNFCCC, Updated Climate Commitments Ahead of COP 26 Still Fall Far Short (Oct. 26, 2021), https://unfccc.int/news/updated-climate-commitments-ahead-of-cop26-summit-fall-far-short-but-net-zero-pledges-provide-hope; *see also* UNFCCC, *Nationally determined contributions under the Paris Agreement: Synthesis report by the Secretariat*, Doc. FCCC/PA/CMA/2022/4, para. 15 (Oct. 26, 2022), https://unfccc.int/sites/default/files/resource/cma2022_04.pdf (stating "Full implementation of all latest NDCs (including all conditional elements) is estimated to lead to a 3.6 (0.7–6.6) per cent emission reduction by 2030 relative to the 2019 level; while implementation of all latest NDCs excluding any conditional elements is estimated to result in 3.1 (0.2–6.0) per cent higher emissions in 2030 than in 2019.").

approximately one-fifth of all global greenhouse pollution ever emitted.[11]  The U.S. position as the leading historic emitter, and currently the second largest emitter, of GHG pollutants may not necessarily restrict options for how the U.S. may choose to *reduce* GHG emissions and decarbonize its economy, but it <u>does</u> suggest that U.S. actions that foreseeably *increase* emissions such as the Willow Project are inconsistent with its international law obligations.[12]

There is relevant and important jurisprudence in cases outside the U.S. that clearly indicate the responsibilities of nation-states to recognize the Paris Agreement goals and respect human rights.  In *Gloucester Resources Limited v Minister for Planning* [2019] NSWLEC 7[13], Chief Judge of the New South Wales Land and Environment Court, Australia, Brian Preston, rejected the creation of a new large coal mine.  This rejection was in significant part based on "the

---

[11]  *See, e.g.*, Carbon Brief, *Which Countries are historically responsible for climate change* (Oct. 2021), https://www.carbonbrief.org/analysis-which-countries-are-historically-responsible-for-climate-change/.

[12]  Intergovernmental Panel on Climate Change (IPCC), Climate Change 2022 Mitigation of Climate Change: Working Group III Contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, *Technical Summary*, TS.5.1 (Priyadarshi R. Shukla et al eds., 2022), https://www.ipcc.ch/report/ar6/wg3/downloads/report/IPCC_AR6_WGIII_FullReport.pdf ("If investments in coal and other fossil infrastructure (e.g., oil and gas) continue, energy systems will be locked-in to higher emissions, making it harder to limit warming to 2°C or 1.5°C (*high confidence*).") [hereinafter IPCC, AR6, Working Group III].

[13]  *See* https://www.caselaw.nsw.gov.au/decision/5c59012ce4b02a5a800be47f.

greenhouse gas emissions of the Project and their likely contribution to adverse impacts on the climate system, environment and people, and that "the greenhouse gas emissions of the coal mine and its coal product will increase global total concentrations of GHGs at a time when what is now urgently needed, in order to meet generally agreed climate targets." The coal proponents in this case argued that if the mine did not go ahead, someone else would produce the coal elsewhere. Justice Preston said that "the market substitution argument is flawed", and referred to the U.S. Court of Appeals in *WildEarth Guardians v. U.S. Bureau of Land Management*, 870 F.3d 1222 (10th Cir., 2017), which rejected the notion of market substitution.

Similarly, in *Waratah Coal Pty Ltd v. Youth Verdict Ltd &* Ors (No 6) [2022] QLC 21, President of the Land Court, Fleur Kingham, declined the approval of a coal mine in Queensland, Australia, by making reference to the goals of the Paris Agreement and the remaining global carbon budget to keep the temperature to 1.5°C. President Kingham said that "in relation to climate change, I have found that the following rights of certain groups of people in Queensland would be limited: the right to life, the cultural rights of First Nations peoples, the rights of children, the right to property and to privacy and home and the right to enjoy human rights equally."[14]

---

[14] *See* https://archive.sclqld.org.au/qjudgment/2022/QLC22-021.pdf.

