Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*, | Case No. 3:23-cv-00058-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendants. | |

## PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT
(Civil Rule 56(a), Local Civil Rule 16.3)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

LIST OF SHORT NAMES AND ACRONYMS ...........................................................vii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

STANDARD OF REVIEW................................................................................................. 7

PLAINTIFFS' INTERESTS ............................................................................................... 8

ARGUMENT...................................................................................................................... 9

    I.     BLM Violated NEPA and the NPRPA By Failing to Consider a Reasonable Range of Alternatives and Arbitrarily Limiting Its Authority..........................................9

    II.    BLM Violated ANILCA Section 810 by Failing to Consider Alternatives That Reduce Impacts to Subsistence Uses. ............................................................................. 17

    III.   BLM Violated NEPA by Failing to Adequately Assess Willow's Reasonably Foreseeable GHG Emissions and Climate Impacts. .....................................................22

    IV.   FWS and BLM Violated the ESA In Multiple Ways........................................ 24

        A.    FWS Violated the ESA's Requirements to Assess Effects and Use the Best Available Science by Failing to Consider Willow's Climate Impacts.............. 26

        B.    FWS's Take Findings are Unlawful and Unsupported by the Record. ..... 31

      1)    FWS applied an unlawful definition of harassment.................................... 31

      2)    FWS failed to assess likely non-lethal harassment of polar bears. .............. 35

        C.    BLM Unlawfully Relied on FWS's Illegal BiOp. ..................................... 36

    V.    The Court Should Vacate the Agencies' Decisions. ......................................... 36

CONCLUSION ................................................................................................................ 39

<u>TABLE OF AUTHORITIES</u>

**Cases**

*350 Montana v. Haaland,*
   50 F.4th 1254 (9th Cir. 2022) ................................................................... 22

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,*
   67 F.3d 723 (9th Cir. 1995) ............................................................... 10, 17

*Aluminum Co. of Am v. Bonneville Power Admin.,*
   175 F.3d 1156 (9th Cir. 1999) ................................................................... 25

*All. for the Wild Rockies v. U.S. Forest Serv.,*
   907 F.3d 1105 (9th Cir. 2018) ................................................................... 37

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
   515 U.S. 687 (1995) ................................................................................. 34

*Bark v. U.S. Forest Serv.,*
   958 F.3d 865 (9th Cir. 2020) ............................................................... 22, 23

*Cal. Cmtys. Against Toxics v. U.S. EPA,*
   688 F.3d 989 (9th Cir. 2012). .................................................................... 37

*Cal. Cosmetology Coalition v. Riley,*
   110 F.3d 1454 (9th Cir. 1997). .................................................................. 33

*Columbia Riverkeeper v. U.S. Army Corp of Eng'rs,*
   2020 U.S. Dist. LEXIS 219535 (W.D. Wash. Nov. 23, 2020) ............................ 23, 24

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) ........................................................... 27, 30

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.,*
   789 F.3d 1075 (9th Cir. 2015) ................................................................... 38

*Ctr. for Biological Diversity v. Bernhardt,*
   982 F.3d 723 (9th Cir. 2020) ............................................................... 23, 36

*Ctr for Biological Diversity v. Bureau of Land Mgmt.,*
   2023 U.S. Dist. LEXIS 97282 (D. Idaho June 2, 2023) ............................ 39

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
   698 F.3d 1101 (9th Cir. 2012) ........................................................... 28, 31

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538. F.3d 1172, 1217 (9th Cir. 2008) ........................................................ 22

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) ................................................................... 25

*Ctr. for Food Safety v. Vilsack*,
    734 F. Supp. 2d 948 (N.D. Cal. 2010) ...................................................... 37

*Diné Citizens Against Ruining Our Env't v. Haaland*,
    59 F.4th 1016 (10th Cir. 2023) ................................................................. 22

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
    423 U.S. 326 (1976) ................................................................................. 37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
    528 U.S. 167 (2000) ................................................................................... 8

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) .................................................................. 10

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) .................................................................. 37

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................................... 8

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ................................................................... 38

*Kern Cty. Farm Bureau v. Allen*
    450 F.3d 1072 (9th Cir. 2006) .................................................................. 30

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) ............................................... 38, 39

*Kunaknana v. Clark*,
    742 F.2d 1145 (9th Cir. 1984) .................................................................. 21

*Morongo Band of Mission Indians v. FAA*
    161 F.3d 569 (9th Cir. 1998) ................................................................... 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................... 8, 30

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG

iii

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ................................................................ 14

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ................................................................ 16

*Nat'l Family Farm Coal. v. U.S. EPA*,
    960 F.3d 1120 (9th Cir. 2020) ........................................................ 37, 39

*Nat'l Res. Def. Council v. Kempthorne*,
    506 F. Supp. 2d 322 (E.D. Cal. 2007) ................................................. 30

*Nat'l Res. Def. Council v. U.S. EPA*,
    38 F.4th 34 (9th Cir. 2022) ................................................................... 37

*Nw. Coal. for Alts. to Pesticides v. U.S. EPA*,
    544 F.3d 1043 (9th Cir. 2008) .............................................................. 8

*Pollinator Stewardship Council v. U.S. EPA*,
    806 F.3d 520 (9th Cir. 2015) ........................................................ 37, 38

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ............................................................... 26

*Save Our Valley v. Sound Transit.*,
    335 F.3d 932, 944 (9th Cir. 2003) ....................................................... 33

*Se. Alaska Conserv. Council v. U.S. Forest Serv.*,
    443 F. Supp. 3d 995 (D. Alaska 2020) ................................................ 18

*Sierra Club v. Marsh*,
    816 F.2d 1376, 1383 (9th Cir. 1987) ................................................... 38

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    555 F. Supp. 3d 739 (D. Alaska 2021) ........................................ passim

*Tenakee Springs v. Clough*,
    750 F. Supp. 1406 (D. Alaska 1990) .................................................. 18

*Tenakee Springs v. Clough*,
    915 F.2d 1308 (9th Cir. 1990) ........................................... 17, 18, 20, 21

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
    878 F.3d 725 (9th Cir. 2017) ......................................................... 33, 34

*W. Watersheds Project v. Zinke*,
441 F. Supp. 3d 1042 (D. Idaho 2020) ...................................................................... 37

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
376 F.3d 853 (9th Cir. 2004) ...................................................................... 10

**Statutes**

5 U.S.C. § 706 ...................................................................... 7, 37

16 U.S.C. § 1532 ...................................................................... 25

16 U.S.C. § 1536 ...................................................................... passim

16 U.S.C. § 1538 ...................................................................... 25

16 U.S.C. § 1539 ...................................................................... 25, 33

16 U.S.C. § 3120 ...................................................................... passim

42 U.S.C. § 4332 ...................................................................... 9

42 U.S.C. § 6504 ...................................................................... 4, 11, 15

42 U.S.C. § 6506a ...................................................................... passim

**Regulations**

40 C.F.R. § 1502.14 ...................................................................... 10

40 C.F.R. § 1502.16 ...................................................................... 22

40 C.F.R. § 1508.1 ...................................................................... 9, 22

40 C.F.R. § 1508.7 ...................................................................... 22

40 C.F.R. § 1508.8 ...................................................................... 22

43 C.F.R. § 3135.2 ...................................................................... 11

43 C.F.R. § 3137.71 ...................................................................... 12

50 C.F.R. § 17.3 ...................................................................... 32, 33, 36

50 C.F.R. § 402.02 ...................................................................... passim

50 C.F.R. § 402.14 ...................................................................... 25, 26, 27, 28

**Other**

Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range,
73 Fed. Reg. 28,212 (May 15, 2008) ...................................................................... 3, 27, 31

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG

v

Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States

      75 Fed. Reg. 76,086 (Dec. 7, 2010) ...................................................................... 3

Endangered and Threatened Wildlife and Plants; Proposed Redefinition of "Harm"

      46 Fed. Reg. at 29,492 (June 2, 1981).................................................................. 34

National Petroleum Reserve in Alaska Designation of Special Areas

      42 Fed. Reg. 28,723 (June 3, 1977) ....................................................................... 4

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| ConocoPhillips | ConocoPhillips Alaska, Inc. |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| GHG | Greenhouse Gas |
| Greater Willow 1 and 2 | GW 1 and GW 2 |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NPRPA | Naval Petroleum Reserves Production Act |
| Reserve | National Petroleum Reserve-Alaska |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| SILA | Sovereign Iñupiat for a Living Arctic |
| Willow | Willow Master Development Plan |

INTRODUCTION

      This is the second time that the Bureau of Land Management (BLM) and U.S. Fish and Wildlife Service (FWS) approved the Willow Master Development Plan (Willow) in violation of the law, threatening significant harm to the resources of the National Petroleum Reserve–Alaska (Reserve) and the people that rely on them. The Reserve is one of the wildest expanses of public lands in the United States. Although BLM administers an oil and gas program in the Reserve, it is required to protect the Reserve's wildlife and surface values, including by providing maximum protection for designated Special Areas. Willow, proposed by ConocoPhillips Alaska, Inc. (ConocoPhillips), would be an extensive new oil and gas complex in an undeveloped area between and adjacent to the community of Nuiqsut and the Teshekpuk Lake Special Area (TLSA). In August 2021, this Court vacated the Defendants' first approvals for Willow due to critical flaws in the agencies' analyses.[1] BLM then prepared a supplemental environmental impact statement (SEIS) and released a new record of decision (ROD) in March 2023.

