TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

RICKEY D. TURNER, JR. (CO Bar No. 38353)
Senior Attorney
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1373
rickey.turner@usdoj.gov

PAUL A. TURCKE (ID Bar No. 4759)
Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (202) 532-5994
paul.turcke@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, et al., <br><br> Defendants, <br> and <br><br> CONOCOPHILLIPS ALASKA, INC., et al., <br><br> Intervenor-Defendants. | Case No. 3:23-cv-00058-SLG |

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 1 of 68

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

        Plaintiffs,

    v.

BUREAU OF LAND MANAGEMENT, et
al.,

        Defendants,
   and

CONOCOPHILLIPS ALASKA, INC., et al.,

        Intervenor-Defendants.

Case No. 3:23-cv-00061-SLG

## DEFENDANTS' MEMORANDUM
## IN OPPOSITION TO PLAINTIFFS' MOTIONS
## FOR SUMMARY JUDGMENT OR JUDGMENT UNDER LOCAL RULE 16.3

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 2 of 68

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................... 1

BACKGROUND ........................................................................................ 2

    I.     Legal Background ...................................................................... 2

         A.    NPRPA .......................................................................... 2

         B.    NEPA ............................................................................ 4

         C.    ANILCA Section 810 .................................................. 5

         D.    ESA ............................................................................... 6

    II.    BLM's NPR-A Programmatic Planning ..................................... 7

    III.   The Willow Project .................................................................... 7

         A.    The 2020 Decision and Subsequent Litigation ................ 7

         B.    The 2023 Decision ...................................................... 9

    IV.   Prior Proceedings ................................................................... 14

STANDARD OF REVIEW ....................................................................... 15

ARGUMENT ........................................................................................... 16

    I.     BLM Complied with NEPA ...................................................... 17

         A.    BLM Considered a Reasonable Range of Alternatives, Including Varying Drill Site Configurations and Alternatives Providing for Maximum Protection of the TLSA ........................... 17

         B.    BLM Properly Considered Climate Change and Greenhouse Gas Emissions, Including Foreign Emissions ................................ 24

    II.    BLM Complied with the NPRPA .............................................. 28

    III.   BLM's ANILCA Section 810 Analysis was Not Arbitrary or Capricious ............................................................................... 32

    IV.   Defendants' Analyses and Determinations Satisfy the ESA ...................... 36

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                i

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 3 of 68

A.     Defendants' Section 7 Analyses and Determinations Are Consistent with the ESA and Reasonable ........................................ 36

       1.     BLM's proposed action.......................................................... 36

       2.     The Service's Section 7 jeopardy analysis on polar bears. ..................................................................................... 38

B.     Plaintiffs' Arguments Fail to Rebut the Reasonableness of the Services' ESA Analyses and Determinations ................................. 40

       1.     The Services appropriately considered Willow's GHG emissions ............................................................................ 40

       2.     The Services complied with the best available science requirement ......................................................................... 45

       3.     FWS's findings regarding take of polar bears are lawful and supported by the record ................................................ 46

             a.     FWS's interpretation of harassment is lawful........... 47

             b.     FWS adequately considered all potential forms of harassment.................................................................. 51

                   i.     Adult female bears prior to and during the denning season ................................................ 51

                   ii.     Non-denning (transient) bears ........................ 54

V.     Remedy.................................................................................................... 56

CONCLUSION ....................................................................................................... 57

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Indus. Dev. & Exp. Auth. v. Biden,*
__F. 3d Supp.__, No. 3:21-cv-00245-SLG
2023 WL 5021555 n.56 (D. Alaska Aug. 7, 2023) ...................................................... 2

*All. for the Wild Rockies v. Pena,*
865 F.3d 1211 (9th Cir. 2017) ..................................................................................... 16

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ...................................................................................... 56

*Ariz. Cattle Growers' Ass'n v. FWS,*
273 F.3d 1229 (9th Cir. 2001) ............................................................................... 45, 48

*Bark v. U.S. Forest Service,*
958 F.3d 865 (9th Cir. 2020) ........................................................................................ 28

*Cal. Cmtys. Against Toxics v. EPA,*
688 F.3d 989 (9th Cir. 2012) ........................................................................................ 56

*CBD v. BLM,*
698 F.3d 1101 (9th Cir. 2012) ...................................................................................... 44

*Chilkat Indian Vill. of Klukwan v. BLM,*
399 F. Supp. 3d 888 (D. Alaska 2019) ................................................................... 26, 27

*Chilkat Indian Village of Klukwan v. BLM,*
825 F. App'x 425 (9th Cir. 2020) ................................................................................. 26

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,*
123 F.3d 1142 (9th Cir. 1997) ........................................................................................ 5

*City of Davis v. Coleman,*
521 F.2d 661 (9th Cir. 1975) ........................................................................................ 27

*Conner v. Burford,*
836 F.2d 1521 (9th Cir. 1988) ...................................................................................... 23

*Conner v. Burford,*
848 F.2d 1441 (9th Cir. 1988) ...................................................................................... 23

*ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n,*
No. 3:22-cv-00121-SLG, 2023 WL 2403720 (D. Alaska Mar. 8, 2023) ........................ 3

*Cook Inletkeeper v. Raimondo,*
    533 F. Supp. 3d 739 (D. Alaska 2021) ......................................................... 55

*Ctr. for Biological Diversity v. Bernhardt ("Liberty"),*
    982 F.3d 723 (9th Cir. 2020) ............................................................ 9, 25, 26

*Ctr. for Biological Diversity v. Kempthorne,*
    588 F.3d 701 (9th Cir. 2009) ..................................................................... 53

*Ctr. for Env't Law & Policy v. U.S. Bureau of Reclamation,*
    655 F.3d 1000 (9th Cir. 2011) ................................................................... 28

*Friends of Animals v. Haaland,*
    997 F.3d 1010 (9th Cir. 2021) ................................................................... 15

*Headwaters, Inc. v. BLM,*
    914 F.2d 1174 (9th Cir. 1990) ................................................................... 28

*Hoonah Indian Ass'n v. Morrison,*
    170 F.3d 1223 (9th Cir. 1999) ................................................................... 35

*In re Big Thorne Project,*
    857 F.3d 968 (9th Cir. 2017) ..................................................................... 16

*In re: Polar Bear Endangered Species Act Listing and 4(d) Rule Litig.,*
    818 F. Supp. 2d 214 (D.D.C. 2011) ........................................................... 42

*Kern Cnty. Farm Bureau v. Allen,*
    450 F.3d 1072 (9th Cir. 2006) ................................................................... 45

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) .............................................................................. 51

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma,*
    962 F. Supp. 2d 1230 (D. Or. 2013) .......................................................... 30

*Klamath-Siskiyou Wildlands Center v. Gerritsma,*
    638 F. App'x 648 (9th Cir. 2016) .............................................................. 30

*Kunaknana v. Clark,*
    742 F.2d 1145, 1150-51 (9th Cir. 1984) ...................................... 5, 32, 33, 34

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) ................................................................... 26

*Miccosukee Tribe of Indians of Fla. v. United States,*
    566 F.3d 1257 (11th Cir. 2009) ................................................................. 45

*Mont. Wilderness Ass'n v. Connell,*
    725 F.3d 988 (9th Cir. 2013) ..................................................................... 24

*Morongo Band of Mission Indians v. Fed. Aviation Admin.,*
  161 F.3d 569 (9th Cir. 1998) ................................................................. 18, 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................ 16, 46

*N. Alaska Env't Ctr. v. Kempthorne,*
  457 F.3d 969 (9th Cir. 2006) ................................................................... 3, 18

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior,*
  983 F.3d 1077 (9th Cir. 2020) ........................................................................ 4

*Nat. Res. Def. Council, Inc. v. Pritzker,*
  828 F.3d 1125 (9th Cir. 2016) ..................................................................... 31

*Nat. Res. Def. Council, Inc. v.EPA,*
  822 F.2d 104 (D.C. Cir. 1987) ....................................................................... 6

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ...................................................................................... 38

*Nat'l Parks Conservation Ass'n v. EPA,*
  788 F.3d 1134 (9th Cir. 2015) ..................................................................... 31

*Nat'l Wildlife Fed'n v. Espy,*
  45 F.3d 1337 (9th Cir. 1995) ....................................................................... 56

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.,*
  117 F.3d 1520 (9th Cir. 1997) ..................................................................... 18

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,*
  402 F.3d 846 (9th Cir. 2005) ....................................................................... 27

*Resources Ltd., Inc. v. Robertson,*
  35 F.3d 1300 (9th Cir. 1993) ....................................................................... 18

*River Runners for Wilderness v. Martin,*
  593 F.3d 1064 (9th Cir. 2010) ..................................................................... 15

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ................................................................................... 4, 5

*Rock Creek All. v. U.S. Forest Serv.,*
  703 F. Supp. 2d 1152 (D. Mont. 2010) ....................................................... 31

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) ....................................................................... 45

*San Luis & Delta-Mendota Water Auth. v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ....................................................................... 45

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*      Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                      v

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 7 of 68

*Se. Alaska Conservation Council v. U.S. Forest Serv.,*
  443 F. Supp. 3d 995 (D. Alaska 2020) ..................................................... 5, 32

*Sec'y of Labor, U.S. Dep't of Labor v. Seward Ship's Drydock,*
  937 F.3d 1301 (9th Cir. 2019) ...................................................................... 51

*Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA I*"),
  516 F. Supp. 3d 943 (D. Alaska 2021) ..................................................... 8, 21

*Sovereign Iñupiat for a Living Arctic v. BLM ("SILA IV"),*
  555 F. Supp. 3d 739, 752-53 (D. Alaska 2021) ..................................... passim

*Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA III*"),
  No. 21-35085, 2021 WL 3371588 (9th Cir. Mar. 9, 2021) ............................ 8

*Sovereign Iñupiat for a Living Arctic v. BLM ("SILA II"),*
  2021 WL 454280 (D. Alaska Feb. 6, 2021) ................................................... 8

*Sovereign Iñupiat for a Living Arctic v. BLM ("SILA V"),*
  Nos. 3:23-cv-00058-SLG and -00061-SLG,
  2023 WL 2759864 (D. Alaska Apr. 3, 2023) ..................................... 2, 20, 21

*Sovereign Iñupiat for a Living Arctic v. BLM,*
  2023 WL 4339382 (9th Cir. May 19, 2023) ................................................. 15

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
  878 F.3d 725 (9th Cir. 2017) ...................................................................... 16

*W. Watersheds Project v. Kraayenbrink,*
  632 F.3d 472 (9th Cir. 2011) ...................................................................... 31

*Westlands Water Dist. v. U.S. Dep't of the Interior,*
  376 F.3d 853 (9th Cir. 2004) ................................................................. 18, 28

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................ 5

**Statutes**

16 U.S.C. § 1362(18) ........................................................................................ 52

16 U.S.C. § 1362(18)(A)(ii) .............................................................................. 55

16 U.S.C. § 1532(19) ........................................................................................ 47

16 U.S.C. § 1536(a)(2) ........................................................................................ 6

16 U.S.C. § 1536(b) ............................................................................................ 6

16 U.S.C. § 1536(o)(2) ........................................................................................ 7

16 U.S.C. § 3112(1) ............................................................................................ 5

16 U.S.C. § 3120(a) ................................................................................................ 32, 33, 34

16 U.S.C. § 3120(a)(1)-(3) ................................................................................... 8, 32, 33

42 U.S.C § 6504(a) ...................................................................................................... 29, 31

42 U.S.C § 6506a(n)(2) ....................................................................................................... 29

42 U.S.C. § 4332(C) ............................................................................................................. 4, 5

42 U.S.C. § 6506a(b) .................................................................................... 4, 14, 29, 31

5 U.S.C. §§ 701-06 ............................................................................................................... 15

Pub. L. No. 94-258, 90 Stat. 303 (1976) .............................................................................. 3

Pub. L. No. 96-514, 94 Stat. 2957 (1980) ............................................................................ 3

**Regulations**

40 C.F.R. § 1502.1 ................................................................................................................ 24

40 C.F.R. § 1502.14(a) (2019) ................................................................... 18, 22, 25, 26

40 C.F.R. § 1502.9(c)(4) (2019) ........................................................................................ 10

40 C.F.R. § 1508.1(g) .......................................................................................................... 39

43 C.F.R. § 3137.71(b)(1) ................................................................................................... 23

43 C.F.R. Part 3130 ................................................................................................................ 3

43 C.F.R. Part 3150 ................................................................................................................ 4

43 C.F.R. Part 3160 ................................................................................................................ 4

50 C.F.R. § 17.3 (2019) ............................................................................... 47, 52, 56

50 C.F.R. § 402.02 ................................................................................................................ 43

50 C.F.R. § 402.02(d) .......................................................................................................... 39

50 C.F.R. § 402.14(a) ............................................................................................. 6, 10, 43

**Other Authorities**

40 Fed. Reg. 44,412 (Sept. 26, 1975) .............................................................................. 49

46 Fed. Reg. 29,490 (June 2, 1981) .................................................................................. 50

73 Fed. Reg. 28,212 (May 15, 2008) ................................................................................ 41

80 Fed. Reg 64,661 (October 23, 2015). ......................................................................... 42

85 Fed. Reg. 43,304 (July 16, 2020) ................................................................................ 10

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*　　Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.　　　　　　　　　　vii

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 9 of 68

87 Fed. Reg. 23,453 (Apr. 20, 2022)..............................................................10, 19

87 Fed. Reg. 64,700 (October 26, 2022) ........................................................42

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 10 of 68

Plaintiffs ask the Court to find unlawful the U.S. Bureau of Land Management ("BLM") March 2023 Record of Decision ("ROD") for the Willow Master Development Plan, which authorizes oil production on leases held by ConocoPhillips Alaska, Inc. ("ConocoPhillips") in the National Petroleum Reserve – Alaska ("Petroleum Reserve" or "NPR-A"). This Court, and the Ninth Circuit, rejected Plaintiffs' efforts to preliminarily enjoin work on the Willow Project. Initial implementation of Willow thus occurred at the end of the 2022-2023 winter work season.

