Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*, | Case No. 3:23-cv-00058-SLG |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.* | |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendants. | |

## REPLY IN SUPPORT OF SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................................iii

LIST OF SHORT NAMES AND ACRONYMS .............................................xi

INTRODUCTION ............................................................................................. 1

ARGUMENT..................................................................................................... 1

  I.   BLM VIOLATED NEPA AND THE NPRPA.................................................. 1

    A.  BLM's Alternatives Analysis Violates NEPA and the NPRPA. .......................... 1

    B.  Alternative E Does Not Redeem BLM's Flawed Analysis. ................................ 6

  II.   BLM VIOLATED ANILCA SECTION 810 BY FAILING TO CONSIDER ALTERNATIVES THAT REDUCE IMPACTS TO SUBSISTENCE USES. ........................................ 10

  III.   BLM VIOLATED NEPA BY FAILING TO ADEQUATELY ASSESS WILLOW'S REASONABLY FORESEEABLE GHG EMISSIONS............................................ 13

  IV.   FWS AND BLM VIOLATED THE ESA................................................. 18

    A.  SILA Has Standing. ............................................................... 18

    B.  FWS Failed to Assess Effects and Use the Best Available Science.................. 22

      1.  Willow's GHG emissions are effects warranting consultation. ................... 23

        i.  FWS applied the wrong legal standard in disregarding Willow's climate effects. ................................................................................... 23

        ii.  Outdated and inapposite agency findings cannot save FWS's faulty BiOp. 27

      2.  FWS failed to consider the best available scientific information. ............... 30

    C.  FWS's Take Findings Are Unlawful and Unsupported by the Record. ............. 31

      1.  FWS's interpretation of harassment fails as a matter of law. ...................... 31

      2.  FWS unlawfully failed to issue an Incidental Take Statement for Polar bears. 37

  V.   Vacatur is Warranted. ............................................................. 39

CONCLUSION ............................................................................. 44

**Cases**

*Alaska Indus. Dev. & Export Auth. v. Biden*,
   2023 U.S. Dist. LEXIS 136474 (D. Alaska Aug. 7, 2023) ..................................... 2, 40

*Alaska Oil & Gas Ass'n v. Pritzker*,
   840 F.3d 671 (9th Cir. 2016) .................................................................... 25

*Alaska Survival v. Surface Transp. Bd.*,
   705 F.3d 1073 (9th Cir. 2013) ................................................................... 9

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
   67 F.3d 723 (9th Cir. 1995) ..................................................................... 11

*Amadeo v. Principal Mut. Life Ins. Co.*,
   290 F.3d 1152 (9th Cir. 2002) ................................................................... 17

*Anacostia Riverkeeper, Inc. v. Jackson*,
   798 F. Supp. 2d 210 (D.D.C. 2011) ............................................................. 29

*Ariz. Cattle Growers' Ass'n v. Salazar*,
   606 F.3d 1160 (9th Cir. 2009) ................................................................... 26

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
   273 F.3d 1229 (9th Cir. 2001) ................................................................... 25

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
   515 U.S. 687 (1995) ..................................................................... 35, 36, 39

*Bark v. United States*,
   958 F.3d 865 (9th Cir. 2020) .................................................................... 17

*Barnum Timber Co. v. U.S. EPA*,
   633 F.3d 894 (9th Cir. 2011) .................................................................... 20

*Brower v. Evans*,
   257 F.3d 1058 (9th Cir. 2001) ............................................................ 23, 25, 31

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
   688 F.3d 989 (9th Cir. 2012) .................................................................... 44

*Cal. v. Bernhardt*,
   472 F. Supp. 3d 573 (N.D. Cal. 2020) ........................................................... 41

*California v. BLM*,
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ...................................................... 41

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) .................................................................. 6

*Cascadia Wildlands v. BIA*,
    801 F.3d 1105 (9th Cir. 2015) ................................................................ 16

*Cascadia Wildlands v. BLM*,
    2021 U.S. Dist. LEXIS 215907 (D. Or. Sept. 13, 2021) ........................... 43

*Chilkat Indian Klukwan v. BLM*,
    399 F. Supp. 3d 888 (D. Alaska 2019) ............................................. 14, 15

*City of Davis v. Coleman*,
    521 F.2d 661 (9th Cir. 1975) ................................................................ 17

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) .............................................................. 24

*Conserv. Nw. v. Rey*,
    674 F. Supp. 2d 1232 (W.D. Wash. 2009) ............................................. 18

*Cook Inletkeeper v. Raimondo*,
    533 F. Supp. 3d 739 (D. Alaska 2021) ................................................. 15

*Corrigan v. Haaland*,
    12 F.4th 901 (9th Cir. 2021) ................................................................ 33

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ........................................................ 22, 42

*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ................................................ 14, 17, 36, 39

*Ctr. for Biological Diversity v. BLM*,
    2023 U.S. Dist. LEXIS 97282 (D. Idaho June 2, 2023) ...................... 42, 43

*Ctr. for Biological Diversity v. BLM*,
    698 F.3d 1101 (9th Cir. 2012) .............................................................. 25

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) ................................................................ 19

*Ctr. for Biological Diversity v. Mattis*,
868 F.3d 803 (9th Cir. 2017) ............................................................ 18, 20, 21

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
508 F.3d 508 (9th Cir. 2007) ............................................................ 30

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
563 F.3d 466 (D.C. Cir. 2009) .......................................................... 19

*Ctr. for Food Safety v. Vilsack*,
734 F. Supp. 2d 948 (N.D. Cal. 2010) .............................................. 41, 43

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ...................................................................... 14, 40

*Ecological Rights Found. v. Pacific Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) .......................................................... 20, 22

*Friends of the Clearwater v. Probert*,
2022 U.S. Dist. 45785 (D. Idaho Mar. 12, 2022) .............................. 18

*Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*,
887 F.3d 906 (9th Cir. 2018) ............................................................ 31

*Hall v. U.S. Dep't of Agric.*,
984 F.3d 825 (9th Cir. 2020) ............................................................ 35

*Hoonah Indian Ass'n v. Morrison*,
170 F.3d 1223 (9th Cir. 1999) .......................................................... 11

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ............................................................ 41

*Janjua v. Neufeld*,
933 F.3d 1061 (9th Cir. 2019) .......................................................... 17

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) .......................................................... 22

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) .......................................................... 29

*Kern Cnty. Farm Bureau v. Allen*,
450 F.3d 1072 (9th Cir. 2006) .......................................................... 29, 31

*Kisor v. Wilkie*,

139 S. Ct. 2400 (2019) .......................................................................... 32

*Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*,
   962 F. Supp. 2d 1230 (D. Or. 2013) ...................................................... 3

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
   109 F. Supp. 3d 1238 (N.D. Cal. 2015) ................................................. 41

*Kunaknana v. Clark*
   742 F.2d 1145, 1152 (9th Cir. 1984). ................................................... 11

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) .............................................................. 14

*League of Conserv. Voters v. Trump*,
   363 F. Supp. 3d 1013 (D. Alaska 2019) ............................................... 37

*League of Wilderness Defenders/Blue Mts. Biodiversity Project v. U.S. Forest Serv.*,
   2012 U.S. Dist. LEXIS 190899 (D. Or. Dec. 10, 2012) ........................ 42

*Mayo v. Jarvis*,
   177 F. Supp. 3d 91 (D.D.C. 2016) ....................................................... 19

*Me. Lobstermen's Ass'n v. NMFS*,
   70 F.4th 582 (D.C. Cir. 2023) .............................................................. 24

*Melone v. Coit*,
   2023 U.S. Dist. LEXIS 135701 (D. Mass. Aug. 4, 2023) ..................... 19

*Miccosukee Tribe of Indians v. United States*,
   566 F.3d 1257 (11th Cir. 2009) ............................................................ 31

*Mont. Wilderness Ass'n v. Connell*,
   725 F.3d 988 (9th Cir. 2013) ................................................................. 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................... 6

*N. Alaska Env't Ctr. v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006) ................................................................. 4

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ............................................................... 4

*Nat'l Audubon Soc'y v. Kempthorne*,
  2006 U.S. Dist. LEXIS 110152 (D. Alaska Sept. 25, 2006) ................................... 3, 4

*Nat'l Family Farm Coal. v. EPA*,
  960 F.3d 1120 (9th Cir. 2020) ................................................................ 44

*Neighbors of the Mogollon Rim v. U.S. Forest Serv.*,
  No. 22-15259, 2023 U.S. App. LEXIS 11031 (9th Cir. May 5, 2023) ....................... 6

*Nat'l Res. Def. Council v. EPA*,
  38 F.4th 34 (9th Cir. 2022) ................................................................. 43

*NRDC v. EPA*,
  526 F.3d 591 (9th Cir. 2008) ................................................................ 32

*NRDC v. Jewell*,
  749 F.3d 776 (9th Cir. 2014) ................................................................ 20

*NRDC v. U.S. Forest Serv.*,
  421 F.3d 797 (9th Cir. 2005) ................................................................. 6

*Or. Nat'l Desert Ass'n v. BLM*,
  625 F.3d 1092 (9th Cir. 2010) ............................................................... 27

*Or. Nat'l Desert Ass'n v. Zinke*,
  250 F. Supp. 3d 773 (D. Or. 2017) .......................................................... 41

*Pollinator Stewardship Council v. EPA*,
  806 F.3d 520 (9th Cir. 2015) ....................................................... 41, 42, 43

*Portland Adventist Med. Ctr. v. Thompson*,
  399 F.3d 1091 (9th Cir. 2005) ............................................................... 4

*Pub. Emps. for Env't Responsibility v. FWS*,
  189 F. Supp. 3d 1 (D.D.C. 2016) ............................................................ 41

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ........................................................................ 41

*Robi v. Five Platters, Inc.*,
  838 F.2d 318 (9th Cir. 1988) ............................................................... 17

*Rocky Mt. Wild v. Bernhardt*,
  506 F. Supp. 3d 1169 (D. Utah 2020) ........................................................ 7

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
  547 U.S. 47 (2006) ......................................................................... 18

*Salmon Spawning & Recovery All. v. Gutierrez,*
  545 F.3d 1220 (9th Cir. 2008) ..................................... 19, 20, 21

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
  747 F.3d 581 (9th Cir. 2014) ......................................................... 23

*San Luis & Delta-Mendota Water Auth. v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ......................................................... 31

*Se. Alaska Conserv. Council v. U.S. Forest Serv.,*
  443 F. Supp. 3d 995 (D. Alaska 2020) ................................. 6, 13

*Solar Energy Industries Ass'n v. FERC,*
  No. 20-72788, slip op. (9th Cir. Sept. 5, 2023) ......................... 44

*Sovereign Iñupiat for a Living Arctic v. BLM,*
  555 F. Supp. 3d 739 (D. Alaska 2021) ............................. passim

*Tenakee Springs v. Clough,*
  750 F. Supp. 1406 (D. Alaska) .................................................... 10

*Tenakee Springs v. Clough,*
  915 F.2d 1308 (9th Cir. 1990) ...................................................... 11