**B. Approval of the Willow Project is inconsistent with U.S. obligations under customary international environmental law to prevent transboundary environmental harm.**

Article 38 of the International Court of Justice Statute provides that a custom is a general practice accepted as law. In addition, Article 1 § 8 of the U.S. Constitution gives Congress power to enact laws related to "Offences against the Law of Nations." The U.S. has repeatedly recognized the duty to prevent transboundary environmental harm such as climate pollution. The 1972 Stockholm Declaration on the Human Environment proclaimed that States have the "responsibility to ensure that activities within their jurisdiction or control do not cause damage to the environment of other States or of areas beyond the limits of national jurisdiction."[15] This principle was strongly affirmed in the 1992 Rio Declaration on Environment and Development, which the U.S. signed and supports, and is widely recognized to reflect a principle of customary international law requiring the prevention of significant transboundary environmental harm. *See, e.g.*, *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion*, 1996 I.C.J. Rep. 226, ¶ 29 (July 8).

The International Court of Justice has further explained that this "principle of prevention, as a customary rule, has its origins in the due diligence that is

---

[15] Stockholm Declaration on the Human Environment, United Nations Conference on the Human Environment, Stockholm, June 5 to 16, 1972, UN Doc. A/CONF.48/14/Rev.1, Principle 21.

9

required of a State in its territory" with regard to preventing transboundary harm and respecting the rights of other States. *Case of Pulp Mills on the River Uruguay (Arg. v. Uru.)*, Judgment, 2010 I.C.J. Rep. 14, ¶ 101 (Apr. 20); *Certain Activities and Construction of a Road* (Costa Rica v. Nicar.), Judgment, 2015 I.C.J. Rep. 665, ¶ 104 (Dec. 16); *Corfu Channel (U.K. v. Alb.),* Judgment, 1949 I.C.J. Rep. 4, p. 22 (Apr. 9).

This principle of prevention is also articulated as a duty to prevent significant transboundary environmental harm.[16] As formulated by the International Law Commission in its project on the protection of the atmosphere, States have the obligation to protect the atmosphere by exercising due diligence.[17] This legal duty to prevent harm to other countries was originally expressed in the landmark arbitration between the U.S. and Canada almost a century ago. *See Trail Smelter Arbitration (U.S. v. Can)*, 3 R.I.A.A. 1905 (1941) (Canada is responsible for reducing transboundary air pollution caused by the operation of a smelter that causes air pollution problems in the U.S.). Today, the U.S. must act in accordance

---

[16] The Rio Declaration possesses this principle as well as related principles. *See* Rio Declaration, Principles 2, 7, 15, 16, UN Doc A/CONF.151/26 (vol. I), 31 I.L.M. 874 (1992); *See also* David Hunter et al., *International Environmental Law and Policy* (6th ed. 2022).

[17] *See, e.g.*, International Law Commission, Report of the International Law Commission: Draft Guidelines on the Protection of the Atmosphere, with commentaries, U.N. Doc. A/76/10, Guideline 3 (2021).

with this principle and re-evaluate the Willow Project, as it will significantly add to the U.S. contributory damage to the global climate system.

**C. All Countries, including the U.S., are under an obligation to Prevent Human Rights Infringements, including those resulting from Climate Change Impacts.**

The individual's interest in a safe climate is reflected primarily in international human rights law. The best available science suggests that the current temperature increase of 1.15°C[18] is already having significant impacts on all human rights.[19] Every incremental temperature increase up to and an increase beyond 1.5°C will have even more profound impacts on human rights.[20] Already in 2018, the IPCC recognized that temperature rise of 1.5°C is not "safe" for

---

[18] World Meteorological Organization (WMO), State of the Global Climate in 2022, Key Messages, https://public.wmo.int/en/our-mandate/climate/wmo-statement-state-of-global-climate (stating that in 2022 global average temperature rise was 1.15 [1.02 to 1.28]°C above pre-industrial levels).

[19] IPCC, Climate Change 2023: Synthesis Report. A Report of the Intergovernmental Panel on Climate Change, *Summary for Policymakers*, sec. A.2, fig. SPM.1 (Hoesung Lee & José Romero eds., 2023) [hereinafter IPCC, AR6, SYR]; IPCC, Climate Change 2022: Impacts, Adaptation and Vulnerability, Working Group II Contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, *Summary for Policymakers*, B.1, B.1.3-1.5 (Hans-Otto Pörtner et al eds., 2022) [hereinafter IPCC, AR6, Working Group II].