      Plaintiffs Sovereign Iñupiat for a Living Arctic and partner groups (collectively, SILA) promptly filed this lawsuit because BLM and FWS again unlawfully approved Willow. Some of the legal issues are similar to the first approvals; some are new legal failures by the agencies. BLM again approved Willow without considering a reasonable range of alternatives consistent with the agency's obligations under the National

---

[1] *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*SILA*), 555 F. Supp. 3d 739, 804–05 (D. Alaska 2021).

Environmental Policy Act (NEPA) and its mandate to protect surface resources under the Naval Petroleum Reserves Production Act (NPRPA). BLM also failed to consider alternatives that would reduce impacts to subsistence users as required by Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA). BLM further failed to adequately assess all the effects of Willow's significant greenhouse gas (GHG) emissions. Finally, FWS, the agency responsible for ensuring that Willow would not jeopardize polar bears, issued a new Biological Opinion (BiOp) that failed to comply with the Endangered Species Act (ESA) because it failed to consider Willow's climate impacts to polar bears and its incidental take statement is legally unsupported and in error. Accordingly, this Court should grant SILA's motion for summary judgment, vacate BLM's ROD and related authorizations, and vacate FWS's BiOp.

## FACTUAL BACKGROUND

Stretching across the Western Arctic, the Reserve provides important habitat for wildlife, including threatened polar bears and migratory birds. It is a mosaic of tundra wetlands, characterized by continuous permafrost and numerous lakes, ponds, slow-moving streams, and wide rivers.[2] Subsistence is a critical part of life for communities in the region,[3] and the Reserve is home to the Western Arctic and Teshekpuk Lake Caribou Herds, which are key subsistence resources. The Ublutuoch River and Fish Creek, two

---

[2] AR820838–39. Citations to 2021_AR refer to the BLM administrative record filed in 2021 in *SILA*, 555 F. Supp. 3d 739; citations to AR or FWS_AR refer to the administrative record filed in this case at ECF Nos. 89-1 to 89-5 and 98-1 to 98-14.

[3] AR821022.

significant coastal rivers important for subsistence use, would be impacted by Willow.[4] Like the rest of the Arctic, the Reserve is warming at a rapid rate and experiencing significant impacts from climate change.[5]

The Reserve also provides habitat for polar bears, which are protected by the Marine Mammal Protection Act and listed as a threatened species under the ESA.[6] The Southern Beaufort Sea population, in the vicinity of Willow, is rapidly declining. The species is "likely to become in danger of extinction throughout all of its range due to declining sea ice habitat."[7] The Willow project area contains designated critical habitat, characteristic terrestrial denning habitat, and locations where polar bears have historically denned.[8]

In its management of the Reserve, BLM is required to provide maximum protection for the Reserve's Special Areas — including the TLSA and Colville River Special Area (CRSA) — which were designated because of their important resource

---

[4] AR821056–57 (explaining subsistence-access boat ramps would be constructed on these waterbodies).

[5] *See, e.g.*, AR820838.

[6] Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range, 73 Fed. Reg. 28,212 (May 15, 2008); Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76,086, 76,088–91 (Dec. 7, 2010).

[7] 73 Fed. Reg. at 28,293.

[8] AR513622 (map of designated polar bear critical habitat overlaid with Willow infrastructure).

Case 3:23-cv-00058-SLG   Document 105   Filed 07/26/23   Page 11 of 48

values.[9] When permitting oil and gas activities, BLM is required to condition and restrict such activities as needed to mitigate adverse effects on the Reserve's resources.[10]

ConocoPhillips' Willow project in the Reserve would extend the existing oil infrastructure surrounding the community of Nuiqsut further west. As proposed, Willow would include an extensive oil production facility, including a spiderweb of gravel roads connecting to ConocoPhillips' Alpine field, a central processing facility, up to five drill pads, an airstrip, 300+ miles of pipelines, an ice bridge over the Colville River for module transport, and bridges over important subsistence waterways.[11] It also includes two gravel mine sites adjacent to the Ublutuoch River.[12] All action alternatives considered in the SEIS would require waivers of previously established river setbacks intended to protect subsistence,[13] and would place at least one drilling pad and infrastructure in the Reserve's designated Special Areas.[14]

In August 2021, this Court vacated BLM's and FWS's first approvals due to serious deficiencies in the agencies' analyses under NEPA and the ESA.[15] Relevant here, the Court held BLM acted unlawfully by failing to consider the NPRPA's directive that BLM provide "maximum protection" for surface values within the TLSA, and by limiting

---

[9] National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977); *see* 42 U.S.C. § 6504(a).

[10] 42 U.S.C. § 6506a(b).

[11] AR820748–49, AR820855.

[12] AR820741.

[13] AR821037.

[14] AR820745.

[15] *SILA*, 555 F. Supp. 3d at 804–05.

alternatives based on the erroneous belief that ConocoPhillips had the right to extract all oil and gas from its leases.[16]

Shortly thereafter, BLM began preparing an SEIS. BLM released a draft SEIS in July 2022, which considered only one new alternative to its prior analysis — Alternative E.[17] Alternative E included four drill sites instead of five; it eliminated the drill site at BT4 within the TLSA and deferred approval of BT5.[18] Alternative E otherwise largely included the same infrastructure, mitigation, and design features as the other action alternatives, including placement of a drill site, pipelines, and gravel road within the TLSA.[19]

In comments on the draft SEIS, SILA questioned BLM's failure to consider a reasonable range of alternatives and its failure to properly address the legal issues identified by this Court.[20] SILA suggested additional alternatives consistent with the project purpose, such as eliminating infrastructure in Special Areas and setbacks, eliminating additional pads, or further limiting GHG emissions.[21] They also questioned the agency's failure to take a hard look at Willow's impacts to a range of resources,

---

[16] *Id.* at 770.
[17] AR814551.
[18] AR814553.
[19] *Id.*
[20] AR704800–20.
[21] AR704837–43 (comments suggesting alternatives).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                                 5

including subsistence and climate, and to consider measures to mitigate adverse effects to the Reserve's subsistence values, among others.[22]

In early 2023, BLM released its final SEIS. Like the draft, the final SEIS still failed to analyze alternatives that meaningfully reduced impacts to Special Areas, involved less infrastructure, or limited GHG emissions. The final SEIS also failed to consider and analyze additional protections for subsistence resources and uses, despite recognizing that there would be significant impacts to subsistence. The final SEIS presented the additive carbon dioxide equivalent ($CO_2e$) emissions estimated to result from Willow over its roughly 30-year duration. BLM found that under Alternative E, there would be a net increase of up to approximately 70 million metric tons (MMT) of $CO_2e$ over the No Action Alternative (i.e., the additive GHG from the project accounting for substitution of oil from other sources).[23] BLM further explained that the annual average GHG emissions from Willow together with direct emissions from reasonably foreseeable future actions would total approximately 25.85 MMT of $CO_2e$.[24] BLM, however, failed to fully calculate and consider the emissions from two reasonably foreseeable future actions despite having the information to do so.

---

[22] AR705042–48, AR705053–61.