The Court's sole task is to evaluate final agency action under the Administrative Procedure Act ("APA") consistent with statutory guidance. While Plaintiffs successfully challenged the October 2020 Willow Master Development Plan ROD ("2020 ROD"), BLM has since produced a Supplemental Environmental Impact Statement ("SEIS") and conducted additional consultation under the Endangered Species Act ("ESA"), thus addressing the Court's concerns with the 2020 decision. Plaintiffs contend that Defendants have only repeated past errors, but such characterizations find no support in the modified plan, which substantially reduces development, improves protections for the Teshekpuk Lake Special Area and subsistence resources and uses, and receives diverse support across Alaska's North Slope.

Defendants thoroughly analyzed Willow's potential impacts in their environmental documents, in satisfaction of the Naval Petroleum Reserves Production Act ("NPRPA"), the National Environmental Policy Act ("NEPA"), the Alaska National Interest Lands

Conservation Act ("ANILCA"), and the ESA.  Defendants' approval of the modified

Willow Project is not arbitrary or capricious.  The Court should deny Plaintiffs' motions

and enter judgment for Defendants.[1]

<h1 style="text-align:center"><u>BACKGROUND</u></h1>

This background discussion summarizes, and is derived from, this Court's prior

experience with the NPR-A and Willow.  *See*, *e.g.*, *Sovereign Iñupiat for a Living Arctic

*v. BLM* ("*SILA V*"), Nos. 3:23-cv-00058-SLG and -00061-SLG, 2023 WL 2759864 (D.

Alaska Apr. 3, 2023) (denying motions for preliminary injunction).

## I.    Legal Background

### A.    NPRPA

The 23.6 million acre NPR-A was originally established by executive order in

1923 as the Naval Petroleum Reserve #4.  *See N. Alaska Env't Ctr. v. Kempthorne*, 457

F.3d 969, 973 (9th Cir. 2006).  In 1976, Congress enacted the NPRPA, Pub. L. No. 94-

258, 90 Stat. 303, giving the area its current name of NPR-A and placing it under the

jurisdiction of the Secretary of the Interior.  In response to the 1979 oil crisis and

reflecting a desire to quickly move from federal to private oil development, Congress

amended the NPRPA in 1980, directing the Secretary to undertake "an expeditious

program of competitive leasing of oil and gas in the [Petroleum Reserve]."  Department

---

[1]      The Court has recently clarified that a motion for summary judgment "is an
appropriate mechanism to seek review of an agency action."  *Alaska Indus. Dev. & Exp.
Auth. v. Biden*, __ F. Supp. 3d __, No. 3:21-cv-00245-SLG, 2023 WL 5021555, at *6
n.56 (D. Alaska Aug. 7, 2023) (citations omitted).  Defendants therefore seek a final
judgment in their favor "effectively making [this] opposition filing[ ] [a] cross-motion[ ]
for summary judgment pursuant to Rules 56 and 7(b)."  *Id.*

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                    2

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 12 of 68

of the Interior Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, 2964-65 (1980); *see also ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, No. 3:22-cv-00121-SLG, 2023 WL 2403720, at *8 (D. Alaska Mar. 8, 2023) (Congress intended "to open the NPR-A to private leasing and exploration and production in order to increase domestic oil supply[.]").  Congress directed that activities taken pursuant to the NPRPA "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the" NPR-A.  42 U.S.C. § 6506a(b).  Thus, "[t]he NPRPA directs BLM to lease [Petroleum] Reserve land to private entities for oil and gas development, while taking such measures as BLM deems necessary or appropriate to mitigate adverse environmental impacts."  *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1081 (9th Cir. 2020) (citing 42 U.S.C. § 6506a).

BLM's oil and gas program in the NPR-A consists of three basic stages: leasing, exploration, and development.  At the leasing stage, and through the development of an "integrated activity plan" ("IAP"), BLM determines which lands to make available for leasing, which lands to defer or make unavailable, and what special stipulations and mitigation measures to apply to oil and gas activities to protect surface resources.  Once BLM adopts an IAP, it may offer for sale and ultimately issue oil and gas leases in any area in which such leasing has been authorized, following the process outlined in 43 C.F.R. Part 3130.

The leasing stage is just the first step toward development in the Petroleum

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                          3

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 13 of 68

Reserve.  Before any lessee may explore for oil and gas, it must obtain authorization under procedures set forth in 43 C.F.R. Part 3150 (governing geophysical surveys) and 43 C.F.R. Part 3160 (governing drilling operations).  If a lessee discovers oil or gas, it may seek approval to develop the resources by submitting an application for a permit to drill that includes a drilling plan and a surface use plan of operations.  *Id*. § 3162.3-1.  At that stage, BLM may require additional project-specific stipulations to further protect surface resources.  *Id*. § 3131.3.

B.    NEPA

NEPA seeks to ensure that federal agencies consider the environmental impacts of proposed major federal actions.  42 U.S.C. § 4332(C); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 16 (2008).  NEPA imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987).  "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (footnote omitted).

NEPA requires agencies to take a "hard look" at the environmental consequences of a proposed federal action.  *Id*. at 350.  For "major Federal actions significantly affecting the quality of the human environment" an agency must prepare an environmental impact statement ("EIS"), 42 U.S.C. § 4332(C), which serves the dual purposes of informing agency decision-makers of the significant environmental effects of a proposed major federal action and ensuring that relevant information is made available

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
Defs.' Mem. in Opp'n to Pls.' Mots. for Summ. J.                                                    4

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 14 of 68

to members of the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. If a reviewing court concludes that an EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences," and that its "form, content and preparation foster both informed decisionmaking and informed public participation[,]" then NEPA is satisfied. *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150-51 (9th Cir. 1997) (internal quotation marks and citations omitted).

C.    ANILCA Section 810

ANILCA Title VIII addresses subsistence management and use, advancing a policy that "the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands[.]" 16 U.S.C. § 3112(1). ANILCA Section 810:

> imposes procedural requirements upon federal decisionmakers; pursuant to its terms, an agency proposing an action resulting in the "use, occupancy, or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs," the availability of other lands for the same purpose, and "other alternatives" that would reduce the impacts to subsistence uses.

*Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1015 (D. Alaska 2020) (quoting 16 U.S.C. § 3120(a)). Section 810's two-step process creates a "procedural mechanism which insures . . . local input into the administrative decision-making process" with respect to subsistence uses and needs, *Kunaknana v. Clark*, 742 F.2d 1145, 1150-51 (9th Cir. 1984), and it identifies determinations that the agency must

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                          5

Case 3:23-cv-00058-SLG    Document 137    Filed 08/23/23    Page 15 of 68

make before proceeding with actions that significantly restrict subsistence uses, *see* 16
U.S.C. § 3120(a)(1)-(3).

    D.    <u>ESA</u>

ESA Section 7(a)(2) requires federal action agencies to consult with either the
U.S. Fish & Wildlife Service ("FWS") or the National Marine Fisheries Service
("NMFS") (collectively, "the Services") whenever a proposed federal action "may affect"
a threatened or endangered species or designated critical habitat that falls under their
respective jurisdiction.  The purpose of consultation is to ensure that any action federal
agencies authorize, fund, or carry out "is not likely to jeopardize the continued existence
of any endangered species or threatened species or result in the destruction or adverse
modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. §
402.14(a).

If a proposed federal action "may affect" but "is not likely to adversely affect" a
listed species or critical habitat, the action agency may consult informally with the
consulting agency.  *Id*. § 402.13(c).  If it concurs with the "not likely to adversely affect"
determination, the consulting agency issues a Letter of Concurrence and concludes
consultation.  *Id*.  If, however, a proposed federal action "may affect" and "is likely to
adversely affect" a listed species or critical habitat, the action agency must engage in
formal consultation with the consulting agency, which results in the consulting agency
issuing a "biological opinion" ("BiOp").  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(a).  If
the consulting agency determines that the project will not violate the jeopardy or adverse
modification prohibitions of ESA Section 7(a)(2), but anticipates the project will cause

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.    6

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 16 of 68

incidental take of a listed species, the consulting agency provides an incidental take statement with the BiOp that specifies the anticipated "amount or extent" of incidental take (if any) and any necessary or appropriate "reasonable and prudent measures" to minimize such impact with associated "terms and conditions" with which the action agency must comply. *Id*. § 402.14(i). If the action agency implements the project as proposed and complies with the terms and conditions of the incidental take statement, ESA Section 7(o)(2) exempts the specified level of take from the ESA Section 9 take prohibition. 16 U.S.C. § 1536(o)(2).

## II. BLM's NPR-A Programmatic Planning

In 2012, BLM issued an IAP/EIS, which analyzed development scenarios and environmental consequences for all BLM-managed federal lands and oil and gas resources within the NPR-A. AR820696. BLM issued a ROD approving that IAP in 2013. *Id*. BLM then issued a revised IAP/EIS and a new ROD in 2020, and after that plan was challenged, BLM again issued a new ROD for the IAP/EIS in 2022 ("2022 IAP ROD"). *See id*.; AR860402. The 2022 IAP ROD, nearly identical to the 2013 IAP ROD, makes 52 percent of the NPR-A available for oil and gas leasing and adopts lease stipulations and required operating procedures applicable to oil and gas activities, including the Willow Project. *See id*.; AR824926.

## III. The Willow Project

### A. The 2020 Decision and Subsequent Litigation

ConocoPhillips acquired multiple NPR-A leases issued by BLM between 1999 and 2017. *See* AR400001-131. After exploration drilling, ConocoPhillips announced

discovery of oil and gas prospects in the Willow area in 2017. *See* AR505216. In 2018, ConocoPhillips submitted its initial request that BLM approve its plan to develop oil and gas resources on the leases. *See* AR820723. ConocoPhillips's proposal included five drill sites, a processing facility, gravel roads, and other infrastructure. *Id.* In 2020, BLM issued the Willow Master Development Plan Environmental Impact Statement ("2020 EIS") and the FWS issued a BiOp, both analyzing the proposal. Following that, BLM issued the 2020 ROD and the U.S. Army Corps of Engineers issued a separate ROD ("Corps ROD"). *See Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA IV*"), 555 F. Supp. 3d 739, 752-53 (D. Alaska 2021). The 2020 ROD adopted ConocoPhillips's proposal of a project with five drill sites, but deferred approval on two of those sites at ConocoPhillips's request. *Id.* at 753.