*U.S. v. Price,*
  980 F.3d 1211 (9th Cir. 2020) ...................................................... 35

*W. Watersheds Project v. Bernhardt,*
  543 F. Supp. 3d 958 (D. Idaho 2021) .......................................... 9

*W. Watersheds Project v. Grimm,*
  921 F.3d 1141 (9th Cir. 2019) ...................................................... 21

*Wash. Env't Council v. Bellon,*
  732 F.3d 1131 (9th Cir. 2013) ...................................................... 22

*Westlands Water Dist. v. U.S. Dep't of the Interior,*
  376 F.3d 853 (9th Cir. 2004) ............................................... 8, 9, 42

*Wildearth Guardians v. U.S. Forest Serv.,*
  70 F.4th 1212 (9th Cir. 2023) ...................................................... 21

*Zuniga v. Barr*,
    946 F.3d 464 (9th Cir. 2019) ................................................. 36

**Statutes**

5 U.S.C. § 706 ................................................................................ 8

16 U.S.C. § 1371 ........................................................................... 37

16 U.S.C. § 1372 ........................................................................... 37

16 U.S.C. § 1536 ........................................................... 21, 37, 42

16 U.S.C. § 1539 ........................................................................... 36

16 U.S.C. § 3111 ........................................................................... 42

16 U.S.C. § 3112 ........................................................................... 42

16 U.S.C. § 3120 ................................................................ 11, 13, 42

42 U.S.C. § 4332 ............................................................................. 6

42 U.S.C. § 6504a ....................................................................... 4, 42

42 U.S.C. § 6505a ........................................................................... 4

42 U.S.C. § 6506a .......................................................... 2, 3, 42, 43

**Regulations**

40 C.F.R. § 1502.14 ..................................................................... 42

40 C.F.R. § 1508.7 ....................................................................... 17

43 C.F.R. § 2361.1 ......................................................................... 3

43 C.F.R. § 3137.71 ....................................................................... 5

43 C.F.R. § 3162.3-1 ................................................................... 2, 3

43 C.F.R. § 3135.1-5 ..................................................................... 43

43 C.F.R. § 3135.2 ..................................................................... 2, 43

50 C.F.R. § 17.3 ............................................................... 34, 35, 39

50 C.F.R. § 18.125 ....................................................................... 37

50 C.F.R. § 402.02 ............................................................. 24, 25, 26

50 C.F.R. § 402.14 ......................................................... 23, 24, 30, 31

**Other**

*Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range,*

    73 Fed. Reg. 28,212 (May 15, 2008) ......................................................... 28

*Special Rule for the Polar Bear Under Section 4(d) of the Endangered Species Act,*

    78 Fed. Reg. 11,766 (Feb. 20, 2013) ......................................................... 32

*Regulations Governing Take of Migratory Birds; Revocation of Provisions,*

    86 Fed. Reg. 54,642 (Oct. 4, 2021) ......................................................... 32

H.R. Rep. No. 97-567 (1982) ......................................................... 36

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| ConocoPhillips | ConocoPhillips Alaska, Inc. |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| GHG | Greenhouse Gas |
| Greater Willow 1 and 2 | GW 1 and GW 2 |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NPRPA | Naval Petroleum Reserves Production Act |
| Reserve | National Petroleum Reserve-Alaska |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| SILA | Sovereign Iñupiat for a Living Arctic |
| Willow | Willow Master Development Plan |

INTRODUCTION

Federal Defendants (collectively, Interior), Intervenor-Defendants ConocoPhillips Alaska, Inc. (ConocoPhillips), State of Alaska (State), North Slope Borough (Borough), Arctic Slope Regional Corporation (ASRC), and Kuukpik Corporation (Kuukpik) fail to show that the Bureau of Land Management (BLM) and Fish and Wildlife Service (FWS) complied with the National Environmental Policy Act (NEPA), Naval Petroleum Reserves Production Act (NPRPA), Alaska National Interest Lands Conservation Act (ANILCA), and the Endangered Species Act (ESA) in their respective approvals of the Willow Master Development Plan (Willow). The court should grant summary judgment for Plaintiffs Sovereign Iñupiat for a Living Arctic et al. (collectively SILA) and vacate the Record of Decision (ROD) and other authorizations issued by BLM and FWS's Biological Opinion (BiOp).

ARGUMENT

**I. BLM Violated NEPA and the NPRPA.**

**A. BLM's Alternatives Analysis Violates NEPA and the NPRPA.**

Defendants focus extensively on BLM's evaluation of Alternative E in the supplemental environmental impact statement (SEIS).[1] But this obfuscates the same fundamental failure in the SEIS that this court previously identified: failing to consider

---

[1] *See e.g.*, Defs.' Mem. in Opp'n to Pls.' Mots. for Summ. J. 27-32, ECF No. 137 [hereinafter Feds.]; North Slope Borough Resp. in Opp'n to Pls.' Mots. for Summ. J. 15-16, ECF No. 143 [hereinafter NSB].

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                          Page 1

more protective alternatives based on erroneous assumptions about the scope of ConocoPhillips' lease rights and BLM's statutory obligations.[2] Interior attacks a strawman by arguing that BLM cannot preclude development in the Reserve or Special Areas.[3] The issue is not whether BLM can or should forbid all development on ConocoPhillips' leases or prohibit all infrastructure in the Teshekpuk Lake Special Area (TLSA).[4] Rather, the question is whether BLM failed to consider a reasonable range of alternatives based on the agency's assumption that it could not strand an "economically viable quantity of recoverable oil."[5]

Under the plain language of the NPRPA and its regulations, BLM may restrict and prohibit activities on existing leases,[6] including by denying drilling permits.[7] Additionally, nothing in the NPRPA or ConocoPhillips' leases entitles the company to extract all economically recoverable oil.[8] While the NPRPA may contemplate some development in Special Areas, it does not mandate that development, as the court

---

[2] *Sovereign Iñupiat for a Living Arctic v. BLM* (*SILA*), 555 F. Supp. 3d 739, 770 (D. Alaska 2021).

[3] Feds. 33 n.7.

[4] ConocoPhillips Alaska, Inc.'s Opp. to Mots. for Summ. J. 25, ECF No. 141 [hereinafter CPAI]; Feds. 27.

[5] SILA Opening Br. 20-23, ECF No. 105 [hereinafter SILA]; AR821948; AR815445.

[6] 42 U.S.C. § 6506a(n)(2); 43 C.F.R. § 3135.2(a)(1), (3); *see id.* § 3162.3-1(h)(2); *see also* SILA 18-19.

[7] 42 U.S.C. § 6506a(k)(2); *see also Alaska Indus. Dev. & Export Auth. v Biden* (*AIDEA*), 2023 U.S. Dist. LEXIS 136474, at *23 (D. Alaska Aug. 7, 2023) (acknowledging NPRPA grants Secretary broad authority, notwithstanding oil and gas program).

[8] SILA 18-20, 24 n.70.

---

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                    Page 2

previously observed.[9] BLM unlawfully constrained its analysis and failed to consider more protective alternatives, consistent with its mandates under the NPRPA.[10] As a result, BLM considered only the no action alternative and a group of substantially similar action alternatives, each allowing development of all, or nearly all, of the recoverable oil and gas under ConocoPhillips' leases.[11]

Interior's arguments regarding deference to its interpretation of the NPRPA's dual mandate are misplaced.[12] SILA does not challenge BLM's interpretation of the statute's mandate. Rather, SILA points out that BLM did not apply the correct legal standard when evaluating alternatives and potential mitigation measures because it failed to recognize its own authority to reasonably restrict ConocoPhillips' activities.[13] ASRC's reliance on *National Audubon Society v. Kempthorne* is similarly off base.[14] There, the court rejected

---

[9] *SILA*, 555 F. Supp. 3d at 769. The Court's prior observation that infrastructure is permissible in TLSA does not absolve BLM of the duty to consider alternatives that provide maximum protection to Special Areas or comply with NEPA. *See* Feds. 33; CPAI 25.

[10] 42 U.S.C. §§ 6504(a), 6506a(b).

[11] SILA 23 (explaining BLM's most restrictive alternative reduced oil recovery by less than 3%).

[12] Feds. 40 (citing *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016)). While the Court in *Klamath* deferred to the agency's finding that impacts would be minimized, it was not evaluating the agency's interpretation of a statutory mandate to "minimize" impacts. *Id.*, *contra* Feds. 40.

[13] *Supra* nn.6-8. BLM must include or provide conditions and restrictions on oil and gas activities and may prohibit activities to protect the Reserve's surface resources. 42 U.S.C. § 6506a(b). This includes activities on existing leases. *Id.* § 6506a(k)(2); *see also* 43 C.F.R. §§ 2361.1(a), (e)(1), 3162.3-1(h)(2).

[14] 2006 U.S. Dist. LEXIS 110152 (D. Alaska Sep. 25, 2006); Arctic Slope Reg'l Corp.'s Summ. J. Br. 17-20, ECF No. 142 [hereinafter ASRC].

---

plaintiffs' arguments that the NPRPA's protective mandate "would bar any leasing in the TLSA" and held Interior must balance the statute's protective mandate with an oil and gas program.[15] Intervenor-Defendants also rely on the Ninth Circuit's acknowledgement in *Northern Alaska Environmental Center v. Kempthorne* (*Northern*)[16] that BLM could not entirely forbid oil and gas when evaluating leasing alternatives at the Reserve's management plan stage.[17] Both holdings are irrelevant because SILA does not argue BLM should have forbidden all oil and gas development. As SILA explained, BLM misinterpreted the NPRPA by taking a legally flawed view of ConocoPhillips' lease rights, thereby limiting the agency's ability to meet its protective mandates.[18] Moreover, the court in *Northern* recognized BLM's ability to accept, reject, or modify applications for future activities and assumed the agency could deny applications altogether.[19] This reinforces SILA's argument that BLM should have considered a more protective alternative.

Defendants do not meaningfully distinguish between BLM's previous unlawful elimination of alternatives based on ConocoPhillips' "right to extract all the oil and gas

---

[15] *Nat'l Audubon Soc'y,* 2006 U.S. Dist. LEXIS 110152, at *44.

[16] 457 F.3d 969 (9th Cir. 2006); CPAI 20-21; NSB 14.

[17] 457 F.3d at 976-77.

[18] SILA 20-24. The Borough's argument that surface protections are subservient to oil and gas also overlooks that BLM "shall" protect resources when administering the oil and gas program. 42 U.S.C. § 6505a(b); *Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1098 (9th Cir. 2005) (stating "shall" is mandatory); *see* NSB 16-17.

[19] 457 F.3d at 976-77.