[20] IPCC, AR6, SYR at B.1 (stating "every increment of global warming will intensify multiple and concurrent hazards (*high confidence*)), B.2 ("Risks and projected adverse impacts and related losses and damages from climate change escalate with every increment of global warming (*very high confidence*)), figs. SPM.3, SPM.4.

nations, communities, or the environment,[21] and more recently, it concluded that exceeding 1.5°C, even temporarily, will cause more drastic and irreparable harm.[22]

Since 2008, the UN Human Rights Council has adopted several resolutions recognizing that climate change constitutes an immediate and far-reaching threat to people and communities around the world, with implications for the full enjoyment of human rights, particularly those of the world's most vulnerable people. *See, e.g.,* Human Rights Council, Res. 7/23: Human rights and climate change, U.N. Doc. A/HRC/RES/7/23 (Mar. 28, 2008) ("*Recognizing also* that the world's poor are especially vulnerable to the effects of climate change, in particular those concentrated in high-risk areas, and also tend to have more limited adaptation capacities"); 18/22 (Oct. 17, 2011),26/27 (July 15, 2014), 29/15 (July 22, 2015), 32/33 (July 18, 2016), 35/20 (July 7, 2017) and 38/4 (July 16, 2018), 41/21 (July 12, 2019), 44/7 (July 6, 2020), 47/24 (July 14, 2021), and 50/9 (July 7, 2022).

In 2009, the Office of the United Nations High Commissioner for Human Rights issued a landmark study concluding that climate change affects the

---

[21] *See* IPCC, Global Warming of 1.5°C: An IPCC Special Report on the impacts of global warming of 1.5°C above pre-industrial levels and related global greenhouse gas emissions pathways, in the context of strengthening the global response to the threat of climate change, sustainable development and efforts to eradicate poverty, *Technical Summary*, TS.5, *Ch. 5*, cross-chapter box 12 (Valérie Masson-Delmotte et al eds., 2019).
[22] IPCC, AR6, Working Group II, *Summary for Policymakers*, B.6-B.6.2.

enjoyment of a wide range of rights and vulnerable groups.[23] This was followed in

2014 by a statement issued by 27 UN Special Rapporteurs and Independent

Experts concluding that "there can no longer be any doubt that climate change

interferes with the enjoyment of human rights recognized and protected by

international law."[24] Special Rapporteurs on the Environment and on Climate

Change have detailed the specific impacts of climate change on a range of

protected rights.[25]

Treaty bodies to which the U.S. is a Party have also consistently emphasized

that States' human rights obligations include the obligation to prevent foreseeable

and serious violations of human rights caused by GHG emissions, and to provide

remedies where such rights are violated. For example, in interpreting Article 6

---

[23] *See* U.N. Gen. Assembly, Hum. Rts. Council, Report of the Office of the United Nations High Commissioner for Human Rights on the relationship between climate change and human rights, U.N. Doc. A/HRC/10/61, (Jan. 15, 2009) [hereinafter 2009 OHCHR Report].

[24] U.N. Office of the High Comm'r for Human Rights, *A new climate change agreement must include human rights protections for all* (Oct. 17, 2014), https://www.ohchr.org/sites/default/files/Documents/HRBodies/Sp/SP_to_UNFCCC.pdf.

[25] Report of the Special Rapporteur on the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy and sustainable environment, U.N. Doc. A/HRC/31/52 (Feb. 1, 2016); Report of the Special Rapporteur on the issue of human rights obligations relating to the enjoyment of a safe, clean, healthy and sustainable environment, U.N. Doc. A/74/161 (July 15, 2019); Report of the Special Rapporteur on the promotion and protection of human rights in the context of climate change, U.N. Doc. A/77/226 (July 26, 2022).

("right to life") of the International Covenant on Civil and Political Rights[26],

ratified by the U.S. in 1992[27], the Human Rights Committee stated:

> Environmental degradation, climate change and unsustainable
> development constitute some of the most pressing and serious threats
> to the ability of present and future generations to enjoy the right to life.
> Obligations of States parties under international environmental law
> should thus inform the content of Article 6 of the Covenant, and the
> obligations of States parties to respect and ensure the right to life should
> also inform their relevant obligations under international environmental
> law.