[23] AR820776.

[24] AR821126 (explaining this number "compris[es] approximately 9.6 MMT of Willow direct and gross indirect emissions, approximately 2.1 MMT due to the change in downstream foreign oil consumption emissions, approximately 48,500 MT due to drilling activity from [Greater Willow 1 (GW-1) and Greater Willow 2 (GW-2)], and approximately 14.1 MMT of other North Slope emissions").

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                                 6

BLM finalized its ROD a month later, adopting Alternative E with additional modifications.[25] BLM approved drill sites BT1, BT2, and BT3 as discussed in the final SEIS, but stated it was disapproving rather than deferring BT5.[26]

Following consultation under the ESA, FWS issued a BiOp that purported to analyze Willow's impacts on polar bears and concluded that the project is not likely to jeopardize the continued existence of polar bears or adversely modify their critical habitat.[27] FWS summarized Willow's potential effects on polar bears that were considered in the BiOp, which included disturbance, human-bear interactions, spills, and effects to prey species.[28] FWS did not consider the effects of Willow's GHG emissions on polar bears in the BiOp. FWS ultimately determined that Willow was not likely to result in any incidental take of polar bears under the ESA.[29]

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if adopted "without observance of procedure required by law."[30] Agency action violates this standard when the agency "relie[s] on factors which Congress has not intended it to consider, entirely

---

[25] AR824900.
[26] AR824900–01.
[27] FWS_AR032537–39.
[28] FWS_AR032529.
[29] FWS_AR032540.
[30] 5 U.S.C. § 706(2)(A), (D).

fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[31] Although an agency's rational conclusions are entitled to deference, the Court must engage in a searching and careful review to ensure that the decision has a firm basis in the record.[32]

## PLAINTIFFS' INTERESTS

SILA has standing to bring this action because they and their members will suffer injuries in fact, those injuries are traceable to defendants' actions, and are redressable by a favorable decision of this Court.[33] Each plaintiff's mission is to protect public lands and wildlife, including in the Reserve.[34] Their members use and enjoy the Reserve, and live in the region and rely on the Reserve and the area that will be impacted by Willow for

---

[31] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*Motor Vehicles*), 463 U.S. 29, 43 (1983).

[32] *Nw. Coal. for Atls. to Pesticides v. U.S. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008).

[33] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000); *see also Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343–45 (1977) (associational standing test).

[34] Benjamin Greuel Decl. ¶¶ 8–13; Daniel Ritzman Decl. ¶¶ 6–11, 13–14, 19–23; Elisabeth Balster Dabney Decl. ¶¶ 4, 6–12; Kristen Miller Decl. ¶¶ 5–10, 19; Ellen Montgomery Decl. ¶¶ 3–4; Robert Thompson Decl. ¶ 5; Sam Kunaknana Decl. ¶¶ 5–6; Siqiñiq Maupin Decl. ¶¶ 7–10.

their way of life.[35] These members are injured by the agencies' approval of Willow in violation of the law.[36] A favorable decision from the Court would redress these injuries.

ARGUMENT

BLM violated NEPA, the NPRPA, and ANILCA in its review and approval of Willow by failing to consider reasonable alternatives to ConocoPhillips' proposal, and specifically alternatives that reduced infrastructure within Special Areas and impacts to surface resources and subsistence users. BLM also violated NEPA because it failed to take a hard look at all of Willow's climate effects. FWS violated the ESA because it failed to consider Willow's climate impacts to polar bears and its incidental take statement is unsupported and in error. In turn, BLM's reliance on FWS's arbitrary BiOp violated the ESA. Because of these legal violations, this Court should vacate the agencies' approvals.

## I. BLM VIOLATED NEPA AND THE NPRPA BY FAILING TO CONSIDER A REASONABLE RANGE OF ALTERNATIVES AND ARBITRARILY LIMITING ITS AUTHORITY.

BLM violated NEPA's mandate to study and disclose a reasonable range of alternatives based on a misinterpretation of its authority under the NPRPA.[37] Although

---

[35] Greuel Decl. ¶¶ 8–9, 22–23, 27–28, 31; Chad Otward Brown Decl. ¶¶ 8–9, 12–19; Ritzman Decl. ¶¶ 24–33; Dabney Decl. ¶¶ 21–22; Miller Decl. ¶¶ 20–21; Thompson Decl. ¶¶ 2–4; Kunaknana Decl. ¶¶ 2, 7–12, 25; Maupin Decl. ¶¶ 13, 18.

[36] Greuel Decl. ¶¶ 22–23, 31, 34–35, 38; Brown Decl. ¶¶ 20–23; Ritzman Decl. ¶¶ 34–41, 43–45; Dabney Decl. ¶¶ 20–24; Miller Decl. ¶¶ 22–25, 27–28, 30–32; Montgomery Decl. ¶¶ 19–23; Thompson Decl. ¶¶ 7–10, 16; Kunaknana Decl. ¶¶ 14, 16–17, 26–31, 33–35; Maupin Decl. ¶¶ 18, 20–24, 26.

[37] 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1508.1(z).

BLM purported to evaluate a new reasonable range of alternatives in the SEIS to comply with this Court's order, the agency committed the same fundamental error as before: failing to consider more protective alternatives based on a critical, mistaken assumption about the scope of ConocoPhillips' lease rights and BLM's statutory obligations.[38] In particular, BLM failed to evaluate alternatives that would meaningfully limit ConocoPhillips' activities — and, in turn, Willow's impacts on Special Areas and surface resources — because it concluded it could not strand any economically viable quantity of recoverable oil.[39]

The analysis of alternatives is the "heart" of an EIS.[40] "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice."[41] "The existence of a viable but unexamined alternative renders an [EIS] inadequate."[42]

The NPRPA mandates that BLM "shall include or provide for such conditions, restrictions, and prohibitions" on activities within the Reserve as it determines necessary to protect surface resources[43] and requires "maximum protection" of surface values in

---

[38] *SILA*, 555 F. Supp. 3d at 770.
[39] AR821709–10, AR821740.
[40] 40 C.F.R. § 1502.14.
[41] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison* (*Alaska Wilderness*), 67 F.3d 723, 729 (9th Cir. 1995)) (internal quotation marks omitted).
[42] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998)).
[43] 42 U.S.C. § 6506a(b).

Special Areas.[44] BLM has considerable discretion to suspend all operations on existing leases or units and deny development applications,[45] and may do so "in the interest of conservation of natural resources" or to mitigate "reasonably foreseeable and significantly adverse effects on surface resources."[46]

BLM once again failed to fulfill its mandates and act in accordance with its broad directive to protect the Reserve's surface resources when evaluating alternatives. This Court previously held that BLM violated NEPA by limiting its alternatives analysis based on the view that ConocoPhillips has the right to extract all possible oil and gas on its leases.[47] Despite that, BLM largely retained the prior EIS's alternatives and faulty alternatives screening criteria,[48] adding only one new alternative (Alternative E) and one new screening criterion.

Although BLM's new screening criterion purported to address this Court's decision, it missed the mark. This criterion stated that ConocoPhillips does not have a right to extract "all possible" oil under its leases and that BLM would consider alternatives that "would reduce infrastructure and impacts relative to [ConocoPhillips'] initial proposal," particularly within the TLSA.[49] However, when implementing this

---

[44] *Id*. § 6504(a).
[45] *Id*. § 6506a(k)(2).
[46] 43 C.F.R. § 3135.2(a)(1), (3).
[47] *SILA*, 555 F. Supp. 3d at 770.
[48] AR821948 ("All screening criteria from the previous Willow [] EIS were retained[.]").
[49] AR821948.

criterion on remand, BLM once again erroneously limited its authority and adopted functionally the same standard. In applying this criterion, the agency disregarded alternatives it deemed inconsistent with ConocoPhillips' lease rights or that failed to allow ConocoPhillips to "fully develop" the Willow reservoir.[50]