Two sets of nearly the same plaintiff groups in the instant suits challenged the 2020 EIS, FWS BiOp, 2020 ROD, and Corps ROD, alleging that defendants did not comply with NEPA, the Federal Land Policy and Management Act, the ESA, and the Clean Water Act. The Court denied their motions for a preliminary injunction but later granted their motions for an injunction pending appeal. *See Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA I*"),516 F. Supp. 3d 943 (D. Alaska 2021);*Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA II*"), Case No. 3:20-cv-00290-SLG, 2021 WL 454280 (D. Alaska Feb. 6, 2021). Plaintiffs ultimately moved to dismiss the appeals because ConocoPhillips agreed not to undertake construction that winter. *See Sovereign Iñupiat for a Living Arctic v. BLM* ("*SILA III*"), No. 21-35085, 2021 WL 3371588 (9th Cir. Mar. 9, 2021).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
Defs.' Mem. in Opp'n to Pls.' Mots. for Summ. J.     8

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 18 of 68

In August 2021, the Court granted the plaintiffs summary judgment in part, holding that BLM violated NEPA and that FWS's BiOp was arbitrary and capricious and thus not in accordance with the ESA. *SILA IV*, 555 F. Supp. 3d at 805. The Court concluded that BLM failed to estimate "the downstream greenhouse gas emissions that will result from consuming oil abroad[.]" *Id*. at 767 (citing *Ctr. for Biological Diversity v. Bernhardt* ("*Liberty*"), 982 F.3d 723, 740 (9th Cir. 2020)) (internal quotation marks omitted). The Court also held that, in analyzing alternatives, BLM failed to acknowledge the extent of its authority under the NPRPA, 42 U.S.C. § 6506a(b), to consider measures ensuring that greater protection be given to surface values within an area known as the Teshekpuk Lake Special Area ("TLSA"). *SILA IV*, 555 F. Supp. 3d at 769-70. And the Court held that BLM had improperly narrowed its analysis based on its view that ConocoPhillips had the right to extract all possible oil and gas on its leases. *Id*. The Court also concluded that FWS's BiOp was not in accordance with the law because it relied on future unspecified mitigation measures for the polar bear, *id*. at 797-801, because it contemplated that at least some biologically significant disturbances of polar bears would occur distinct from hazing but nonetheless quantified non-hazing take of polar bears at zero, *id*. at 801-02, and because it set forth a flawed process for authorizing anticipated take, *id*. at 802-03. The Court vacated BLM's Willow Project approvals, and no party appealed.

B.    The 2023 Decision

BLM began preparing an SEIS to address the identified NEPA deficiencies. *See* AR500001 (Notice of Intent); AR824890-91 (explaining the SEIS was prepared "to

address the District Court's decision").  Although it was not required, BLM's effort included informal scoping.[2]  *See* AR500001; AR567366-77 (scoping report).  And BLM received assistance from multiple cooperating agencies including the North Slope Borough, Native Village of Nuiqsut, City of Nuiqsut, Iñupiat Community of the Arctic Slope, and the U.S. Environmental Protection Agency ("EPA").  AR820714.  BLM published a Draft SEIS in July 2022, held numerous public meetings, and ultimately received a total of 218,931 submissions during the public comment period, including 4,440 unique comments.  AR820698.  BLM released the Final SEIS ("FSEIS") in February 2023.  *See* AR824903.

In the FSEIS, BLM considered numerous new alternative concepts and analyzed four action alternatives in detail, including a new action alternative, Alternative E, which would approve three drill sites (sites BT1, BT2, and BT3), defer approval of a fourth (BT4), and disapprove a fifth (BT5).  AR820729-33.  BLM also considered different methods for the delivery of construction components to the remote development area.  AR820730; AR820746 (describing "sealift module delivery options").

The FSEIS substantially expands the discussion of greenhouse gas ("GHG") emissions and climate change.  *See* AR820757-78 (new text highlighted in yellow).  The FSEIS presents quantified predictions for multiple GHG emissions streams related to the

---

[2]      Scoping is optional for a supplemental EIS.  *See* 40 C.F.R. § 1502.9(c)(4) (2019).  The Council on Environmental Quality ("CEQ") amended its NEPA regulations in 2020 and again in 2022.  85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (Apr. 20, 2022).  Because BLM began this NEPA process before those amendments' effective dates, BLM applied the prior regulations.  AR821922.  This brief solely cites the CEQ regulations as codified at 40 C.F.R. Parts 1500-08 (2019).

Willow Project for each action alternative and quantifies downstream combustion GHG emissions resulting from the predicted change in domestic and foreign oil consumption. *See* AR820770 (Table 3.2.7) (providing quantified estimates of GHG emissions resulting from changes in foreign consumption); AR820771 (Table 3.2.8) (providing estimates of total GHG emissions addressing domestic and foreign impacts).

BLM's climate change analysis includes discussions of observed, AR820758-59, and projected, AR820759-60, climate trends in the Arctic and North Slope, and extensively discusses the effects of the project on climate change, AR820757-78. *See also* AR822432-73 (technical appendix describing methodology). Among other things, the FSEIS predicts climate effects for each of the alternatives, including through an analysis of the social cost of Project-related GHG emissions. BLM first quantified GHG emissions for the no-action alternative using an energy substitution model. AR820766-67. Next, BLM analyzed the social cost of GHG emissions for each action alternative, first by presenting calculated direct and indirect GHG emissions per alternative, AR820770-72, and then translating this to social cost comparisons (in dollars) per alternative, AR820772-78. BLM also identified lease stipulations and required operating procedures "intended to mitigate climate change impacts from development activity," including ambient air monitoring and restrictions to protect vegetation and tundra. AR820762. In providing cooperating agency feedback on a preliminary version of the FSEIS, the U.S. Environmental Protection Agency observed that the FSEIS contains "the most transparent analysis [it] has seen" regarding GHG emissions and their social cost. AR500740-47.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*　　Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.　　　　　　　　　　11

Case 3:23-cv-00058-SLG　Document 137　Filed 08/23/23　Page 21 of 68

On June 16, 2022, and November 11, 2022, BLM requested ESA Section 7 consultation with FWS and NMFS, respectively, regarding the potential effects of the Willow Project on ESA-listed species, including the polar bear and ice seals (bearded seal and ringed seal which depend on sea ice), among other species, and any designated critical habitat. AR511596; FWS_AR030001; AR524719; NMFS_AR000001-03. On January 13, 2023, FWS issued its BiOp which concluded formal consultation with BLM. With respect to the polar bear, FWS determined that the Willow Project was not likely to jeopardize the continued existence of the polar bear or adversely modify its designated critical habitat. FWS_AR032536-39. On March 2, 2023, NMFS agreed with BLM's "not likely to adversely affect" determination with respect to ice seals and issued a Letter of Concurrence, thus concluding informal consultation with BLM. NMFS_AR000143.

On March 13, 2023, BLM published the Willow Project ROD. AR824880; AR511590-92 (news release entitled "Interior Department Substantially Reduces Scope of Willow Project"). The ROD approved the development of three drill sites (sites BT1, BT2, and BT3) and approved delivery of components using the Colville River Crossing sealift module delivery option. AR824891-93. Rather than deferring the BT4 drill site, the ROD disapproved both BT4 and BT5, explaining that disapproving both of these drill sites "reduces the overall period of construction activities, which tend to involve more intense impacts to subsistence activities and wildlife including caribou." AR824900.

The ROD explained that selecting Alternative E, with modifications, "would result in fewer overall environmental impacts – including impacts to important surface resources, subsistence uses and resources, and the climate – than the other action

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                    12

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 22 of 68

alternatives and module delivery options and therefore is considered by BLM to be the environmentally preferred alternative." AR824897-98. "This alternative was developed by BLM and cooperating agencies to reduce impacts to surface resources, particularly in the TLSA, in response to the Alaska District Court's remand decision." AR824898. The ROD further explained that the selected alternative "reflects careful consideration of the Secretary's statutory directive to provide maximum protection to significant surface values within the NPR-A (i.e., Special Areas)" by requiring "less surface infrastructure, primarily within the TLSA," resulting in reduced "impacts to wetlands and vegetation, hydrology, gravel resources, and wildlife" and diminishing "potential impediments to the movement of caribou and subsistence users." *Id*. These benefits largely occur because:

> As compared to the Proponent's proposed project (Alternative B in the Final Supplemental EIS – proposing five drill sites: BT1, BT2, BT3, BT4 and BT5), the project approved in this Decision (BT1, BT2 and BT3 approved; BT4 and BT5 disapproved) significantly reduces the footprint of project infrastructure and the level of construction and operational activities, both within and outside of the sensitive TLSA, and thereby substantially reduces impacts to a broad range of surface resources.

AR824900; *compare* AR820717 (FSEIS map) and AR824894 (ROD map). "Disapproving BT4 and BT5 also reduces the Project's direct and indirect greenhouse gas emissions, better enabling the United States to reach its economy-wide target of reducing its net greenhouse gas emissions by 50% to 52% below 2005 levels by 2030 pursuant to its commitment under the Paris Agreement." AR824900.

Also on March 13, 2023, BLM issued decisions relating to an amended right-of-way grant, AR949599-650, and mineral material sale contract, AR949651-83. That day, ConocoPhillips began ice road construction and expressed its intent to conduct winter

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.     13

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 23 of 68

construction activities consisting of "(1) ice road and pad construction, (2) opening a gravel mine site, (3) constructing a gravel road that will provide access to the Willow Project area, (4) constructing a subsistence boat ramp on the Tinmiaqsiugvik River, and (5) gravel work in the Kuparuk River Unit."  *SILA V*, 2023 WL 2759864 at *3.

## IV.    Prior Proceedings

Plaintiffs filed their complaints on March 14 and March 15, 2023.  The Court adopted the parties' stipulated schedule, whereby on March 16, 2023, Plaintiffs moved for a preliminary injunction and, in the case of SILA Plaintiffs, a temporary restraining order.

The Court denied Plaintiffs' motions on April 3, concluding that Plaintiffs had failed to show they would be irreparably harmed by ConocoPhillips's planned winter activities.  The Court also concluded that the balance of the equities and public interest both "tip sharply" against granting preliminary injunctive relief. *Id*. at *15.  While one of Plaintiffs' members offered a declaration addressing adverse effects to subsistence hunting, the Court found more persuasive the considerable evidence from other local residents who indicated that even the limited 2023 winter road building would improve access to subsistence resources, including caribou hunting.  *Id*. at *13.[3]

Given these findings, the Court did not reach the likelihood of Plaintiffs' success on the merits. *Id*.  The Court subsequently denied Plaintiffs' motions for an injunction

---

[3]    The Court additionally noted broad support for the modified 2023 version of the Willow Project.  *Seeid*. at *14; *see also* AR776224-27 (letter of support from Voice of the Arctic Iñupiat on behalf of 24 of its members comprising tribes, Alaska Native corporations, local governments, and tribal nonprofits across the North Slope).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              14

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 24 of 68

pending appeal.  *See* Order, ECF No. 78 in No. 3:23-cv-58-SLG; ECF No. 87 in No.

3:23-cv-61-SLG.  Plaintiffs unsuccessfully sought emergency relief in the Circuit Court,

and shortly thereafter voluntarily dismissed their preliminary injunction appeals.  *See*

*Sovereign Iñupiat for a Living Arctic v. BLM*, No. 23-35226, 2023 WL 4339382 (9th Cir.

May 19, 2023).  Defendants have filed the administrative records and the parties now

seek a ruling on the merits in advance of the 2023-24 winter work season.[4]

## STANDARD OF REVIEW

Courts review agency decisions under the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701-06.  In such review a court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction,"

or "without observance of procedure required by law."  *Id.* § 706(2)(C).  Under the

arbitrary and capricious standard, the scope of review is deferential and narrow, and the

court is not to substitute its judgment for that of the agency.  *Friends of Animals v.*

*Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021); *see also River Runners for Wilderness v.*

*Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (the APA "does not allow the

court to overturn an agency decision because it disagrees with the decision") (citations

---

[4]    The briefs submitted by amici curiae do little to cure Plaintiffs' flawed arguments.
The Court's role focuses on evaluating the NEPA, NPRPA, ANILCA, and ESA claims
before it under the APA standard of review.  The Court has thus correctly noted that an
amicus cannot generally raise issues beyond those presented by the parties.  *See* Order Re
Mots. to File *Amicus Curiae* Brs. 4, ECF No. 134 in No. 3:23-cv-58-SLG; ECF No. 147
in No. 3:23-cv-61-SLG.  And amicus briefs that simply repeat Plaintiffs' arguments are
similarly unhelpful.  The Court has broad discretion to consider them, but the amicus
briefs provide little assistance in ruling on the pending motions.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                    15

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 25 of 68

omitted).  An agency must "articulate a satisfactory explanation for its action," and a court may find an agency decision arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732-33 (9th Cir. 2017) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).  It is "not the role of a reviewing court to weigh competing scientific analyses." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1221 (9th Cir. 2017) (cleaned up).  The judgments of land management agencies, like BLM, "often require trade-offs among worthy objectives . . . Congress left such judgments to a politically responsive agency with relevant expertise." *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017) (citation omitted).