---

possible within the leased areas,"[20] and its present view that it cannot "strand an economically viable quantity of recoverable oil"[21] or disallow full-field development.[22] BLM's definition of "economically viable amount of oil" as oil that ConocoPhillips proposes to develop underscores the agency's assumption that ConocoPhillips had a legal right to access all recoverable oil beneath its leases.[23] ConocoPhillips fails to articulate a practical difference between allowing recovery of all oil versus all oil that is economically feasible to recover.[24] It strains credulity to imply that the company would seek to recover oil that is uneconomic to develop.[25] The screening criteria BLM used in 2020 are, therefore, virtually indistinguishable from the criteria it used in 2023 and violate NEPA.[26]

Interior's argument regarding 43 C.F.R. § 3137.71(b)(1) ignores BLM's statements in the record.[27] SILA agrees this provision does not limit BLM's authority to

---

[20] *SILA*, 555 F. Supp. 3d at 770.
[21] AR821965.
[22] *E.g.*, AR821709.
[23] SILA 20 n.51.
[24] CPAI 22-24.
[25] Indeed, the 2020 ROD allowed for production of 91% of the oil beneath ConocoPhillips' leases, i.e., the amount of oil which was economic to recover. AR505788.
[26] *SILA*, 555 F. Supp. 3d at 768.
[27] Feds. 33 n.7.

restrict or condition activities.[28] The problem is that BLM relied on it in the final SEIS as a reason to eliminate more protective alternatives.[29]

Intervenor-Defendants' assertions that BLM appropriately considered only full-field development to avoid a "piecemeal" analysis should be rejected.[30] Intervenor-Defendants conflate BLM's obligation to examine the full range of impacts from ConocoPhillips' proposal with BLM's obligation to evaluate reasonable alternatives and mitigation measures.[31] Focusing on only the maximum potential impacts of a project does not meet NEPA's mandate.[32]

### B. Alternative E Does Not Redeem BLM's Flawed Analysis.

Despite its reduced footprint, Alternative E and the elimination of the Bear Tooth (BT) 4 drillsite and disapproval of BT5 in the ROD do not redeem BLM's unlawful alternatives analysis. Interior points to the purported environmental benefits of Alternative E as adopted in the ROD but fails to account for the fact that BLM's prior

---

[28] SILA 20.

[29] AR814575-76; AR821740; AR821709-10 (excluding alternatives precluding ConocoPhillips from "fully develop[ing]" reservoir); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

[30] Kuukpik Corp.'s Resp. in Opp'n to Mots. for Summ. J. 23-26, ECF No. 144 [hereinafter Kuukpik]; CPAI 23-24.

[31] 42 U.S.C. § 4332(2)(C)(i).

[32] *See, e.g.*, *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (failing to consider more protective alternatives); *Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (rejecting decision where agency limited consideration to alternatives allowing maximum development); *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1013-14 (D. Alaska 2020); *Neighbors of the Mogollon Rim v. USFS*, No. 22-15259, 2023 U.S. App. LEXIS 11031, at *4 (9th Cir. May 5, 2023).

unlawful approval likewise authorized only three drill sites.[33] While Interior is correct that BLM disapproved rather than deferred the BT5 drill site this time, BLM did not deny BT4.[34] Alternative E enlarged and relocated BT2 to allow for recovery of the majority of the oil beneath the BT4 pad.[35]

As before, it does not follow that BLM complied with its statutory mandates or considered a reasonable range of alternatives simply because it did not approve every pad ConocoPhillips proposed.[36] Defendants focus on the ROD's mitigation measures, and slightly reduced footprint and impacts compared to other alternatives.[37] But those measures do not negate the fact that BLM improperly screened out alternatives and measures that would preclude full-field development of the Willow reservoir from analysis at the start.[38]

Defendants point to BLM's screening and elimination process to argue BLM satisfied NEPA and reasonably explained its decision not to consider additional alternatives.[39] While the agency may have provided a lengthier explanation, its similar

---

[33] Feds. 30; AR186056; SILA 23.

[34] Feds. 30.

[35] AR501814; *see also* SILA 22-23 & n.62.

[36] *SILA*, 555 F. Supp. 3d at 753; *see Rocky Mt. Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1186 (D. Utah 2020) (rejecting BLM's range of alternatives because "BLM's position confuses the power to act with the requirement to analyze").

[37] AR824892; Feds. 31-34, 39-40. Interior points to the 2022 Integrated Activity Plan (IAP) decision but fails to identify what stipulations resulted in a "significant difference" in Willow's impacts. Feds. 30 n.6.

[38] AR501182-83; AR821737, AR821739; *see also supra* n.32.

[39] Feds. 29, 32-33; CPAI 21; Kuukpik 23; NSB 17-19.

substantive reasons for rejecting reasonable alternatives are still unlawful.[40] Kuukpik's argument that BLM's misinterpretation only led it to reject three potential alternatives is immaterial because failing to consider viable alternatives violates NEPA.[41] Further, the issue is not that every action alternative was indistinguishable in terms of miles of roads, acres of gravel, etc. Because BLM arbitrarily limited its consideration of alternatives at the outset of the process to those which would only affect ConocoPhillips' resource recovery by small fractions, the issue is that it failed to consider a reasonable range of alternatives, contrary to NEPA's goals of public participation and transparent agency decision-making.[42]

Defendants are incorrect that SILA did not identify other reasonable alternatives or simply wanted an alternative with no infrastructure in the TLSA.[43] SILA identified reasonable alternatives, such as eliminating additional pads in setbacks or further limiting greenhouse gas emissions.[44] However, the agency refused to carry these forward based on its flawed reading of its authority.[45]

Defendants' arguments that BLM was not obligated to consider alternatives unrelated to the project purpose also mischaracterize SILA's point.[46] Nothing in BLM's

---

[40] 5 U.S.C. § 706(2)(A), (D); *see also* SILA 20-24.
[41] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004); *see* Kuukpik 23.
[42] *Westlands Water Dist.*, 376 F.3d at 868.
[43] Feds. 27; CPAI 25.
[44] AR704837-43 (comments suggesting alternatives).
[45] *Supra* Argument I.A.
[46] Feds. 32-33; NSB 14.

purpose and need precluded the agency from considering alternatives that would shift infrastructure out of the TLSA or other sensitive ecosystems like the Fish Creek setback.[47] An EIS must analyze every reasonable alternative within the proposals' nature and scope.[48] Reducing access to some of the oil and gas under ConocoPhillips' leases does not mean the project's purpose would be unmet.[49]

Finally, Defendants cite cases for the proposition that SILA's suggested alternatives are outside NEPA's "rule of reason" or that that BLM was not required to consider an additional "middle ground" alternative because the existing range was adequate.[50] These cases are inapposite because SILA suggested reasonable alternatives consistent with the project's purpose and the NPRPA's requirements to mitigate impacts on surface resources.[51] Interior states that BLM's "expanded discussion" of the no action alternative provided for informed decision-making,[52] but that does not excuse BLM's failure to consider a reasonable range of alternatives, including one or more that achieve

---

[47] SILA 13, 22; AR820723–24 (purpose and need statement).

[48] *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013).

[49] SILA 24; *see also W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 983 (D. Idaho 2021) (rejecting agency's alternatives because development and protective measures were not "mutually exclusive" or "contrary to the purpose and need").

[50] Feds. 34; NSB 16.

[51] *Cf. Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (upholding decision where Plaintiff did not explain why additional middle-ground alternative would foster informed decision-making); *Westlands Water Dist.*, 376 F.3d at 871-72 (not requiring consideration of additional middle-ground alternatives that would not meet project purpose).

[52] Feds. 34; SILA 21.

greater resource protection by reducing ConocoPhillips' oil recovery by more than a small percentage.

## II. BLM VIOLATED ANILCA SECTION 810 BY FAILING TO CONSIDER ALTERNATIVES THAT REDUCE IMPACTS TO SUBSISTENCE USES.

BLM failed to consider alternatives to reduce impacts to subsistence users as required by ANILCA Section 810. Contrary to Interior's and Kuukpik's assertions,[53] in its ANILCA Section 810 analysis and throughout its decision-making process, BLM indicated it eliminated alternatives from consideration on the basis that it could not strand economically viable quantities of recoverable oil.[54] As a result, BLM improperly limited the scope of the alternatives it considered for the purposes of its Tier 1 analysis under Section 810.[55] Further, by misinterpreting its own statutory authority and obligations, BLM also failed to meet its Tier 2 obligations to ensure its decision involved the minimum amount of public lands necessary and included reasonable steps to minimize impacts to subsistence.[56] Had BLM not improperly limited the scope of its analysis, it could and should have considered other options to minimize Willow's impacts to subsistence.[57]

---

[53] Feds. 45; Kuukpik 19.

[54] AR 821965; AR821958-59; AR820701; AR501204-05.

[55] SILA 26-28; *Tenakee Springs v. Clough*, 750 F. Supp. 1406, 1421 (D. Alaska 1990) (indicating the agency's contractual obligations should not preempt laws designed to protect subsistence), *rev'd on other grounds*, 915 F.2d 1308 (9th Cir. 1990).

[56] SILA 29. Contrary to Interior's assertion, SILA does challenge BLM's failure to take reasonable steps to minimize adverse impacts to subsistence. *Id.*; Feds. 45 n.13.

[57] AR704837-43.

---

Intervenor-Defendants' dismissal of *Tenakee Springs v. Clough* ignores the core holding of that and other relevant cases: where an agency confines how it interprets the scope of its authority under a statute or contract, and thereby limits its consideration of alternatives, it acts contrary to Section 810's mandate to minimize impacts to subsistence.[58] The Borough's reliance on *Kunaknana v. Clark* for the proposition that BLM's obligations under Section 810 are limited by the Reserve's oil and gas program is also misplaced.[59] While *Kunaknana* considered that question at the leasing stage, the court recognized the agency was obligated to protect subsistence at later stages as well.[60] The language of the statute makes clear that Section 810 applies to permits for site-specific development.[61] Intervenors' reliance on *Hoonah Indian Ass'n v. Morrison* is similarly misplaced because SILA is not arguing subsistence impacts override all other uses.[62] Consistent with the Court's reasoning in *Hoonah*, BLM failed to comply with Section 810 here because it unlawfully limited its consideration of options that could use the "minimal" amount of lands "necessary" for oil development.[63]

Defendants' arguments that BLM satisfied Section 810 by developing Alternative E overstate the impact of Alternative E's measures and are contrary to BLM's own

---

[58] NSB 22; Kuukpik 20; *Tenakee Springs*, 915 F.2d at 1311–12; *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995).

[59] NSB 24.

[60] 742 F.2d 1145, 1152 (9th Cir. 1984).

[61] 16 U.S.C. § 3120(a).

[62] 170 F.3d 1223 (9th Cir. 1999); NSB 23; Kuukpik 19 n.55.