*See* Human Rights Comm., General Comment No. 36 (2018) on article 6 of the

ICCPR, on the right to life ¶ 62, CCPR/C/GC/36 (Oct. 30, 2018).[28]

A safe climate system is also an integral part of the human right to a clean,

healthy, and sustainable environment recognized in 2022 by the UN General

Assembly, which the U.S. supported and still supports. G.A. Res. 76/300, U.N.

Doc. A/76/L.75 (July 28, 2022) (recognizing the right to a clean, healthy and

---

[26] United Nations, International Covenant on Civil and Political Rights, Dec. 1966, 999 U.N.T.S. 171.

[27] 138 Cong. Rec. S4781-01 (1992).

[28] *See also Billy v. Australia*, (2019) CCPR/C/135/D/3624/2019, ¶ 8.12 (observing that Australia's failure to implement adaptation measures adequate to counter rising sea levels amounted to a failure to protect against "foreseeable and serious violations of private and family life and the home") and ¶ 8.14 (finding that complainants' right to culture was violated where impacts "could have reasonably been foreseen by the State party"); *Sacchi v. Argentina*, (2019) CRC/C/88/D/104/2019, ¶ 10.6 ("[f]ailure to take measures to prevent foreseeable human rights harm caused by climate change or to regulate activities contributing to such harms could constitute a violation of States' human rights obligations").

14

sustainable environment as a human right that is important for the enjoyment of other human rights and that requires the full implementation of multilateral environmental treaties); *see also* UN Human Rights Council, Res. 48/13: Resolution adopted by the Human Rights Council, U.N. Doc. A/HRC/RES/48/13 (Oct. 8, 2021) (the Human Rights Council was the first UN body to recognize the right to a clean, healthy and sustainable environment as a human right at the global level).

Similarly, as courts and experts have acknowledged, a healthy environment necessarily includes a safe climate. Just this year, the Supreme Court of Hawaii ruled that the right to a clean and healthful environment in the State Constitution includes the right to a safe climate. *In re Hawai'i Elec. Light Co.*, Haw., No. SCOT-22-0000418 (Mar. 13, 2023), p. 18; *see also* Inter-American Court of Human Rights, Advisory Opinion 23/17; Special Rapporteur on human rights and the environment, "A Safe Climate," U.N. Doc. A/74/161 (July 2019). Climate change effects and related disasters undoubtedly impact human rights by giving rise to deaths, disease or malnutrition (rights to life and health), threatening food security or livelihoods (right to food), impacting upon water supplies and compromising access to safe drinking water (right to water), destroying coastal settlements through storm surge (right to adequate housing), and, in some cases, forcing relocation as traditional territories become uninhabitable.

Climate change is already and will continue to cause severe and disproportionate adverse impacts on the rights of Indigenous Peoples around the globe, including those living in the Arctic:

> Climate change, together with pollution and environmental degradation, poses a serious threat to indigenous peoples, who often live in marginal lands and fragile ecosystems which are particularly sensitive to alterations in the physical environment. Climate change-related impacts have already led to the relocation of Inuit communities in polar regions and affected their traditional livelihoods. Indigenous peoples inhabiting low-lying island States face similar pressures, threatening their cultural identity which is closely linked to their traditional lands and livelihoods.

2009 OHCHR Report, Para. 51. The IPCC has affirmed that Indigenous Peoples in the Arctic will be "among the most severely affected by climate change, including food security aspects, traditional travel and hunting and cultural values and references." IPCC, Climate Change 2014 Impacts, Adaptation, and Vulnerability, Part A: Global and Sectoral Aspects, Working Group II Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, p. 1003 (Christopher B. Field et al eds., 2014). [29]

---

[29] IPCC, AR6, Working Group II, p. 594 (sec. 4.3.8) "Climate-driven hydrological changes are affecting culturally significant terrestrial and freshwater species and ecosystems, particularly for Indigenous Peoples, local communities and traditional peoples in the Arctic, high mountain areas, and small islands (high confidence). These climate impacts on cultural water uses are influencing travel, hunting, herding, fishing and gathering practices, which have negative implications for livelihoods, cultural traditions, economies and self-determination (Table 4.5)."