Citing 43 C.F.R. § 3137.71(b)(1), BLM defined "fully develop" to mean it could not consider an alternative that would strand an economically viable quantity of oil — which the agency arbitrarily said was a quantity that warrants an additional drilling pad.[51] In other words, BLM limited its consideration of alternatives to only those that would still allow ConocoPhillips to fully develop its leases.[52] BLM did not explain how it generated this definition or why this regulatory provision is applicable. In fact, 43 C.F.R. § 3137.71 imposes requirements on lessees — not BLM — and governs their contractual obligations regarding continued development planning within oil and gas units.[53] Nothing in this provision confers a development guarantee to lessees or limits BLM's authority to restrict or condition activities to protect the Reserve's surface resources. BLM's assumption that it cannot limit ConocoPhillips' access to economically viable quantities

---

[50] AR821709.
[51] AR821709–10, AR821740; *see also* AR501470 (meeting notes containing Environmental Protection Agency's inquiry regarding how BLM defined "economically viable," and response that "BLM concluded that if [ConocoPhillips] was proposing to develop a road and pad then it was economically viable to develop").
[52] AR821958.
[53] 43 C.F.R. § 3137.71(b)(1) ("If you have drilled a well that meets the productivity criteria, your plan must describe the activities to fully develop the oil and gas field.").

of oil disregards the plain language in the NPRPA and its implementing regulations and is contrary to this Court's previous decision.[54]

The draft SEIS contained numerous statements espousing BLM's unlawful view of its authority to restrict development. In describing the no action alternative, the agency stated, "BLM does not have the authority to select this alternative because [ConocoPhillips'] leases are valid and provide the right to develop the oil and gas resources therein."[55] BLM stated that it could not delay permitting Willow because "BLM is required by the NPRPA to administer an 'expeditious' program of oil and gas leasing" and may not deny development.[56] The final SEIS did not clarify BLM's position in responses to comments questioning BLM's limited view of its authority, nor did it consider any additional or suggested alternatives.[57] Instead, BLM affirmed that it screened alternatives based on the assumption that it must not strand economically viable quantities of recoverable oil.[58]

---

[54] *Supra* nn.43–45; *SILA*, 555 F. Supp. 3d at 769–70. *But see* AR821958 (explaining pad was required in the TLSA because "there is an economically viable quantity of recoverable oil in this area based on [BLM's] review of the available geologic data and because there is enough resource accessible from BT4 that [ConocoPhillips] has proposed constructing a gravel road and drill pad to access it").

[55] AR816462.

[56] AR815460.

[57] AR821737, AR821739 (comment response stating "[t]he Supplemental EIS does not state that BLM's legal authority to condition or reject the Willow Project is constrained, or that BLM cannot select Alternative A (No Action)").

[58] AR821958, AR820701.

Case 3:23-cv-00058-SLG   Document 105   Filed 07/26/23   Page 21 of 48

The addition of Alternative E in the SEIS and BLM's adoption of it as modified does not save BLM's faulty analysis. All action alternatives still included infrastructure in the TLSA and CRSA and presented only small variations on ConocoPhillips' proposed project.[59] BLM acknowledged that an alternative rejecting infrastructure, including a drill site, in the TLSA would "theoretically … provide maximum protection to important surface resources in the TLSA," but rejected evaluating such an alternative because "it would not meet the Project's purpose and need and would strand an economically viable quantity of recoverable oil."[60] BLM offered the same justifications for its refusal to evaluate alternatives that would eliminate both the originally proposed BT4 and BT5 drill sites or that would place the BT2 site outside of the protective Fish Creek setback.[61]

The ROD's elimination of BT4 and disapproval of BT5 do not alter the fact that BLM limited its analysis and decision based on the faulty premise that it must allow ConocoPhillips to "fully develop" the Willow reservoir. Indeed, Alternative E relocated the BT2 pad to allow recovery of the majority of the oil that would have been captured by

---

[59] AR820745; *see also* AR820732 ("Alternative E evaluates the full development of the Willow reservoir with up to four drill site pads[.]"). *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (rejecting substantially similar range of alternatives where agency rejected proposals that were "more consistent with its basic policy objectives than the alternatives that were the subject of final consideration.").

[60] AR821965.

[61] AR821965–67; *see also* AR501204–05 (chart deeming these alternatives "technologically and logistically feasible" and consistent with the District Court's decision, but contrary to ConocoPhillips' lease rights and full field development); AR505821 (explaining moving BT2 pad out of Fish Creek setback "does not meet full development requirements").

BT4.[62] And while BLM claimed it reduced impacts to surface resources and subsistence uses by disapproving BT5,[63] the ROD allows for 94% of the oil production from Alternative E identified in the final SEIS.[64] BLM explained that that Alternative E evaluated the "full development potential of the Willow Reservoir."[65] As such, the decision is substantially similar to BLM's legally flawed 2020 approval, which likewise did not authorize BT4 and BT5.[66]

The NPRPA requires BLM to condition, restrict, or prohibit activity to protect surface resources and "assure the maximum protection" of surface values within Special Areas.[67] BLM did not justify its conclusion that precluding infrastructure in the TLSA is inconsistent with the NPRPA's requirements.[68] And the agency failed to explain how evaluating any project alternative that would strand economically recoverable oil is inconsistent with its mandate to mitigate adverse effects on surface resources.[69] ConocoPhillips' leases do not, and legally could not, override BLM's statutory

---

[62] AR820732, AR820777 (final SEIS noting "under Alternative E, the elimination of BT4 results in 15.4 million barrels (2.45%) less production relative to Alternative B").

[63] AR824898.

[64] AR824901, AR509220 (chart demonstrating cumulative production under Alternative E (613.45 units) would be similar to Alternative B (628.87 units); s*ee also* AR505892 (noting total GHG emissions "[m]ay not be materially different between action alternatives").

[65] AR820701, AR821958.

[66] *SILA*, 555 F. Supp. 3d at 753.

[67] 42 U.S.C. § 6504(a).

[68] *Id*.

[69] *Id*. § 6506a(b).

obligations.[70] BLM's flawed screening criteria severely curtailed the agency's consideration of reasonable alternatives that address Willow's significant impacts to climate, wildlife, subsistence, and other natural values. BLM's framework for considering alternatives was again "inconsistent with its own statutory responsibility to mitigate adverse effects on the surface resources."[71]

Finally, BLM failed to explain its rejection of alternatives as inconsistent with the project's purpose and need. The purpose and need is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir … while providing maximum protection to significant surface resources within the [Reserve]."[72] As noted above, SILA and others suggested alternatives consistent with the project purpose and BLM's statutory obligations to protect Special Areas.[73] But BLM never explained, and it is unclear on its face, why alternatives that would reduce infrastructure or locate it outside of sensitive areas while otherwise allowing production would be inconsistent with this purpose or contrary to BLM's statutory obligations.[74]

---

[70] ConocoPhillips' leases reflect that the rights granted are subject to applicable laws, which include the suspension authority in the NPRPA. *See, e.g.*, 2021_ AR_400127.

[71] *SILA*, 555 F. Supp. 3d at 769.

[72] AR820723–24.

[73] *Supra* n.21. These were not amorphous middle-ground alternatives, but specific alternative components consistent with the purpose and need.

[74] *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) ("[R]eview of an agency decision is based on the administrative record and the basis for the agency's decision must come from the record.").

In sum, BLM violated NEPA and the NPRPA by failing to consider a reasonable range of alternatives due to its misinterpretation of its authority and obligations under the NPRPA.

## II. BLM VIOLATED ANILCA SECTION 810 BY FAILING TO CONSIDER ALTERNATIVES THAT REDUCE IMPACTS TO SUBSISTENCE USES.

BLM failed to consider alternatives that would reduce impacts to subsistence as required by ANILCA Section 810. ANILCA requires consideration of alternatives in a manner similar to, but also distinct from, NEPA's requirements.[75] Section 810 requires agencies evaluate "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes," in addition to evaluating the effects of a project and the availability of other lands.[76] If the agency determines at this first stage of analysis (called a Tier-1 evaluation) that the proposed action significantly restricts subsistence uses, the agency is required to make further findings (called a Tier-2 evaluation).[77] At the Tier-2 stage, the agency must determine whether such a restriction is necessary and consistent with sound public lands management; that the activity will involve the minimal amount of public lands necessary to accomplish its purposes; and require reasonable steps to minimize adverse impacts on

---

[75] *See, e.g.*, *Tenakee Springs v. Clough*, 915 F.2d 1308, 1312–13 (9th Cir. 1990); *Alaska Wilderness*, 67 F.3d at 731.