## ARGUMENT

Plaintiffs are not entitled to any relief.  The FSEIS directly responds to the Court's 2021 decision.  Moreover, based on the analysis therein, BLM approved only a scaled-back version of the project that permits fewer drill sites and substantially less infrastructure in the TLSA than ConocoPhillips had proposed.  BLM prepared a robust analysis of climate change effects, including quantification of domestic and foreign downstream GHG emissions.  And while ANILCA Section 810 compliance was not a basis for remand, BLM revised that analysis and fully addressed its obligations to

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                    16

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 26 of 68

evaluate impacts to subsistence uses. Finally, Defendants complied with the ESA by conducting additional consultations and issuing a new FWS BiOp that resolved concerns raised by the Court in its 2021 decision. For all these reasons, the Court should deny Plaintiffs' motions and enter judgment for Defendants.

## I.        BLM Complied with NEPA

Plaintiffs err in contending that BLM failed to address procedural requirements under NEPA. *See* Pls.' Opening Br. for Summ. J. 9, ECF No. 105 in No. 3:23-cv-58-SLG ("SILA Br."); Pls.' Principal Br. under Local Rule 16.3(c)(1) 10, ECF No. 115 in No. 3:23-cv-61-SLG ("CBD Br.").[5] Underlying their arguments is Plaintiffs' belief that BLM should have adopted an alternative disapproving the Willow Project, or prohibited development in the TLSA. But neither the Court's 2021 ruling nor NEPA require BLM to include a specific action alternative or to adopt any particular outcome. Instead, the Court identified three deficient aspects of BLM's prior "alternatives analysis[.]" *SILA IV*, 555 F. Supp. 3d at 805. The FSEIS addresses and corrects each deficiency, and fully complies with NEPA.

### A.        BLM Considered a Reasonable Range of Alternatives, Including Varying Drill Site Configurations and Alternatives Providing for Maximum Protection of the TLSA

Both Plaintiff groups first argue under NEPA that BLM failed to consider a reasonable range of alternatives. *See* SILA Br. 17-25; CBD Br. 17-24. Plaintiffs ignore, however, BLM's thorough process of identifying and screening alternatives and the

---

[5]        Throughout this brief, the citations to Plaintiffs' filings refer to the ECF-stamped page numbers from the docket rather than the page numbers of the Plaintiffs' briefs.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*        Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                    17

Case 3:23-cv-00058-SLG    Document 137    Filed 08/23/23    Page 27 of 68

substantial revisions made in response to the Court's 2021 decision.

NEPA's implementing regulations direct an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (2019). An agency's choice of alternatives is governed by a "rule of reason," under which it "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (internal quotation marks and citation omitted). An agency's consideration of alternatives is governed by the "nature and scope of the proposed action." *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) (internal quotation marks and citation omitted). NEPA does not require an agency to discuss "[a]lternatives that are unlikely to be implemented[,]" *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993), alternatives that are "inconsistent with the [agency's] basic policy objectives," *see id.* (internal quotation marks and citation omitted), or "alternatives similar to alternatives actually considered[.]" *N. Alaska Envtl. Ctr.*, 457 F.3d at 978 (citation omitted). "Thus, an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990). The "touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 575 (9th Cir. 1998) (internal quotation marks and citation omitted).

As an initial matter, BLM rectified the deficiencies identified by the Court's 2021

summary judgment order. In reviewing the 2020 EIS, the Court held that BLM (1) "failed to consider the statutory directive that 'maximum protection' be given to surface values within the TLSA," and (2) improperly "developed its alternatives analysis based on the view that ConocoPhillips has the right to extract all possible oil and gas on its leases[.]" *SILA IV*, 555 F. Supp. 3d at 770. While the Court explained that "infrastructure is allowed, and indeed anticipated, within the TLSA," it concluded that BLM's explanation erroneously "presupposes the preclusion of any alternative development scenarios within the TLSA based on the lease terms[.]" *Id.* The Court directed BLM to "reassess its alternatives analysis[.]" *Id.*

BLM followed the Court's direction in the 2023 FSEIS and ROD. *See* AR824896-98. The FSEIS contains 266 pages discussing how BLM developed alternatives. AR821906-822171 (Appx. D-1). BLM and cooperating agencies generated and considered an extensive list of "alternative components" – essentially, different project design features, configurations, and timelines. BLM reasonably explained why it ultimately included some components but declined to include others within the action alternatives analyzed in detail. *See generally* AR821955-78. Among the numerous alternative components considered by BLM for the first time in the SEIS were alternative components number 36 and 44, which would reroute the Willow access road outside of the Colville River Special Area (leaving no facilities there), and prohibit all infrastructure in the TLSA, respectively. AR821957-58. BLM developed an entirely new Alternative (Alt. E) that reduced impacts over alternatives considered in the 2020 EIS and specifically eliminated an entire drilling pad and its associated infrastructure from within

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              19

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 29 of 68

the TLSA.  AR820732-33.

In contrast with the 2020 ROD, BLM ultimately approved a modified version of Alternative E, which amounts to a substantially scaled-back version of the Project that authorizes only three drilling pads, specifically denying ConocoPhillips's request for a fourth and fifth pad.  AR824897-901.  Compared to ConocoPhillips's proposal (Alt. B in the FSEIS), Alternative E – as modified in the ROD – "significantly reduces the footprint of project infrastructure and the level of construction and operational activities, both within and outside of the sensitive TLSA, and thereby substantially reduces impacts to a broad range of surface resources."  AR824900 (noting that reduced length of road and pipelines will also reduce adverse impacts to caribou and their subsistence harvest).  The slimmer project profile works in concert with broader lease stipulations adopted in the programmatic 2022 IAP ROD,[6] including specific measures to eliminate or reduce adverse effects within the TLSA.  *See* AR824892; AR824898-99; *see also* AR860402-07 (2022 IAP ROD).  Plaintiffs are thus incorrect that BLM repeated its earlier error.  *See* SILA Br. 22-23 (claiming the ROD "is substantially similar to BLM's legally flawed 2020 approval"); CBD Br. 21 (claiming Alt. E "is hardly different from the other three").

Brushing aside BLM's significant new analysis, Plaintiffs contend that BLM

---

[6]    Some of the same Plaintiff organizations challenged the 2020 IAP/EIS, and many of them supported the 2013 ROD and its reinstitution through the 2022 IAP ROD.  *See* Decl. of Benjamin Greuel ¶¶ 13-14, ECF No. 23-4 in No. 3:23-cv-00058-SLG  ("In response to our litigation, the Biden administration decided to review the IAP/EIS and ultimately reinstated the protections provided under the 2013 IAP").  This represents another significant difference between the present challenge to the Willow 2023 decisions and litigation challenging the 2020 decisions.

"once again erroneously limited its authority to consider alternatives" as a result of the purported "assumption that it must not strand economically viable quantities of recoverable oil." SILA Br. 20-21; CBD Br. 18-19. Relatedly, Plaintiffs assert that "all action alternatives . . . presented only small variations on ConocoPhillips' proposed project." SILA Br. 22; *see also* CBD Br. 21-22. These arguments misconstrue the Court's 2021 decision and ignore BLM's extensive new alternatives analysis in the 2023 FSEIS.

When it held in 2021 that BLM improperly limited alternatives "based on the view that ConocoPhillips has the right to extract all possible oil and gas on its leases," the Court had before it a much different alternatives analysis. *SILA IV*, 555 F. Supp. 3d at 770. In the 2020 EIS, "[e]ach action alternative considered the same drill site locations and would produce the same amount of oil." *Id.* at 768 n.156 (citations omitted). The 2023 FSEIS, by contrast, includes meaningful variations among the action alternatives, including the number and total surface area of drill site gravel pads (ranging from 62.8 to 88.3 acres); infield pipelines (ranging from 30.2 to 47.0 miles); gravel roads (ranging from 27.2 to 37.4 miles); ice roads (ranging from 431.2 to 962.4 miles); and infrastructure in special areas (ranging in the TLSA from 61.2 acres/4.9 miles of pipeline to 179.6 acres/12.2 miles of pipeline). *See* AR820747-52 (Table 2.7.1 comparison of action alternatives).

BLM also considered alternatives that produce less oil. *Contra* CBD Br. 19-22. BLM thoroughly analyzed the no-action alternative, under which no oil would be produced. *See*, *e.g.*, AR820766 (addressing Alt. A impacts to climate change). Then

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J. 21

Case 3:23-cv-00058-SLG Document 137 Filed 08/23/23 Page 31 of 68

BLM analyzed a new alternative in the FSEIS (Alt. E) estimated to result in somewhat less production of oil, 613.5 million barrels, than ConocoPhillips's proposed action (Alt. B), 628.9 million barrels. *See* AR820777. BLM ultimately approved an alternative in the ROD (modified Alt. E) that is projected to result in the development of considerably less oil than ConocoPhillips's proposal – 576 million barrels rather than 628.9 million barrels. *See* AR824901; *see also* AR824899 (ROD-approved Alt. E as modified is projected to include up to 199 wells, substantially fewer than the 251 wells anticipated under the other action alternatives). And modified Alternative E is also projected to have lower direct and indirect GHG emissions than the other action alternatives studied in detail. *See* AR824900-01; AR820770-71.

Finally, in addition to the no-action alternative, BLM considered an alternative component (No. 44) that would have prohibited all infrastructure in the TLSA by eliminating drill site BT4 and shifting drill site BT2 south to just outside the TLSA. AR821965. Plaintiffs argue that BLM improperly rejected this component. *See* CBD Br. 20; SILA Br. 21-22. But BLM satisfied NEPA's requirement that it "briefly discuss" its reasons for not incorporating this component, *see* 40 C.F.R. § 1502.14(a), and Plaintiffs ignore BLM's reasoned explanation in arguing otherwise.

BLM declined to carry forward alternative component No. 44 for multiple reasons. BLM explained that eliminating Willow Project infrastructure in the TLSA would "completely eliminate access to oil and gas resources in several" Willow leases in the TLSA that could only be reached by a drill site located within the TLSA. AR821965. It would also "substantially reduce access" to oil and gas resources in additional TLSA

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*        Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                    22

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 32 of 68

leases that could only be partially reached from a drill site location just outside of the TLSA. *Id*. And it would "create significant overlap in drilling reach between drill sites BT1 and BT2," as BT2 moved outside of the TLSA would be substantially closer to BT1. *Id*. BLM explained that the alternative was not reasonable or feasible due to the limits of available drilling technology and the fact that approximately 67 percent of ConocoPhillips's Willow Project "leases by surface area are located in the TLSA." *Id*. BLM thus reasoned that this alternative component would not meet the project's purpose and need and eliminated it from detailed evaluation. *Id*.

NEPA does not require BLM to consider this alternative component in greater detail. As the Court noted, "infrastructure is allowed, and indeed anticipated, within the TLSA."[7] *SILA IV*, 555 F. Supp. 3d at 769. Still, consistent with BLM's statutory authority, the 2023 FSEIS and ROD contain significant elements designed to avoid, reduce, or otherwise mitigate impacts in the TLSA. *See* AR824891; AR824898-99; AR824920-93 (identifying lease stipulations, required operating procedures, design

---

[7]     The Willow leases, issued between 1999 and 2017, are "non-[no surface occupancy]" leases; the Ninth Circuit has explained that they contain stipulations that "authorize the government to impose reasonable conditions on drilling, construction, and other surface-disturbing activities…[but] they do not authorize the government to preclude such activities altogether." *Conner v. Burford*, 836 F.2d 1521, 1524 (9th Cir. 1988), reprinted as amended, 848 F.2d 1441. Under that precedent, ConocoPhillips does possess development rights in its leases, subject to reasonable regulation. Plaintiffs also conflate ConocoPhillips's lease rights with its development obligations, contending that BLM "limited its consideration of alternatives" through application of 43 C.F.R. § 3137.71(b)(1). SILA Br. 20-21; CBD Br. 20 n.4. BLM makes no such claim. That provision speaks to ConocoPhillips's development obligations, not its lease rights, and requires, for the Willow development plan to be approved, that it "must describe the activities to fully develop the oil and gas field." 43 C.F.R. § 3137.71(b)(1).

features, and additional adopted mitigation measures); AR824394-455.  For example, BLM will develop compensatory mitigation for impacts on the TLSA and its caribou herd, including protecting surface areas, ensuring a buffer along all shores of the lake, and moving infrastructure farther from calving areas.  AR824955 (Measure 27).

In sum, BLM's analysis of a new action alternative, and its expanded discussion of the no-action alternative, correct the errors identified by the Court and satisfy NEPA's dual purposes of informed decision-making and meaningful public involvement.  *See* 40 C.F.R. § 1502.1; *Morongo Band*, 161 F.3d at 575.  Plaintiffs overlook much of BLM's analysis, and they fail to demonstrate that the analysis was arbitrary or capricious.