[63] NSB 23-24; *Hoonah*, 170 F.3d at 1230; *supra* pp. 8-9 (explaining BLM's failure to consider smaller project consistent with purpose and need).

findings.[64] First, Interior's focus on Alternative E as reducing indirect impacts ignores that the agency still found overall that Alternative E would only marginally reduce Willow's impacts to subsistence users.[65] Despite Alternative E's mitigation measures, BLM found there would be significant impacts to subsistence, regardless of whether those impacts were direct or indirect.[66] While BLM stated in the final SEIS that Alternative E could reduce indirect impacts, BLM did not alter its final findings that no alternative meaningfully reduced significant subsistence impacts.[67]

Defendants' assertions that ConocoPhillips' proposal and Alternative E presented significantly different impacts, particularly regarding caribou deflection, are contradicted by the agency's findings.[68] While BLM found the reduction in infrastructure "could lessen the frequency or severity of deflection of caribou," BLM acknowledged that, even with those changes, "many caribou would still encounter roads, including the pinch point where the access road intersects with infield roads, during their migration south."[69] When looking at indirect impacts, BLM concluded overall that only a "slightly smaller percentage of Nuiqsut harvesters (88%) would be affected under Alternative E compared to Alternative B (91%)," with that difference largely relating to goose hunting, not

---

[64] Feds. 43-45; NSB 21-22, 24; Kuukpik 17-18.
[65] Feds. 43-44 & n.12; SILA 18; AR824339-40.
[66] SILA 26-27; AR821062.
[67] SILA 26; AR824339.
[68] Feds. 45; NSB 21-22.
[69] AR824339. The elimination of BT5 did not change this because the particularly impactful east to west infrastructure and the pinch point stayed the same. AR824894 (map of selected project).

caribou hunting.[70] BLM similarly concluded that, "while the decrease in infrastructure within the TLSA may reduce deflection of caribou and lessen impacts on resource availability for Nuiqsut harvesters, the difference in direct impacts on caribou hunters would be minimal."[71] Even with the changes in Alternative E, BLM concluded the project "is likely to deflect … caribou from areas where Nuiqsut hunters harvest them."[72]

Finally, Defendants' argument that the inclusion of the Tier-2 determinations in the ROD was appropriate because BLM indicated those findings would be in the ROD does not cure BLM's procedural violation.[73] Section 810(b) requires those findings be included in the EIS.[74]

## III. BLM VIOLATED NEPA BY FAILING TO ADEQUATELY ASSESS WILLOW'S REASONABLY FORESEEABLE GHG EMISSIONS AND CLIMATE IMPACTS.

Interior's post hoc argument in its brief that Greater Willow 1 and 2 (GW-1 and GW-2) are not reasonably foreseeable is directly contradicted by the record.[75] BLM specifically identified GW-1 and GW-2 as reasonably foreseeable future actions that would rely on and expand Willow's infrastructure.[76] As such, BLM was required to do a

---

[70] AR824339.

[71] AR824339-40.

[72] AR824340.

[73] Feds. 44; NSB 22-23 n.4; Kuukpik 20.

[74] 16 U.S.C. § 3120(b); SILA 29; *see also Se. Alaska Conserv. Council*, 443 F. Supp. 3d at 1015 (noting requirement to include findings in EIS).

[75] Feds. 36. SILA's and CBD's arguments are not inconsistent. Feds. 36 n.8. They are complementary in that SILA argues that Greater Willow's emissions are both indirect and cumulative impacts.

[76] AR822689-93; AR821122.

quantified analysis of the reasonably foreseeable impacts of the Greater Willow development's greenhouse gas (GHG) emissions but failed to do so.[77]

Interior's reliance on *Chilkat Indian Klukwan v. BLM* (*Chilkat*) is misplaced.[78] In *Chilkat*, the agency did not acknowledge future mining activities were reasonably foreseeable, and the record did not contain specific, quantifiable information regarding future development on which to base an analysis.[79] Unlike *Chilkat*, BLM expressly identified GW-1 and GW-2 as reasonably foreseeable[80] and had enough information to calculate the pads' projected downstream emissions.[81] Interior cannot claim that these projects were not foreseeable when BLM previously acknowledged the opposite.[82]

ConocoPhillips advances an argument Interior did not — that BLM fully quantified the foreseeable emissions from GW-1 and GW-2 as part of the analysis of

---

[77] *Ctr. for Biological Diversity v. Bernhardt* (*CBD I*), 982 F.3d 723, 737 (9th Cir. 2020).

[78] 399 F. Supp. 3d 888 (D. Alaska 2019); Feds. 36–37. The language Interior relies on in *Chilkat* was removed from the underlying Ninth Circuit decision. *Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th Cir. 2005) (amended).

[79] 399 F. Supp. 3d at 921-22.

[80] AR822689-93; AR821122.

[81] AR821124; SILA 31.

[82] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908-09 (2020) (recognizing post hoc rationales should not be accepted); *see also N. Plains Re. Council*, *Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (indicating reasonably foreseeable actions need to be considered even when not specific proposals).

---

foreseeable downstream emissions.[83] But the record indicates BLM only quantified a limited subset of GW-1 and GW-2's direct emissions.[84]

Contrary to Interior's assertion in its brief, the final SEIS did not disclose all the projected emissions from foreseeable development in the Reserve because BLM did not calculate the foreseeable downstream emissions from burning Greater Willow's projected 75 million barrels of oil.[85] BLM's calculation of some, but not all, of the foreseeable GHG emissions from Greater Willow underscores that BLM's analysis was incomplete.[86]

ConocoPhillips' extensive reliance on the Reserve's IAP to claim BLM looked at Greater Willow's downstream emissions is misleading and manufactures an argument the agency itself did not provide.[87] The IAP's emissions analysis was for a hypothetical development scenario and did not directly calculate the foreseeable emissions from Greater Willow.[88] Regardless, BLM's specific statements about GW-1 and GW-2 in the Willow SEIS indicate BLM did not look at all the foreseeable emissions from Greater

---

[83] CPAI 27-29.

[84] CPAI 26; AR822689-90; AR821126 (only listing direct emissions from GW-1 and GW-2's developmental drilling in cumulative impacts analysis).

[85] Feds. 37.

[86] SILA 32; *Cook Inletkeeper v. Raimondo*, 533 F. Supp. 3d 739, 755 n.87 (D. Alaska 2021) (indicating where agency "opted" to quantify take, it needed to do so in non-arbitrary manner); *supra* n.82 (rejecting post hoc rationales). BLM arbitrarily excluded construction and operations emissions when identifying Greater Willow's emissions in the cumulative impacts analysis. SILA 32; AR821126. ConocoPhillips' argument that SILA waived this argument fails. Commenters flagged BLM was obligated to look at Greater Willow's foreseeable emissions and that was sufficient notice. AR704894; *Chilkat*, 399 F. Supp. 3d at 912.

[87] CPAI 27.

[88] FWS_AR364010.

---

Willow, nor did it point to the IAP as calculating those emissions.[89] Defendants cannot hide behind the IAP's generalized, hypothetical analysis to counter BLM's express statements about what it considered for Greater Willow.

ConocoPhillips' reliance on *Cascadia Wildlands v. BIA* for the proposition that the agency can aggregate its analysis is misplaced.[90] *Cascadia* says that, even if an agency chooses to aggregate effects, it must be clear from the record that the agency considered those impacts and documented that consideration.[91] Here, BLM purportedly calculated the foreseeable emissions from GW-1 and GW-2 but did not include the downstream emissions in those calculations.[92] BLM did not look at all of Greater Willow's emissions, aggregated or not.

Interior's attempt to distinguish *Bark v. United States* and *City of Davis v. Coleman* on the ground that those cases related to environmental assessments (EA) and whether impacts were significant also fail.[93] BLM's obligation to quantify and consider reasonably foreseeable impacts under NEPA is not limited to environmental assessments.[94]

---

[89] AR822689-90; AR821126.
[90] 801 F.3d 1105, 1112 (9th Cir. 2015); CPAI 26.
[91] 801 F.3d at 1112.
[92] AR822689-90.
[93] Feds. 38 & n.10; *Bark*, 958 F.3d 865 (9th Cir. 2020); *City of Davis*, 521 F.2d 661 (9th Cir. 1975).
[94] 40 C.F.R. § 1508.7; *CBD I*, 982 F.3d at 737.

Additionally, Interior's argument that this Court already upheld the cumulative effects analysis for Greater Willow in the prior lawsuit is misleading.[95] This Court did not previously evaluate the current question: whether BLM met its specific obligation to quantify Greater Willow's reasonably foreseeable GHG emissions.[96] ConocoPhillips' similar argument that SILA is precluded from challenging the emissions analysis is also baseless.[97] For issue preclusion to apply, the same issue must be litigated and decided in prior litigation between the same parties.[98] Whether BLM adequately assessed the reasonably foreseeable GHG emissions in the 2023 SEIS was not at issue in the 2021 litigation, nor could it have been since the challenged analysis is new.[99]

---

[95] Feds. 35-36.

[96] *SILA*, 555 F. Supp. 3d at 780-81; *CBD I*, 982 F.3d at 737.

[97] CPAI 28. ConocoPhillips' cited cases support that issue preclusion does not apply here. *Id.*; *Janjua v. Neufeld*, 933 F.3d 1061, 1065-68 (9th Cir. 2019) (holding issue preclusion did not apply because issue was not raised or decided previously); *Robi v. Five Platters, Inc.*, 838 F.2d 318, 326 (9th Cir. 1988) (requiring identical issue).

[98] *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1159 (9th Cir. 2002). Environment America was not part of the prior litigation.

[99] AR821126 (highlighting BLM's new analysis); *see Friends of the Clearwater v. Probert,* 2022 U.S. Dist. 45785, at *36-37 (D. Idaho Mar. 12, 2022) (holding plaintiffs not barred since prior litigation involved different ROD); *see also Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1243 (W.D. Wash. 2009) (same).

## IV. FWS AND BLM VIOLATED THE ESA.

### A. SILA Has Standing.

ConocoPhillips' and the State's challenges to SILA's standing are based on a misunderstanding of the law and SILA's claims.[100]

The State incorrectly asserts that SILA fails to show injury-in-fact to bring its harassment claim. Regarding injury-in-fact, Courts focus on whether the violated procedures are intended to protect a threatened interest of plaintiffs.[101] The Ninth Circuit recognizes that the ESA's consultation procedures protect scientific, aesthetic, economic, and recreational interests in wildlife because they are "designed to advance the ESA's overall goal of species preservation."[102] SILA's members' interests in polar bears meet this standard. Robert Thompson guided polar bear viewing trips in the past and plans to in the future.[103] He will be injured personally, culturally, and economically if this polar bear population is harmed or reduced.[104] He shared his traditional knowledge about oil

---

[100] *See* SILA 16-17; *cf.* CPAI 42-50; State of Alaska's Response in Opp. to Mots. for Summ. J. 9-22, ECF No. 145 [hereinafter SOA]. SILA has standing because it is an independent entity, Decl. of Siqiñiq Maupin ¶ 7-14, ECF No. 105-9, regardless of whether it receives administrative support from another entity. CPAI 42 n.142. The State misunderstands the purpose of SILA's declarations: they establish the plaintiff organizations' ability to bring this case on behalf of their members. SOA 11-13. Additionally, if this Court finds standing for one plaintiff, that is sufficient for all plaintiffs. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

[101] *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816-17 (9th Cir. 2017).