16

**II. The best available science demonstrates that it is no longer possible to achieve the Paris Agreement's 1.5°C temperature goal and avoid dangerous climate consequences unless States reject major fossil fuel developments such as the Willow Project.**

The best available science confirms that the world must leave major fossil fuel reserves undeveloped. In 2023, the Intergovernmental Panel on Climate Change (IPCC), the most authoritative collection of world climate scientists, concluded that all pathways to fulfilling the commitments of the 2015 Paris Agreement "involve rapid and deep and in most cases immediate GHG emission reductions in all sectors this decade."[30] The IPCC further recognized that "[l]imiting global warming to 2°C or below will [necessarily] leave a substantial amount of fossil fuels unburned and could strand considerable fossil fuel infrastructure *(high confidence)*".[31] Meeting the Paris climate goals will, by definition, mean keeping dangerous fossil fuels unburned and in the ground.

Similarly, over the past decade, the International Energy Agency (IEA) has consistently warned that countries cannot develop proven fossil fuel reserves, much less new ones, if the world is to keep temperature rise below 1.5°C or even 2.0°C .[32] In 2012, IEA estimated that the world must leave undeveloped two-thirds

---

[30] IPCC, AR6, SYR, *Summary for Policymakers*, B.6, Fig. SPM.5.

[31] IPCC, AR6, Working Group III, *Summary for Policymakers*, C.4.4.

[32] *See also* IPCC, AR6, Working Group III, *Technical Summary*, Box TS.8 (p. 90) (focusing on Stranded Assets: "Without early retirements, or reductions in

of proven fossil fuel reserves if we are to limit warming to 2°C.[33]  In 2020, the IEA

concluded that "unabated combustion of all today's fossil fuel reserves would

result in three times more $CO_2$ emissions than the remaining $CO_2$ budget" to stay

under the 2°C commitment in the Paris Agreement.[34]  In 2021, the IEA warned that

*no new oil and gas fields* should be approved for development and *no investments*

should be made in new fossil fuel infrastructure.[35]

    The current Willow Project is precisely the type of fossil fuel development

of which the IPCC and IEA warned.[36]  As Plaintiffs have explained, the colossal

Willow Project would cause millions if not billions of metric tons of greenhouse

gas and provide a hub for future exploration and development, leading to even

greater surface impacts and climate degradation.  The overall environmental

footprint of this project is enormous.  Approval of the Willow Project gravely

jeopardizes U.S. legal commitments because such a large fossil fuel project will

---

utilization, the current fossil infrastructure will emit more GHGs than is
compatible with limiting warming to 1.5°C.").

[33]  International Energy Agency, *World Energy Outlook 2012*.

[34]  International Energy Agency, 2020, *The Oil and Gas Industry in Energy Transitions*, p. 97.

[35]  International Energy Agency, 2021, *Net Zero by 2050: A Road Map for the Global Energy Sector* (emphasis added).

[36]  Further, the United Nations Secretary-General has called for a phase-out of fossil fuels expeditiously to avoid "climate catastrophe."  U.N. News, "Gueterres calls for phasing out fossil fuels to avoid climate 'catastrophe'" (June 15, 2023), https://news.un.org/en/story/2023/06/1137747.

18

spur huge amounts of downstream greenhouse pollution via domestic and foreign consumption.

This court is fully authorized to look at international law norms, and particularly U.S. commitments under international law, in making its decision. *See, e.g., Thompson v. Oklahoma*, 487 U.S. 815, 830, n.31, 34 (1988) (recognizing that laws, judicial practice, and statistics of other countries can be relevant considerations in a court's decision-making); *Trop v. Dulles*, 356 U.S. 86, 101-04, n.35, 37-38 (1958) (noting "civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime"); *Twining v. New Jersey*, 211 U.S. 78, 113 (1908) (citing "jurisprudence of civilized and free countries outside the domain of the common law" in reference to the Fifth Amendment's privilege against self-incrimination); *Latta v. Otter*, 779 F.3d 902, 906, n.7 (9th Cir. 2015) (citing the European Court of Human Rights in a case determining a state's right to define marriage).