[76] 16 U.S.C. § 3120(a).

[77] *Id.*

subsistence.[78] These findings must be included in an EIS where one is required.[79] A core purpose of Section 810 is to ensure not only that impacts to subsistence are adequately considered, but also that adverse effects are minimized.[80] Indeed, Section 810 imposes substantive limitations on an agency's discretion to consider and select alternatives, and "an agency proceeds at its peril where it fails to include within the set of alternatives to be considered one which can be implemented in conformity with ANILCA's substantive mandate."[81]

In the draft SEIS, BLM concluded that all action alternatives would cause significant restrictions to subsistence.[82] In the final SEIS, BLM claimed that it considered ways to reduce impacts to subsistence users under Alternative E, but also acknowledged that none of the action alternatives meaningfully reduced the use and occupancy of lands needed for subsistence purposes.[83] Although Alternative E purportedly reduced infrastructure in the TLSA to lessen impacts to caribou hunting, BLM admitted the benefits to subsistence users from doing that would be "minimal."[84] BLM recognized that "the reduction in infrastructure in the TLSA under Alternative E will not result in a

_____

[78] *Id*. § 3120(a)(3).

[79] *Id*. § 3120(b); *Tenakee Springs*, 915 F.2d at 1312–13.

[80] *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1017 (D. Alaska 2020).

[81] *Tenakee Springs*, 750 F. Supp. 1406, 1421 (D. Alaska 1990), *rev'd on other grounds*, 915 F.2d 1308 (9th Cir. 1990).

[82] AR816488, AR816491, AR816494, AR816496.

[83] AR824339.

[84] AR824339 (explaining Alternative E would impact subsistence use areas in the TLSA for 67% of Nuiqsut harvesters, versus 73% under Alternative B).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                                      18

substantial reduction in direct impacts on Nuiqsut subsistence harvesters compared to the other action alternatives."[85] BLM provided only a conclusory sentence in the final SEIS that deferring BT5 would reduce the intensity and severity of impacts because all construction activity would not occur simultaneously.[86] But this statement misses the point: it is not just that construction occurring simultaneously will cause severe impacts to subsistence — it is that the project infrastructure as a whole will have significant ongoing impacts, and those impacts were not meaningfully reduced by the changes in Alternative E. BLM's statements in the ROD that there will be fewer impacts without BT5 are likewise questionable given the agency's findings that any reductions in impacts would be limited.[87]

BLM did not adequately consider any alternatives which would "reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[88] Indeed, Alternative E only "slightly" reduced impacts on subsistence compared to ConocoPhillips' proposed action, and still impacted a significant number of subsistence harvesters.[89] In its Section 810 analysis, BLM explained that it eliminated a number of alternatives from analysis "due to economic, or technological feasibility or

---

[85] AR821062.
[86] AR824339.
[87] AR824897–901.
[88] 16 U.S.C. § 3120(a).
[89] AR824340 (finding only "a slightly smaller percentage of Nuiqsut harvesters (88%) would potentially be affected under Alternative E compared to Alternative B (91%)," with that slight difference relating to goose hunting).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    19

practicability, or because they did not meet the purpose of the proposed action to produce the oil discovered on [ConocoPhillips'] leases."[90] As a result, BLM improperly limited the scope of its alternatives by relying on the erroneous assumption that it could not strand economically viable quantities of recoverable oil.[91] BLM also failed to reasonably explain why reducing infrastructure on lands relied upon by subsistence users was inconsistent with the purpose of the proposed action (i.e., ConocoPhillips' ability to produce oil on its leases).

In *Tenakee Springs v. Clough*, the Ninth Circuit considered and rejected arguments that an agency's contractual obligation with industry should preempt laws designed to protect subsistence, including Section 810.[92] The Court found that, where an agency improperly confines the scope of its authority under a statute or contract and thereby limits its consideration of alternatives, it acts contrary to the substantive purpose of Section 810 to minimize impacts to subsistence.[93] Similar to *Tenakee Springs*, BLM's interpretation of ConocoPhillips' lease rights and failure to consider alternatives to reduce the use and occupancy of public lands needed for subsistence is contrary to Section 810.[94]

---

[90] AR824332.

[91] *See, e.g.*, AR821958; AR820701; AR501204–5; *see also supra* Argument Part I.

[92] 915 F.2d at 1312.

[93] *Id*.

[94] 16 U.S.C. § 3120(a). The NPRPA's general requirement to conduct a leasing program does not lessen or override BLM's duties under Section 810; BLM was still obligated to consider alternatives at this stage that would reduce or eliminate the use and

As a result of its limited range of alternatives and misinterpretation of its own statutory authority, BLM also failed to meet its Tier-2 obligations.[95] BLM's Tier-2 findings stated that its decision involved the minimum amount of public lands necessary and included reasonable steps to minimize adverse impacts to subsistence.[96] However, those assertions are unsubstantiated and not entitled to deference because BLM operated under the assumption it could not consider options that would limit access to economically recoverable oil.[97] Had BLM not misinterpreted its own legal authority and mandates and limited the scope of its analysis, it could have considered other alternatives and measures to minimize the impacts to subsistence. BLM's Tier-2 obligations are closely related to, but distinct from, its obligation to consider a reasonable range of alternatives, and BLM failed to comply with both.[98] Moreover, BLM failed to include its Tier-2 findings in the final SEIS, contrary to ANILCA.[99] Inclusion of the findings in the ROD was not sufficient because it deprived the public of the opportunity to evaluate the findings prior to a final decision.

In sum, BLM failed to comply with ANILCA Section 810 by failing to consider alternatives that would reduce impacts to subsistence. This also rendered its findings that

occupancy of lands needed for subsistence. *See Kunaknana v. Clark*, 742 F.2d 1145, 1150–51 (9th Cir. 1984); 42 U.S.C. § 6506a(a)–(b).
   [95] 16 U.S.C. § 3120(a)(3)(B); AR824998–5001.
   [96] AR824998–5001.
   [97] *See, e.g.*, AR821958.
   [98] *Tenakee Springs*, 915 F.2d at 1312–13.
   [99] AR824371 (noting the final SEIS did not contain Tier-2 findings); 16 U.S.C. § 3120(b).

its approval involved the minimum amount of public land necessary for the project and

included measures to minimize subsistence impacts arbitrary and capricious.

## III. BLM VIOLATED NEPA BY FAILING TO ADEQUATELY ASSESS WILLOW'S REASONABLY FORESEEABLE GHG EMISSIONS AND CLIMATE IMPACTS.

NEPA requires agencies to consider the direct, indirect, and cumulative impacts of

climate change as part of their environmental analyses.[100] Indirect impacts are those that

are "caused by the action and are later in time or farther removed in distance but are still

reasonably foreseeable."[101] Such impacts include "growth inducing effects or other

effects related to induced changes in the pattern of land use."[102] Cumulative impacts are

those in addition to "other past, present, and reasonably foreseeable future actions."[103]

Cumulative impacts analyses are "insufficient when they discuss[] only the direct effects

of the project at issue on a small area and merely contemplate[] other projects but [have]

no quantified assessment of their combined impacts."[104] GW-1 and GW-2 qualify as both

indirect and cumulative impacts since they are growth-inducing effects of the Willow

project and reasonably foreseeable future actions. As such, BLM was required to do a

---

[100] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538. F.3d 1172, 1217 (9th Cir. 2008); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

[101] 40 C.F.R. § 1508.1(g).

[102] *Id.*

[103] 40 C.F.R. § 1508.7; *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872–73 (9th Cir. 2020); *see also 350 Montana v. Haaland*, 50 F.4th 1254, 1272 (9th Cir. 2022); *Diné Citizens Against Ruining Our Env't v. Haaland* (*Diné Citizens*), 59 F.4th 1016, 1039–44 (10th Cir. 2023) (holding BLM violated NEPA by failing to take a hard look at the direct, indirect, and cumulative impacts of GHG emissions).

[104] *Bark*, 958 F.3d at 872 (citation omitted).

quantified analysis of the reasonably foreseeable impacts of the Greater Willow development's GHG emissions.[105] It failed to do so.