What Plaintiffs appear to want is more analysis of additional, unspecified variants somewhere between the no-action alternative and Alternative E.  But courts routinely reject similar arguments in NEPA cases.  *See*, *e.g*., *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (rejecting argument that BLM was required to consider additional "mid-range alternative[s]"); *Westlands Water Dist.*, 376 F.3d at 871-72 (reversing district court ruling finding range of alternatives to be inadequate, holding that "[t]he EIS was not required to consider more mid-range alternatives to comply with NEPA").  BLM considered a reasonable range of alternatives and explained why Plaintiffs' preferred alternative was not workable.  It thus satisfied NEPA's requirement that agencies take a "hard look" at the environmental consequences of a proposed federal action.

B.      BLM Properly Considered Climate Change and Greenhouse Gas Emissions, Including Foreign Emissions

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*      Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                  24

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 34 of 68

Plaintiffs argue that BLM was required to quantify downstream GHG emissions not from Willow, but attributable to "future development" that might be facilitated by Willow. *See* CBD Br. 24; SILA Br. 30-32.

In so arguing, they tacitly admit that the FSEIS amply addresses the Court's earlier ruling and *Liberty*. In the prior litigation the Court found that BLM's 2020 analysis was unlawful because it failed "to estimate foreign greenhouse gas emissions" caused by eventual production of oil from Willow, or failed to provide a reasonable explanation why producing such an estimate was not possible. *SILA IV*, 555 F. Supp. 3d at 763-65. The Court therefore concluded that "BLM's greenhouse gas emissions analysis suffers from the same flaws the Ninth Circuit identified in *Liberty*." *Id*. at 765; *see also Liberty*, 982 F.3d at 737. In response, BLM undertook a state-of-the-art analysis of climate change, including by quantifying Willow's domestic and foreign downstream GHG emissions. *See above* 10-11. Plaintiffs no longer challenge that aspect of BLM's NEPA compliance.

Changing tack, CBD Plaintiffs now argue that "BLM never disclosed the downstream [GHG] emissions consequences of Willow's significant growth-inducing effects." CBD Br. 28. In particular, they point to "Greater or West Willow" as the "most definitive of future development projects" and suggest that BLM failed to analyze potential impacts of Greater Willow "as a reasonably foreseeable future action." *Id*. at 26. SILA Plaintiffs similarly now argue that Greater Willow will have indirect or cumulative impacts that BLM failed to sufficiently address in the FSEIS. *See* SILA Br.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*      Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              25

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 35 of 68

30.[8]  These arguments are flawed on many levels.

Greater Willow is not a proposed action and, therefore, it is not reasonably foreseeable; it is instead "an oil and gas discovery with two exploration wells" in "areas [that] represent the general potential for future activity, but there is no certainty as to whether, how, or when this discovery could be developed."  AR821124.  This Court has flatly rejected a similar argument that some potential future action falling below the "proposed action" threshold required an indirect or cumulative impacts analysis.  *See Chilkat Indian Vill. of Klukwan v. BLM*, 399 F. Supp. 3d 888, 920 (D. Alaska 2019), *aff'd,* 825 F. App'x 425 (9th Cir. 2020).[9]

Even if there were a duty to examine potential impacts from Greater Willow, BLM did so.  Indeed, CBD Plaintiffs similarly attempted to leverage Greater Willow in their challenge to the 2020 EIS and ROD, and this Court was not persuaded.  There, CBD Plaintiffs argued that BLM failed to adequately address the cumulative impacts of

---

[8]  Plaintiffs make inconsistent arguments.  SILA Plaintiffs argue that Greater Willow variants "qualify as both indirect and cumulative impacts since they are growth-inducing effects of the Willow project and reasonably foreseeable future actions."  SILA Br. 30. CBD Plaintiffs' argument apparently focuses solely on Willow's "growth-inducing indirect effects" which are legally "[d]istinct from the direct and overall cumulative effects associated with a project[.]"  CBD Br. 25.

[9]  Any BLM NEPA obligations here focus on whether Greater Willow was a "reasonably foreseeable future action" when the FSEIS was prepared.  *See Liberty*, 982 F.3d at 737 ("[t]he agency need consider only indirect effects that are 'reasonably foreseeable'") (quoting 40 C.F.R. § 1508.8(b) (2019)).  And "reasonably foreseeable" "include[s] only proposed actions."  *Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th Cir. 2005) (internal quotation marks and citation omitted).  The Ninth Circuit has explained that the analysis of projects "not yet proposed" and that are "more remote in time" is "both speculative and premature."  *Id.*  By contrast, "any future project, once proposed, becomes more concrete and less speculative[.]"  *Id.*

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*       Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                         26

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 36 of 68

Greater Willow. *SILA IV*, 555 F. Supp. 3d at 781. But this Court concluded that the discussion of Greater Willow in the 2020 EIS was "sufficient for the decision maker and the public to understand the potential scope and impacts of Greater Willow." *Id.* The same conclusion should follow here, especially because the current record – which includes both the 2020 EIS and the 2023 FSEIS – presents an even more thorough discussion of Greater Willow. *See* AR821128-29 (including "near-field modeling analysis" for Greater Willow in the discussion of reasonably foreseeable future actions considered for cumulative impacts to air quality). Most relevant here, the FSEIS discloses the "[p]rojected cumulative GHG emissions from all of the cumulative sources described [in the FSEIS] and potential future development resulting from the BLM Coastal Plain Oil and Gas Leasing Program . . . and the NPR-A[.]" AR821126.

Moreover, Plaintiffs' cited cases are readily distinguishable. *See* CBD Br. 25 (citing *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005), and *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975)), as prescribing requirements for "assessment of a project's specific growth-inducing indirect effects"). Most fundamentally, the cases have no bearing here because the growth induced by the proposed actions at issue in those cases was "reasonably foreseeable" in tangible ways that the agency failed to consider. Greater Willow does not meet these criteria and this Court has found "inapposite" an attempt to extend *City of Davis* in the manner now attempted by CBD Plaintiffs. *See Vill. of Klukwan*, 399 F. Supp. 3d at 920 (distinguishing *City of Davis* and concluding that a NEPA document need not forecast impacts stemming from potential future actions that are not themselves proposed); *see*

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              27

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 37 of 68

*also Ctr. for Env't Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1011-12 (9th Cir. 2011) (finding potential future growth "attenuated" and reliant on multiple future agency approvals). Even putting that aside, however, the cases CBD Plaintiffs cite involve consideration of "growth-inducing effects" in the wholly different context of assessing whether the impacts of the proposed action at issue were *significant* and therefore rendered unlawful the agency's decision to prepare an Environmental Assessment ("EA") rather than an EIS. Because BLM prepared an EIS here, the holdings of *Ocean Advocates* and *City of Davis* do not apply.[10]

Given Greater Willow's nascent but uncertain status, the FSEIS does more than NEPA requires in analyzing any potential future impacts. And there is no basis in the cases Plaintiffs cite for extending the quantification requirement described in *Liberty* beyond the proposed action and onto all potential future developments. The Court should reject Plaintiffs' NEPA-related GHG emissions arguments.

## II. BLM Complied with the NPRPA

Both Plaintiffs at times suggest that BLM has violated the NPRPA, although it is not entirely clear whether this is an independent argument or part of their NEPA

---

[10] SILA Plaintiffs rely on *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020) in arguing that "BLM was required to do a quantified analysis of the reasonably foreseeable impacts of the Greater Willow development's GHG emissions." SILA Br. 30-31. But *Bark* is distinguishable for the same reasons as *City of Davis* – it held that an inadequate discussion of cumulative impacts invalidated an agency's reliance on an EA to conclude that the proposed action would have no significant impacts. *See Bark*, 958 F.3d at 870-72 (explaining the "decision not to prepare an EIS was arbitrary and capricious for two independent reasons," the first being that "the effects of the Project are highly controversial and uncertain" and the second that the agency "failed to identify and meaningfully analyze the cumulative impacts of the Project").

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*  Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.  28

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 38 of 68

argument.  *See* SILA Br. 25 (stating that BLM's alleged violation of NEPA alternatives requirements is "based on a misinterpretation of its authority under the NPRPA"); CBD Br. 30-34 (separate section alleging violations of the NPRPA).  In any event, BLM reasonably exercised its broad discretion and properly applied the NPRPA's resource-protection requirements.

The NPRPA provides for "maximum protection" of surface values in the conduct of oil and gas activities within designated special areas of the NPR-A in this fashion:

> Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.

42 U.S.C § 6504(a).[11]  A separate section of the NPRPA applies more broadly throughout the NPR-A:

> Activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Petroleum Reserve].

*Id*. § 6506a(b).

Consistent with these requirements, the FSEIS and ROD contain numerous required operating procedures, design features, and other mitigation measures specifically designed to provide maximum protection to TLSA surface resources, and to avoid or

---

[11]    When Congress amended the NPRPA in 1980 it stated "that any exploration *or production* undertaken pursuant to this section shall be in accordance with section 6504(a) of this title."  42 U.S.C § 6506a(n)(2) (emphasis added).

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*       Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                        29

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 39 of 68

mitigate reasonably foreseeable and significantly adverse impacts to other NPR-A surface resources. *See above* 23-24; AR824891; AR824898-99; AR824920-92. Plaintiffs do not engage with these measures, instead repeating their argument that BLM was required to consider an alternative that eliminates all infrastructure in the TLSA. *See* SILA Br. 23-24. But Plaintiffs point to no supporting authority constraining BLM's discretion or defining how BLM must assure maximum protection to TLSA surface resource values. Indeed, Plaintiffs acknowledge the NPRPA imbues BLM with "considerable discretion." SILA Br. 18-19. Such discretion is apparent from the statutory text, and courts decline to interpret similar provisions to "maximize" protection or "minimize" impacts as imposing some quantifiable threshold against which to judge agency action. *Cf. Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013), *aff'd,* 638 F. App'x 648 (9th Cir. 2016) (finding BLM determination that a decision "is reasonably designed to minimize" impacts from vehicle use "is entitled to deference").

CBD Plaintiffs' GHG-based emissions arguments also fail. CBD Plaintiffs contend that Willow's "massive [GHG] emissions" will "exacerbate" climate harm to surface values in violation of Section 6504(a). CBD Br. 30. In this context, they posit that BLM's efforts to reduce GHG emissions were not sufficiently meaningful, or that the hypothetical possibility of an approach that would produce fewer GHG emissions demonstrates that Alternative E, as modified, falls somewhere short of providing "maximum protection." *See* CBD Br. 31. The argument fails because it is speculative and lacks connection to the relevant statutory terms. While Plaintiffs cite to general discussions about climate change "in the Arctic and North Slope," they fail to connect

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                    30

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 40 of 68

climate change effects of Project emissions to "surface values" of the TLSA or "surface resources" in any particular area within the Petroleum Reserve. *Id.* at 30-31; 42 U.S.C. §§ 6504(a), 6506a(b).

CBD Plaintiffs' challenge to the adequacy of BLM's mitigation measures outside Special Areas fares no better. The statutory language frames BLM's authority in the broadest terms, directing that approved activities "include or provide for such conditions, restrictions, and prohibitions as the Secretary *deems necessary or appropriate* to mitigate *reasonably* foreseeable and *significantly* adverse effects on the surface resources of the [Petroleum Reserve]." 42 U.S.C. § 6506a(b) (emphasis added). Plaintiffs' cited cases are easily distinguished because they involve adoption of measures "in 'direct conflict'" with "the recommendations of [the agency's] subject matter experts[.]" *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011)). Or they involve conclusions regarding compliance with some quantified standard or calculable conclusion. *See* CBD Br. 33-34 (citing *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015) (addressing reduction of nitrous oxide emissions to specified levels and cost-effectiveness of measures adopted)); *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1170 (D. Mont. 2010), *aff'd in part sub nom. Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439 (9th Cir. 2011) (failure to explain decision to forgo sediment reduction measures when other aspects of the decision quantify the level of sediment reduction required and sediment-producing effects of the approved action).

In sum, Plaintiffs' mere disagreement with BLM's choices to assure maximum

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                              31

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 41 of 68

protection of TLSA surface values or to take necessary and appropriate measures to address NPR-A surface resources falls far short of their burden. BLM acknowledged the statutory criteria, reasonably explained its analysis and measures taken, and fully complied with the NPRPA.

## III.   BLM's ANILCA Section 810 Analysis was Not Arbitrary or Capricious

SILA Plaintiffs contend that BLM violated Section 810 of ANILCA, 16 U.S.C. § 3120(a), in two ways. They first contend that BLM failed to consider alternatives that reduce impacts to subsistence uses. SILA Br. 25. Second, they assert that this failure to evaluate alternatives led BLM to erroneously conclude that Alternative E was the alternative that involved the minimal amount of public lands necessary to accomplish the project purpose. *Id.* at 29. The record demonstrates that BLM fully complied with Section 810 and did not act arbitrarily or capriciously.