[102] *Salmon Spawning & Recovery All. v. Gutierrez* (*Salmon Spawning*), 545 F.3d 1220, 1225-26 (9th Cir. 2008).

[103] Decl. of Robert James Thompson ¶ 3, ECF No. 105-7.

[104] *Id.* ¶¶ 7-8, 12-13, 16.

---

and gas development impacting polar bears by decreasing usable onshore habitat and exacerbating climate change.[105] Daniel Ritzman explained that he has been to and plans to return to the project area.[106] Mr. Ritzman also explained that he has observed polar bears outside of Kaktovik and that Willow's construction and development will harm his opportunity to do so in the future.[107] The polar bear population that will be harmed by Willow (Southern Beaufort Sea) is the same one that Mr. Thompson and Mr. Ritzman enjoy.[108] SILA does not need to show that members view polar bears at the Willow site; impacts to these polar bears will harm members' ability to continue enjoying them across their range.[109] Because SILA's interests are in a migratory species, the State's reliance on cases where plaintiffs seek to protect a specific area are inapposite.[110]

ConocoPhillips argues that SILA failed to show causation and redressability for its GHG consultation claim.[111] SILA's challenge to FWS's arbitrary BiOp is a procedural claim, meaning the causation and redressability prongs of standing are relaxed.[112]

---

[105] *Id.* ¶¶ 8, 10-11, 14.
[106] Decl. of Daniel Ritzman ¶¶ 26-32, ECF No. 105-3.
[107] *Id.* ¶ 34, 38, 40.
[108] Thompson Decl. ¶ 12; FWS AR032465 (range map); FWS AR032484-85; AR820974.
[109] *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707-08 (9th Cir 2009); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 131 (D.D.C. 2016); *Melone v. Coit*, 2023 U.S. Dist. LEXIS 135701, *11 (D. Mass. Aug. 4, 2023) (indicating location of where plaintiff observes wildlife "is irrelevant" where it is the same migratory population for which agency authorized harassment); *cf.* SOA 12-17, 20-21.
[110] SOA 16-19.
[111] CPAI 42-50.
[112] *Salmon Spawning*, 545 F.3d at 1229 (internal citations omitted).

ConocoPhillips asserts that SILA's GHG consultation claim lacks causality because SILA cannot connect Willow's emissions to impacts to polar bears.[113] This misrepresents SILA's consultation claim: Interior's failure to consult on GHG impacts is a procedural injury.[114] As such, SILA is not required to show that Willow's GHG emissions definitively cause impacts to polar bears.[115] It is undisputed that Willow will produce downstream GHG emissions. It is also undisputed that GHGs cause climate change and that climate change harms polar bears.[116] Interior's failure to consult on these effects harms SILA's interests in polar bears.[117]

ConocoPhillips is also incorrect that SILA cannot show redressability because climate change is a complex global problem.[118] Because SILA asserts a procedural injury, SILA does not have to show that the substantive outcome will in fact be different

---

[113] CPAI 44-48.

[114] *NRDC v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014); *Salmon Spawning*, 545 F.3d at 1225-26; *cf.* CPAI 48-49.

[115] *Mattis*, 868 F.3d at 817-18 (9th Cir. 2017) (explaining that for causation for procedural injury, courts focus on process and not substantive result); *see also Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000) (explaining while causation cannot be "speculative" it is a lower bar than demonstrating success on the merits); *Barnum Timber Co. v. U.S. EPA*, 633 F.3d 894, 901 (9th Cir 2011).

[116] SILA 35 & nn.127-29.

[117] ConocoPhillips' reliance on *Wildearth Guardians v. U.S. Forest Service*, 70 F.4th 1212 (9th Cir. 2023), is misplaced. CPAI 48-49. There, plaintiffs sought to protect wolves from lethal removal. The Court held plaintiffs lacked standing because the agency did not regulate lethal removal or the third party that controlled wolf removal, or participate in wolf removal. 70 F.4th at 1218. In stark contrast, here FWS is required to consult on polar bears and to impose mitigation requirements on ConocoPhillips to avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A).

[118] CPAI 45-50; *see also* SOA 22.

— only that, if the proper procedure is followed, the government could better protect SILA's interests.[119] SILA's requested relief is for BLM and FWS to consult on Willow's GHG emissions and associated impacts to polar bears to ensure compliance with the mandates to ensure against jeopardy or adverse modification of critical habitat.[120] Given the threats to polar bears from climate change, FWS could reach a different conclusion or require additional mitigation measures after considering Willow's GHG emissions.[121] SILA, therefore, demonstrated redressability.[122]

ConocoPhillips' reliance on *Washington Environmental Council v. Bellon*[123] and *Julianna v. United States*[124] is misplaced.[125] In *Bellon*, Plaintiffs sued to force the Washington State Department of Ecology to directly regulate GHGs from refineries

---

[119] *Salmon Spawning*, 545 F.3d 1226.

[120] SILA 34-36.

[121] *Mattis*, 868 F.3d at 819-20 (explaining courts remedy procedural defects by ordering compliance with statutory obligations); *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1147 (9th Cir. 2019). ConocoPhillips' declaration arguing Willow's GHG emissions will not ultimately harm polar bears addresses the merits of SILA's claim, which is not the proper standing inquiry. CPAI 47 n.164; Decl. of Anne E. Smith, Ph.D., ECF No. 141-3; *Ecological Rights Found.*, 230 F.3d 1152; *see also Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1082-83 (9th Cir. 2015) (rejecting argument that plaintiffs must show reinitiating consultation would change outcome).

[122] Because SILA meets all three standing requirements to bring its consultation claims, *supra* pp. 18-21, it also demonstrates standing to challenge BLM's reliance on the unlawful BiOp.

[123] 732 F.3d 1131 (9th Cir. 2013).

[124] 947 F.3d 1159(9th Cir. 2020).

[125] CPAI 44, 50. ConocoPhillips' assertion that SILA cannot claim a procedural injury based on *Bellon*, CPAI 48, ignores that the injury at issue there was not procedural. 732 F.3d at 1145.

---

under the Clean Air Act, alleging injuries from GHG pollution.[126] The Court determined the plaintiffs could not show that their injuries were caused by the agency's failure to regulate GHGs.[127] The Court also determined plaintiffs did not show that implementing such regulations would redress their injuries.[128] In *Juliana*, plaintiffs sought to force the federal government to adopt a plan to phase out fossil fuels.[129] The Court held that plaintiffs' claim was not redressable because the Court could not grant an injunction to require and supervise the implementation of such a plan.[130] Unlike both of these cases, SILA does not seek to force a substantive outcome requiring the agencies to regulate GHGs. SILA seeks to enforce a procedural mandate: i.e., for BLM and FWS to consult on the effects of Willow's GHG emissions on polar bears.[131] These cases are, therefore, inapposite and SILA has standing to bring its ESA claims.

### B. FWS Failed to Assess Effects and Use the Best Available Science.

As a threshold matter, the agencies are not due the deference they claim because FWS failed to address a factor that was essential to an informed decision: whether Willow's significant GHG emissions would impair polar bears' recovery and survival.[132]

---

[126] 732 F.3d at 1135.

[127] *Id.* at 1143-44.

[128] *Id.* at 1146-47.

[129] 947 F.3d at 1164-65.

[130] *Id.* at 1171.

[131] *Contra* CPAI 48. Because those cases did not involve a procedural right, the causation and redressability factors were not lessened, as they are here. *See supra* n.112.

[132] *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). *Contra* Feds. 55-56; CPAI 51; NSB 34.

---

While agencies receive deference for determining what constitutes the best available science, incomplete information does not excuse failing to meet this requirement.[133]

### 1. Willow's GHG emissions are effects warranting consultation.

The record belies Interior's statements that the agencies consulted on Willow's GHG emissions.[134] Neither BLM's biological assessment nor FWS's BiOp discuss Willow's emissions or climate change-inducing effects.[135] That the final SEIS considered Willow's emissions is irrelevant to the question of whether the agencies adequately analyzed the effects of those emissions under the ESA.[136]

> i. FWS applied the wrong legal standard in disregarding Willow's climate effects.

Defendants argue that current science does not allow the agencies to link a project's GHG emissions with decreases in specific areas of sea ice or consequences to polar bears.[137] This misconstrues the level of certainty required for consideration of effects under the ESA. While agencies need not evaluate speculative impacts or those

---

[133] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014); *Brower*, 257 F.3d at 1067 ("The deference accorded an agency's scientific or technical expertise is not unlimited [and] can be rebutted when its decisions … are not reasoned."); *cf.* Feds 55.

[134] *See, e.g.*, Feds. 50, 53.

[135] *See* Feds. 47; FWS_AR030115-17 (generally acknowledging climate change affects polar bears, but not addressing Willow's climate change impacts); FWS_AR030118-20 (not mentioning Willow's GHG emissions in effects determination); FWS_AR032341; *see also* 50 C.F.R. § 402.14(c)(1)(iv) (explaining action agency must describe action's effects during formal consultation).

[136] Feds. 46-48; SILA 32-39; 50 C.F.R. § 402.14(h)(1)(iii) (requiring BiOp discuss action's effects on species and habitat).

[137] Feds. 51; NSB 30, 34-36; CPAI 44-48.

---

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                              Page 23

with an attenuated causal chain,[138] the record shows that Willow's climate impacts are "reasonably certain to occur."[139]

In interpreting the "reasonable certainty" standard in the context of incidental take, the Ninth Circuit explained the "lenient standard" is met where FWS has "a reasonable basis to conclude that a take will occur."[140] Here, FWS had a reasonable basis to conclude that Willow's GHG emissions would have negative consequences on polar bears.[141] Even assuming the standard for consideration of an effect is "more likely than not,"[142] the science is clear that any significant additive amount of emissions is more likely than not inconsistent with the survival and recovery of polar bears.[143] FWS's failure to consider Willow's climate effects based on a lack of "granularity,"[144] a strict "linear relationship" between emissions and impacts,[145] or an inability to "determine

---

[138] NSB 27, 35; CPAI 51, 54. The Borough cites *Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582 (D.C. Cir. 2023), but this case is not controlling and inapposite. There, the agency attributed unknown causes of death to fisheries, which the Court deemed speculative. *Id.* at 601. Here, it is undisputed that anthropogenic GHG emissions are jeopardizing polar bears and Willow would contribute to these emissions. SILA 35 & nn.127-29.; *see also Conner v. Burford*, 848 F.2d 1441, 1453-54 (9th Cir. 1988) (explaining uncertainty does not allow agencies to ignore potential effects).

[139] 50 C.F.R. § 402.02; *Id.* § 402.14(g)(3)-(4) (requiring BiOp consider direct and indirect effects).

[140] *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1243 (9th Cir. 2001).

[141] 50 C.F.R. § 402.02 (broadly defining "effects" and agency "action"); SILA 35-36, 38-39.

[142] *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 684 (9th Cir. 2016).

[143] *Infra* n.152-53

[144] FWS_AR032341.

[145] FWS_AR032345-46 (BLM analysis); FWS AR032341 (FWS adopting BLM analysis).