## III.   The Court should vacate the agency's approval of the Willow Project.

The Court should vacate the agency's approval of the Willow Project because the agency's failure to consider all of the Project's indirect and direct emissions as well as alternative future energy pathways were serious procedural and substantive flaws that will inevitably contribute to substantial harm to the environment and to human rights in contravention of U.S. international

commitments.  The agencies failure here to consider adequate alternatives was a

major and substantive error.  *See, e.g.*, *Alaska Conservation Council v. U.S. Forest

Serv.*, 468 F. Supp. 3d 1148, 1155 (D. Alaska 2020).

As already explained, approval of the Willow Project is fundamentally at

odds with U.S. international obligations to prevent serious harm to the environment

and human rights from an unsafe climate system.  The project as designed cannot

be reconciled with U.S. international obligations and the global goal of stabilizing

the climate system at a level that avoids devastating impacts on the environment

and violations of human rights.

Vacatur is the standard remedy for relief under the Administrative Procedure

Act, which directs reviewing courts to "set aside" unlawful agency action.  5

U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 413–14 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S.

99, 105 (1977).  Whether agency action should be vacated depends on, first, how

serious the agency's errors are and, second, on "the disruptive consequences of an

interim change that may itself be changed."  *Allied–Signal, Inc. v. U.S. Nuclear

Regulatory Comm'n,* 988 F.2d 146, 150–51 (D.C. Cir. 1993).

With respect to the first factor, the Willow Project is fundamentally at odds

with U.S. legal obligations under multilateral legal instruments and customary

international law.  If the Willow Project moves forward in any form, irreversible

harm will occur to human rights, as well as to the air, atmosphere, climate, and wildlife species in the region. The federal agencies should start over with a clearer vision of alternatives that will avoid the catastrophic consequences of the current Willow project.

With respect to the second factor, the interim consequences of vacating the project while the agency reconsiders the full impacts of the Willow Project leaves all parties essentially with the *status quo*. Allowing an illegal project to proceed would create far more irreparable damage. In *Calif. Communities Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012), for example, the Court did not vacate a flawed Clean Air Act rule because doing so would lead to counterproductive impacts as lack of the rule would stop a needed power plant "resulting in blackouts[,] … [which] necessitate the use of diesel generators that pollute the air, the very danger the Clean Air Act aims to prevent." Similarly, in *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995), the final rule keeping the Bruneau Hot Spring Snail on the federal endangered species list was not vacated in order to prevent potential extinction, despite a flaw in the public comment process leading to the species listing. 58 F.3d at 1405–06. And, in *Allied Signal*, the agency rule continued in effect as the Nuclear Regulatory Commission recalculated fees for a certain class of federal licensees, because numerous other licensees would be negatively impacted if the entire rule was

vacated. 988 F.2d at 151. Delay of the project causes very little, if any, harm in this case, and allowing it to proceed would lead to irreversible damage.

The Willow Project is fundamentally at odds with U.S. legal obligations under international legal instruments and customary international law, and should not proceed in any manner as currently designed. A mere remand of this project to the agency, without a complete overhaul of BLM's action, will cause severe injury, and will not address the seriousness of this project's legal infirmities. Damage, potentially irreversible, will occur in the interim if this project is allowed to proceed in any fashion. The U.S. federal agencies must re-analyze their entire approach with alternatives that are consistent with rapid and steep GHG emission cuts, as well as less reliance on fossil fuel extraction, production, and consumption. In sum, the impacts of this flawed agency action are highly significant, the agency analysis possesses fatal flaws that harms many individuals and parties, and thus equity demands this final agency action be vacated.

## CONCLUSION

For all the reasons herein stated, Amici UN Rapporteurs respectfully request this Court to reject the current Willow Project, vacate the underlying agency actions, and instruct the federal agencies to reconsider their alternatives.

Dated: July 26, 2023

Respectfully submitted,

/s/ WJ Snape III

_____

William J. Snape, III (D.C. Bar No. 455266)*
David B. Hunter
AMERICAN UNIVERSITY,
WASHINGTON COLLEGE OF LAW
4300 Nebraska Avenue, NW
Washington, D.C. 20016
Telephone: 202-536-9351 (cell)
Telephone: 202-274-4443 (land)
wsnape@wcl.american.edu
dhunter@wcl.american.edu
*(*Pro Hac Vice* Motion Pending)

*Attorneys for Amici, U.N. Special Rapporteurs*