BLM recognized the Willow development was likely to expand in the future and to enable further development in the region.[106] BLM specifically identified two additional pads — GW-1 and GW-2 — as reasonably foreseeable future actions that would likely rely on and expand Willow's infrastructure.[107] Despite that, BLM failed to look at all foreseeable climate impacts from GW-1 and GW-2 as part of its analysis of Willow. BLM recognized GW-1 and GW-2 were likely to produce up to 75 million barrels of oil and gas.[108] But BLM never calculated the downstream GHG emissions that burning the oil and gas produced from GW-1 and GW-2 would generate. In other words, BLM had the information it needed to calculate the projected downstream emissions from GW-1 and GW-2, but failed to do so and, thus, failed to consider those impacts.

Amplifying this failure is the fact that BLM arbitrarily limited its analysis of Greater Willow's GHG emissions by only including a subset of those pads' emissions in

---

[105] *Bark*, 958 F.3d at 872; *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020) (indicating the agency must do a quantitative estimate of reasonably foreseeable downstream greenhouse gas emissions); *see also Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*, 2020 U.S. Dist. LEXIS 219535, at *11–16 (W.D. Wash. Nov. 23, 2020) (indicating the Corps violated NEPA by failing to consider "indirect cumulative" GHG emissions).

[106] AR821122 (indicating "[c]onstruction of the Willow Project may result in additional development opportunities to the south and west of the Project area" and identifying Greater Willow as reasonably foreseeable).

[107] AR822689–93; AR821122.

[108] AR821124.

its overall analysis. BLM estimated the annual GHG emissions from GW-1 and GW-2 at approximately 8,500 metric tons from construction, 48,500 metric tons from development drilling, and 8,500 metric tons from routine operations.[109] But when quantifying Greater Willow's combined climate impacts and emissions, BLM included only the 48,500 metric tons from development drilling. The agency failed to include the emissions from construction and routine operations at GW-1 and GW-2 without explanation — thereby further underestimating its already inadequate GHG emissions analysis for Willow.[110] BLM's failure to calculate and consider the reasonably foreseeable downstream emissions from consumption of GW-1 and GW-2's oil and to consider all emissions from the construction, development, and operation of GW-1 and GW-2 as part of its impacts analysis was arbitrary and capricious and contrary to NEPA.[111]

## IV. FWS AND BLM VIOLATED THE ESA IN MULTIPLE WAYS.

To achieve its protective mandate, the ESA requires that federal agencies consult with FWS to ensure their actions are not likely to jeopardize the continued existence of species or destroy or adversely modify critical habitat.[112] "*Jeopardize the continued existence of* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a

---

[109] AR822690.
[110] AR821126.
[111] *Columbia Riverkeeper,* 2020 U.S. Dist. LEXIS 219535, at *11 (holding that the Corps should have considered the reasonably foreseeable indirect and cumulative effects of the downstream emissions from both the project and a related action).
[112] 16 U.S.C. § 1536(a)(2).

listed species ....”[113] An agency's BiOp, produced during formal consultation, must discuss the effects of the action on listed species or critical habitat and provide the consulting agency's opinion on whether the action is likely to cause jeopardy or adversely modify critical habitat.[114]

The ESA generally prohibits the "take" of any member of a listed species.[115] "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[116] The ESA provides a limited exception to this prohibition where the "taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."[117] Where FWS concludes that the action consulted on will cause incidental take, FWS must specify that take in an incidental take statement (ITS) in the BiOp.[118] An ITS serves multiple protective functions, including as a check on the agency's finding that the authorized take will not cause jeopardy.[119] An ITS must specify the impact of authorized take on the species, include reasonable and prudent measures to minimize impacts, and provide terms and conditions to implement such measures, among other requirements.[120]

---

[113] 50 C.F.R. § 402.02 (emphasis added).
[114] *Aluminum Co. of Am. v. Bonneville Power Admin.*, 175 F.3d 1156, 1158–59 (9th Cir. 1999) (citing 50 C.F.R. § 402.14(h)(3)).
[115] 16 U.S.C. § 1538(a)(1)(B).
[116] *Id.* § 1532(19).
[117] *Id.* § 1539(a)(1)(B).
[118] *Id.* § 1536(b)(4)(C)(ii)–(iv); 50 C.F.R. § 402.14(i).
[119] *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012).
[120] 16 U.S.C. § 1536(b)(4)(C)(i)–(iv).

FWS violated the ESA and APA because it failed to consider Willow's climate change–inducing effects and made arbitrary findings regarding potential take of polar bears. As a result, BLM's reliance on the invalid BiOp violated its substantive ESA obligations.

### A. FWS Violated the ESA's Requirements to Assess Effects and Use the Best Available Science by Failing to Consider Willow's Climate Impacts.

During consultation, FWS must consider the effects of the proposed action, including cumulative effects.[121] The effects of the action are "all consequences to listed species or critical habitat that are caused by the proposed action" that "would not occur but for the proposed action and [are] reasonably certain to occur."[122] The ESA further requires FWS to use "the best scientific and commercial data available" when formulating a BiOp.[123] "An agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them."[124] FWS failed to meet these mandates.

First, FWS violated the ESA by failing to consider Willow's GHG emissions and associated climate impacts on polar bears, contrary to the ESA's core mandates to

---

[121] 50 C.F.R. § 402.14(g)(3)–(4).

[122] *Id*. § 402.02; *see also id*. (broadly defining agency action to include "actions directly or indirectly causing modifications to the land, water, or air" and "effects" to include those which "may occur later in time and … consequences occurring outside the immediate area involved in the action").

[123] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

[124] *San Luis & Delta–Mendota Water Authority v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014).

analyze the effects of an agency's action on protected species and ensure against jeopardy.[125] The BiOp is devoid of any qualitative discussion or analysis of how the additive GHG emissions from Willow will affect polar bears and their critical habitat. Although the BiOp recognizes that climate change is causing habitat degradation and loss and thus negatively impacting polar bear populations,[126] it is silent as to how Willow will exacerbate those climate effects. In particular, the BiOp fails to acknowledge or explain how Willow's emissions could further reduce sea ice extent or otherwise reduce the survival and recovery of polar bears.

It is beyond dispute that GHG emissions drive climate change,[127] and that Willow would cause an increase in such emissions and thus exacerbate global climate change.[128] Polar bears are listed under the ESA primarily because climate change is degrading their sea ice habitat.[129] Willow's additive direct and indirect GHG emissions are "effects" under the ESA because these emissions would not occur "but for" BLM's action approving Willow and are "reasonably certain to occur."[130] At a minimum, Willow's GHG emissions "may affect" polar bears and meet the threshold requirement for being

---

[125] 50 C.F.R. § 402.14(g)(3)–(4).

[126] FWS_AR032467.

[127] AR820757–58; *see also e.g.*, AR644514–35 (2021 study examining need to align global fossil fuel production with climate limits).

[128] *See* AR820761–62 (explaining BLM's quantitative analysis and noting Willow's contribution to global climate change); *see also infra* n.133 (acknowledging significance of Willow's GHG emissions).

[129] 73 Fed. Reg. 28,212; FWS_AR032467.

[130] 50 C.F.R. § 402.02; *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (explaining FWS must consult on "all the possible ramifications of the agency action").

considered during consultation.[131] Therefore, FWS's failure to acknowledge Willow's GHG emissions in the BiOp and consider whether those emissions would reasonably be expected, directly or indirectly, to reduce the likelihood of polar bears' recovery violates the ESA.

Second, by ignoring Willow's climate-inducing effects on polar bears and their habitat, FWS failed to consider "the best scientific and commercial data available."[132] The best available science demonstrates that continued emissions of GHGs at current or higher rates will jeopardize polar bears. One study demonstrated that two-thirds of the world's polar bears could disappear by mid-century under current emissions rates.[133] Other recent studies considering projected sea ice decline have acknowledged that continued or increased GHG emission rates will jeopardize some polar bear populations by 2100.[134] BLM's final SEIS quantified the additive CO2e emissions estimated to result from Willow over its roughly 30-year duration and acknowledged that Willow's climate

---

[131] *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122–25 (9th Cir. 2012).

[132] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

[133] AR725287–94 (2010 study describing linear relationship between sea ice and warming climate).