Section 810 establishes a two-step process. *See Kunaknana*, 742 F.2d at 1150-51; *Se. Alaska*, 443 F. Supp. 3d at 1015. At Tier 1, the threshold question is whether the agency's action "would significantly restrict subsistence uses[.]" 16 U.S.C. § 3120(a). To make that finding, the agency considers the effect of such action "on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* If an agency determines that the proposal will significantly restrict subsistence uses, it may not authorize the action unless it satisfies the Tier-2 requirements. Tier 2 requires the agency to give notice, hold a hearing, *see id.* § 3120(a)(1) & (2), and determine that:

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

*Id*. § 3120(a)(3); *see also Kunaknana*, 742 F.2d at 1150-51 (explaining process).

BLM's Section 810 analysis and determinations are found in Appendix G of the FSEIS, AR824300-75, and Appendix B of the ROD, AR824994-5003, respectively. Consistent with the requirements of Tier 1, FSEIS Appendix G contains a thorough analysis of all four action alternatives (including Alternative E), the no-action alternative, the three module delivery options, and the "cumulative case" – a comprehensive discussion of impacts of the Willow Project and other reasonably foreseeable future actions. *See*, *e.g*., AR824302-03 (Appx. G, Table of Contents). BLM developed Alternative E to address the Court's concerns that it had not considered an alternative that provided greater protection of the TLSA. *See* AR824999. Alternative E reduced infrastructure within the TLSA relative to the previously analyzed alternatives in order to protect caribou movement and migration and reduce the effects of development on the traditional subsistence way of life of the community of Nuiqsut. *Id*. For each alternative, BLM evaluated the effects on subsistence uses and needs, the availability of other lands, and other alternatives that would reduce or eliminate the use of public lands needed for subsistence purpose. *See* AR824300-74.

BLM concluded that all action alternatives, including Alternative E, may significantly restrict subsistence uses due to altered distribution of caribou and furbearers

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*      Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                    33

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 43 of 68

and limitations on subsistence user access near the Willow Project area. *See* AR824998.

BLM noted, however, that Alternative E would result in fewer impacts within the TLSA,

a key habitat and migratory area for caribou, by reducing infrastructure there by 43% and

relocating infrastructure (including roads, pipelines, and the nearest drill site) farther

from calving and mosquito-free areas that are particularly important for caribou.

AR824998-99. Contrary to Plaintiffs' contentions, *see* SILA Br. 26-27, these reductions

were not meaningless. BLM further explained that the Tier-2 determinations regarding

the alternative ultimately selected by the agency would be made available in the ROD

making that selection. AR824371.

Consistent with that representation, Appendix B of the ROD summarizes the

Section 810 evaluation and presents BLM's Tier-2 determinations specific to the

alternative selected by the ROD. *See* AR824998-5001. With regard to the first two Tier-

2 determinations required by Section 810, BLM determined that the modified Alternative

E adopted by the ROD was necessary to fulfill the purpose and need of the proposed

action and would involve the minimal amount of public lands necessary to accomplish

that purpose. AR824998-5000. On the latter point, the modifications to Alternative E

approved by BLM would "further reduce[] impacts to subsistence uses by disapproving

drill site BT5," as compared to the version of Alternative E that BLM studied at Tier 1,

which disapproved drill site BT4 but deferred approval of BT5.[12] AR825000.

---

[12] SILA Plaintiffs assert that BLM "admitted" that Alternative E's reduction of infrastructure in the TLSA would only have "minimal" benefits. SILA Br. 26. But their argument selectively cites BLM's discussion of direct impacts. BLM explained that the benefit of TLSA design features and stipulations is primarily "a lessening of *indirect*

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*  Nos. 3:23-cv-00058; -61-SLG
Defs.' Mem. in Opp'n to Pls.' Mots. for Summ. J.  34

Case 3:23-cv-00058-SLG  Document 137  Filed 08/23/23  Page 44 of 68

Elimination of these drill sites reduces impediments to caribou movement and subsistence user access that were the basis of BLM's positive "may significantly restrict subsistence uses" finding. AR825001. The ROD also imposes numerous protective and mitigation measures designed to reduce impacts. *See* AR824920-93 (identifying and discussing mitigation measures). While the no-action alternative would result in fewer impacts than Alternative E, it would not accomplish the purpose and need of the proposed action because it would not allow for any production of oil discovered on ConocoPhillips's leases. AR824308; AR824999; *see also Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1229-30 (9th Cir. 1999).[13]

Thus, the record shows that, contrary to SILA Plaintiffs' contentions, BLM fully considered alternatives that would minimize the use of public lands needed for subsistence purposes in both its Tier-1 and Tier 2-analyses. BLM did not improperly limit its analysis to avoid stranding economically viable oil reserves. *See above* 20-23. BLM also reasonably concluded that the modified Alternative E would involve the minimal amount of public lands necessary to accomplish the purpose and need of the project. *See* AR824999-5000; AR824339.

---

impacts (e.g., impacts related to resource availability resulting from deflection of caribou)." AR824339 (emphasis added). The difference between Alternatives E and B when such indirect impacts are taken into account is much more significant than Plaintiffs portray.

[13]     Plaintiffs do not appear to challenge BLM's third required Tier-2 finding – that BLM will take reasonable steps to minimize adverse impacts upon subsistence users. Regardless, the record shows that BLM incorporated various mitigation measures into Alternative E to minimize impacts. AR824500-01. For example, Alternative E includes construction of subsistence boat ramps, avoidance of overwintering fish habitat, and measures to ensure caribou crossings. *See* AR824500; AR824920-93.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                    35

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 45 of 68

In sum, BLM performed all procedures required under ANILCA Section 810 and its conclusions are reasonable and supported by the FSEIS and ROD. Plaintiffs have failed to show that BLM's analysis or conclusions were arbitrary and capricious.

## IV. Defendants' Analyses and Determinations Satisfy the ESA

Plaintiffs do not assert that FWS repeated the errors identified in the Court's 2021 decision of inappropriately relying on uncertain Marine Mammal Protection Act ("MMPA") mitigation measures or relying on a flawed process for authorizing incidental take. Instead, they (1) raise a new argument that Defendants ignored the potential impacts of Willow's GHG emissions in their ESA Section 7 determinations concerning polar bears and ice seals; and (2) renew the prior argument that FWS failed to properly analyze incidental take due to harassment. *See* SILA Br. 32-44, CBD Br. 34-47. Plaintiffs are wrong. The Services' Section 7 conclusions on the impacts of BLM's authorization of ConocoPhillips's Willow Project on listed species and designated critical habitat, including the FWS's polar bear harassment (take) analysis, are consistent with the ESA, reasonable, supported by the record, and should be upheld. FWS_AR032536-39; NMFS_AR000143.

### A. Defendants' Section 7 Analyses and Determinations Are Consistent with the ESA and Reasonable

1. BLM evaluated the threats of climate change and Willow's contribution to climate change through GHG emissions

In addition to providing "the most transparent [GHG] analysis . . . seen to date" in its NEPA process, *see* AR500744 (EPA comments on preliminary FSEIS), BLM fully grappled with climate-change related issues in its ESA Section 7 consultations. BLM

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              36

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 46 of 68

recognized the ongoing and projected impacts of climate change and specifically addressed the potential for the Willow Project to contribute to climate-related impacts on listed species and their critical habitat.  *See*, *e*.*g*., FWS_AR030115-20.  More specifically, as relevant to Plaintiffs' arguments, BLM acknowledged the impact on sea ice – habitat needed by polar bears and ice seals – from global climate change, and Willow's contribution to climate change.  *See*, *e*.*g*., FWS_AR030115-17; NMFS_AR000073; AR820757-62.  For example, BLM detailed extensively the increasing threat of climate change on ice-dependent listed species.  FWS_AR030115-20; NMFS_AR000073. Additionally, BLM estimated that Willow's contribution to climate change could be an increase in global GHG emissions by approximately 9,268 thousand metric tons per year of CO2 equivalent for 30 years.  AR820709.  BLM based its estimate on a relatively small contribution of direct emissions from Willow's construction and operations and, in larger part, on the indirect GHG emissions ascribable to Willow from the processing, transport, and subsequent combustion of oil from downstream consumers.  AR820671.

BLM next acknowledged the trend of diminishing summer sea ice in the Arctic. AR820758-59.  Based on the latest science, BLM explained that Arctic summer sea ice varies approximately linearly with global surface temperature and the minimum annual Arctic sea ice area will likely fall below 1 million square kilometers at least once before 2050.  AR820759.  BLM also noted that the 15 lowest September sea ice extents in the satellite record (since 1979) have all occurred in the last 15 years and that certain scientists estimated the sensitivity of September Arctic sea-ice loss from the period 1953 to 2015 to be $3.0 \pm 0.3$ square meters per metric ton of anthropogenic CO2 emissions.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*      Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                          37

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 47 of 68

AR820758. As a result, BLM acknowledged the potential adverse impacts on sea ice and, in turn, sea ice-dependent listed species. AR820758-59; FWS_AR030115-20; NMFS_AR000073.

While BLM did not specifically consider Willow's GHG emissions as part of its initial ESA "effects" analysis, this is immaterial because it determined the Willow Project "may affect" listed species and their designated critical habitat. Accordingly, before authorizing the Project, BLM requested Section 7 consultation with the Services to ensure that the Willow Project's potential effects would not likely jeopardize the continued existence of listed species or their designated critical habitat and, in some cases, would not even likely adversely affect various species. FWS_AR030001; NMFS_AR000001-02.

2.     The Services' Section 7 analyses comply with the ESA

The ESA does not impose any obligation on action agencies or consulting agencies to solicit or consider public comments on the scope of Section 7 consultations. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007). Nevertheless, during its supplemental NEPA process, BLM received comments from Plaintiff CBD raising ESA-related concerns, among others. FWS_AR032348-70. Among other things, CBD claimed that the Willow Project "may affect hundreds of threatened and endangered species and their critical habitats due to the resulting increase in carbon emissions" and "BLM must therefore consult [on those species] under the ESA prior to permitting" the Project. FWS_AR032369. CBD further claimed that BLM must expand its "Action Area" beyond previously utilized parameters (*i.e.*, onshore areas

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*      Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                    38

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 48 of 68

within a mile of project activities and offshore areas within 1.5 miles of project activities) because "it is clear that the anticipated greenhouse gas pollution from oil and gas activity under Willow will harm listed species far beyond the immediate area of the proposed action in a manner that is attributable to the agency action." FWS_AR032327. After considering these comments and the recent scientific studies proffered by Plaintiff, BLM evaluated whether the scope of its ongoing consultations with the Services should be expanded. FWS_AR032312. In doing so, BLM gave proper effect to all relevant standards governing Section 7 consultation.

Compared to the NEPA context, where agencies must disclose all "reasonably foreseeable" consequences of their proposed actions, an exercise that can entail reasoned speculation and prediction, 40 C.F.R. § 1508.1(g), the focus of ESA Section 7 consultations is more limited. Once an action agency determines that an action "may affect" listed species or their designated critical habitat and consultation begins, the action and consulting agencies evaluate the "effects of the action," which are defined as "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." FWS_AR032341, 032345; 50 C.F.R. §§ 402.14(g)(3)-(4); 402.02. The ESA's implementing regulations further explain that a "consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02(d). Thus, the ESA's focus is on the identifiable effects of the specific agency action at issue on listed species.

After considering Plaintiff CBD's comments and its referenced studies, and

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                        39

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 49 of 68

applying that information to the ESA's "effects of the action" standard, BLM concluded, and the Services concurred, that the existing scope of the effects analysis in the ongoing Section 7 consultations was appropriate. Defendants explained that quantifying a marginal decrease in seasonal sea ice in unknown spots somewhere in the millions of square miles of the circumpolar Arctic does not enable the Agencies' expert biologists to identify any "reasonably certain to occur" consequences to any listed species or critical habitat, and thus fails to reveal any additional "effects of the action." FWS_AR032341, 032345-46; NMFS_AR000495.

After formally consulting with BLM on all aspects of the Willow Project, including its GHG emissions, FWS, in its expert opinion, concluded that the Willow Project would not likely jeopardize the polar bear or adversely modify designated critical habitat. FWS_AR032536-39. NMFS, for its part, concluded that the Willow Project would "not likely adversely affect" ice seals or designated critical habitat, completing informal consultation with BLM. NMFS_AR000183-84. These Section 7 determinations are consistent with the ESA, reasonable, supported by the administrative record, and should be upheld.