---

precise effects to individual animals" unlawfully raises this standard.[146] The Ninth Circuit

has rejected this level of certainty under the ESA.[147] Indeed, the "may affect" standard

sets an even lower bar, requiring consideration of any possible effect on listed species.[148]

A lack of specificity for determining precise impacts to individual animals is not an

excuse for FWS to bypass analyzing those impacts altogether.[149] Defendants argue

SILA's reliance on these phrases fails because FWS was reasonable overall.[150] But the

record demonstrates that the inability to estimate precise impacts was the agencies' basis

for overlooking Willow's climate effects.[151]

Current science allows FWS to assess whether an action's additive emissions are

of a magnitude that is "appreciable" in terms of diminishing the survival and recovery of

polar bears by undermining the reductions needed to avoid sea ice loss.[152] SILA also

identified several studies that describe the relationship between GHG emissions and the

---

[146] FWS_AR032345; FWS AR032341.

[147] SILA 38 & n.142; *see also Brower*, 257 F.3d at 1070 ("Scientific findings in marine mammal conservation area are often necessarily made from incomplete or imperfect information.").

[148] *See Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1122-24 (9th Cir. 2012) (holding FWS's failure to consider particular effect in BiOp unlawful under the "may affect" standard); *cf.* Feds. 53-54.

[149] *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1165-67 (9th Cir. 2009) (determining critical habitat by considering species-level use rather than individual animals where data are inconclusive was proper and comports with ESA's conservation goals); AR726844 (explaining jeopardy determination should focus on species' impacts, not individual animals).

[150] Feds. 54; CPAI 54; NSB 35.

[151] FWS_AR032341-47; *see also supra* n.29.

[152] 50 C.F.R. § 402.02 (defining jeopardy); *see also* AR751166-69 (Notz and Stroeve study quantifying sea ice loss per metric ton of anthropogenic $CO_2e$ emissions).

decline of sea ice and polar bear populations, without needing to quantify specific sea ice losses from particular emissions.[153] Defendants fail to rationally explain why, in light of the extensive studies indicating GHG emissions will jeopardize polar bears, FWS lacked sufficient evidence to provide even a qualitative discussion of Willow's climate effects on polar bears.

ConocoPhillips fabricates new arguments for why the impacts of Willow's emissions are marginal to bolster BLM's conclusion for not considering them.[154] Those arguments are not reflected in the record. First, FWS did not consider the study by Notz and Stroeve that would have allowed it to quantify Willow's emissions.[155] Nor did the agencies evaluate Willow's downstream GHG emissions or relate them to sea ice extent in the context of this study's findings. Contrary to Interior's assertion, nothing in the record indicates that FWS considered the "output" of models quantifying sea ice loss from Willow's emissions.[156] As such, there is no basis to conclude that FWS evaluated Willow's emissions and reasonably deemed them too "marginal" to consider.

---

[153] SILA 36-37 (citing Atwood et al. (2015); Jenssen et al. (2015)); *see also* AR725322-28 (Molnár et al. (2020) (examining polar bear persistence under various emissions scenarios and finding "high greenhouse gas emissions … will jeopardize the persistence of all but a few high-Arctic subpopulations by 2100")).

[154] CPAI 37, 47-48; *see also* FWS_AR032346.

[155] AR751166-69.

[156] Feds. 56. Relatedly, ConocoPhillips' extra-record declaration describing what FWS would have found had it performed such an analysis cannot support FWS's decision. CPAI 47 n.164; Smith Decl.; *see supra* n.29; *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010) ("We cannot defer to a void.").

ii.   Outdated and inapposite agency findings cannot save FWS's faulty BiOp.

Defendants' reliance on outdated or irrelevant agency decisions and policy documents to argue FWS is not obligated to consider Willow's emissions should be rejected.[157] Contrary to Defendants' assertions, FWS's 2008 polar bear listing decision does not support its actions here.[158] In 2008, FWS did not consult on project emissions because it was unable to calculate downstream GHG emissions based on the state of the science.[159] Here, BLM calculated Willow's additive downstream GHG emissions,[160] rendering those outdated uncertainties irrelevant. The 2008 decision also stated that "[t]he best scientific data available to [FWS] today does not provide the degree of precision needed to draw a causal connection" between oil production and a particular impact to polar bears or sea ice habitat.[161] But FWS had additional information available to it fifteen years later when it developed the Willow BiOp, which the agency improperly failed to consider.[162]

---

[157] Intervenor-Defendants improperly submitted numerous extra-record documents the agency itself did not consider and that are substantively irrelevant to FWS's decision here. CPAI 39-40; NSB 31-32 nn.6-8; Pls. Mot. to Strike 2–3, ECF. 150 (indicating APA cases are evaluated based on the agency's record).

[158] Feds. 51-52; CPAI 38-39; NSB 31.

[159] 73 Fed. Reg. 28,212, 28,300 (May 15, 2008) (citing uncertainties regarding ultimate production amounts and consumption of oil and gas).

[160] SILA 14; Feds. 46-48.

[161] 73 Fed. Reg. at 28,300.

[162] *See, e.g.*, *supra* n.152-53 (citing recent studies); *infra* Argument IV.B.2.

Defendants also point to a 2008 memorandum by former Secretary Bernhardt (Bernhardt memorandum) to justify forgoing analyzing Willow's emissions.[163] Like the listing decision, the Bernhardt memorandum is based on out-of-date information regarding the relationship between polar bears and GHG emissions. Interior's reliance on *In re: Polar Bear Endangered Species Act Listing and 4(d) Rule Litigation* and Intervenors' citations to various 2008 agency letters are also misplaced.[164] There is no indication FWS considered Intervenors' extra-record documents,[165] nor do those 2008 findings evaluate the current state of science. Contrary to ConocoPhillips' assertions, FWS not considering GHG emissions under Section 7 previously does not make it lawful today.[166] FWS cannot rely on outdated agency findings to justify overlooking climate effects to polar bears based on current scientific literature.[167]

Further, the Bernhardt memorandum, as well as the EPA regulations and FWS's emperor penguin listing decision relied on by Defendants, focus on a separate question: whether GHG emissions can trigger formal consultation or define the action area being

---

[163] Feds. 54; CPAI 40; NSB 33.

[164] Feds. 52; CPAI 39-40; NSB 31-32 nn.6-8.

[165] *Supra* n.157.

[166] *See, e.g.*, *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 234 (D.D.C. 2011) (explaining longstanding agency practice cannot overcome statutory or regulatory mandates); CPAI 36, 50.

[167] *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (the best available data requirement "prohibits an agency from disregarding scientific data that is in some way better than the evidence it relies on" (internal brackets and quotation marks omitted)).

evaluated.[168] That question is irrelevant to this case. Here, FWS engaged in formal consultation regarding Willow's impacts to polar bears.[169] Thus, the extent to which Willow's GHG emissions would impact sea ice was already within scope of consultation. The memorandum does not negate the need to consult on those effects. Contrary to Defendants' claims, SILA is not arguing that all actions causing GHG emissions necessarily trigger ESA consultation for polar bears or sea ice critical habitat.[170] Rather, where sea ice is part of the action area subject to consultation, FWS cannot ignore the proposed action's significant GHG emissions and those emissions' impacts on sea ice.[171] Moreover, the Ninth Circuit rejected similar arguments that agencies need not assess the effects of their actions on climate change on the basis that it is a global problem whose precise impacts are uncertain.[172]

---

[168] FWS_AR032371-77; Feds. 52; CPAI 41. The emperor penguin listing is even less applicable because FWS stated it could not determine whether GHG emissions would cause take of penguins. FWS_AR032341. Whether take will occur is a separate inquiry from whether an effect warrants consultation. *Karuk Tribe of Cal. v. USFS*, 681 F.3d 1006, 1028 (9th Cir. 2012) (en banc).

[169] FWS_AR032530-31.

[170] CPAI 53; NSB 36-37; *see* Feds. 52, 54.

[171] 50 C.F.R. § 402.14(h)(1)(iii).

[172] *See, e.g.*, *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 508 F.3d 508, 550 (9th Cir. 2007) (indicating agency is not excused from assessing the effects of its actions just because climate change is a global phenomenon), *vacated and amended on other grounds*, 538 F.3d 1172 (9th Cir. 2008); Feds. 50-51; CPAI 42; NSB 30.

---

## 2. *FWS failed to consider the best available scientific information.*

FWS neither acknowledged nor discredited recent studies enabling the agencies to estimate sea loss from continued GHG emissions in its BiOp or correspondence with BLM.[173] Indeed, contrary to ConocoPhillips' assertions, only two studies were cited in BLM's letter to FWS explaining that the agency lacked sufficiently granular information to warrant analysis, neither of which were the studies SILA raised.[174] As a result, this case is factually inapposite to the cases Defendants cite and no deference is warranted.[175] While FWS acknowledged that polar bears are generally suffering from sea ice decline, it failed to acknowledge that this decline is due to primarily to anthropogenic GHG emissions.[176] The ESA's best available scientific information standard requires the agency to consider data even if it offers "less than conclusive proof."[177] The best

---

[173] *Supra* nn.152-53; FWS_AR032549-68 (BiOp not citing Molnár or Notz and Stroeve studies). *Contra* Feds. 56. While public comments attached to BLM's letter cited Notz and Stroeve, AR513501, there is no indication FWS reviewed this or other relevant studies prior to deciding it lacked sufficiently specific information to consider Willow's climate impacts in the BiOp.

[174] FWS_AR032347; CPAI 51, 55.

[175] Feds. 55-56; NSB 34; *Kern Cnty. Farm Bureau*, 450 F.3d at 1081 (rejecting claim FWS ignored best available science where it cited studies "at least twenty" times); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995-98 (9th Cir. 2014) (indicating agency cannot ignore available studies and rejecting challenge because agency evaluated relevant impacts); *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1265 (11th Cir. 2009) (noting BiOp addressed issues and statements raised by Plaintiffs and therefore considered the best available science); *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 924-25 (9th Cir. 2018) (explaining BiOp evaluated identified impacts and agency responded to letter flagging study).

[176] FWS_AR032485-86.

[177] *Brower*, 257 F.3d at 1071; *see also* 50 C.F.R. § 402.14(g)(8).

available science demonstrates that continued emissions of GHGs at current or higher rates will jeopardize polar bears, and FWS's failure to acknowledge Willow's contribution to such impacts was arbitrary.[178]

## C. FWS's Take Findings Are Unlawful and Unsupported by the Record.

### 1. FWS's interpretation of harassment fails as a matter of law.

As a threshold matter, FWS acknowledged in the BiOp that its new interpretation of harassment, requiring specific intent directed towards wildlife, is inconsistent with its past practice.[179] Accordingly, it is not entitled to deference.[180] Defendants' briefs assert that FWS's ad hoc interpretation is the only reasonable one based on the regulation's language and history.[181] If that were true, it begs the question of why FWS misapplied its regulation for decades. Other BiOps make clear that FWS has not previously interpreted its harassment definition in this manner.[182] Tellingly, FWS did not rely on this interpretation to determine the incidental take of other species in the Willow BiOp.[183]

---

[178] SILA 36.