[134] *See e.g.*, FWS_AR371710 (2015 study noting "[m]odels have also predicted losses of polar bear sea ice habitats … during this century and indicated that two-thirds of the world's polar bears could disappear if greenhouse gas emissions continue as predicted" (citations omitted)); FWS_AR036641 (2015 study concluding that polar bears' long-term persistence will require stabilizing projected loss of sea ice habitat by maintaining GHG emissions at or below a stabilized emissions scenario).

impacts would be significant.[135] And in fact, a study in the agency's record allows FWS to quantify the overall amount of sea ice loss that could be attributed to BLM's approval of Willow.[136] This information made it possible for FWS to consider the extent to which Willow will undermine attainment of GHG mitigation and thus impair the recovery of polar bears.[137] However, FWS failed to acknowledge Willow's significant additive GHG emissions or consider them in its jeopardy analysis.

By BLM's own calculations, Willow will result in millions of additive tons of $CO_2e$ being emitted that otherwise would not be. Since these additional emissions will contribute to additional sea ice loss, and polar bear survival and recovery depend on delaying sea ice losses, FWS cannot ignore the effect of these emissions on the species and its habitat.[138] An assessment of how much sooner a given level of sea ice loss will occur due to Willow's approval is an important component of assessing the impacts of BLM's action on polar bears and critical habitat that FWS ignored.[139] Despite the

---

[135] *See* AR820771 (quantifying Alternative E emissions and indicating the emissions reach the significance threshold stating, "[w]hile there are no specific NEPA guidelines to determine the significance of a particular quantity of GHG emissions, this climate test significance result is consistent with BLM's level of environmental review for the Willow MDP (i.e., development of an EIS)").

[136] AR751166–70 (2016 study estimating a loss of $3.0 \pm 0.3$ square meters of September sea ice per metric ton of anthropogenic $CO_2e$ emissions).

[137] *Id*. ("[A]ny measure taken to mitigate CO2 emissions will directly slow the ongoing loss of Arctic summer sea ice.").

[138] FWS_AR032467 (BiOp acknowledging "[l]oss of sea ice habitat due to climate change is identified as the primary threat to polar bears").

[139] *Motor Vehicles*, 463 U.S. at 43; *see also Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006) (quoting *Conner*, 848 F.2d at 1454 (explaining "FWS cannot ignore available biological information" when consulting under the ESA).

evidence before the agency, FWS failed to explain how Willow's substantial and significant additional GHG emissions would not appreciably diminish the likelihood of polar bear survival and recovery.

Instead, on this important point, the record contains a single e-mail where FWS agreed with a BLM memorandum asserting such effects need not be considered. The memorandum concludes that current science does not provide sufficient "granularity" to assess Willow's climate effects on polar bears.[140] This impermissibly increases the certainty required to consider effects in a BiOp. The ESA requires that FWS ensure that the effects of agency actions are not "likely" to jeopardize species or adversely modify critical habitat — which, here, includes sea ice.[141] Even if the agency was unable to predict with detail precisely how sea ice would be altered in the project area, FWS could not ignore those effects altogether. Uncertainty and incomplete information do not excuse agencies from predicting the effects of actions and assessing whether such effects are likely to reduce a species' likelihood of recovery.[142]

The agencies acknowledged that GHG emissions collectively contribute to climate change impacts like sea ice loss, which in turn impacts polar bears — indeed, this was the basis for FWS listing polar bears under the ESA.[143] FWS has acknowledged that

---

[140] FWS_AR032341, FWS_AR032345.
[141] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02; FWS_AR032530–31.
[142] 16 U.S.C. § 1536(a)(2); *Conner*, 848 F.2d at 1452–54; *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 367–70 (E.D. Cal. 2007).
[143] FWS_AR032344 (BLM memorandum); 73 Fed. Reg. 28,212.

emissions reductions are necessary to ensure the survival of the species.[144] The ESA does not require sea ice effects be evaluated at either a granular level or not at all, particularly when it is clear qualitatively that any significant additive amount of emissions is more likely than not inconsistent with the survival and recovery of a species that requires urgent emissions reductions to persist. FWS's failure to consider the impact of these emissions was arbitrary.[145]

## B. FWS's Take Findings are Unlawful and Unsupported by the Record.

In failing to issue an ITS for Willow, FWS applied an unlawful definition of "harassment" and failed to evaluate all potential nonlethal harassment that would impact polar bears over Willow's project life.

### 1) FWS applied an unlawful definition of harassment.

In determining that FWS "does not anticipate [Willow] would result in any incidental take of polar bears,"[146] the agency misinterpreted the definition of harassment to require specific intent directed toward the listed animal, rather than general intent to commit acts that create a likelihood for injury.

Harassment is defined in FWS's regulations as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an

---

[144] FWS_AR376521–22 (FWS polar bear status review noting that, unless GHG emissions are reduced, polar bears remain vulnerable to "range-wide loss of sea ice habitat").

[145] *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d at 1124 (explaining BiOp violates APA where it fails to consider all plausible effects to species).

[146] FWS_AR032540.

extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."[147] In its BiOp, FWS stated that incidental harassment would not occur because "incidental disturbances resulting from this proposed action would not occur intentionally or negligently" since ConocoPhillips' activities "would be conducted with the intent of developing and producing oil and gas and without any intent to annoy, disturb, or harass polar bears."[148] FWS acknowledged that it had not previously defined harassment in this manner.[149] This ad hoc definition is contrary to FWS's implementing regulations because it ignores that harassment occurs under the ESA without the specific intent to cause disturbance or injury of the listed animal. The inclusion of "negligent," "omission," and "creates the likelihood" in FWS's regulatory definition indicates that the specific intent to take wildlife is not required for an action to qualify as incidental harassment.[150] FWS's application of its ad hoc definition facially conflicts with its regulatory definition of the term "harassment."[151]

Moreover, it is contrary to the ESA. The ESA provides a limited exception to its take prohibition where the "taking is incidental to, and not the purpose of, the carrying

---

[147] 50 C.F.R. § 17.3.

[148] FWS_AR032541.

[149] FWS_AR032542. This definition is also inconsistent with FWS's acknowledgment that intentional and incidental take are distinct. *Id*.

[150] 50 C.F.R. § 17.3; *cf*. FWS_AR032542 (FWS's conclusory statement that its ad hoc definition would "give proper effect to all elements of the definition of 'harass'").

[151] *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 734 ("Deference to the FWS's interpretation is not warranted because the plain language of this regulation is not reasonably susceptible to the FWS's new interpretation.").

out of an otherwise lawful activity."[152] FWS's ad hoc definition of harassment ignores that the statute itself indicates incidental take occurs without the specific intent to cause take — i.e., when the applicant is engaged in an otherwise lawful activity. FWS read this out of the definition of incidental take by requiring ConocoPhillips have specific intent to cause harassment. FWS's interpretation, therefore, unlawfully amends the ESA to "add to the statute something which is not there."[153]

Congress' inclusion of "not the purpose of" demonstrates that acts done without specific intent directed toward a listed animal fall within the definition of incidental take. Consistent with the statute, the ESA's implementing regulations similarly define "incidental take" as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."[154] The plain language of the statute and regulation are clear; incidental take, by definition, occurs where the applicant lacks the specific intent to take the listed species. As the Supreme Court explained, the ESA's legislative history "make[s] clear that Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions."[155] FWS's ad hoc

---

[152] 16 U.S.C. § 1539(a)(1)(B).

[153] *Save Our Valley v. Sound Transit*, 335 F.3d 932, 944 (9th Cir. 2003) (quoting *Cal. Cosmetology Coalition v. Riley*, 110 F.3d 1454, 1460 (9th Cir. 1997) (internal quotation marks omitted).

[154] 50 C.F.R. § 402.02.

[155] *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995); *see also id.* at 696 n.9 (explaining Congress replaced the term "willfully" with "knowingly" in the ESA's penalties and enforcement provision to make "criminal violations of the act a general rather than a specific intent crime").

definition, which narrows the category of actions which would qualify as incidental take, is particularly problematic given the agency is interpreting an exception to a statutory take prohibition.[156]

FWS incorrectly relied on the Preamble to a 1981 rulemaking to assert that harassment requires specific intent to harass wildlife.[157] That rulemaking redefined "harm" for purposes of ESA criminal liability under Section 9; it did not purport to define "harass" or address Section 7 of the ESA, the relevant provision for BLM's consultation process for Willow. To the extent this Preamble has any relevance, it concedes that requiring "a showing of specific intent to harass or harm [] to prove a taking" is "inconsistent with the strict liability prohibitions established by [ESA] Sections 9 and 11."[158] The Preamble also explains "'[t]ake' is defined broadly" and "includes harassment, whether intentional or not."[159] Thus, the Preamble conflicts with FWS's ad hoc interpretation of harassment.