> **B.** Plaintiffs' Arguments Fail to Rebut the Reasonableness of the Services' ESA Analyses and Determinations

Dissatisfied with the Services' well-reasoned Section 7 determinations, Plaintiffs levy a variety of challenges, but none resonate. SILA Br. 32-44; CBD Br. 34-47. Each is addressed in turn below.

> 1. The Services appropriately considered Willow's GHG emissions

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                          40

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 50 of 68

Plaintiffs first argue that the Services ignored Willow's GHG effects on the polar bear and ice seals – *i.e.*, impacts on sea ice. SILA Br. 34-36; CBD Br. 35-39. Contrary to Plaintiffs' assertions, as detailed above, the Agencies did consider Willow's potential GHG impacts. Due primarily to the inability of any current science to link a specific volume of a project's GHG emissions with not only marginal decreases in specific areas of sea ice, but also ensuing consequences to listed species or critical habitat, the Agencies reasonably determined that Willow GHG emission-caused consequences to polar bears or ice seals were not reasonably certain to occur specifically as a result of the Willow Project. Thus, the Agencies could not identify any "effects of the action" flowing from Willow's GHG emissions per applicable ESA standards. FWS_AR032341-47; NMFS_AR000495-96. This approach and position, as outlined in BLM's 2023 Memorandum regarding Willow's GHG impacts, FWS_AR032344-47, is not new or limited to this situation.

In 2008, FWS added the polar bear to the list of threatened species under the ESA. 73 Fed. Reg. 28,212 (May 15, 2008); FWS_AR032463. The rationale for listing was the threat posed by future loss of sea ice, with FWS noting that increased global temperatures are "very likely due to the observed increase in anthropogenic GHG concentrations" and that the Arctic was likely to be "ice free" in the summer at some time in the 21st century. *Id*. at 28,212, 28,230, 28,245. In the listing, FWS specifically addressed the "Regulatory Implications for Consultations under Section 7 of the Act" for projects that emit GHGs (like a power plant) and specifically for "oil and gas development activities conducted on Alaska's North Slope." *Id*. at 28,299-300. FWS explained that the Section 7 effects

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                          41

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 51 of 68

analysis is limited to effects to listed species or critical habitat that are "reasonably certain to occur" and would not occur "but for" the action under consultation. *Id*. FWS noted this causal connection is missing between specific sources of GHG and effects posed to polar bears or their habitat – *i.e.*, insufficient data "to establish the required causal connection" between a specific agency action and a specific listed species or to establish that impacts are reasonably certain to occur. *Id*. at 28,300; *see also In re: Polar Bear Endangered Species Act Listing and 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 230-32 (D.D.C. 2011) (affirming FWS's conclusion that climate modeling does not currently allow the agency to draw a causal connection between GHG emissions from a specific source and the impact on a particular polar bear). Based on the same reasoning, other Federal agencies recently made similar conclusions. *See*, *e.g.*, 80 Fed. Reg. 64,661, 64,925 (October 23, 2015) (explaining that EPA's rules regarding vehicle fuel standards (2012) or implementing the Clean Power Plan (2015) were not subject to consultation under ESA section 7(a)(2) because "'any potential for a specific impact on listed species in their habitats associated with these very small changes in average global temperature and ocean pH is too remote to trigger the threshold for ESA section 7(a)(2).'"); *see also* FWS_AR032341; 87 Fed. Reg. 64,700, 64,704 (October 26, 2022) (concluding that "based on the best scientific data available [FWS is] unable to draw a causal link between the effects of specific GHG emissions and take of the emperor penguin.").

Plaintiffs next argue that Defendants applied the wrong standards when conducting their analysis of Willow's GHG emissions. SILA Br. 34-36, CBD Br. 37-39. They assert that BLM was required to consult on Willow's GHG emissions because those

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                    42

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 52 of 68

emissions "may affect" listed species or critical habitat. This notion is flawed in multiple respects. First, BLM *did* consult on these emissions as detailed above. Second, the "may affect" threshold is only applied by action agencies in determining whether ESA consultation must be initiated in the first place. 50 C.F.R. § 402.14(a). And third, an action agency's "may affect" determination addresses the entirety of the proposed action, not specific subcomponents in isolation like GHG emissions.

In any event, the Services' implementing regulations make clear that once consultation is underway, the only potential consequences that must be evaluated and described are "effects of the action." *Id*. § 402.14(c)(iv) (describing required contents of a biological assessment); *Id*. § 402.14(g)(3) (describing what the Services must evaluate); *Id*. § 402.14(h) (describing required contents of a BiOp). And as explained above, the "effects of the action" is defined by the Services' implementing regulation to encompass only those "consequences to listed species or critical habitat" that "would not occur but for the proposed action" and are "reasonably certain to occur." *Id*. § 402.02. Neither the ESA nor its implementing regulations require action agencies or consulting agencies to describe in their consultation documents – either quantitatively or qualitatively – any hypothetical consequences that do not rise to the level of "effects of the action."[14] Plaintiffs' attempt to transpose the pre-consultation "may affect" standard into the

---

[14]    SILA Plaintiffs assert that "Willow's additive direct and indirect GHG emissions are 'effects' under the ESA because these emissions would not occur 'but for' BLM's action approving Willow and are 'reasonably certain to occur.'" SILA Br. 35. This appears to be an incomplete characterization of the "effects of the action" definition in that it omits the clause "consequences to listed species or critical habitat." 50 C.F.R. § 402.02.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*        Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              43

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 53 of 68

consultation process, and thus to expand the list of required contents for biological assessments and BiOps must be rejected.

CBD Plaintiffs further misapply the ESA's pre-consultation standards when they reference "no effect" determinations and associated case law. CBD Br. 37-38. Specifically, Plaintiffs cite *CBD v. BLM*, 698 F.3d 1101 (9th Cir. 2012), and argue that the "no effect" test applies on an effect-by-effect basis. The cited case is distinguishable, as it involved a situation where there was no analysis at all in the record of a part of the action (groundwater pumping) that had probable effects on listed species. Here, in contrast, BLM initiated and completed consultation with both Services on the full proposed action, and fully documented why Willow's GHG emissions would not cause any consequences meeting the ESA's "effects of the action" standard. Further, while CBD Plaintiffs are correct in observing that Defendants used scientific terms like "granularity," "precision," and "reliability," when assessing the utility and limitations of Plaintiffs' favored models, CBD Plaintiffs are incorrect in portraying these terms as anything but small parts of an overall comprehensive and well-reasoned explanation of how Defendants applied each element of the "effects of the action" standard.

In sum, Defendants' conclusions with respect to Willow's GHG emissions are not only consistent with applicable ESA standards, a long-standing Department of the Interior determination, and the recent approaches taken by other federal agencies, they also reflect Defendants' reasonable, project-specific application of what Plaintiffs characterize as the latest science. *See* FWS_AR032371-77. The consultation record illustrates Defendants' consideration of Willow GHG emissions and the latest climate

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                    44

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 54 of 68

science and reasonably explains why that science still does not allow for the identification of reasonably certain consequences to listed species or habitat caused by Project-specific emissions. FWS_AR032341-47. Consideration of these issues requires a high level of expertise and the reviewing Services' scientific determinations warrant substantial deference. *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001).

2.     The Services complied with the best available science requirement

Pointing to various studies and BLM's Willow GHG estimates in the FSEIS, Plaintiffs argue that the agencies ignored the best available science which invalidated Defendants' approach, position, and conclusion outlined above. SILA Br. 36-39; CBD Br. 39-41. Plaintiffs are mistaken.

Deference to an agency's analysis and decision is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise. "The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination deserving deference." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1265 (11th Cir. 2009); *accord San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). "An agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014); *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006) ("Without any evidence in the record that FWS ignored relevant information, we hold that FWS satisfied

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
Defs.' Mem. in Opp'n to Pls.' Mots. for Summ. J.                                    45

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 55 of 68

its duty . . . .").

Defendants did not ignore the studies cited by Plaintiffs. Rather, they comprehensively described key overarching issues like the contribution of GHG emissions to climate change and the projected impacts to sea ice and ice-dependent species. *See*, *e.g.*, AR820758-59; FWS_AR030115-20; NMFS_AR000073. Defendants expressly considered the studies referenced in Plaintiffs' argument – *i.e.*, models that correlate discrete volumes of GHG emissions with marginal seasonal decreases in Arctic sea ice. After considering the outputs of these models in conjunction with relevant ESA standards, Defendants reasonably concluded that information about marginal seasonal decreases in sea ice occurring somewhere in the Arctic did not permit the identification of any additional "effects of the action." FWS_AR032341, 032345-46; NMFS_AR000495. At its core, Plaintiffs' real argument is that they simply disagree with Defendants' expert scientific determinations, which are owed deference. But mere disagreement with Defendants' expert scientific determinations regarding studies they expressly considered is not a grounds for invalidating agency action. Plaintiffs fail to demonstrate that Defendants ignored any science and fail to demonstrate that agency scientific conclusions are "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

> 3.  FWS's findings regarding take of polar bears are lawful and supported by the record

With respect to the incidental take statement, Plaintiffs argue that FWS applied an unlawful interpretation of "harassment" and failed to evaluate all potential nonlethal

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                          46

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 56 of 68

harassment that would impact polar bears over Willow's project life.  SILA Br. 39-44;
CBD Br. 41-47.  Plaintiffs' arguments are without merit.

<u>a.</u>     <u><em>FWS's interpretation of harassment is lawful</em></u>

Plaintiffs first challenge FWS's application of its implementing regulation's definition of "harass."  SILA Br. 39-43; CBD Br. 41-44.  Plaintiffs argue – mistakenly – that FWS applied its definition of "harass" in a manner that arbitrarily assumed no "harassment" take could occur absent ConocoPhillips specifically intending to negatively impact polar bears.  *Id*.  FWS reasonably applied its implementing regulation and also explained the multiple bases that "separately and independently" support (beyond its definition of "harass") its finding that no incidental harassment is anticipated to result from the Willow Project.  FWS_AR032541.

In the ESA, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The ESA's implementing regulations further define "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns . . . ."  50 C.F.R. § 17.3 (2019).  In other words, as explained by FWS, the regulatory definition requires that "two elements must be shown before a finding of harassment can be made: (1) likelihood of injury to wildlife, and (2) some degree of fault, either intentional or negligent."  FWS_AR032541.

The FWS addressed this first required element – *i.e.*, "likelihood of injury to wildlife" – in the effects analysis of the BiOp.  While acknowledging that various

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.    47

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 57 of 68

project-related activities would "intermittently [and] incidentally expose small number of polar bears of the SBS stock to disturbance," FWS explained how "effects from these exposures would be limited to temporary changes in behavior that would not be biologically significant." FWS_AR03257. FWS further explained that incidental disturbances from this project are not anticipated to create a "likelihood of injury" to polar bears and as such would not result in any "harassment" per the ESA. *Id*. These expert scientific determinations warrant considerable deference. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236. The BiOp thus provides a clear basis, rooted in FWS's biological expertise, for its conclusion that project-related disturbances are not anticipated to "harass" any polar bears.

FWS also addressed the second required element of ESA "harassment" – *i.e.*, "degree of fault, either intentional or negligent" – in the BiOp's incidental take statement. FWS_AR032541. That discussion correctly observed that (outside of the "hazing" context which is not at issue here) the applicant would conduct its activities "without any intent to annoy, disturb or harass polar bears." *Id*. But, contrary to Plaintiffs' incomplete characterizations, FWS's analysis did not end there. The ensuing discussion in the incidental take statement explains how the proposed action would be conducted in accordance with all reasonable measures to avoid injury to polar bears, that such protective measures collectively constitute a reasonable and robust standard of care for minimizing impacts to polar bears, and that any incidental disturbances that occur despite those precautions would not entail any "degree of fault" – whether intentional *or negligent* – and thus could not constitute ESA harassment per the applicable legal

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*　　Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.　　　　　　　　　48

Case 3:23-cv-00058-SLG　Document 137　Filed 08/23/23　Page 58 of 68

standard.  FWS_AR032541-FWS_AR032542.  Plaintiffs ignore (and do not dispute) FWS's reasoned findings concerning the absence of negligence here.  Because the record shows how FWS properly applied its interpretation of "harass" that encompasses unintentional (albeit negligent) as well as intentional acts and omissions, Plaintiffs' false assertions that FWS arbitrarily required "specific intent" ring hollow.