[179] FWS_AR032542 ("[FWS] acknowledges that it has not consistently given effect to the "intentional or negligent" language of its ESA definition of "harass" when developing biological opinions for polar bears.").

[180] *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) (giving no deference to ad hoc statements); *Nat'l Res. Def. Council v. EPA*, 526 F.3d 591, 605 (9th 2008) (explaining inconsistent interpretation receives "considerably less deference").

[181] Feds. 61; CPAI 58-60; NSB 37-38.

[182] *See, e.g.*, 2020_FWS_AR000766 (not requiring any fault by operator in 2020 Willow BiOp incidental take statement); FWS_AR376616 (same for 2019 Nanushuk project BiOp); FWS_AR376194 (same for 2011 Colville Delta-5 project BiOp); FWS_AR375976 (same for 2006 Oooguruk project BiOp).

[183] FWS_AR032540; FWS_AR032503.

---

Nor has FWS taken this position in other rulemakings.[184] These post hoc arguments should be rejected.[185] Additionally, ConocoPhillips' arguments that the BiOp's Incidental Take Statement (or lack thereof) is an "authoritative" policy statement akin to a formal rulemaking are meritless.[186] The Ninth Circuit declined to extend such deference to individual permitting decisions.[187]

FWS's ad hoc interpretation requires ConocoPhillips to have the specific intent to harass wildlife for there to be an act meeting its regulatory definition of harassment. Contrary to Interior's assertions, SILA does not ignore the BiOp's discussion regarding "negligence."[188] But SILA does not allege that ConocoPhillips would negligently carry out its oil and gas activities. Thus, the proper focus is whether ConocoPhillips' intentional acts to develop oil and gas would pose the unintended, but foreseeable, consequence of harassing polar bears. Regardless, SILA explained that harassment simply requires that ConocoPhillips intentionally or negligently commit acts that create a likelihood of injury.[189] The regulation's use of the term "negligence" illustrates SILA's

---

[184] 78 Fed. Reg. 11,766, 11,770 (Feb. 20, 2013) (polar bear Section 4(d) Rule explaining the ESA's "take restrictions … apply regardless of whether the action causing take is purposefully directed at the animal or not"); 86 Fed. Reg. 54,642, 54,643-44 (Oct. 4, 2021) (Migratory Bird Treaty Act rulemaking explaining ESA incidental take liability does not require action directed at wildlife).
[185] *Supra* n.82.
[186] CPAI 60-61.
[187] *Corrigan v. Haaland*, 12 F.4th 901, 914 n.6 (9th Cir. 2021).
[188] Feds. 59.
[189] SILA 39-41.

point that specific intent to harass wildlife is not required. In contrast, FWS's BiOp required such intent:

> The applicant's activities … would be conducted with the intent of developing and producing oil and gas and without any intent to annoy, disturb, or harass polar bears … [and] the applicant's activities would be conducted in accordance with "reasonable measures to avoid injury to" to polar bears and any incidental (i.e., not intentional) disturbance of polar bears that nevertheless results from the proposed action would not entail any "degree of fault, either intentional or negligent", and thus would not constitute "harassment.[190]

Interior states that "the plain language and regulatory history show that FWS applies 'harass' only to (1) intentional harassment of animals and (2) unintentional harassment traceable to a negligent act or omission."[191]

Defendants' arguments regarding the second category are contrary to FWS's reasoning in the BiOp. SILA agrees that the regulatory definition of harassment encompasses "unintentional harassment *traceable to* a negligent act or omission"[192] or "[a] negligent act that incidentally causes the likelihood of injury to a listed animal [but] not done for the purpose of harassing the animal."[193] This interpretation only requires intent to engage in the underlying activity. But FWS did not focus its harassment analysis on such actions. Instead, FWS erroneously applied its interpretation to conclude that no

---

[190] FWS_AR032541.
[191] Feds. 60.
[192] *Id.* (emphasis added).
[193] CPAI 61.

harassment would occur "negligently" unless ConocoPhillips failed to comply with polar-bear-specific mitigation measures.[194]

FWS's regulation simply requires ConocoPhillips intend to commit the act that causes the annoyance, regardless of whether mitigation measures are followed or not.[195] As factual matter, harassment could occur while ConocoPhillips negligently undertakes its oil and gas activities because polar bear mitigation measures do not cover all possible actions. For instance, ConocoPhillips personnel could negligently drive a vehicle and disturb bears without violating any applicable polar bear mitigation measure.[196] Compliance with mitigation measures does not mean harassment could not occur.

Interior's characterization of intentional harassment is also fundamentally flawed because it is contrary to the regulation's plain language. "Harassment" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."[197] The terms "intentional or negligent" inform the immediately following terms "act or omission," not

---

[194] FWS_AR032541; *see also* Feds. 58-59 (arguing same).

[195] 50 C.F.R. § 17.3.

[196] *See, e.g.*, FWS_AR032516 (noting vehicle disturbance would occur throughout project life and be greatest during construction); FWS_AR032412-13, FWS_AR032420 (prohibiting chasing wildlife, requiring certain vehicles and den avoidance, but not mitigating vehicle noise or activity extent).

[197] 50 C.F.R. § 17.3.

the later phrase: "injury to wildlife."[198] This definition does not require any intentional or negligent behavior directed towards wildlife; FWS's interpretation is erroneous.[199]

Defendants also point to FWS's 1975 regulations, which indicate that the agency sought to avoid take liability attaching regardless of intent or negligence.[200] But again, this simply indicates harassment requires the intent to take an underlying action.

As SILA explained, an act done with the specific intent to impact the species cannot qualify as incidental take under the ESA.[201] An individual cannot seek authorization to purposefully harass polar bears via an incidental take statement.[202] Congress chose the word "incidental" specifically "to cover situations in which it is known that a taking will occur if the other activity is engaged in but such taking is incidental to, and not the purpose of, the activity."[203] As a practical matter, FWS's interpretation would preclude harassment from being covered in an ITS, subject to the

---

[198] *See U.S. v. Price*, 980 F.3d 1211, 1218 (9th Cir. 2020) (applying "the most natural grammatical reading of a statute"); *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 838 (9th Cir. 2020) (explaining modifiers normally apply to the closest language).

[199] *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 700-01 (1995) (rejecting interpretation of ESA "harm" that would require "a direct application of force" against listed species).

[200] Feds. 59-60; CPAI 59-60.

[201] SILA 40-41; *see also* FWS_AR032542-43 (distinguishing between intentional and incidental take).

[202] 16 U.S.C. § 1539(a)(1)(B).

[203] H.R. Rep. No. 97-567, at 31 (1982); *Babbitt*, 515 U.S. at 704-05 (explaining Congress intended "take" to apply broadly to cover indirect actions).

---

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                           Page 35

Case 3:23-cv-00058-SLG   Document 155   Filed 09/15/23   Page 46 of 56

ESA's protective mandates.[204] Excluding acts of harassment from incidental take contravenes the ESA's plain language and Congress' intent.[205]

FWS's ad hoc definition would also create an unsupported distinction between the ESA and Marine Mammal Protection Act (MMPA).[206] The MMPA generally prohibits take with some exceptions,[207] including allowing the Secretary to permit the "incidental, but not intentional" take of a marine mammal.[208] Marine mammal take must be authorized under the MMPA before it can be permitted under the ESA's incidental take statement requirements.[209] FWS's ad hoc definition of harassment as requiring specific intent directed at wildlife, or occurring out of compliance with required mitigation, cannot be authorized as incidental take under the MMPA.[210] As such, FWS's ad hoc interpretation would mean that ESA "harassment" would rarely, if ever, comply with the

---

[204] SILA 33 (explaining incidental take statement's protective functions).
[205] *Zuniga v. Barr*, 946 F.3d 464, 470 (9th Cir. 2019) (rejecting interpretations of regulations inconsistent with statute); SILA 33.
[206] *CBD I*, 982 F.3d at 74142 (explaining applicability of both statutes where FWS may authorize take of marine mammals).
[207] 16 U.S.C. §§ 1371(a), 1372(a).
[208] *Id*. § 1371(a)(5)(A)(i).
[209] *Id.* § 1536(b)(4)(C).
[210] *Id.* § 1371(a)(5)(A)(i); 50 C.F.R. § 18.125(b) (requiring compliance with terms and conditions of a letter of authorization under the MMPA); *see also* FWS_AR032543 (BiOp acknowledging treating intentional acts as incidental take would create inconsistencies between the statutes).

MMPA. The Court should reject any interpretation of harassment rendering the ESA's requirements to ensure MMPA compliance surplusage.[211]

### 2. *FWS unlawfully failed to issue an Incidental Take Statement for Polar bears.*

Interior points to statements in the BiOp regarding the distance of Willow's infrastructure from the coast to imply that harassment is not reasonably certain because the project is inland.[212] Willow is within ESA-designated critical habitat,[213] and its infrastructure overlaps with potential terrestrial denning habitat — i.e., areas deemed suitable for denning, despite their inland location.[214] Given that the agencies acknowledge the presence of polar bears and their habitat in the project area, these arguments should be rejected.

Interior also argues that because FWS's model predicted a low probability of potential MMPA Level A take or lethal take of cubs, there is no basis for finding ESA harassment of maternal bears prospecting for den sites.[215] This misconstrues SILA's argument. Regardless of the model's findings related to cubs, FWS found that Willow could affect maternal bears in multiple ways, including by altering movements,

---

[211] *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1018 (D. Alaska 2019) (giving effect to all statutory provisions and not rendering parts superfluous).
[212] Feds. 62; NSB 41-42; CPAI 64.
[213] FWS_AR032488.
[214] FWS_AR032490 (map of polar bear critical habitat and potential terrestrial denning habitat overlapping Willow infrastructure); AR824103-04 (describing habitat in Willow area).
[215] Feds. 62-63.

disturbing females at dens, or causing den abandonment.[216] It is also undisputed that

FWS's model did not forecast whether adult females prospecting for den sites could

suffer injury — FWS's model only considered potential injury to denning cubs.[217]

Defendants characterize impacts to maternal bears as not being "biologically

significant" based on FWS's other findings in the BiOp.[218] But these record cites do not

undercut FWS's finding that Willow could disrupt maternal bears' behavior.[219] Nor did

FWS explain its assumption that polar bears can simply move away from disturbance,

and thereby avoid harassment, in the context of such disturbances impairing breeding in a

population already suffering from reduced denning and reproductive success.[220] While

Interior argues that maternal bears would not be disturbed more than other non-denning

bears, this overlooks that ESA harassment specifically includes disturbances that interfere

with breeding and sheltering.[221] Indeed, the Ninth Circuit acknowledged that den

abandonment and relocation may qualify as ESA harassment.[222]

---

[216] FWS_AR032517.

[217] FWS_AR032580. Defendants' argument that the model did not find potential injury to adult bears omits the fact that the model did not evaluate it. Feds. 62-63; NSB 42-43; CPAI 64-66; *but see* SILA 43 (explaining model assumed all non-lethal take of adults would be limited to MMPA Level B harassment).