FWS's analysis should have focused on whether ConocoPhillips' actions or omissions in constructing and operating Willow could create a likelihood of injury by disturbing polar bears to such an extent as to significantly disrupt normal behavioral patterns — not whether ConocoPhillips intended to disturb polar bears. FWS's

---

[156] *Turtle Island Restoration Network*, 878 F.3d at 734–35.
[157] FWS_AR032541.
[158] 46 Fed. Reg. at 29,492.
[159] *Id*. at 29,491.

determination that it need not consider whether ConocoPhillips' unintentional actions could result in incidental take was legal error.

### 2) FWS failed to assess likely non-lethal harassment of polar bears.

FWS's presentation of its ad hoc definition of harassment as one of two independent reasons for its finding that incidental take would not occur does not save its faulty analysis.[160] FWS's assertion that ConocoPhillips' activities would not create a likelihood of injury via non-lethal harassment is arbitrary and conflicts with the record.

FWS acknowledged that Willow "could affect denning polar bears by obstructing or altering movements of pregnant females as they prospect for den sites; by disturbing females at den sites before cubs are born, which could force the female to search for an alternate site; or by causing premature den or den site abandonment after cubs are born, which could cause the imminent death of cubs or reduced probability of their survival over time."[161] However, in assessing impacts to denning bears, FWS largely limited its discussion to its modeling assessment's finding of Willow's low risk of cub injury or mortality.[162] It did not consider whether other disturbances — such as disturbing females to the point which they must search for an alternate den site — could qualify as incidental harassment. FWS also explained that "impacts on transient polar bears exposed to

---

[160] FWS_AR032541.
[161] FWS_AR032517.
[162] FWS_AR032518–19; FWS_AR032580 (explaining FWS's assessment of Level A harassment, i.e., where there is potential for injury, focused on cubs, whereas "[a]dult females received [non-injurious] harassment for any disturbance").

project-related disturbance potentially include disruption of normal activities, displacement from foraging and resting areas, and interruption of movement patterns."[163] Such impacts would logically create a likelihood of injury to polar bears by significantly disrupting their normal behavioral patterns including breeding, feeding, or sheltering.[164] FWS failed to explain why such impacts do not qualify as harassment.

In sum, FWS's failure to prepare an ITS to account for reasonably certain non-lethal harassment violated the ESA.[165]

### C. BLM Unlawfully Relied on FWS's Illegal BiOp.

BLM "cannot meet its Section 7 duties by relying on a legally flawed [BiOp] or failing to discuss information that might undercut the opinion's conclusions."[166] Because FWS's BiOp was facially flawed, as described above, BLM's reliance upon it to authorize Willow violated the ESA.[167]

## V. THE COURT SHOULD VACATE THE AGENCIES' DECISIONS.

Vacatur is the presumptive APA remedy.[168] The Court should apply the presumptive remedy and vacate the ROD, final SEIS, BiOp, and permits.

---

[163] FWS_AR032513.
[164] 50 C.F.R. § 17.3.
[165] *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 750.
[166] *Id.* at 751.
[167] 16 U.S.C. § 1536(a)(2), (b)(3)(A), (b)(4).
[168] 5 U.S.C. § 706(2); *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                          36

The agencies and Intervenor-Defendants may argue that vacatur is not warranted. As an equitable defense, the burden is on defendants to show that this case is one of the "rare circumstances" where the Court should deviate from the default remedy.[169] They cannot.

Courts recognize an exception to the remedy of vacatur in "limited circumstances."[170] Courts remand agency decisions without vacating when there could be serious environmental harm from vacating.[171] Courts also consider the seriousness of the agency's error and "the disruptive consequences of an interim change that may itself be changed."[172] In cases involving ESA violations, "courts will tip the scales in favor of the endangered species."[173]

---

[169] *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *All. for the Wild Rockies*, 907 F.3d at 1121–22; *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1083 (D. Idaho 2020).

[170] *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citing *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

[171] *See, e.g.*, *Nat. Res. Def. Council v. U.S. EPA*, 38 F.4th 34, 51–52 (9th Cir. 2022) (explaining courts consider harm to the environment); *Nat'l Family Farm Coal. v. U.S. EPA*, 960 F.3d 1120, 1144–45 (9th Cir. 2020) (stating courts "consider the extent to which either vacating or leaving the decision in place would risk environmental harm); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely [when] serious irreparable environmental injury [will occur if the decision is vacated].").

[172] *Pollinator Stewardship Council*, 806 F.3d at 532.

[173] *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987)); *cf. Cottonwood Envtl. Law Ctr. v U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) ("[C]ourts do not have discretion to balance the parties' competing interests in ESA cases.").

Most importantly, there will be no environmental harm from vacatur here. Instead, vacatur will protect the Willow project area from further gravel mining, construction of roads and extensive permanent infrastructure, and eventual development and production activities.[174] This alone weighs heavily in favor of the presumptive remedy of vacatur.[175] Regarding the seriousness of the error, the legal violations go to the core purposes of the statutes and are consequential to the agencies' decisions approving the project.[176] As this Court previously found, the agencies' violations of NEPA, the NPRPA, and the ESA are serious errors warranting vacatur.[177] Regarding the disruptive consequences, it is unlikely that the agency could reach the same decision following remand given that the legal errors are substantive breaches of statutory mandates, not technical or procedural issues with the permitting process.[178] Moreover, Interior conceded that last winter's work should not impact the remedy in this case and that those construction activities would not

---

[174] *See Pollinator Stewardship Council*, 806 F.3d at 532; *see also supra* Plaintiffs' Interests and cited declarations (describing harms from construction and operation). ConocoPhillips argued that its interim reclamation activities following last winter's construction would abate any safety risks or environmental damage during the pendency of this litigation, further confirming that there would be no additional environmental harm from vacating now. ConocoPhillips Alaska, Inc.'s Opp'n to Mots. for Inj. Pending Appeal at 24, Case No. 23-35226, ECF 18-1.

[175] *See supra* n.171; *cf. Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (declining to vacate rule where doing so would risk harm to endangered species).

[176] *Supra* Argument Parts I–IV.

[177] *See SILA*, 555 F. Supp. 3d at 804–05 (vacating prior Willow permits and BiOp).

[178] *See Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1244 (noting courts remand without vacatur when errors are "mere technical or procedural formalities that the [agencies] can easily cure").

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                         38

commit the agencies to any future outcome.[179] Additionally, arguments regarding

speculative earnings and tax revenues do not overcome the presumptive remedy of

vacatur — a point made even more clear in light of the fact that ConocoPhillips has not

made a final investment decision.[180] In sum, the default remedy of vacatur is warranted.

<u>CONCLUSION</u>

This Court should grant SILA's Motion for Summary Judgment, and vacate the

ROD, final SEIS, BiOp, and all decisions that rely on these documents, including the

right-of-way, any permits to drill, and the material sales contract.

Respectfully submitted,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

---

[179] Defs.' Mem. in Opp'n to Pls.' Mots. for Prelim. Inj. at 43, ECF No. 43.

[180] Mem. in Supp. of Pls.' Mot. for Temp. Restraining Order and Prelim. Inj. Exs. 6 at 1 (ECF No. 23-18) & 8 at 1 (ECF No. 23-20); *see, e.g.*, *Nat'l Family Farm Coal.*, 960 F.3d at 1144–45 (vacating despite financial impacts to farmers); *Ctr for Biological Diversity v. U.S. BLM*, 2023 U.S. Dist. LEXIS 97282 (D. Idaho June 2, 2023) (rejecting economic arguments and noting that if economic harm could overcome vacatur, permittees would be incentivized to invest heavily upfront).

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) because it contains 9,992 words, excluding the parts of the brief exempted by Local Civil Rule. 7.4(a)(4).

s/ Bridget Psarianos
Bridget Psarianos

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2023, I caused a copy of the PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

s/ Bridget Psarianos
Bridget Psarianos