Plaintiffs suggest that FWS's interpretation of "harass" conflicts with the separate regulatory definition of "incidental take."  SILA Br. 41-42, CBD Br. 42.  This argument also fails, given FWS's express consideration of unintentional (albeit negligent) acts or omissions described above.  Plaintiffs also invent their own interpretation of "harass" under which harassment take occurs regardless of any degree of fault.  SILA Br. 42; CBD Br. 41-42.  These interpretations fail because they read "negligent" out of the regulation and render the clause "an intentional or negligent act" meaningless.  In other words, if all that matters is that someone intended to commit an act that somehow resulted in harassment, then it makes no difference whether that act was performed negligently or not.  This directly contradicts not only the plain language of the regulation but also the regulatory history.

The definition of "harass" was promulgated in a 1975 rulemaking, after public notice and comment.  *See* 40 Fed. Reg. 44,412 (Sept. 26, 1975) (final rule).  In the Proposed Rule for that rulemaking, FWS proposed a definition of "harass" that had no reference to intent or negligence and that combined the concepts of harassment and harm. The proposed definition was: "an act which either actually or potentially harms wildlife by killing or injuring it, or by annoying it to such an extent as to cause serious disruption

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              49

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 59 of 68

in essential behavior patterns, such as feeding, breeding or sheltering; significant environmental modification or degradation which has such effects is included within the meaning of 'harass.'"  40 Fed. Reg. 28,712, 28,714 (July 8, 1975) (proposed rule).

However, in the Final Rule, FWS separated the definitions for "harass" and "harm" and added the "intentional or negligent" language to the "harass" definition.  In so doing, FWS explained, "the definition of 'harass' has been modified by restricting its application to acts or omissions which are done intentionally or negligently.  In the proposal, 'harass' would have applied to any action, regardless of intent or negligence."  40 Fed. Reg. at 44,413.  FWS further explained its rationale in the 1981 rulemaking when it revised the "harm" definition.  46 Fed. Reg. 29,490 (June 2, 1981).  While the 1981 rulemaking largely concerns the separate ESA standard for "harm," it contains a brief but highly relevant discussion of the "harass" standard.  That text, which is the only portion of the 1981 rulemaking cited in the BiOp here, clarifies that "two elements must be shown before a finding of harassment can be made: (1) likelihood of injury to wildlife, and (2) some degree of fault, either intentional or negligent."  FWS_AR032541; 46 Fed. Reg. 29,490, 29,491.

In short, the plain language and regulatory history show that FWS applies "harass" only to (1) intentional harassment of animals and (2) unintentional harassment traceable to a negligent acts or omission.  Plaintiffs here do not dispute FWS's finding that the proposed action would be conducted absent either (1) intent to harass polar bears, or (2) negligence.  Instead, Plaintiffs advance an incomplete characterization of FWS's incidental take statement and offer an alternative interpretation of "harass" that squarely

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                              50

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 60 of 68

conflicts with the regulatory text and was specifically rejected by the FWS in multiple rulemakings. And even if the regulation is ambiguous (it is not), FWS's interpretation is the only reasonable one given the plain language of the definition and the regulatory history, such that FWS's interpretation should be upheld. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) (upholding the proposition that courts should defer to an agency's reasonable interpretation of its own ambiguous regulations); *see also Sec'y of Labor, U.S. Dep't of Labor v. Seward Ship's Drydock*, 937 F.3d 1301, 1309 (9th Cir. 2019) (noting that any ambiguity in the regulation "is dispelled by the purpose of the [regulation] and its regulatory history," referring in particular to statements in the Federal Register describing the regulation's "primary objective").

> b.    *FWS adequately considered all potential forms of harassment*

Plaintiffs' arguments that FWS failed to account for all non-lethal harassment, SILA Br. 43-44, and harassment of non-denning bears, CBD Br. 44-46, fare no better.[15] FWS adequately explained why it did not anticipate any harassment to denning bears or non-denning (i.e., transient) bears. Plaintiffs' arguments should be rejected.

> i.    *Adult female bears prior to and during the denning season*

SILA Plaintiffs complain that FWS failed to adequately consider the possibility of the Project harassing polar bears engaged in denning or prospecting for den sites. SILA Br. 43-44. This is not accurate. FWS considered these possibilities and reasonably found that no harassment is anticipated.

---

[15]    Plaintiffs do not challenge any FWS findings related to cubs.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                                  51

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 61 of 68

Various portions of the BiOp explain why disturbance of denning or prospecting bears is unlikely to occur given the location and timing of Project activities. FWS_AR032509 ("The majority of the Action Area is farther inland that polar bears typically occur, including transient (non-denning) individuals and females prospecting for den sites and/or establishing dens"); FWS_AR032517 ("we anticipated impacts to denning polar bears associated with activities at Oliktok Dock would be discountable due to lack of temporal overlap with the denning period"); FWS_AR032520 (noting the inland location of the "vast majority of Project infrastructure and activities" and the fact that "Project-related activities occurring closer to shore would utilize existing infrastructure already subject to disturbance"); FWS_AR032518 (discussing the scarcity of historical dens occurring even a few miles inland of the coast and implicitly recognizing the distinct possibility that no (zero) polar bear would attempt to den in the Action Area over the 30-year life of the project).

The BiOp also addresses the extent of potential impacts that could occur to any bears that do seek to den in the Project area. FWS_AR032518-20. This analysis was largely informed by FWS's peer-reviewed predictive model which estimates the potential for various impacts to occur to cubs as well as the adult female during each stage of the denning cycle. Plaintiffs make no argument that FWS's modelling assumptions were deficient in any way. Undisputed is FWS's assumption that any denning adult females subjected to Project-related disturbance could experience MMPA "Level B harassment" (which requires only a disruption of behavioral patterns) but would not experience any MMPA "Level A harassment" (which requires a potential to injure). 16 U.S.C. §

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                              52

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 62 of 68

1362(18); FWS_AR032580 ("Level B harassment was applicable to both adults and cubs, if present, whereas Level A harassment and lethal take were applicable only to cubs").

Plaintiffs do not and cannot logically explain how an impact determined to lack any potential to injure an adult female polar bear is nevertheless "likely to injure" that bear such that the ESA standard for "harass" is implicated. 50 C.F.R. § 17.3; *see also* FWS_AR032540 ("Whereas acts causing a 'potential to disturb' or 'potential to injure' a marine mammal could qualify as MMPA Level B harassment' or MMPA 'Level A harassment', respectively, no ESA take can occur unless the act creates a 'likelihood of injury' (an element of 'harass' under the ESA) or 'actually kills or injures' a marine mammal (an element of 'harm' under the ESA)"); FWS_AR032542 ("Here, the anticipated number of all MMPA Level A Harassments [even when combined with the anticipated number of lethal takes] is zero", which "supports the Service's conclusion that no incidental ESA take of denning bears is anticipated to result from the Proposed Action").

The possibility of disturbing a denning adult female bear is concerning in the sense that it could precipitate a behavioral reaction that can indirectly affect cub survival (a possibility FWS thoroughly considered but deemed highly unlikely here). But the notion espoused by Plaintiffs that a "likelihood of injury" (which is a required element of ESA harassment) could accrue to the adult bear herself is unsupported, speculative at best, and contradicted by the well-reasoned and undisputed assumptions underpinning FWS's peer-reviewed model as well as by FWS's express conclusions reported in the BiOp. *See*, *e.g*., *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 711 (9th Cir.

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*　　　Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.　　　　　　　　　　　53

Case 3:23-cv-00058-SLG　Document 137　Filed 08/23/23　Page 63 of 68

2009) (rejecting as speculative an argument that climate change-related stressors will weaken polar bears such that they will be impacted by industrial activities to a greater degree than anticipated by FWS).

SILA Plaintiffs further speculate that potential disturbance to prospecting female bears suggests ESA harassment. This notion similarly lacks support. Nothing in FWS's comprehensive analysis suggests that the consequences of disturbing a prospecting bear would be any more severe than the consequences of disturbing any other non-denning or "transient" bear (a topic discussed in more detail in the next section below).

In sum, FWS thoroughly considered whether the potential disturbance of prospecting or denning adult bears would constitute take in the form of ESA "harassment." FWS found that the likelihood of any of this type of disturbance would be low and, if it occurred at all, it would not result in a "likelihood of injury" – a required element of ESA "harassment." FWS's conclusions are consistent with the ESA, reasonable, supported by the record, and entitled to deference.

### ii. *Non-denning (transient) bears*

CBD Plaintiffs mount a similar attack on FWS's finding that no incidental harassment is anticipated. CDB Br. 44-46. But this argument, which focuses on non-denning or "transient" bears, is similarly unavailing.

FWS does not deny that small numbers of transient bears could be exposed to project-related disturbance. FWS_AR032516. But FWS also makes clear that such exposures would be brief and would only result in short-term changes in behavior that are not biologically significant. FWS_AR 032516-17 (listing five reasons why project-

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                    54

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 64 of 68

related disturbance would not result in injury to transient bears); FWS_AR032529

("Some transient polar bears would experience incidental disturbance associated with the

Proposed Project, but resulting impacts would be limited to minor and short-term

behavioral changes, that do not result in a likelihood of injury."); FWS_AR032537 ("We

find that a host of construction and production activities associated with the Proposed

Action would intermittently incidentally expose small numbers of polar bears of the SBS

stock to disturbance, and that effects from these exposures would be limited to temporary

changes in behavior that would not be biologically significant.").  Therefore, FWS

concluded that "incidental disturbance to non-denning polar bears is not anticipated to

create a 'likelihood of injury' to any polar bears, and thus incidental disturbance would

not 'harass' non-denning polar bears" per the ESA.  *See* 50 C.F.R. § 17.3;

FWS_AR032537.

Plaintiffs' responses are unpersuasive.  The record studies they posit as

contradicting this conclusion concern potential broad-scale climate-related impacts to

polar bears, are of limited import to this project-specific analysis, and were fully

considered by FWS in rendering its scientific determination.  CBD Br. 45-46.  And the

sole case cited by Plaintiffs is inapposite because, among other reasons, it concerned

MMPA Level B harassment, which the MMPA defines as the "potential to disturb," 16

U.S.C. § 1362(18)(A)(ii), and the record in that case indicated that noise from tug boat

vessels had the potential to disturb beluga whales.  CBD Br. 46; *see Cook Inletkeeper v.*

*Raimondo*, 533 F. Supp. 3d 739, 753-759 (D. Alaska 2021).  Here, FWS acknowledged

that small numbers of transient polar bears would be exposed to industrial disturbance

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*     Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                    55

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 65 of 68

and then explained why any ensuing consequences would not rise to the level of ESA harassment.

Finally, contrary to Plaintiffs' implications, the ESA does not require FWS to analyze whether unanticipated impacts could theoretically qualify as harassment. FWS clearly explained why it did not anticipate harassment of transient non-denning bears. That explanation was thorough and reasonable, and supported by the record. Plaintiffs' argument should be rejected.

## V.    Remedy

While Plaintiffs are not entitled to any relief, they maintain that the Court should apply the "presumptive remedy" and vacate Defendants' decision documents. CBD Br. 47-50; SILA Br. 44-47. But sometimes even a flawed agency decision "need not be vacated." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (citations omitted). When "equity demands," courts may leave in place an agency action "while the agency follows the necessary procedures to correct" its error. *Id.* (internal quotation marks and citation omitted). Whether an agency action should be vacated depends on several factors, including "how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (district court "is not required to set aside every unlawful agency action."). Consideration of these factors will be informed by the Court's ruling on the merits, and is therefore premature at this time. If the Court finds in Plaintiffs' favor, it should permit the parties

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*    Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                      56

Case 3:23-cv-00058-SLG    Document 137    Filed 08/23/23    Page 66 of 68

to further brief remedy.

## **CONCLUSION**

For the foregoing reasons, the Court should deny each of Plaintiffs' motions, enter

judgment for Defendants, and dismiss these cases with prejudice.

Respectfully submitted.

DATED: August 23, 2023.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Rickey D. Turner, Jr.*
RICKEY D. TURNER, JR., Senior Attorney
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1373
rickey.turner@usdoj.gov

*/s/ Paul A. Turcke*
PAUL A. TURCKE
Trial Attorney, Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
202-532-5994 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Counsel for Defendants*

Of Counsel:

MIKE GIERYIC
MIKE ROUTHIER
Office of the Regional Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, AK 99508

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*  Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.  57

Case 3:23-cv-00058-SLG  Document 137  Filed 08/23/23  Page 67 of 68

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) as modified by applicable orders issued by or requested from the Court because this memorandum contains 15,245 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4).  This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word 365 Apps for enterprise (Version 2305 Build 16501.20242).

*/s/ Paul A. Turcke*
Paul A. Turcke

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2023, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*          Nos. 3:23-cv-00058; -61-SLG
DEFS.' MEM. IN OPP'N TO PLS.' MOTS. FOR SUMM. J.                                            58

Case 3:23-cv-00058-SLG   Document 137   Filed 08/23/23   Page 68 of 68