[218] Feds. 57-58; CPAI 62; NSB 38-39; *see also* FWS_AR 032516-17.

[219] FWS_AR032517.

[220] FWS_AR032484-85, FWS_AR032469-70.

[221] 50 C.F.R. § 17.3.

[222] *See CBD I*, 982 F.3d at 750-51 ("These disturbances implicate disruptions in behavioral patterns contemplated in the ESA and MMPA, such as polar bears' breeding and sheltering."); *see also Babbitt*, 515 U.S. at 710 (O'Connor, J., concurring) (noting "injure" is defined in dictionary as "to impair" and explaining that impairing an animal's ability to breed qualifies as "injury" under the ESA).

To the extent Interior argues that mitigation measures would minimize impacts to non-denning polar bears, FWS acknowledged in the BiOp that compliance with mitigation measures would not foreclose the potential for disturbance effects.[223] The other reasons Interior points to in support of FWS's finding that transient bears would not be impacted relate to the project's location, which, as explained, does not negate potential injury to polar bears.[224] Additionally, the Borough's assertion that denning bears tolerate exposure and that mitigation measures would preclude denning impacts overlooks that SILA's argument focuses on maternal bears prospecting for den sites.[225]

For the reasons described above, BLM's reliance on FWS's BiOp also violates the ESA.

## V.  VACATUR IS WARRANTED.

The default remedy of vacatur is warranted.[226] Interior presents no argument on remedy.[227] Intervenor-Defendants do not meet their burden to show that this case is one of the "rare circumstances" to deviate from the presumptive remedy.[228]

---

[223] FWS_AR032522.
[224] Feds. 64 (citing FWS_AR 032516-17).
[225] NSB 42; SILA 43-44.
[226] SILA 44-47; *see also Dep't of Homeland Sec.*, 140 S. Ct. at 1901 (explaining because agency decision violated APA, it "must be vacated"); *AIDEA*, 2023 U.S. Dist. LEXIS 136474, at *35 n.153 (explaining vacatur is presumptive remedy for NEPA violations).
[227] Feds. 66-67.
[228] SILA 45 & n.169.

Most importantly, allowing Willow to proceed will result in significant and permanent environmental harm to the Reserve and subsistence resources.[229] Kuukpik's and the State's argument that vacating will cause environmental harm because environmentally beneficial mitigation measures will not be carried out is circular.[230] Mitigation is only needed because of the harms from building Willow; without the project, there are no harms to mitigate. The State's argument that vacatur could lead to environmental harm from additional disturbance of the already-developed area is refuted by ConocoPhillips' assertion that interim reclamation activities secured those sites.[231] Because this case is not one where vacatur would cause environmental harm, but would instead protect the area, vacatur is strongly favored.[232]

Regarding the seriousness of the errors, the errors are neither minor nor procedural defects that can be easily fixed.[233] A fundamental purpose of NEPA is to ensure agencies

---

[229] SILA 46.

[230] Kuukpik 31-32; SOA 25-26.

[231] ConocoPhillips Alaska, Inc.'s Opp'n to Mots. for Inj. Pending Appeal at 24, Case No. 23-35226, ECF 18-1. The State's argument that tundra travel causes greater harm than permanent gravel roads strains credulity. SOA 27.

[232] Cf. *Pollinator Stewardship Council v. U.S. EPA* (*Pollinator*), 806 F.3d 520, 532 (9th Cir. 2015) (vacating where leaving rule in place "risks more potential environmental harm"); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (not vacating because it could lead to "potential extinction"); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) (recognizing "limited circumstances" for remand without vacatur, "namely [when] serious irreparable environmental injury [will occur if the decision is vacated]").

[233] *See California v. Bernhardt*, 472 F. Supp. 3d 573, 630 (N.D. Cal 2020) ("[C]ourts generally only remand without vacatur when the errors are minor procedural mistakes …") (quoting *California v. BLM*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017)); *cf.* SOA 24-25; Kuukpik 35-36.

Case 3:23-cv-00058-SLG   Document 155   Filed 09/15/23   Page 51 of 56

have information about the impacts of a proposal to make an informed choice before

taking action.[234] If projects can proceed in the face of an incomplete analysis, that

purpose is stymied.[235] The alternatives analysis is the "heart" of an EIS and the failure to

consider a reasonable alternative makes an EIS inadequate.[236] ANILCA Section 810

substantively protects subsistence uses and users in land management decisions.[237] The

NPRPA requires maximum protection of Special Areas and protection of all surface

resources alongside oil and gas.[238] And the ESA prioritizes protecting endangered and

threatened species and their habitat by requiring consultation to ensure against

jeopardy.[239] Because the agency's errors are substantive, based on invalid legal

justifications, and go to the fundamental purposes of the statutes, this factor strongly

favors vacatur.[240]

---

[234] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

[235] *See Or. Nat. Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017) (explaining seriousness of errors is based on purposes of statute; finding serious error from NEPA failures); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1245 (N.D. Cal. 2015) (failing to analyze cumulative impacts rarely minor error); *see also Pub. Emps. for Envtl. Responsibility v. FWS*, 189 F. Supp. 3d 1, 2-3 (D.D.C. 2016) (explaining D.C. District Courts routinely vacate for NEPA violations).

[236] 40 C.F.R. § 1502.14; *Westlands Water Dist.*, 376 F.3d at 865; *see also Ctr. for Biological Diversity v. BLM* (*CBD II*), 2023 U.S. Dist. LEXIS 97282 (D. Idaho June 2, 2023).

[237] 16 U.S.C. §§ 3111, 3112, 3120.

[238] 42 U.S.C. §§ 6504(a), 6506a(b).

[239] 16 U.S.C. §§ 1536(a); *see also Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1090.

[240] *Cf. League of Wilderness Defenders/Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 2012 U.S. Dist. LEXIS 190899, at *9 (D. Or. Dec. 10, 2012) (noting courts decline to vacate when doing so is against "the very purpose of the underlying statutes").

---

Intervenor-Defendants present many arguments focusing on the disruptive consequences of vacatur.[241] But the disruptive consequences of vacatur are evaluated in in light of the likelihood that a decision will remain unchanged following remand.[242] Given the seriousness of Interior's errors, it is likely that Interior could and would reach a different decision following remand.[243] Therefore, the disruptive consequences are entitled to less weight.[244]

ConocoPhillips relies heavily on expenditures, contracts, and present and future investments to argue that the disruptive consequences overcome vacatur.[245] It points to money spent to date — including while this case moves forward, knowing SILA sought vacatur — as well as expenses and contracts expected for next season.[246] This argument should be rejected because it incentivizes companies to spend up front to avoid

---

[241] *See, e.g.*, CPAI 68-69; NSB 43-44.

[242] *Pollinator*, 806 F.3d at 532.

[243] *See NRDC v. EPA*, 38 F.4th 34, 51-52 (9th Cir. 2022) (vacating because not possible to predict if agency would reach same outcome); *Cascadia Wildlands v. BLM*, 2021 U.S. Dist. LEXIS 215907, *35-36 (D. Or. Sept. 13, 2021) (explaining substantive errors more serious than procedural and make it unlikely agency can fix issue on remand).

[244] *See Pollinator*, 806 F.3d at 532 (explaining that if different decision "may be reached," disruptive consequences are undermined); *Ctr. for Food Safety*, 734 F. Supp. 2d at 952.

[245] CPAI 68-69.

[246] *Id.*, *see also* Decl. of Connor A. Dunn. ¶¶ 3-11, ECF. No. 141-2. ConocoPhillips' lack of a final investment decision considerably undercuts its concerns about the economic impact of vacatur.

---

vacatur.[247] ConocoPhillips also revives its previously-rejected argument that vacatur will result in the project never being built.[248] While ConocoPhillips may desire more certainty, it has multiple avenues available to retain its leases.[249]

Intervenor-Defendants also present several arguments asserting lost jobs, and decreased revenues, royalties, taxes, dividends, and grants.[250] These are all speculative because ConocoPhillips still has not made a final investment decision.[251] Regardless, these benefits can still be obtained if the project is approved in the future, including the ability to use fabricated project components and equipment.

Finally, Intervenor-Defendants present an incomplete reading of *California Communities Against Toxics v. U.S. EPA* (*California Communities*) to argue that economic and jobs impacts overcome vacatur.[252] There, the Court relied on more than economic and jobs impacts when declining to vacate. Instead, the Ninth Circuit determined that vacating the rule would lead to increased air pollution, "the very danger

---

[247] *CBD II*, 2023 U.S. Dist. LEXIS 97282, at *7, *16-18, *24-29 (vacating approvals for partially constructed road for NEPA violations; finding mining company's economic harm does not tip scales away from vacatur).

[248] CPAI 69; Order re Mots. For Temp. Restraining Order and Prelim. Inj. at 36 n.144, ECF No. 74.

[249] 42 U.S.C. § 6506a(i)(6); *see also id.* § 6506a(i)(3) (directing renewal of non-producing leases if diligence by lessee); 43 C.F.R. §§ 3135.1-5(b), 3135.2(b), (c) (allowing lease suspension). ConocoPhillips acknowledges that this factor is a risk to evaluate, but not determinative. Dunn Decl. ¶ 17.

[250] ASRC 22-24; SOA 25, 28-30, 32-33, 35-36; CPAI 69; NSB 43-45; Kuukpik 32-35.

[251] SILA 47 n.180.

[252] *See, e.g.*, CPAI 70; ASRC 21; SOA 35.

---

the Clean Air Act aims to prevent," and require duplicative legislation.[253] It was, therefore, a combination of the environmental harm and disruptive consequences beyond just economics that resulted in the Court leaving the rule in place.[254] *California Communities* instructs that vacatur is warranted here because there will be no environmental harm from vacating and the disruptive consequences do not rise to the level warranting a departure from the default remedy.

<u>CONCLUSION</u>

This Court should grant SILA's Motion for Summary Judgment and vacate the agencies' decisions.

Respectfully submitted,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

---

[253] 688 F.3d 989, 993-94 (9th Cir. 2012); *cf. Solar Energy Industries Ass'n v. FERC*, No. 20-72788, slip op. at 81-83 (9th Cir. Sept. 5, 2023) (identifying need for states, utilities, and FERC to readopt rules if 2020 order is vacated).

[254] *Cal. Cmtys.*, 688 F.3d 989; *cf. Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1145 (9th Cir. 2020) (vacating herbicide registrations despite economic impact given EPA's errors).

---

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*
Case No. 3:23-cv-00058-SLG                                                    Page 44

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief contains 11,384 words, excluding items exempted by Local Civil Rule 7.4(a)(4). Plaintiffs' Unopposed Motion to File Overlength Reply is submitted concurrently.

s/ Bridget Psarianos
Bridget Psarianos

## CERTIFICATE OF SERVICE

I certify that on September 15, 2023, I caused a copy of the PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

s/ Bridget Psarianos
Bridget Psarianos