# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

SOVEREIGN IÑUPIAT FOR A LIVING
ARCTIC, *et al.*,

        Plaintiffs,

        v.

BUREAU OF LAND MANAGEMENT,
*et al.*,

        Defendants,

    and

CONOCOPHILLIPS ALASKA, INC.,
*et al.*,

        Intervenor-Defendants.

Case No. 3:23-cv-00058-SLG

---

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

        Plaintiffs,

        v.

BUREAU OF LAND MANAGEMENT,
*et al.*,

        Defendants,
    and

CONOCOPHILLIPS ALASKA, INC.,
*et al.*,

        Intervenor-Defendants.

Case No. 3:23-cv-00061-SLG

## DECISION & ORDER

This order is entered in two related cases challenging the Bureau of Land Management's ("BLM") March 2023 Record of Decision ("ROD") for the Willow Master Development Plan ("Willow Project," "Willow," or "Project"), which authorizes oil production on leases held by ConocoPhillips Alaska, Inc. ("ConocoPhillips"), in the National Petroleum Reserve in Alaska ("NPR-A" or "Reserve"). Sovereign Iñupiat for a Living Arctic Plaintiffs ("SILA Plaintiffs")[1] and Center for Biological Diversity Plaintiffs ("CBD Plaintiffs")[2] (collectively, "Plaintiffs") bring suit pursuant to the Administrative Procedure Act ("APA") against Federal Defendants.[3] ConocoPhillips, Arctic Slope Regional Corporation ("ASRC"), North Slope Borough ("NSB"), Kuukpik Corporation ("Kuukpik"), and the State of Alaska

---

[1] In Case No. 3:23-cv-00058-SLG, SILA Plaintiffs are Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Environment America, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society.

[2] In Case No. 3:23-cv-00061-SLG, CBD Plaintiffs are Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, Greenpeace, Inc., and Natural Resources Defense Council, Inc.

[3] In Case No. 3:23-cv-00058-SLG, Federal Defendants are the U.S. Bureau of Land Management; U.S. Fish and Wildlife Service; and the U.S. Department of the Interior. In Case No. 3:23-cv-00061-SLG, Federal Defendants are the same with the addition of the National Marine Fisheries Service; U.S. Department of Commerce; Deb Haaland, in her official capacity as Secretary of the Interior; Tommy P. Beaudreau, in his official capacity as Deputy Secretary of the Interior; Gina M. Raimondo, in her official capacity as Secretary of Commerce; Steven Cohn, in his official capacity as Alaska State Director of Bureau of Land Management; Sara Boario, in her official capacity as Alaska Regional Director of U.S. Fish and Wildlife Service; and Jonathan Kurland, in his official capacity as Regional Administrator of National Marine Fisheries Service.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 2 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 2 of 109

("State") (collectively, "Intervenor-Defendants") were permitted to intervene in both cases.[4]

SILA Plaintiffs and CBD Plaintiffs filed opening briefs at Docket 105 in Case No. 3:23-cv-00058-SLG and Docket 115 in Case No. 3:23-cv-00061-SLG, respectively, seeking vacatur of BLM's Record of Decision ("ROD"), BLM's Final Supplemental Environmental Impact Statement ("Final SEIS"), and the Fish and Wildlife Service's ("FWS") Biological Opinion ("BiOp"). CBD Plaintiffs also seek to set aside the Letter of Concurrence by the National Marine Fisheries Service ("NMFS").[5] Federal Defendants and Intervenor-Defendants (collectively, "Defendants") each filed briefs in opposition.[6] Plaintiffs each replied in support.[7] ConocoPhillips then filed a Notice of Supplemental Authority in Support of

---

[4] *See* Dockets 9, 27, 37, 39, 45 (Case No. 3:23-cv-00058-SLG); Dockets 28, 31, 40, 43, 51 (Case No. 3:23-cv-00061-SLG). In addition, there were numerous amici briefs filed in both cases. *See* Dockets 100, 101, 104, 110, 133, 147 (Case No. 3:23-cv-00058-SLG); Dockets 117, 123, 125, 137, 146, 162 (Case No. 3:23-cv-00061-SLG).

[5] *See* Docket 104 at ¶¶ 219-22 (Case No. 3:23-cv-00061-SLG).

[6] Dockets 137 (Federal Defendants), 141 (ConocoPhillips), 142 (ASRC), 143 (NSB), 144 (Kuukpik), 145 (State) (Case No. 3:23-cv-00058-SLG); Dockets 149 (Federal Defendants), 153 (ConocoPhillips), 154 (ASRC), 155 (NSB), 156 (Kuukpik), 157 (State) (Case No. 3:23-cv-00061-SLG). While SILA Plaintiffs' and CBD Plaintiffs' briefs are different from each other, Defendants' briefs are identical in both cases. Therefore, the Court will cite only to Defendants' briefing in Case No. 3:23-cv-00058-SLG for simplicity.

[7] Docket 155 (Case No. 3:23-cv-00058-SLG); Docket 170 (Case No. 3:23-cv-00061-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 3 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 3 of 109

Intervenor-Defendants' Opposition to Plaintiffs' Summary Judgment Motions,[8] to which Plaintiffs responded.[9]

SILA Plaintiffs also filed a Motion to Strike at Docket 150 in Case No. 3:23-cv-00058-SLG, seeking to strike portions of ConocoPhillips's and NSB's filings in opposition "that rely on extra-record evidence and the parties' extra-record declarations and materials."[10] ConocoPhillips and NSB each responded in opposition at Docket 158 and Docket 157, respectively, to which SILA Plaintiffs replied at Docket 163.[11]

No party requested oral argument, and oral argument was not necessary to the Court's determination.

## BACKGROUND

The Court set out the background in some detail in its previous order at Docket 74 in Case No. 3:23-cv-00058-SLG and Docket 82 in Case No. 3:23-cv-00061-SLG.[12] The Court assumes familiarity here and briefly summarizes the relevant facts.

---

[8] Docket 164 (Case No. 3:23-cv-00058-SLG); Docket 181 (Case No. 3:23-cv-00061-SLG).

[9] Docket 165 (Case No. 3:23-cv-00058-SLG); Docket 182 (Case No. 3:23-cv-00061-SLG).

[10] Docket 150 at 2 (Case No. 3:23-cv-00058-SLG).

[11] Case No. 3:23-cv-00058-SLG.

[12] *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, Case No. 3:23-cv-00058-SLG, 2023 WL 2759864 (D. Alaska Apr. 3, 2023), *appeal dismissed*, No. 23-35226, 2023 WL 4339382 (9th Cir. May 19, 2023).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 4 of 109

Case 3:23-cv-00058-SLG    Document 166    Filed 11/09/23    Page 4 of 109

The National Petroleum Reserve in Alaska ("NPR-A"), on Alaska's North Slope, consists of 23.6 million acres and is the Nation's largest single unit of public land.[13]  Established as the Naval Petroleum Reserve in 1923, the NPR-A was renamed and its management authority was transferred to the Secretary of the Interior in 1976 by the Naval Petroleum Reserves Production Act ("NPRPA"), 42 U.S.C. § 6501 *et seq.*[14]  In 1980, the NPRPA was amended by an appropriations rider that directed the Secretary of the Interior to conduct "an expeditious program of competitive leasing of oil and gas in the" NPR-A.[15]  Over the years, Intervenor-Defendant ConocoPhillips has acquired and developed significant lease holdings in the northeast portion of the NPR-A.[16]

On May 10, 2018, ConocoPhillips requested that BLM prepare an Environmental Impact Statement ("EIS") for the Willow Project, as required by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*[17] The following year, BLM made available for public comment a Draft EIS for the

---

[13] *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006).

[14] H.R. Rep. No. 94-81, at 5-6, 8-9 (1975); Naval Petroleum Reserves Production Act, Pub. L. No. 94-258, 90 Stat. 303 (1976); 42 U.S.C. § 6503(a).

[15] Pub. L. No. 96-514, 94 Stat. 2964 (1980) (codified at 42 U.S.C. § 6506a).

[16] Docket 5 at 2-7 (Case No. 3:23-cv-00058-SLG) (ConocoPhillips Mot. to Intervene).

[17] Notice of Availability of the Willow Master Development Plan Draft Environmental Impact Statement, Alaska, 84 Fed. Reg. 45801, 45801 (Aug. 30, 2019).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 5 of 109

Project.[18]  Then, on March 26, 2020, BLM released a Supplemental Draft EIS that evaluated additional Project components.[19]  BLM published its notice regarding the availability of the Final EIS on August 14, 2020.[20]  On October 26, 2020, then-Secretary of the Interior David Bernhardt signed the ROD approving the Willow Project.[21]

In late 2020, a number of plaintiffs filed two lawsuits challenging the Federal Defendants' compliance with NEPA and the Endangered Species Act ("ESA") in preparing the Final EIS and ROD for the Willow Project.[22]  In August 2021, the Court identified several discrete deficiencies in the agencies' analyses and vacated BLM's approval of the Willow Project and FWS's Biological Opinion ("BiOp").[23]

---

[18] *Id.*

[19] Notice of Availability of the Supplement to the Willow Master Development Plan Draft Environmental Impact Statement, Alaska, 85 Fed. Reg. 17094, 17094 (Mar. 26, 2020) ("This targeted Supplement to the Draft EIS only addresses additional analysis for three Project components added by the Project proponent: Module delivery Option 3, a constructed freshwater reservoir, and up to three boat ramps for subsistence access.").

[20] Notice of Availability of the Willow Master Development Plan Final Environmental Impact Statement, Alaska, 85 Fed. Reg. 49677 (Aug. 14, 2020).

[21] *Sovereign Iñupiat for a Living Arctic*, 2023 WL 2759864, at *2.

[22] *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 516 F. Supp. 3d 943, 948 (D. Alaska 2021).  Plaintiffs in those cases are nearly identical to those in these cases: Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society (Case No. 3:20-cv-00290-SLG), and Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc. (Case No. 3:20-cv-00308-SLG).

[23] *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 805 (D. Alaska 2021) [hereinafter *SILA I*].

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 6 of 109
Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 6 of 109

Following the Court's decision, BLM began preparing a Supplemental Environmental Impact Statement ("SEIS") for the Willow Project "to address deficiencies identified by [the Court]."[24]  On July 25, 2022, BLM made available for public comment a Draft SEIS.[25]  And on January 13, 2023, FWS issued a new BiOp considering the effects of the Willow Project to listed species and designated critical habitats protected by the ESA.[26]  On March 2, 2023, NMFS issued a Letter of Concurrence to BLM's biological assessment finding that the Willow Project "may affect, but is not likely to adversely affect," several species of marine mammals.[27]  On February 6, 2023, BLM published the notice of availability of the Final SEIS in the Federal Register.[28]  And on March 12, 2023, Deputy Secretary of the Interior Tommy Beaudreau signed the ROD approving the Willow Project.[29]

As approved by the ROD, the Willow Project will consist of three drill sites and related support infrastructure, including a processing facility, airstrip,

---

[24] Notice of Availability of the Draft Supplemental Environmental Impact Statement for the Willow Master Development Plan, Alaska, 87 Fed. Reg. 44148, 44149 (July 25, 2022).

[25] *Id.* at 44148.

[26] FWS_AR032380-582.

[27] NMFS_AR000143.  The marine mammals include: the bowhead whale, blue whale, fin whale, North Pacific right whale, Western North Pacific distinct population segment ("DPS") gray whale, Western North Pacific DPS or Mexico DPS humpback whale, sperm whale, Arctic subspecies ringed seal, Beringia DPS bearded seal, and the Western DPS Steller sea lion. NMFS_AR000143.

[28] Notice of Availability of the Final Supplemental Environmental Impact Statement for the Willow Master Development Plan, Alaska, 88 Fed. Reg. 7756 (Feb. 6, 2023).

[29] AR824916.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 7 of 109

operations center, gravel mine, gravel roads connecting the Project infrastructure, and pipelines.[30]  The ROD disapproved of two additional drill sites that had been proposed by ConocoPhillips, explaining that this decision "significantly reduces the footprint of project infrastructure and the level of construction and operational activities, both within and outside of the sensitive [Teshekpuk Lake Special Area], and thereby substantially reduces impacts to a broad range of surface resources."[31]  Five days after BLM issued the ROD, ConocoPhillips relinquished 68,085.50 acres of leased lands in the Reserve because BLM "did not approve drilling pads that could have developed [these] leases."[32]

SILA Plaintiffs filed their case on March 14, 2023, and CBD Plaintiffs filed their case the following day.[33]  On March 16, 2023, Plaintiffs moved for preliminary injunctive relief and a temporary restraining order seeking to enjoin ConocoPhillips from beginning construction activities for the Willow Project.[34]  This Court denied those motions on April 3, 2023.[35]  Plaintiffs unsuccessfully sought emergency relief at the Ninth Circuit, and shortly thereafter voluntarily dismissed their preliminary

---

[30] AR824892.

[31] AR824900.

[32] Docket 48-10 at 23 (Case No. 3:23-cv-00058-SLG).

[33] Docket 1 (Case No. 3:23-cv-00058-SLG); Docket 1 (Case No. 3:23-cv-00061-SLG).

[34] Docket 23 (Case No. 3:23-cv-00058-SLG); Docket 24 (Case No. 3:23-cv-00061-SLG).

[35] *Sovereign Iñupiat for a Living Arctic*, 2023 WL 2759864, at *15.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 8 of 109

injunction appeals.[36]  The merits of Plaintiffs' claims against Federal Defendants are now ripe for decision.

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the [Administrative Procedure Act] of its own force may serve as a jurisdictional predicate."[37]

## LEGAL STANDARD

Plaintiffs seek judicial review under the Administrative Procedure Act ("APA").[38]  Under that statute, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"[39]  Agency action is arbitrary and capricious if it:

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.[40]

---

[36] *Sovereign Iñupiat for a Living Arctic*, 2023 WL 4339382, at *1.

[37] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[38] Docket 88 at ¶ 11 (Case No. 3:23-cv-00058-SLG) (Am. Compl.); Docket 104 at ¶ 11 (Case No. 3:23-cv-00061-SLG) (Am. Compl.).

[39] 5 U.S.C. § 706(2)(A).

[40] *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 9 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 9 of 109

A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[41] "[D]eference to the agency's decisions is especially warranted when reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise."[42] "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[43] "Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[44]

## DISCUSSION

Upon consideration of the parties' briefing and the record in this case, the Court finds as follows:

---

[41] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

[42] *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1130 (9th Cir. 2012) (internal quotation marks omitted).

[43] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted).

[44] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 10 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 10 of 109

## I.    National Environmental Policy Act

Plaintiffs bring two NEPA claims: First, Plaintiffs contend that BLM failed to consider a reasonable range of alternatives for the Willow Project, as required by NEPA.[45]    Second, Plaintiffs contend that BLM violated NEPA by failing to adequately analyze global greenhouse gas emissions from future oil development on lands adjacent to Willow, for which Willow will serve as a catalyst.[46]

### a.  Reasonable Range of Alternatives

Both sets of Plaintiffs claim that BLM's alternatives analysis for the Willow Project violated NEPA.[47]  In preparing an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action, "and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."[48]  "NEPA does not force agencies to 'review

---

[45] Docket 105 at 17-25 (Case No. 3:23-cv-00058-SLG); Docket 115 at 17-24 (Case No. 3:23-cv-00061-SLG).

[46] Docket 105 at 30-32 (Case No. 3:23-cv-00058-SLG); Docket 115 at 24-29 (Case No. 3:23-cv-00061-SLG).

[47] Docket 105 at 18 (Case No. 3:23-cv-00058-SLG); Docket 115 at 17 (Case No. 3:23-cv-00061-SLG).

[48] 40 C.F.R. § 1502.14(a) (2019).  The Council on Environmental Quality published a new rule, effective September 14, 2020, that substantially revised the regulations implementing NEPA, including changes to the definition of reasonable range of alternatives.  However, citations in this case are to the 2019 Code of Federal Regulations, reflecting the regulations originally promulgated in 1978, with a minor substantive amendment in 1986.  *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55978 (Nov. 29, 1978); National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. 15618 (Apr. 25, 1986).  This is because the 2020 NEPA regulations only apply to NEPA process begun after September 14, 2020, although agencies have the option to apply the 2020 NEPA regulations to ongoing activities begun before that date.  40 C.F.R. § 1506.13 (2020).  BLM

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 11 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 11 of 109

remote and speculative alternatives,' 'only reasonable or feasible ones.'"[49] However, an EIS must consider alternatives "varied enough to allow for a real, informed choice."[50] "The range of alternatives that an agency must consider is based on the purpose and need of the proposed agency action," so a court must "begin by determining whether or not the purpose and need statement was reasonable."[51] A court then "determine[s] whether the agency considered a reasonable range of alternatives based on its purpose and need."[52] "The existence of a viable but unexamined alternative renders an environmental review conducted under NEPA inadequate."[53] The "touchstone for [a court's] inquiry is whether an

---

determined that since the 2020 Willow Final EIS was developed under the 1978 regulations, the 2023 SEIS would also comply with the 1978 regulations as they concern a reasonable range of alternatives. *See* AR821922.

[49] *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 843 (9th Cir. 2023) (first quoting *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 580 (9th Cir. 2016); and then quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Cir. 2004)); *see also Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) ("Nor must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." (citation omitted)).

[50] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008) (citation omitted).

[51] *Fed. Aviation Admin.*, 63 F.4th at 843 (alterations omitted) (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022)).

[52] *Id.* (citing *Audubon Soc'y of Portland*, 40 F.4th at 982).

[53] *Id.* at 844-45 (alteration omitted) (quoting *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S. Ct. 2582 (2023)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 12 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 12 of 109

EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation."[54]

Here, Plaintiffs contend that BLM violated NEPA by failing to consider a reasonable range of alternatives "based on a misinterpretation of its authority under the NPRPA" that restricted its alternatives analysis to only those alternatives that would fully develop the oil resource.[55]  Plaintiffs assert that the agency erred by not considering an alternative that would allow some oil production but would leave considerable quantities of recoverable oil in the ground.[56]  The issue at the heart of this claim is the intersection of two directives in the NPRPA.  The first is Congress's directive to the Secretary of the Interior to "conduct an expeditious program of competitive leasing of oil and gas in the Reserve,"[57] as a result of which the government granted non-NSO leases to ConocoPhillips, according to it the "right to drill for, mine, extract, remove and dispose of all the oil and gas" from the subsurface.[58]  The second NPRPA directive requires that, when authorizing these

---

[54] *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

[55] Docket 105 at 17, 20 (Case No. 3:23-cv-00058-SLG); Docket 115 at 17-18 (Case No. 3:23-cv-00061-SLG).

[56] Docket 105 at 23 (Case No. 3:23-cv-00058-SLG); Docket 115 at 19-20 (Case No. 3:23-cv-00061-SLG).

[57] 42 U.S.C. § 6506a(a).

[58] *See* AR950259.  Some oil and gas leases contain "no surface occupancy" ("NSO") stipulations.  *Conner v. Burford*, 848 F.2d 1441, 1444 (9th Cir. 1988).  "Leases not governed by an NSO stipulation" are called "non-NSO leases," and non-NSO leases contain "mitigation

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 13 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 13 of 109

oil and gas activities in the Reserve, the Secretary "mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the" NPR-A and "assure the maximum protection" to the Teshekpuk Lake Special Area ("TLSA") and other areas designated by the Secretary of the Interior as containing significant surface values.[59]

This Court first considered the import of these two directives when reviewing BLM's 2020 ROD for the Willow Project. In 2020, BLM defined the Project's purpose as follows: "The purpose of the Proposed Action is to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources under leaseholds in the northeast area of the NPR-A, consistent with the proponent's federal oil and gas lease and unit obligations."[60] In furtherance of this purpose, "BLM asserted that ConocoPhillips' lease rights precluded the agency from considering alternatives concerning the configuration

stipulations" which "authorize the government to impose reasonable conditions on drilling, construction, and other surface-disturbing activities; unlike NSO stipulations, however, they do not authorize the government to preclude such activities altogether." *Id.* The Willow leases are non-NSO leases. Each lease provides: "Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provision of this lease." *See, e.g.*, AR950259.

[59] 42 U.S.C. § 6506a(b); 42 U.S.C. § 6504(a) ("Any exploration within . . . the Teshekpuk Lake areas . . . shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.").

[60] *SILA I*, 555 F. Supp. 3d at 768.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 14 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 14 of 109

or location of the drill pads" because ConocoPhillips had the right "to extract all the oil and gas possible within the leased areas."[61]   But the Court held in 2021 that "[t]he leases do not grant the lessee the unfettered right to drill wherever it chooses or categorically preclude BLM from considering alternative development scenarios"; hence, "BLM acted contrary to law insofar as it developed its alternatives analysis based on the view that ConocoPhillips had the right to extract all possible oil and gas from its leases."[62]   The Court also concluded that BLM's asserted lack of authority was "inconsistent with its own statutory responsibility to mitigate adverse effects on the surface resources" set out in the NPRPA.[63] Accordingly, the Court held that BLM's alternatives analysis violated NEPA and the NPRPA.[64]

On remand, BLM prepared a supplemental EIS that was intended to address the deficiencies identified by this Court in the original EIS.[65]   In the SEIS, BLM identified the purpose and need of the Proposed Action as follows:

> The purpose of the Proposed Action is to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir located in the [Bear Tooth Unit], while providing maximum protection to significant

---

[61] *Id.*

[62] *Id.* at 768, 805.

[63] *Id.* at 769 (citing 42 U.S.C. § 6506a(b)).

[64] *Id.* at 770.

[65] AR820696.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 15 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 15 of 109

surface resources within the NPR-A, consistent with BLM's statutory directives. The need for federal action (i.e., issuance of authorizations) is established by BLM's responsibilities under various federal statutes, including the NPRPA (as amended) and the Federal Land Policy and Management Act as well as various federal responsibilities of cooperating agencies under other statutes, including the Clean Water Act (CWA). Under the NPRPA, BLM is authorized to conduct oil and gas leasing and development in the NPR-A (42 USC 6506a). BLM is required to respond to the Proponent's requests for [a Master Development Plan] and related authorizations to develop and produce petroleum in the NPR-A.[66]

The Court "begin[s] by determining whether or not the purpose and need statement was reasonable" and then "determine[s] whether the agency considered a reasonable range of alternatives based on its purpose and need."[67] The purpose and need statement in this case as quoted above adequately frames the authorization of NPR-A oil and gas production while providing for the protection of significant surface resources as directed by the NPRPA. None of the parties dispute the reasonableness of the purpose and need statement, and the Court similarly finds that the statement is reasonable given the NPRPA's directives and BLM's responsibilities pursuant to federal law. The Court thus turns to an analysis of whether BLM considered a reasonable range of alternatives based on this purpose and need.

---

[66] AR820696-97; *see also* AR821927.

[67] *Fed. Aviation Admin.*, 63 F.4th at 843 (quoting *Audubon Soc'y of Portland*, 40 F.4th at 981).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 16 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 16 of 109

Plaintiffs assert that BLM improperly rejected alternatives that would "strand an economically viable quantity of [recoverable] oil."[68] Plaintiffs contend that "BLM's erroneous view of its authority under the [NPRPA] precluded it from evaluating any alternatives that struck a middle ground between recovering all economically viable oil from the field and recovering no oil at all."[69] Plaintiffs maintain that there is no real distinction between BLM's new standard and its previous interpretation that it must allow ConocoPhillips to extract "all possible oil" from Willow, which the Court held to be contrary to law.[70] Plaintiffs instead assert that "[a]n alternative that substantially reduces Willow's carbon footprint and prohibits infrastructure within the [TLSA], while also allowing ConocoPhillips to produce *some* oil from its leases, satisfies" the purpose and need for the Project.[71] They contend that the purpose and need statement "calls simply for 'the production and transportation to market of federal oil . . . in the Willow reservoir'" and that it does not mandate "a threshold amount of oil recovery."[72] Plaintiffs assert that a middle ground alternative that would preclude any infrastructure in the TLSA and

---

[68] Docket 105 at 20 (Case No. 3:23-cv-00058-SLG) (citing AR821709-10, AR821740, AR501470); Docket 115 at 18-19 (Case No. 3:23-cv-00061-SLG) (citing AR821958-59, AR814575-76).

[69] Docket 170 at 17 (Case No. 3:23-cv-00061-SLG).

[70] Docket 115 at 18-19 (Case No. 3:23-cv-00061-SLG); *see also* Docket 105 at 20 (Case No. 3:23-cv-00058-SLG); *SILA I*, 555 F. Supp. 3d. at 770.

[71] Docket 115 at 24 (Case No. 3:23-cv-00061-SLG) (emphasis in original).

[72] Docket 170 at 19 (Case No. 3:23-cv-00061-SLG) (quoting AR820696).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 17 of 109

still allow for 71% recovery of the reservoir's oil "plainly satisf[ies] the Project's purpose and need."[73]

The Court finds that BLM did consider the requisite reasonable range of alternatives based on the Project's purpose and need. The Ninth Circuit's decision in *Northern Alaska Environmental Center v. Kempthorne* is instructive.[74] In that case, the plaintiffs challenged the federal government's decision to make the entire Northwest Planning Area ("NWPA") of the NPR-A available for leasing.[75] The plaintiffs argued that the government failed to consider as a reasonable alternative an alternative proposed by the Audubon Society that would "add four new special areas [in the NWPA] and, therefore, make 35 percent of the high oil potential area unavailable for leasing."[76] The *Kempthorne* plaintiffs asserted that the five alternatives the agency improperly considered proposed only full development or no development alternatives.[77] The Ninth Circuit disagreed and held that the "consideration of the five alternatives satisfied the NEPA requirement to consider a broad range of possible alternatives," "[g]iven the policy objectives of the

---

[73] Docket 170 at 18 (Case No. 3:23-cv-00061-SLG). CBD Plaintiffs contend that "an alternative eliminating infrastructure in the [TLSA] would have afforded that area maximum protection while also providing access to 71 percent of the reservoir's oil." Docket 170 at 18 (Case No. 3:23-cv-00061-SLG).

[74] 457 F.3d 969 (9th Cir. 2006).

[75] *Id.* at 973.

[76] *Id.* at 978.

[77] *Id.*

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 18 of 109

Case 3:23-cv-00058-SLG    Document 166    Filed 11/09/23    Page 18 of 109

project."[78]   The Ninth Circuit upheld the agency's rejection of the Audubon Alternative as "inconsistent with the NWPA project and statutory mandates."[79]   The circuit court held that the agency's explanation, "coupled with [the agency's] willingness to incorporate several" of the Audubon Society's recommended mitigation measures, "satisfied the NEPA requirements to consider or properly reject proposed alternatives."[80]

Plaintiffs assert that reliance on *Kempthorne* is "misplaced" because, according to Plaintiffs, BLM in that case "did not constrain alternatives based on a misapprehension of its authority."[81]   But the Court finds that BLM did not misapprehend its authority here.   The NPR-A was set aside by Congress to be a petroleum reserve to help meet the Nation's need for oil and gas.[82]   Established in 1923, the NPR-A was originally "one of four Naval Petroleum Reserves created from public lands to assure the Navy's ships would have adequate petroleum

---

[78] *Id.*

[79] *Id.* at 978-79.

[80] *Id.*

[81] Docket 170 at 16 n.2 (Case No. 3:23-cv-00061-SLG).

[82] *See* Naval Petroleum Reserves Production Act, Pub. L. No. 94-258, 90 Stat. 303 (1976) ("An Act to authorize the Secretary of the Interior to establish on certain public lands of the United States national petroleum reserves the development of which needs to be regulated in a manner consistent with the total energy needs of the Nation, and for other purposes.").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 19 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 19 of 109

supplies."[83]  Then an "oil embargo during the 1970s established that the Nation had a need for oil that exceeded the needs of the Navy."[84]  In response, Congress enacted the NPRPA in 1976, "which transferred NPR-A management authority from the Secretary of the Navy to the Secretary of the Interior."[85]  And in 1980, "Congress, driven by the fuel crisis of the previous decade, directed the Secretary to carry out an 'expeditious program of competitive leasing of oil and gas' on the Reserve."[86]  Although Congress directed "maximum protection" be accorded to significant surface values in the TLSA and other Special Areas while undertaking oil and gas activities in the NPR-A, it still clearly envisioned that the TLSA would be developed for oil and gas production.[87]  So it is with this Congressional objective of NPR-A oil and gas development in mind—even in Special Areas, though with greater protections in those areas—that BLM's alternatives analysis is evaluated.[88]

ConocoPhillips, as the lessee, has the right and the responsibility to fully develop its oil and gas leases in the NPR-A subject to reasonable restrictions and

---

[83] *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, __ F. Supp. 3d ___, Case No. 3:22-cv-00121-SLG, 2023 WL 2403720, at *1 (D. Alaska Mar. 8, 2023) (citing H.R. Rep. No. 94-81, at 5-6 (1975)).

[84] *Id.* (quoting *N. Alaska Env't Ctr. v. Norton*, 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005), *aff'd sub nom. N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006)).

[85] *Id.* (first citing Pub. L. No. 94-258; and then citing 42 U.S.C. § 6503(a)).

[86] *Kempthorne*, 457 F.3d at 973 (quoting 42 U.S.C. § 6506a(a)).

[87] *See* 42 U.S.C. § 6504(a).

[88] *See Kempthorne*, 457 F.3d at 978.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 20 of 109

mitigation measures imposed by the federal government.[89]  The alternatives that
BLM analyzed are fully consistent with an interpretation of the purpose and need
statement that recognizes the rights and responsibilities of the lessee.[90]  Given the
significant surface values in the TLSA, BLM may have elected to prohibit all
infrastructure in the TLSA at the Integrated Activity Plan ("IAP") development stage
or at the lease sale stage,[91] but "the sale of a non-NSO oil or gas lease constitutes
the 'point of commitment;' after the lease is sold the government no longer has the
ability to prohibit potentially significant inroads on the environment."[92]  As this Court
previously recognized, "infrastructure is allowed, and indeed anticipated, within the

---

[89] *See* 43 C.F.R. § 3137.71(b)(1).  *See also Kempthorne*, 457 F.3d at 976 ("The government
can condition permits for drilling on implementation of environmentally protective measures, and
we assume it can deny a specific application altogether if a particularly sensitive area is sought
to be developed and mitigation measures are not available.  The government cannot, however,
consistent with current statutory imperatives, forbid all oil and gas development in Alaska's
NWPA.").  The Ninth Circuit has long recognized that non-NSO leases for oil and gas
development on federal land "permit reasonable regulation of surface-disturbing activities to
reduce their impact on the environment," but these stipulations do not "preclude the lessees
from engaging in surface-disturbing activities altogether," including "build[ing] roads and drill[ing]
for oil, subject only to reasonable mitigation measures."  *Conner*, 848 F.2d at 1448-49; *see also
Kempthorne*, 457 F.3d at 976-77 (explaining that the oil and gas leases for the Northwest
Planning Area of the NPR-A are similar to the leases discussed in *Conner*).

[90] Section 4 of ConocoPhillips' NPR-A oil and gas leases provide, in relevant part: "Lessee must
exercise reasonable diligence in developing and producing, and *must prevent unnecessary
damage to, loss of, or waste of leased resources*."  *See, e.g.*, AR950260 (emphasis added).

[91] *See, e.g.*, AR950259 (describing land included in the lease at item 3).

[92] *Conner*, 848 F.2d at 1451.  *Conner* held that "the distinction between the NSO and non-NSO
leases [is] critical."  *Id.* at 1449.  While NSO leases do not constitute "an irreversible
commitment of resources requiring the preparation of an EIS," the government may not sell a
non-NSO lease without first preparing an EIS which includes consideration of a "no action"
alternative.  *Id.* at 1447, 1451.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 21 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 21 of 109

TLSA."[93]  An alternative that would leave considerable quantities of economically recoverable oil in the ground is quite simply inconsistent with the Congressional policy objective of resource extraction in the NPR-A.  Thus, the Court rejects Plaintiffs' assertion that BLM need only allow "ConocoPhillips to produce *some* oil from its leases" in order to satisfy the purpose and need for the Project.[94]  Rather, the Court finds that BLM's decision to consider only those alternatives that constitute full field development, subject to reasonable mitigation measures, is consistent with the NPRPA's policy objectives and the purpose and need of the Willow Project.

In responding to a comment that critiqued the Draft SEIS's rejection of alternatives that would substantially restrict the quantity of oil to be extracted, BLM explained:

> The purpose of a master development plan is to evaluate the impacts of full field development to ensure that [NEPA] analyses are not segmented[.]  [T]o the extent that an alternative concept strands an economically viable quantity of oil, the BLM would expect to receive a future permit application to develop it.  Such an alternative concept therefore does not disclose and analyze the impacts of full field development and is a false comparison to other action alternatives.[95]

---

[93] *SILA I*, 555 F. Supp. 3d at 769.

[94] Docket 115 at 24 (Case No. 3:23-cv-00061-SLG) (emphasis in original).

[95] AR821710 (see response to Comment 6501-200).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 22 of 109

BLM further explained that the term "fully develop" is contained in 43 C.F.R. § 3137.71(b)(1).[96]  This regulation, which was promulgated in accordance with the NPRPA,[97] provides that, in order for a lessee to meet its continuing oil and gas development obligations, it must submit a plan to BLM "describ[ing] the activities to fully develop the oil and gas field" if the lessee has "drilled a well that meets the productivity criteria."[98]  BLM explains that this "mean[s] that a lessee may not strand such a large quantity of oil and gas that, standing alone, is economic to develop (i.e., that would warrant construction of an additional drill pad)."[99]  For the Willow Project, a partial development alternative would invite "future permit application[s] to develop" an additional drill pad,[100] which would result in a "piecemeal" analysis of the Project rather than the required "full field development" and accompanying analysis.[101]  Further, a partial development alternative for the

---

[96] AR821710 (see response to Comment 6501-200).

[97] *See* 42 U.S.C. § 6506a(o) ("As soon as practicable after August 8, 2005, the Secretary shall issue regulations to implement this section."); 43 C.F.R. §§ 3130.0-1, 3130.0-2, 3130.0-3 (providing the purpose, policy, and authority for 43 C.F.R. Part 3130, "Oil and Gas Leasing: National Petroleum Reserve, Alaska").

[98] 43 C.F.R. § 3137.71(b)(1).

[99] AR821710 (see response to Comment 6501-200).

[100] AR821710 (see response to Comment 6501-200).

[101] Docket 144 at 23 (Case No. 3:23-cv-00058-SLG).  *See also* Docket 141 at 24 (Case No. 3:23-cv-00058-SLG) ("BLM concluded that some of Plaintiffs' proposals to eliminate all infrastructure in the TLSA were not viable alternatives for a master development plan because they would strand so much recoverable oil that ConocoPhillips would certainly later apply to build another drill site." (citing AR821710, AR821958)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 23 of 109

Project would invite challenges that BLM was "improperly segmenting the project and failing to consider the impacts associated with drill sites that were likely to be constructed and were sufficiently connected to the Willow project to require consideration in a single EIS."[102]  Thus, BLM's consideration of only those alternatives that evaluated the full extent of oil production at Willow in one Final SEIS is reasonable and consistent with the NPRPA's directives.[103]

Plaintiffs assert that only considering alternatives that allow for full field development is "functionally indistinguishable" from BLM's prior statement that it must allow the lessee to extract "all possible oil."[104]  Similar to Plaintiffs' arguments here, one commenter on the Draft SEIS for the Willow Project stated that BLM had "adopted a functionally indistinguishable position" from the 2020 FEIS that "seems to . . . let ConocoPhillips develop all the oil [it] thinks is profitable to develop."[105]  In response, however, BLM explained that the Final SEIS "does not assume that ConocoPhillips has the right to extract all possible oil and gas from its leases," and

---

[102] Docket 144 at 26 (Case No. 3:23-cv-00058-SLG).  *See also* AR509715 (commenting that "BLM should be clear about the true scope of Willow and should not allow Conoco to piecemeal its proposal").

[103] *See* AR821737 ("The purpose of a master development plan is to evaluate the full development of an oil prospect to disclose all impacts related to the proposed project and prevent segmentation of the [NEPA] analysis . . . .").

[104] Docket 115 at 18-19 (Case No. 3:23-cv-00061-SLG).

[105] AR821709 (see Comment 6501-193).  "However, 43 CFR 3137.71(b)(1) requires lessees to 'fully develop' the oil and gas field, meaning that a lessee may not strand such a large quantity of oil and gas that, standing alone, is economic to develop (i.e., that would warrant construction of an additional drill pad)."  AR821709 (see response to Comment 6501-193).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 24 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 24 of 109

recognized that BLM "may condition Project approval to protect surface resources even if doing so reduces the amount of oil and gas that can be profitably produced."[106]  The Court agrees.  As BLM noted in the Final SEIS, compared to Alternative B, Preferred Alternative E would result in "15.4 million barrels (2.45%) less production" of oil.[107]  This is certainly a distinguishable difference from BLM's previous "all possible oil" standard, and the Court finds that BLM's Final SEIS alternatives analysis remedies this deficiency in the 2020 FEIS.

Furthermore, based on the Project's stated purpose and need, BLM conducted an adequate analysis of possible alternatives, including considering alternatives that would reduce or eliminate infrastructure in the TLSA, as sought by Plaintiffs.[108]  "BLM considered over 50 alternative concepts in developing the range of alternatives included in the Draft Supplemental EIS; those that did not

---

[106] AR821709 (see response to Comment 6501-193).

[107] AR820777.  Alternative E as modified in the ROD would result in "52.9 million barrels (8.4%) less production relative to Alternative B," an almost 6% further reduction of production than that contemplated by Alternative E in the Final SEIS.  AR824901.

[108] In the Final SEIS, BLM dedicated 250 pages to Alternatives Development.  *See* AR821912-14 (table of contents for Appendix D.1 of the Final SEIS, Alternatives Development, showing about 250 pages of analysis).  BLM explained that it "began the alternatives development process" for the 2023 Final SEIS "with a hard look at the NPR-A Special Areas, particularly the TLSA and CRSA."  AR821948.  This "hard look" involved (1) review of the "comments submitted during the 2020 EIS process for suggestions of alternatives" to protect surface resources in the NPR-A Special Areas; (2) the development of a map to show "a baseline for how important surface resources overlay the sub-surface resources"; and (3) requests for additional information from ConocoPhillips regarding subsurface resources and "drilling reach polygons . . . to illustrate how much of the subsurface resource could be accessed from a given drill site pad location."  AR821948.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 25 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 25 of 109

meet the screening criteria were eliminated from full analysis."[109]   Specifically, BLM's consideration of Alternative Component Numbers 36 and 44 rebuts Plaintiffs' contention that BLM "failed to explain its rejection of alternatives" that avoid placing any infrastructure in the NPR-A Special Areas as "inconsistent with the project's purpose and need."[110]  Alternative Component Number 36 would have rerouted the access road so it would be outside of the Colville River Special Area ("CRSA").[111]   And Alternative Component Number 44 would have removed all infrastructure, including gravel pads, gravel roads, and pipelines, from within the TLSA, permitting construction of three drill site pads outside of the TLSA.[112]

As required by its regulations, BLM "briefly discuss[ed] the reasons for" eliminating these alternatives from further consideration.[113]   BLM stated that it eliminated Alternative Component Number 36 from further analysis because the proposed access road outside of the CRSA "would pass directly over or in very close proximity to an observed yellow-billed loon nest," and thereby result in more

---

[109] AR821710 (see response to Comment 6501-201).

[110] Docket 105 at 24 (Case No. 3:23-cv-00058-SLG); AR821953.

[111] AR821953.

[112] AR821953.

[113] 40 C.F.R. § 1502.14(a).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 26 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 26 of 109

impacts to these loons relative to other alternatives.[114]   And BLM eliminated Alternative Component Number 44 from further analysis because, while it "would theoretically . . . provide maximum protection to important surface resources in the TLSA," it "would not meet the Project's purpose and need and would strand an economically viable quantity of recoverable oil."[115]   BLM explained that "[a]pproximately 67% [of ConocoPhillips' Bear Tooth Unit] leases by surface area are located in the TLSA."[116]  If no new Project infrastructure is constructed within the TLSA, it "would completely eliminate access to oil and gas resources in several BTU leases located in the TLSA" and "substantially reduce access to such resources in additional BTU leases located in the TLSA."[117]   These brief explanations of why each of these alternatives were removed from further consideration satisfied NEPA's requirements.[118]

---

[114] AR821957.  BLM explained that this would be less compliant with the 2013 NPR-A IAP, which allows for infrastructure in the CRSA but "would require an exception to encroach on [the] yellow-billed loon nesting setback buffer."  AR821957.

[115] AR821965, AR821958.

[116] AR821965.

[117] AR821965.  This is because the alternative "would strand all of the oil that would be accessed by drill site BT4 and some of the oil that would be accessed from drill site BT2."  BLM further explained that this alternative would "create significant overlap in drilling reach between drill sites BT1 and BT2, which would have the net effect of having all of the surface impacts of a road and two pads but with far less resource recovery."  AR821965.

[118] *See* 40 C.F.R. § 1502.14(a); *Kempthorne*, 457 F.3d at 978 (citing 40 C.F.R. § 1502.14(a)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 27 of 109

Although BLM did not give further consideration to Alternative Component Numbers 36 or 44, BLM did consider a range of alternatives on the scope of infrastructure development in the NPR-A Special Areas as part of the Final SEIS.[119] And while BLM did not, due to its interpretation of the Willow Project's purpose and need, implement Plaintiffs' suggestions to prohibit all TLSA infrastructure, "the Preferred Alternative it did adopt included some protections similar to those" that Plaintiffs sought, such as less TLSA infrastructure, much the same as BLM did with the Audubon Alternative in *Kempthorne*.[120] For just as BLM's "consideration of the five alternatives [in *Kempthorne*] satisfied the NEPA requirement" "[g]iven the policy objectives of the project," so too does BLM's in-depth consideration of the five alternatives here satisfy NEPA, given the NPRPA's policy objectives and the Willow Project's purpose and need.[121] And while Plaintiffs

---

[119] For example, Alternative C consisted of up to 12.5 miles of gravel road and gravel pads (179.6 acres total) in the TLSA, while Alternative E consisted of up to 5 miles of gravel road and gravel pads (61.2 acres total) in the TLSA. BLM also considered 12.2 miles of pipeline in the TLSA as part of Alternative C, versus 4.9 miles of pipeline in the TLSA as part of Alternative E. Similarly, BLM considered 8.1 acres of gravel road development in the CRSA as part of Alternatives B and C, and 0.5 acres of gravel pad development in the CRSA as part of Alternative D. AR820751. In addition, BLM analyzed Alternative A, the No Action Alternative, which would prohibit all proposed project activities on ConocoPhillips' Willow leaseholds, including in the TLSA and the CRSA. AR820730.

[120] *See Kempthorne*, 457 F.3d at 978 ("Although BLM chose not to adopt the entire Audubon Alternative, the Preferred Alternative it did adopt included some protections similar to those in the Audubon Alternative. Since BLM adopted components of the Audubon Alternative in developing the Preferred Alternative, the BLM adequately examined a range of viable alternatives in preparing the FEIS." (citing *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999))).

[121] *Id.*

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 28 of 109
Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 28 of 109

contend that Alternative E, the Preferred Alternative, "is hardly different from the other three" alternatives first considered in the 2020 FEIS,[122] BLM explained that Alternative E "reduces infrastructure in the TLSA by more than 40% relative to other action alternatives."[123]  At the same time, Alternative E as modified in the ROD would still "produce approximately 94% of the total production for Alternative E as analyzed in the Final [SEIS]."[124]  In sum, the full field development framework for the alternatives analysis undertaken in the Final SEIS strikes an appropriate balance between the NPRPA's two directives of conducting an expeditious oil and gas leasing program in the NPR-A while protecting significant surface resources.

Further, Plaintiffs have not "met [their] burden, as [parties] challenging an agency's failure to consider an alternative, 'to show that the alternative is viable.'"[125]  "[A]n EIS's range of alternatives" is reviewed under the "rule of reason"—an EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones."[126]  Although Plaintiffs advocate that no infrastructure be built in the TLSA, they fail to show how such an alternative would appropriately

---

[122] Docket 115 at 21 (Case No. 3:23-cv-00061-SLG).

[123] AR821859 (see response to Comment 30962-19).

[124] AR824901.

[125] *Fed. Aviation Admin.*, 63 F.4th at 846-47 (first quoting *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013); and then quoting *Audubon Soc'y of Portland*, 40 F.4th at 983).

[126] *Westlands Water Dist.*, 376 F.3d at 868 (citation omitted).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 29 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 29 of 109

meet the two objectives of the NPRPA: extracting the oil in the Reserve while mitigating the impact on the surface resources caused by that extraction. In addition, Plaintiffs do not explain why another alternative is necessary to foster an informed decision and public participation. In this regard, the Ninth Circuit's decision in *Montana Wilderness Ass'n v. Connell* is instructive.[127] In that case, BLM considered six different airstrip alternatives: two would open 10 airstrips, one would open seven airstrips, another would open six airstrips, another would open five airstrips year-round and a sixth seasonally, and the final alternative would open no airstrips. The plaintiffs contended that BLM unreasonably failed to consider a "middle ground" alternative that would have opened somewhere between zero and six airstrips.[128] The Ninth Circuit rejected this argument, explaining that "[a]lthough BLM could have included an alternative that opened more than zero but less than six alternatives, NEPA did not compel the agency to do so."[129] The circuit court explained that "the touchstone of the NEPA inquiry is 'whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.'"[130] The circuit court held that

---

[127] 725 F.3d 988 (9th Cir. 2013).

[128] *Id.* at 1004.

[129] *Id.* at 1004-05.

[130] *Id.* at 1005 (quoting *Westlands Water Dist.*, 376 F.3d at 868).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 30 of 109

the plaintiffs in that case failed to show how consideration of another alternative would have been "necessary to foster" these goals.[131]

Similarly in this case, BLM considered a range of alternatives with respect to the scope of development in the TLSA, ranging from 61.2 acres to 179.6 acres of gravel road and gravel pad construction and from 4.9 to 12.2 miles of pipeline construction.[132]   And similarly here, while "Plaintiffs appear to want . . . more analysis of additional, unspecified variants somewhere between the no-action alternative and Alternative E," they have not shown "why another alternative was necessary to foster informed decisionmaking and public participation."[133]

CBD Plaintiffs also cite to three cases in support of their position: *Center for Biological Diversity v. National Highway Traffic Safety Administration*,[134] *Center for Biological Diversity v. U.S. Fish & Wildlife Service*,[135] and *Wild Fish Conservancy v. National Park Service*.[136]   These cases, however, are inapposite.  In *National Highway Traffic Safety Administration*, the agency acknowledged that the range of alternatives it had considered was "very narrow and minimal"; the court explained

---

[131] *Id.*

[132] AR820751.

[133] Docket 137 at 34 (Case No. 3:23-cv-00058-SLG); *Mont. Wilderness Ass'n*, 725 F.3d at 1005.

[134] 538 F.3d 1172 (9th Cir. 2008).

[135] 409 F. Supp. 3d 738 (D. Ariz. 2019), *aff'd*, 33 F.4th 1202 (9th Cir. 2022).

[136] 8 F. Supp. 3d 1289 (W.D. Wash. 2014), *aff'd*, 687 F. App'x 554 (9th Cir. 2017).  *See* Docket 115 at 22-23 (Case No. 3:23-cv-00061-SLG); Docket 170 at 17 (Case No. 3:23-cv-00061-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 31 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 31 of 109

how the agency had improperly circumscribed its discretion.[137]  Here, however, "BLM considered a wide range of [Master Development Plan] alternatives with significant differences in the number of drill sites, size of gravel footprint, number of wells, and miles of gravel and ice roads."[138]  In *U.S. Fish & Wildlife Service*, the court held that the agency had applied the wrong regulations, a mistake that "infected the FEIS and led to the [agency] misinforming the public and failing to consider reasonable alternatives within the scope of its duties."[139]  In the instant case, BLM considered the appropriate regulations in developing its viable alternatives consistent with its obligations under the NPRPA.  And in *Wild Fish Conservancy*, the district court held that the agency failed to give meaningful consideration to an alternative "between 0% and 82%" release rate for hatchery fish.[140]  That case, however, concerned the management of a sustainable resource; it does not pertain to the extraction of a non-renewable resource on public lands set aside as a petroleum reserve.  Thus, for all the reasons set forth above, the Court finds that BLM's alternatives analysis for the Willow Project complied with NEPA.

---

[137] 538 F.3d at 1217-19 (agency setting average fuel economy standards offered ranges that varied from only 22.2 to 23.6 mpg).

[138] Docket 141 at 21 (Case No. 3:23-cv-00058-SLG); AR820730-33, AR822115-20.

[139] 409 F. Supp. 3d at 764.

[140] 8 F. Supp. 3d at 1300-01.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 32 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 32 of 109

### b. Greenhouse Gas Emissions

Plaintiffs assert that Federal Defendants violated NEPA in their analysis of the greenhouse gas ("GHG") emissions from reasonably foreseeable future actions that will be induced by the Willow Project.[141] Plaintiffs' GHG emissions arguments focus on a potential future development: Greater Willow, also referred to as West Willow.[142]

"NEPA requires agencies to evaluate the direct and indirect effects of the proposed action."[143] "[D]irect effects occur 'at the same time and place' as the proposed project, while indirect effects occur 'later in time or [are] farther removed in distance.'"[144] "Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."[145] An agency need only consider "indirect effects that are 'reasonably foreseeable' or those that 'a person of ordinary prudence would take

---

[141] Docket 105 at 30 (Case No. 3:23-cv-00058-SLG); Docket 115 at 24 (Case No. 3:23-cv-00061-SLG).

[142] Docket 105 at 30-31 (Case No. 3:23-cv-00058-SLG); Docket 115 at 26 (Case No. 3:23-cv-00061-SLG).

[143] *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020) [hereinafter *Liberty*] (citing 40 C.F.R. § 1502.16).

[144] *Id.* (quoting 40 C.F.R. § 1508.8(a), (b)).

[145] 40 C.F.R. § 1508.8(b).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 33 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 33 of 109

into account in reaching a decision.'"[146]  In addition to direct and indirect impacts,

a cumulative impact "results from the incremental impact of the action when added

to other past, present, and reasonably foreseeable future actions"; such impacts

"can result from individually minor but collectively significant actions taking place

over a period of time."[147]  A cumulative impacts analysis "must be more than

perfunctory;  it must provide 'a useful analysis of the cumulative impacts of past,

present, and future projects.'"[148]  "[A]n agency must provide 'some quantified or

detailed information; . . . [g]eneral statements about possible effects and some risk

do not constitute a hard look absent a justification regarding why more definitive

information could not be provided.'"[149]

In 2021, this Court held that "BLM's exclusion of foreign emissions in its

alternatives analysis in the Willow EIS was arbitrary and capricious."[150]  This

finding was based on the Ninth Circuit's decision in *Center for Biological Diversity*

*v. Bernhardt* ("*Liberty*"), which concluded that, based on "basic economic

---

[146] *Liberty*, 982 F.3d at 737 (alteration omitted) (first quoting 40 C.F.R. § 1508.8(b); then quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016); and then citing 40 C.F.R. § 1502.22(b)).

[147] 40 C.F.R. § 1508.7.  In this order, "effects" is used interchangeably with "impacts" when discussing direct, indirect, and cumulative effects of reasonably foreseeable future actions.

[148] *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (quoting *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002)).

[149] *Id.* (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379-80 (9th Cir. 1998)).

[150] *SILA I*, 555 F. Supp. 3d at 765.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 34 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 34 of 109

principles," the production of oil from the Liberty project would increase worldwide oil consumption.[151]  The Ninth Circuit thus held that "[e]missions resulting from the foreign consumption of oil [produced at Liberty] are . . . a 'reasonably foreseeable' indirect effect of drilling."[152]  Therefore, the Circuit Court held that an EIS must "either give[] a quantitative estimate of the downstream greenhouse gas emissions that will result from consuming oil abroad, or explain[] more specifically why it could not have done so, and provide[] a more thorough discussion of how foreign oil consumption might change the carbon dioxide equivalents analysis."[153]

In the Final SEIS, BLM rectified this deficiency in the 2020 FEIS by including foreign GHG emissions in its alternatives analysis for the Willow Project.[154]  Neither set of Plaintiffs challenge that analysis in this appeal.  Rather, Plaintiffs now

---

[151] 982 F.3d at 736 ("If oil is produced from Liberty, the total supply of oil in the world will rise. Increasing global supply will reduce prices.  Once prices drop, foreign consumers will buy and consume more oil.").

[152] *Id.* at 738 (citing *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003)).

[153] *Id.* at 740 (internal quotation marks omitted) (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017)).  The 2019 version of 40 C.F.R. § 1502.22 requires an agency, when there is "incomplete or unavailable information," to explain "that the information is lacking, its relevance, a summary of any existing credible evidence evaluating the foreseeable adverse impacts, and the agency's evaluation of the impacts based upon 'theoretical approaches or research methods generally accepted in the scientific community.'"  *Liberty*, 982 F.3d at 739 (quoting 40 C.F.R. § 1502.22(b)); *see* discussion *supra* note 48 (explaining the reasons for using the 2019 version of the Code of Federal Regulations).  The 2019 version of 40 C.F.R. § 1502.22 can be accessed at the National Archives eCFR website, https://www.ecfr.gov/on/2019-07-24/title-40/chapter-V/part-1502/section-1502.22 (last visited Nov. 3, 2023).

[154] AR821126.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 35 of 109

challenge the GHG emissions analysis for West Willow.[155]  Currently, "West Willow is an oil and gas discovery with two exploration wells . . . [that] represent the general potential for future activity, but there is no certainty as to whether, how, or when this discovery could be developed."[156]  However, the Final SEIS identifies West Willow as a reasonably foreseeable future action ("RFFA") that is a growth-inducing impact of the Willow Project, and estimates that West Willow could produce up to 75 million barrels of oil, with development starting after 2035.[157]

SILA Plaintiffs maintain that because the development of West Willow is an RFFA, "BLM was required to do a quantified analysis of the reasonably foreseeable impacts of the [West] Willow development's [GHG] emissions but failed to do so."[158]  CBD Plaintiffs maintain that "BLM was separately required to analyze West Willow's downstream emissions and the downstream emissions from additional foreseeable oil development induced by Willow as indirect

---

[155] Docket 105 at 30-31 (Case No. 3:23-cv-00058-SLG); Docket 115 at 26 (Case No. 3:23-cv-00061-SLG).

[156] AR821124.

[157] AR821122, AR821124, AR822689.

[158] Docket 155 at 24-25 (Case No. 3:23-cv-00058-SLG).  The two exploration wells in Greater Willow are called Greater Willow 1 ("GW1") and Greater Willow 2 ("GW2").  AR821124.  The Court agrees with Plaintiffs and ConocoPhillips that West Willow is an RFFA; the Court rejects Federal Defendants' position that West Willow is not a "proposed action" and therefore does not require any indirect or cumulative impacts analyses.  *See* Docket 137 at 36 (Case No. 3:23-cv-00058-SLG).  Federal Defendants cite to a holding that was expressly withdrawn by the Ninth Circuit.  Docket 137 at 36 n.9 (Case No. 3:23-cv-00058-SLG) (citing *Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th Cir. 2005)).  The *Lands Council* court specifically "deleted in their entirety" the language that Federal Defendants cite regarding proposed actions.  *See Lands Council*, 395 F.3d at 1022-23.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 36 of 109

effects."[159] CBD Plaintiffs assert that the GHG emissions from the 75 million barrels of oil that West Willow may produce were "not disclosed anywhere in the [Final] SEIS," nor were they included in the 2020 IAP for the development of the entire NPR-A.[160] Rather, CBD Plaintiffs note that "it appears the IAP assessment specifically excludes West Willow from its downstream emissions analysis."[161]

Plaintiffs' assertions that the Final SEIS violates NEPA in its GHG emissions analysis for West Willow are unfounded. "In 2012, BLM completed an IAP/EIS that analyzed development scenarios and related environmental consequences for all BLM-managed federal lands and oil and gas resources within the NPR-A . . . ."[162] The ROD for that IAP/EIS was issued in 2013.[163] BLM then issued a revised IAP/EIS and ROD in 2020, but after BLM "was directed [by court order] to reevaluate the 2020 NPR-A IAP," it issued a new IAP ROD in 2022.[164] The 2022 IAP ROD designated "approximately 11.8 million acres (52 percent) of the approximately 22.8 million acres subsurface estate managed by the BLM in the

---

[159] Docket 170 at 21-22 (Case No. 3:23-cv-00061-SLG) (emphasis omitted) (first citing 40 C.F.R. § 1508.8(b); and then citing *Liberty*, 982 F.3d at 737-38).

[160] Docket 170 at 25-26 (Case No. 3:23-cv-00061-SLG).

[161] Docket 115 at 29 n.6 (Case No. 3:23-cv-00061-SLG) (citing FWS_AR364553, FWS_AR363937, FWS_AR364805, AR822689); Docket 170 at 26 (Case No. 3:23-cv-00061-SLG).

[162] AR820723.

[163] AR820723.

[164] AR820723.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 37 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 37 of 109

NPR-A . . . for oil and gas leasing," including land within the TLSA.[165] "The remaining approximately 11 million acres (48 percent) of the NPR-A are closed to oil and gas leasing . . . in order to protect and conserve important surface resources and uses in these areas."[166] The Willow Project Final SEIS "tiers to the 2012 and 2020 IAP/EISs."[167]

That BLM derived its analysis of Willow's cumulative GHG emissions impacts from the 2020 IAP is reasonable; "incorporating by reference the general discussions" from the IAP is permitted.[168] As this Court previously noted, the "Ninth Circuit has held that an agency may group together several projects in its cumulative impacts analysis, including RFFAs."[169] Here, the Final SEIS incorporates by reference the 2020 IAP's projected GHG emissions discussion in

---

[165] AR516640.

[166] AR516640.

[167] AR820723; *see* 40 C.F.R. § 1508.28 (2019) ("Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses (such as . . . site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared."). *See* discussion *supra* note 48 (explaining the reasons for using the 2019 version of the Code of Federal Regulations). The 2019 version of 40 C.F.R. § 1508 can be accessed at the National Archives eCFR website, https://www.ecfr.gov/on/2019-11-28/title-40/chapter-V/part-1508/section-1508.28 (last visited Nov. 3, 2023).

[168] *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1048 (9th Cir. 2013) (quoting 40 C.F.R. § 1508.28); *see* discussion *supra* note 167.

[169] *SILA I*, 555 F. Supp. 3d at 782 (citing *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1112 (9th Cir. 2015)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 38 of 109

the "Cumulative Impacts to Climate Change" section.[170]  The 2020 IAP discussed "low development" and "medium development" scenarios for the NPR-A, where "additional satellite developments would be added in the Bear Tooth Unit and connected to the Willow development."[171]  It then specifically estimated downstream GHG emissions for future development scenarios in the NPR-A, including both "low and high" hypothetical emissions.[172]  Thus, the 2020 IAP included estimates for downstream GHG emissions from developments like West Willow in these future development scenarios.  Furthermore, the Final SEIS used "the higher end of the . . . NPR-A range of projected emissions," thereby capturing the full potential growth-inducing impacts by the Willow Project.[173]  And the Final SEIS made a comprehensive analysis, including the cumulative effects of Willow's "direct and indirect emissions, the increase in downstream foreign oil consumption emissions, existing GHG emissions sources on the North Slope . . . , and GHG

---

[170] See AR821126 (referencing "BLM 2020b" in the third paragraph).  The Final SEIS references the 2012 IAP/EIS as "BLM 2012c," the 2020 IAP/EIS as "BLM 2020b," and the 2022 IAP ROD as "BLM 2022b."  See AR820723 (Section 1.3, National Petroleum Reserve in Alaska).  The Final SEIS also incorporates by reference the 2022 IAP ROD's discussion of projected annual NPR-A direct and indirect emissions.  AR821126.

[171] FWS_AR363937-38.

[172] FWS_AR364010-11.

[173] AR821126 ("Using the higher end of the Coastal Plain and NPR-A range of projected emissions, the cumulative annual average of gross GHG emissions from the Project, the Coastal Plain, NPR-A, and other North Slope emissions would be approximately 95.60 MMT (i.e., about 1.46% of the 2019 U.S. GHG inventory and 2.9% to 3.0% of U.S. net GHG emissions target for 2030).").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 39 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 39 of 109

emissions from the West Willow discovery."[174]  Therefore, even if West Willow's projected downstream emissions were not specifically included in the IAP analysis that was incorporated into the Final SEIS, the IAP analysis, with its low to high range of projected GHG emissions from future potential projects in the NPR-A, gives readers and the decision maker sufficient information regarding the cumulative effects of GHG emissions from future development that may be induced by the Willow Project.[175]

SILA Plaintiffs additionally assert that BLM erred in its estimate of the indirect effects of West Willow's GHG emissions.  Specifically, they point out that BLM estimated the annual GHG emissions from West Willow "at approximately 8,500 metric tons from construction, 48,500 metric tons from development drilling, and 8,500 metric tons from routine operations."[176]  SILA Plaintiffs assert, however,

_____

[174] AR821126.  The Final SEIS includes quantified values of the estimated emissions.  *See also* AR820760-62 (discussing trends in and climate change impacts from GHG emissions); AR820770-73 (tables on GHG emissions estimates and social costs of GHG emissions); AR822432-73 (Appendix E.2A, Climate and Climate Change Technical Appendix).

[175] CBD Plaintiffs contend that the IAP "considered West Willow as a component of Willow and excluded it from emissions analysis as a planned development" in the IAP.  Docket 170 at 26 (Case No. 3:23-cv-00061-SLG).  If in fact West Willow was not included in the IAP emissions analysis, its exclusion is inconsequential.  The Final SEIS included the "cumulative effects of Willow's downstream emissions in the context of *all* such emissions from future development" in the NPR-A and across the North Slope.  Docket 141 at 26 (Case No. 3:23-cv-00058-SLG) (emphasis in original) (citing AR821126).  The Final SEIS estimated West Willow's resource potential at approximately 75 million barrels of oil, and the IAP estimated that, under a high development scenario, "peak production from NPR-A developments could reach a maximum . . . [t]otal lifetime production" of approximately 2.6 billion barrels of oil.  AR821124; FWS_AR364559.  Thus, under a high development scenario, West Willow's potential of 75 million barrels would constitute 2.9% of peak NPR-A production.

[176] Docket 105 at 32 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 40 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 40 of 109

that "when quantifying [West] Willow's combined climate impacts and emissions," BLM, "without explanation," "included only the 48,500 metric tons from development drilling," but not the emissions from construction and routine operations.[177]  The exclusion of these potential emissions from West Willow is inconsequential; as ConocoPhillips points out, the Final SEIS estimated future development impacts of up to 370,000 metric tons of annual direct emissions and 6,200,000 metric tons of annual indirect emissions based on aggressive development scenarios.[178]  The Final SEIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of Willow's growth-inducing impacts, allowing for meaningful public participation and informed decision-making about the Willow Project.[179]

CBD Plaintiffs rely on four cases in support of their position regarding the requirement to address induced growth: *City of Davis v. Coleman*;[180] *Natural Resources Defense Council, Inc. v. Department of Energy*;[181] *Barnes v. U.S.*

---

[177] Docket 105 at 32 (Case No. 3:23-cv-00058-SLG).

[178] Docket 141 at 29 (Case No. 3:23-cv-00058-SLG); *see also Audubon Soc'y of Portland*, 40 F.4th at 984 ("[W]e do not 'fly-speck' [the agency's] analysis and 'hold it insufficient on the basis of inconsequential, technical deficiencies.'" (citation omitted)).

[179] *Fed. Aviation Admin.*, 63 F.4th at 849 (quoting *Audubon Soc'y of Portland*, 40 F.4th at 984);

[180] 521 F.2d 661 (9th Cir. 1975).

[181] Case No. C-04-04448 SC, 2007 WL 1302498 (N.D. Cal. May 2, 2007).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 41 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 41 of 109

*Department of Transportation*;[182] and *Ocean Advocates v. U.S. Army Corps of Engineers.*[183]  However, all four cases involved an agency's failure to prepare an EIS altogether and addressed whether potential growth-inducing impacts could trigger an EIS.  As such, they are inapposite here.

For the foregoing reasons, the Court finds that the Final SEIS appropriately analyzed the indirect and cumulative GHG emissions impacts of the Willow Project and provided information "sufficient for the decision maker and the public to understand the potential scope and impacts of Greater Willow" and other growth-inducing impacts that Willow may cause as required by NEPA.[184]

## II. Naval Petroleum Reserves Production Act

In conjunction with their NEPA claims, SILA Plaintiffs contend that BLM violated the NPRPA by failing to consider a reasonable range of alternatives and arbitrarily limiting its authority.[185]  The Court rejects this argument for the same reasons that it has upheld BLM's alternatives analysis under NEPA.[186]

CBD Plaintiffs maintain that BLM violated the NPRPA by "failing to reasonably explain its decision not to adopt an alternative or mitigation measures

---

[182] 655 F.3d 1124 (9th Cir. 2011).

[183] 402 F.3d 846.  *See* Docket 115 at 25 (Case No. 3:23-cv-00061-SLG).

[184] *SILA I*, 555 F. Supp. 3d at 781.

[185] Docket 105 at 17 (Case No. 3:23-cv-00058-SLG).

[186] *See* discussion *supra* Section I.a.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 42 of 109

to limit Willow's downstream emissions," since these emissions would "exacerbate climate harm to the surface resources of the Reserve."[187]   Similar to their NEPA claims, CBD Plaintiffs suggest that BLM should have considered alternatives that "reduc[ed] total oil production or delay[ed] production" in order to "meaningfully reduce carbon emissions."[188]

CBD Plaintiffs' assertion that BLM violated the NPRPA because it failed to address the impact that Willow's GHG emissions may have to the surface resources of the NPR-A is unpersuasive.[189]   While one might generally conclude that climate change can damage the NPR-A's surface resources, CBD Plaintiffs do not causally link how GHG emissions from the Willow Project would specifically harm NPR-A surface resources.[190]   As discussed above, the "purpose of the

---

[187] Docket 115 at 30 (Case No. 3:23-cv-00061-SLG).

[188] Docket 115 at 31 (Case No. 3:23-cv-00061-SLG).

[189] Docket 115 at 30 (Case No. 3:23-cv-00061-SLG).

[190] Indeed, case law suggests that "attempting to establish a causal nexus" in this context "may be a particularly challenging task."

> This is so because there is a natural disjunction between Plaintiffs' localized injuries and the greenhouse effect.  Greenhouse gases, once emitted from a specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric lifetime.  Current research on how greenhouse gases influence global climate change has focused on the cumulative environmental effects from aggregate regional or global sources.  *But there is limited scientific capability in assessing, detecting, or measuring the relationship between a certain GHG emission source and localized climate impacts in a given region.*  As the U.S. Geological Survey observed, "[i]t is currently beyond the scope of existing science to identify a specific source of CO2 emissions and designate it as the cause of specific climate impacts at an exact location."

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 43 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 43 of 109

NPRPA is to increase the production of oil" while taking measures that "the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A]."[191]  While CBD Plaintiffs are correct that the impact on surface resources should be mitigated, the Secretary in this context has broad discretion in how to protect NPR-A surface resources, needing only to do so as the Secretary "deems necessary or appropriate," and only for "reasonably foreseeable and significantly adverse effects."[192]  In any event, the Final SEIS and the ROD discussed and implemented numerous "operating procedures, design features, and other mitigation measures specifically designed to provide maximum protection to TLSA surface resources, and to avoid or mitigate reasonably foreseeable and significantly adverse impacts to other NPR-A surface resources."[193]  And Alternative E, as modified in the ROD,

---

*Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1143 (9th Cir. 2013) (emphasis added) (citation omitted).

[191] Docket 141 at 35 (Case No. 3:23-cv-00058-SLG) (emphasis omitted); 42 U.S.C. § 6506a(b).

[192] 42 U.S.C. § 6506a(b).

[193] Docket 137 at 39-40 (Case No. 3:23-cv-00058-SLG) (citing AR824891, AR824898-99, AR824920-92).  The Final SEIS discusses mitigation measures in Appendix I (Avoidance, Minimization, and Mitigation).  AR824891.  The ROD discusses the mitigation measures it adopted from the Final SEIS in Appendix A, Mitigation Measures.  AR824891.  Further, the ROD discusses mitigation measures analyzed in the Final SEIS but not adopted by the ROD in Appendix A, Section 4.0, "which includes BLM's rationale for not adopting the measures." AR824891.  CBD Plaintiffs' assertion that "BLM never explained its decision not to explore any *other* mitigation measures that would limit climate harms to surface resources" is without merit. *See* Docket 115 at 34 (Case No. 3:23-cv-00061-SLG) (emphasis in original).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 44 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 44 of 109

would result in "a total reduction of indirect [carbon dioxide equivalent] emissions of 21,750,000 metric tons" as compared to the previously selected Alternative B.[194]

CBD Plaintiffs point to three specific measures that they assert "BLM arbitrarily rejected": (1) BLM rejected changing the Project's operating term from 30 years to no more than 20 years; (2) BLM declined to periodically review its NEPA analysis in the event ConocoPhillips recovered higher amounts of oil than anticipated; and (3) BLM rejected a measure to mitigate GHG emissions through land reforestation.[195]  As to the first point, BLM explained that "[a]ll project alternatives are designed and evaluated based on a full 30-year field life consistent with the Master Development Plan for the Bear Tooth Unit."[196]  The Final SEIS explained that the Project's field life is estimated to be 30 years for Alternatives B, C, and E, or 31 years for Alternative D.[197]  Ceasing operations after 20 years would be inconsistent with full field development.  Thus, BLM's decision to use a 30-year field life is logical and not arbitrary.[198]  As to the second point, BLM explained that periodically reviewing its NEPA analysis "would provide no additional reduction of

---

[194] AR824901.

[195] Docket 115 at 33 (Case No. 3:23-cv-00061-SLG).

[196] AR824972.

[197] AR820743.  The ROD notes, however, that "[s]election of Alternative E would reduce both the scope and scale of development and resulting production, thereby reducing GHG emissions."  AR824972.

[198] *See* discussion *supra* Section I.a.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 45 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 45 of 109

known Project effects," and that such re-analysis is not required by regulation because the "suggested points of re-analysis are not tied to specific BLM action."[199] While CBD Plaintiffs assert that BLM's position is unsupported, the Court finds that BLM's rejection of this measure for these reasons is not arbitrary or capricious and is consistent with its statutory directives.[200] As to the third point, BLM explained that a reforestation measure "conflicts with and duplicates current initiatives, both from the industry and government perspective."[201] Contrary to CBD Plaintiffs' statement that BLM simply "cited complexity, the need for government-wide cooperation, and [BLM's] inability to enforce the measure,"[202] BLM explained that a reforestation measure was a "narrow and prescriptive approach" that would "conflict[] with and duplicate[] current initiatives," because ConocoPhillips was "already committed to net-zero GHG emissions by 2050 on a *portfolio-wide* basis."[203] BLM further explained that it would not be feasible for BLM to enforce such a measure because enforcement would "require[] the sort of government-wide cooperation and goal setting that is already occurring by those best

---

[199] AR824964.

[200] *See* Docket 115 at 33 (Case No. 3:23-cv-00061-SLG). BLM also noted that it "may voluntarily conduct additional analysis if it is determined that a change in conditions warrants reanalysis." AR824964.

[201] AR824973.

[202] Docket 115 at 33-34 (Case No. 3:23-cv-00061-SLG).

[203] AR824973 (emphasis in original).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 46 of 109

Case 3:23-cv-00058-SLG    Document 166    Filed 11/09/23    Page 46 of 109

positioned to directly regulate and guide such initiatives, such as the EPA and the SEC."[204]  Thus, BLM provided a well-reasoned explanation for why it did not adopt this measure; its decision was not arbitrary.

In addition, CBD Plaintiffs assert that "BLM failed to rationally justify why [a] five percent drop in downstream emissions" set out by Alternative E as modified by the ROD "satisfied the agency's [NPRPA] obligations."[205]  As discussed above, BLM adequately explained its reasons for rejecting further consideration of alternatives that would be inconsistent with full field development.[206]  Accordingly, the Court finds that BLM complied with its obligations pursuant to the NPRPA.

### III.    Alaska National Interest Lands Conservation Act § 810

SILA Plaintiffs contend that BLM violated § 810 of ANILCA by failing to consider alternatives that would reduce impacts to subsistence uses.[207]  "The purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction," but it "does not prohibit all federal land use actions which would adversely affect subsistence resources."[208]  Rather, it "sets forth a procedure through which such effects must be considered and provides that

---

[204] AR824973.

[205] Docket 170 at 29 (Case No. 3:23-cv-00061-SLG).

[206] *See* discussion *supra* Section I.a.

[207] Docket 105 at 25-30 (Case No. 3:23-cv-00058-SLG); *see* 16 U.S.C. § 3120.

[208] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 47 of 109

actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."[209]  "Both NEPA and ANILCA require [an agency] to consider reasonable alternatives to a proposed action."[210]

ANILCA § 810 establishes "a two-step process: first, the agency determines whether the contemplated action may significantly restrict subsistence use" by evaluating (1) "the effect of such use, occupancy, or disposition [of public lands] on subsistence uses and needs," (2) "the availability of other lands for the purposes sought to be achieved," and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes" (referred to as the Tier-1 evaluation).[211]  Second, if the agency determines that the proposed action may significantly restrict subsistence use, then it "must comply with the notice and hearing procedures" laid out in § 810(a)(1)-(3) (Tier-2 evaluation).[212]  As part of the Tier-2 evaluation, the agency must give notice to the appropriate State agency, local committees, and regional councils; give notice of and hold a hearing in the vicinity of the area involved; and determine that

---

[209] *Id.*

[210] *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990).

[211] *Kunaknana v. Clark*, 742 F.2d 1145, 1150-51 (9th Cir. 1984); 16 U.S.C. § 3120(a).

[212] *Kunaknana*, 742 F.2d at 1151.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 48 of 109

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.[213]

Additionally, if the agency is required to prepare an EIS, the agency must include its § 810(a) findings in that EIS.[214]

Here, SILA Plaintiffs focus on the third requirement in the Tier-1 evaluation—that the authorizing agency shall evaluate "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[215] Echoing their NEPA argument, SILA Plaintiffs maintain that BLM failed to "adequately consider any alternatives which would 'reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes,'" because "BLM improperly limited the scope of its alternatives by relying on the erroneous assumption that it could not strand economically viable quantities of recoverable oil."[216] However, SILA Plaintiffs seek to convert this Tier-1 evaluation factor into a requirement that BLM must consider "other alternatives

---

[213] 16 U.S.C. § 3120(a)(1)-(3).

[214] *Id.* § 3120(b).

[215] *Id.* § 3120(a).

[216] Docket 105 at 27-28 (Case No. 3:23-cv-00058-SLG) (quoting 16 U.S.C. § 3120(a)); *see also* Docket 155 at 21 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 49 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 49 of 109

which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[217]   But the consideration of alternatives is simply one factor that BLM must evaluate at Tier-1 to determine whether the proposed action "may significantly restrict subsistence uses."[218]

BLM appropriately made a Tier-1 evaluation here by evaluating, for each proposed action alternative, "the effect of such use, occupancy, or disposition [of public lands] on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[219]   Based on that evaluation, BLM concluded that each action alternative, except the No Action Alternative (Alternative A), "may significantly restrict subsistence uses."[220]   The Tier-1 evaluation requires no more than that.

---

[217] 16 U.S.C. § 3120(a).

[218] *Id.*  In any event, the Court has already held that BLM did not misapprehend its authority, and that it considered a reasonable range of alternatives pursuant to NEPA based on the Willow Project's stated purpose and need.  *See* discussion *supra* Section I.a.

[219] 16 U.S.C. § 3120(a).  The table of contents for Appendix G, ANILCA § 810 Analysis, most clearly lays out how BLM conducted its Tier-1 evaluation.  For each proposed action alternative, BLM considered all three § 810(a) factors before making its finding of whether the action alternative "may significantly restrict subsistence uses."  *See* AR824302 (sections B.1 through B.5); *see, e.g.*, AR824340 (noting in the Alternative E findings section that the action alternative "may significantly restrict subsistence uses for the community of Nuiqsut").  BLM also made Tier-1 evaluations for the three module delivery options and the "cumulative case," which includes a discussion of Willow impacts and other RFFAs.  *See* AR824302-03 (sections B.6 through B.9).  However, SILA Plaintiffs do not appear to challenge any of these latter determinations.

[220] *See* AR824309, AR824332, AR824336, AR824338, AR824340.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 50 of 109

"That BLM made affirmative Tier-1 findings for all proposed action alternatives does not mean BLM violated ANILCA. Rather, it means BLM was required under all alternatives to hold hearings, take reasonable steps to reduce impacts, and make certain findings."[221]

This leads to the Tier-2 evaluation. SILA Plaintiffs contend that "[a]s a result of its limited range of alternatives and misinterpretation of its own statutory authority, BLM also failed to meet its Tier-2 obligations."[222] SILA Plaintiffs do not challenge BLM's compliance with the first two requirements of the Tier-2 evaluation set out in § 810(a)(1) and (2): giving appropriate notice and holding a hearing regarding the affirmative Tier-1 findings.[223] Rather, SILA Plaintiffs assert that BLM failed to meet the third requirement of the Tier-2 evaluation, specifically § 810(a)(3)(B) and (C), in not ensuring that "(B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such

---

[221] Docket 144 at 19 (Case No. 3:23-cv-00058-SLG) (footnotes and emphasis omitted).

[222] Docket 105 at 29 (Case No. 3:23-cv-00058-SLG); Docket 155 at 21 (Case No. 3:23-cv-00058-SLG).

[223] *See* 16 U.S.C. § 3120(a)(1), (2); AR824371 (Section C, Notice and Hearing).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 51 of 109

actions."[224]  SILA Plaintiffs contend that BLM's failure in the Tier-2 evaluation again stems from "improperly limit[ing] the scope of its analysis."[225]

SILA Plaintiffs' Tier-2 argument is unpersuasive.  The Court has already rejected Plaintiffs' argument that BLM improperly limited the scope of its analysis to full field development pursuant to NEPA and the NPRPA.  For the same reason, the Court rejects SILA Plaintiffs' argument here, because ANILCA § 810 "must be read in light of" the NPRPA.[226]  As such, it was appropriate for BLM to consider only those action alternatives that would result in full field development,[227] and for BLM to conduct its ANILCA § 810 analysis based on those action alternatives.  As BLM explained in its § 810(a) findings, of the four action alternatives that "met the purpose and need of the proposed action," Alternative E as modified in the ROD "involves the minimal amount of public lands necessary," because its "total

---

[224] Docket 155 at 21 & n.56 (Case No. 3:23-cv-00058-SLG); 16 U.S.C. § 3120(a)(3)(B), (C).  It appears that SILA Plaintiffs do not directly challenge the agency's § 810(a)(3)(A) finding, which provides that the agency must determine that "such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands."  16 U.S.C. § 3120(a)(3)(A).

[225] Docket 155 at 21 (Case No. 3:23-cv-00058-SLG).

[226] *Kunaknana*, 742 F.2d at 1150-51.  *Kunaknana* held that ANILCA § 810 "must be read in light of section 6508," which was recodified at 42 U.S.C. § 6506a, the NPRPA appropriations rider directing the Secretary to conduct "an expeditious program of competitive leasing of oil and gas" in the NPR-A.  *Kunaknana*, 742 F.2d at 1150-51; 42 U.S.C. § 6506a(a).

[227] *See* discussion *supra* Section I.a.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 52 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 52 of 109

footprint of approximately 499 acres . . . is less than any of the other action alternatives."[228]

Furthermore, Alternative E as modified in the ROD ensures that "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources" through a variety of measures.[229] It disapproved drill sites BT4 and BT5 "and their associated road and pipeline segments," which "substantially reduce[s] impacts to subsistence resources and uses," including in the TLSA.[230] And Alternative E as modified in the ROD includes "subsistence tundra access ramps and pullouts on gravel roads with locations based on community input";[231] "construction of up to three subsistence boat ramps to provide local residents with improved river access";[232] and continued consultation with affected subsistence users and local stakeholders.[233] In addition, Mitigation Measure 27 in the ROD

---

[228] AR824999-825000; 16 U.S.C. § 3120(a)(3)(B).

[229] 16 U.S.C. § 3120(a)(3)(C).

[230] AR825001. "In addition, Alternative E would reduce infrastructure within the TLSA by 43% and move infrastructure (including roads, pipelines, and the nearest drill site) farther from high-density calving areas and mosquito-relief habitat . . . ." AR824339.

[231] AR824938 (Design Measure 72).

[232] AR824943 (Design Measure 112).

[233] AR824938 (Design Measures 68 and 69). Continued consultation will be with "affected subsistence communities, tribes, Alaska Native Corporations, and NSB, as well as the Kuukpikmuit Subsistence Oversight Panel, Alaska Eskimo Whaling Commission, Nuiqsut Whaling Captains, and Barrow Whaling Captains," and "the Kuukpik Subsistence Oversight Panel, the Native Village of Nuiqsut, and Kuukpik Corporation." AR824938 (Design Measures 68 and 69).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 53 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 53 of 109

directs BLM to "develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the project on that Herd, to include protecting the surface area of Teshekpuk Lake, a buffer along all shores of the lake, and the K-10 Caribou Movement Corridors/K-16 Deferral Areas."[234] Kuukpik Corporation, which is the "Alaska Native village corporation for the community of Nuiqsut, the village closest to the future Willow site," calls this "a groundbreaking mitigation measure" for protection of "the caribou herd that is most important to Nuiqsut subsistence users."[235]

SILA Plaintiffs, beyond repeating their assertion that BLM unlawfully limited its own authority, do not explain why the measures BLM adopted here are insufficient to mitigate Willow's impacts on subsistence uses and resources in light

---

[234] AR824955.

[235] Docket 144 at 7, 31 (Case No. 3:23-cv-00058-SLG). Kuukpik Corporation supports Alternative E as modified in the ROD; indeed, "this iteration of the Project is the first alternative that Kuukpik believes can support the findings that BLM is required to make under ANILCA 810." Docket 144 at 16-17, 17 n.44 (Case No. 3:23-cv-00058-SLG) (quoting AR704766). The Arctic Slope Regional Corporation, which is the Alaska Native regional corporation encompassing the North Slope of Alaska (including Nuiqsut), and the North Slope Borough, an "area-wide local government representing eight remote Native villages on the North Slope of Alaska" and whose "jurisdiction includes the entire NPR-A," including Willow, also support Alternative E and the subsistence measures adopted to mitigate Willow's impact. *See* Docket 142 at 5-8, 14-16 (Case No. 3:23-cv-00058-SLG); Docket 143 at 10, 20-25 (Case No. 3:23-cv-00058-SLG).

Kuukpik further notes that the gravel roads required to support the Willow Project actually make subsistence hunting safer because, before the roads, it "was easy to get [4 wheelers] stuck" on "very wet and marshy" tundra, and hunters "couldn't go as far to find caribou." Docket 144 at 29 n.98 (Case No. 3:23-cv-00058-SLG) (quoting Docket 58-2 at ¶ 4 (Decl. Nellie Kaigelak) (Case No. 3:23-cv-00061-SLG)). In addition, the three boat ramps would provide Nuiqsut residents access to "good hunting and fishing" areas that are currently challenging or difficult to reach. Docket 58-2 at ¶ 11 (Decl. Nellie Kaigelak) (Case No. 3:23-cv-00061-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 54 of 109

Case 3:23-cv-00058-SLG    Document 166    Filed 11/09/23    Page 54 of 109

of the Project's stated purpose and need.[236]   Thus, the Court finds that BLM's

finding that it took "reasonable steps . . . to minimize adverse impacts upon

subsistence uses and resources" after engaging in meaningful consultations with

affected subsistence users and local stakeholders, and after considering and

adopting a multitude of mitigation measures, was consistent with ANILCA and not

arbitrary or capricious.[237]   Accordingly, the Court finds that BLM complied with its

obligations for both Tier-1 and Tier-2 evaluations pursuant to ANILCA § 810(a).

Lastly, SILA Plaintiffs contend that "BLM failed to include its Tier-2 findings

in the [F]inal SEIS, contrary to ANILCA," and that "[i]nclusion of the findings in the

ROD was not sufficient because it deprived the public of the opportunity to evaluate

the findings prior to a final decision."[238]   The Court agrees that, pursuant to §

810(b), it was error for BLM to not include the Tier-2 findings in the Final SEIS and

to instead make those findings in the ROD.[239]   However, while inclusion in the Final

---

[236] SILA Plaintiffs rely on *City of Tenakee Springs v. Clough* for the proposition that "where an agency improperly confines the scope of its authority under a statute or contract and thereby limits its consideration of alternatives, it acts contrary to the substantive purpose of Section 810 to minimize impacts to subsistence."  Docket 105 at 28 (Case No. 3:23-cv-00058-SLG) (citing *Tenakee Springs*, 915 F.2d at 1312).  However, the Court has found that BLM did not improperly confine the scope of its authority here.

[237] 16 U.S.C. § 3120(a)(3)(C).  The ROD lists multiple additional mitigation measures, such as required operating procedures A-11, E-1, E-3, E-7, F-4, H-1, and H-3, and Lease Stipulation K-1 in the 2022 IAP ROD; Project Design Measures 68, 69, 72, and 112 in the ROD; and additional Mitigation Measures 1, 2, 11, 13, 15, 16, 17, 18, 21, 24, 26, and 27 in the ROD.  AR825000.

[238] Docket 105 at 29 (Case No. 3:23-cv-00058-SLG) (first citing AR824371; and then citing 16 U.S.C. § 3120(b)).

[239] ANILCA § 810(b) provides: "If the Secretary is required to prepare an environmental impact statement pursuant to [NEPA], he shall provide the notice and hearing and include the findings

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 55 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 55 of 109

SEIS would have given the public "the opportunity to evaluate the findings prior to a final decision," as SILA Plaintiffs assert,[240] there would still have been no opportunity for public comment or participation had the findings been included in the Final SEIS. And the extensive § 810 discussion in the Final SEIS was sufficient to meaningfully inform the public regarding Willow's impact on subsistence uses.[241] Therefore, BLM's error here has no "substantive effect" on the outcome, and the Court finds that the error is harmless.[242]

## IV.    Motion to Strike

The Court next addresses SILA Plaintiffs' Motion to Strike. SILA Plaintiffs ask the Court to strike the "extra-record evidence" attached to the responses filed by ConocoPhillips, specifically the Declaration of Anne E. Smith and her curriculum vitae;[243] a 2008 letter from Robert J. Meyers, Principal Deputy Assistant

---

required by subsection (a) as part of such environmental impact statement." 16 U.S.C. § 3120(b). However, the Court recognizes the challenge an agency faces to include those findings in the SEIS before the preferred alternative has been selected in the ROD.

[240] Docket 105 at 29 (Case No. 3:23-cv-00058-SLG).

[241] *See* AR824300-75 (Final SEIS, Appendix G, ANILCA § 810 Analysis).

[242] *See* Docket 144 at 20 (Case No. 3:23-cv-00058-SLG); *PDK Lab'ys Inc. v. U.S. Drug Enf't Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule: § 706 of the Administrative Procedure Act, 5 U.S.C. § 706, instructs reviewing courts to take 'due account . . . of the rule of prejudicial error.' If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

[243] Dockets 141-3, 141-4 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 56 of 109

Case 3:23-cv-00058-SLG    Document 166    Filed 11/09/23    Page 56 of 109

Administrator, Office of Air and Radiation, EPA;[244] and the portions of ConocoPhillips' response brief that rely on that evidence.[245] SILA Plaintiffs also move to strike the Declaration of Tyson Kade and the attached exhibits filed by NSB:[246] a 2008 memorandum from Mark D. Myers, Director, U.S. Geological Survey;[247] the Meyers letter identified by ConocoPhillips;[248] and a 2008 letter from James H. Lecky, Director, Office of Protected Resources, NMFS.[249] They also seek to strike the portions of NSB's response brief relying on those exhibits.[250]

The Court grants in part and denies in part SILA Plaintiffs' Motion to Strike. First, ConocoPhillips filed the Smith Declaration and curriculum vitae "for the purpose of addressing standing," rather than as a supplement to the administrative record for the decision on the merits.[251] Because these documents were filed "not

---

[244] Docket 141-1 at 17-25 (Case No. 3:23-cv-00058-SLG).

[245] Docket 150 at 2 (Case No. 3:23-cv-00058-SLG).

[246] Docket 150 at 2 (Case No. 3:23-cv-00058-SLG); Docket 143-1 (Case No. 3:23-cv-00058-SLG).

[247] Docket 143-1 at 5-6 (Case No. 3:23-cv-00058-SLG).

[248] Docket 143-1 at 8-16 (Case No. 3:23-cv-00058-SLG).

[249] Docket 143-1 at 18-19 (Case No. 3:23-cv-00058-SLG).

[250] Docket 150 at 2 (Case No. 3:23-cv-00058-SLG).

[251] Docket 158 at 12 (Case No. 3:23-cv-00058-SLG). The Smith Declaration discusses whether a causal link can be reliably established between GHG emissions from the Willow Project and a loss of Arctic sea ice. *See* Docket 141-3 at ¶ 8 (Case No. 3:23-cv-00058-SLG). ConocoPhillips relies on this declaration in its argument that Plaintiffs lack standing to assert their ESA GHG emissions claims. *See* Docket 141 at 42-50 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 57 of 109

Case 3:23-cv-00058-SLG     Document 166     Filed 11/09/23     Page 57 of 109

in order to supplement the administrative record on the merits, but rather to determine whether [Plaintiffs] can satisfy a prerequisite to this court's jurisdiction," the Court declines to strike them.[252]

Second, two of the challenged exhibits were referenced and partially relied upon in the administrative record. While "judicial review of agency action is [generally] limited to review of the administrative record," "certain circumstances may justify expanding review beyond the record."[253] The Ninth Circuit

> allow[s] expansion of the administrative record in four narrowly construed circumstances: (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.[254]

The 2008 Meyers letter filed by both ConocoPhillips and NSB and the 2008 Myers memorandum filed by NSB were cited and partially discussed in a Department of Interior memorandum contained in the administrative record.[255] As such, they fall

---

[252] *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997) (citation omitted). However, because the Court does not separately address causation and redressability with respect to Plaintiffs' GHG emissions ESA claim, the Court did not consider the Smith materials. *See* discussion *infra* Section V.b.

[253] *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989) (citations omitted).

[254] *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (citing *Lands Council*, 395 F.3d at 1030).

[255] FWS_AR032371; FWS_AR032375-77 & nn.6 & 8. *See Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) ("The whole administrative record, therefore, consists of all

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 58 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 58 of 109

within the second exception of "documents not in the record" on which "the agency relied."[256]  Accordingly, the motion to strike these documents is denied.

However, the final challenged exhibit—the 2008 Lecky letter—does not fall within an exception.  NSB relies on the letter to demonstrate that BLM and the Services reasonably concluded that Willow's GHG emissions were outside the scope of the Section 7 consultation and that the agencies considered the best available science in making those determinations.[257]  The Court does not find that the 2008 Lecky letter is "necessary to determine if the agency has considered all factors and explained its decision" or that it is "needed to explain technical terms or complex subjects."[258]  There is no evidence that BLM relied on this letter in carrying out its obligations pursuant to the ESA, and Plaintiffs do not assert "bad faith on the part of the agency" here.[259]  Accordingly, the Court grants the motion to strike as to the 2008 Lecky letter[260] and the sentence in NSB's response in opposition that relies on it, where NSB asserts: "Following a review of EPA's analysis, NMFS 'agree[d] that current models do not allow us to trace a link

---

documents and materials directly or indirectly considered by agency decision-makers . . . ." (emphasis and citation omitted)).

[256] *Fence Creek Cattle*, 602 F.3d at 1131 (citation omitted).

[257] Docket 157 at 6-8 (Case No. 3:23-cv-00058-SLG).

[258] *See Fence Creek Cattle*, 602 F.3d at 1131 (citation omitted).

[259] *Id.*

[260] Docket 143-1 at 18-19 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 59 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 59 of 109

between individual actions that contribute to atmospheric carbon levels and localized climate impacts relevant to a consultation.'"[261]

## V. Endangered Species Act

Plaintiffs assert that (1) FWS erred in finding in its BiOp that there would be no incidental take of polar bears, and BLM unlawfully relied on FWS's BiOp,[262] and (2) BLM failed to consult with FWS and NMFS regarding Willow's carbon emissions as an effect of the Willow Project.[263]

### a. Applicable Law

"The ESA 'is a comprehensive scheme with the broad purpose of protecting endangered and threatened species.'"[264] Section 9 of the ESA prohibits the "take" of any endangered species.[265] A "take" under the ESA occurs when an endangered animal is harassed, harmed, pursued, hunted, shot, wounded, killed,

---

[261] Docket 143 at 33 & n.8 (Case No. 3:23-cv-00058-SLG).

[262] Docket 105 at 39-44 (Case No. 3:23-cv-00058-SLG); Docket 115 at 41-47 (Case No. 3:23-cv-00061-SLG).

[263] SILA Plaintiffs challenge FWS's failure to consider Willow's GHG emissions as an effect of the project in the BiOp, Docket 105 at 34 (Case No. 3:23-cv-00058-SLG), whereas CBD Plaintiffs assert that BLM erroneously concluded that Willow's GHG emissions are not an effect of the action and that FWS and NMFS improperly concurred with that conclusion, Docket 115 at 35-39 (Case No. 3:23-cv-00061-SLG).

[264] *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1036 (9th Cir. 2015) (quoting *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1106 (9th Cir. 2012)).

[265] 16 U.S.C. § 1538(a)(1)(B).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 60 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 60 of 109

trapped, captured, or collected, or when anyone attempts to engage in such

conduct.[266]

Section 7 of the ESA "imposes an affirmative duty to prevent violations of

Section 9 upon federal agencies."[267]

> Section 7(a)(2) of the ESA requires every federal agency to "insure
> that any action authorized, funded, or carried out by such agency . . .
> is not likely to jeopardize the continued existence of any endangered
> species or threatened species or result in the destruction or adverse
> modification of [critical] habitat of such species."[268]

In accordance with this affirmative duty, federal agencies must prepare a

"biological assessment . . . evaluat[ing] the potential effects of the action on listed

and proposed species and designated and proposed critical habitat."[269]   The

biological assessment ("BA") is "used in determining whether formal consultation"

is required.[270]   Formal consultation with FWS or NMFS is required when the action

agency determines that listed species or critical habitat is likely to be adversely

---

[266] 16 U.S.C. §1532(19); 50 C.F.R. § 17.3 (defining "harass" as action that "creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering").

[267] *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1238 (9th Cir. 2001) (citing 16 U.S.C. § 1536(a)(2)).

[268] *Ctr. for Biological Diversity*, 807 F.3d at 1036 (alterations in original) (quoting 16 U.S.C. § 1536(a)(2)).

[269] 50 C.F.R. § 402.12(a).

[270] *Id.*

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 61 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 61 of 109

affected by the action.[271]  The applicable service then produces a BiOp containing a "detailed discussion of the effects of the action on listed species or critical habitat."[272]

> Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action.  A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur.  Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action.[273]

The BiOp must also opine as to whether the action will jeopardize an endangered species or destroy or adversely modify the species' designated critical habitat.[274]  If the service determines that the proposed action will neither jeopardize the species ("no jeopardy determination") nor adversely modify its habitat ("no adverse modification determination"), it then authorizes the taking of a listed species incidental to the proposed project by issuing an incidental take statement ("ITS") with the BiOp.[275]

---

[271] *Id.* § 402.12(k)(1).

[272] *Id.* § 402.14(h)(iii).

[273] *Id.* § 402.02.

[274] *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1)(iv).

[275] *See* 16 U.S.C § 1536(b)(4); 50 C.F.R. § 402.14(i); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (9th Cir. 2012).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 62 of 109

"The incidental take statement estimates the amount of the project's incidental take of the listed species, includes any 'reasonable and prudent measures' considered 'necessary or appropriate to minimize such impact,' and—in the case of marine mammals such as the polar bear—describes specific measures necessary to comply with the" Marine Mammal Protection Act ("MMPA").[276] "The purpose of the incidental take statement is, at least in part, to specify the amount of take that may occur, and include triggers that indicate non-compliance with the statement and require re-consultation [under Section 7 of the ESA] with FWS."[277] "A taking that complies with the terms and conditions of a Section 7 incidental take statement is not prohibited by Section 9."[278]

### b. Standing

As a threshold issue, Intervenor-Defendants dispute Plaintiffs' standing to bring their ESA claims.[279] Under Article III of the Constitution, "[t]he jurisdiction of the federal courts is limited to 'cases' and 'controversies.'"[280] Federal courts

---

[276] *Liberty*, 982 F.3d at 742 (citing 50 C.F.R. § 402.14(i)(1)); *see* 16 U.S.C. § 1361 *et seq.* (MMPA).

[277] *Liberty*, 982 F.3d at 748 (first citing 16 U.S.C. § 1536(b)(4); and then citing 50 C.F.R. § 402.14(i)(1)(i)).

[278] *Id.* at 742 (first citing *Salazar*, 695 F.3d at 909; 16 U.S.C. § 1536(o)(2); then citing 16 U.S.C. § 1536(o)(2); and then citing 50 C.F.R. § 402.14(i)(5)).

[279] Docket 141 at 42-50 (Case No. 3:23-cv-00058-SLG); Docket 145 at 9-22 (Case No. 3:23-cv-00058-SLG).

[280] *Bellon*, 732 F.3d at 1138 (quoting U.S. Const. art. III, § 2).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 63 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 63 of 109

enforce this jurisdictional limitation through the doctrine of "Article III standing."[281] Plaintiffs bear the burden of establishing their standing to bring suit.[282]

SILA Plaintiffs and CBD Plaintiffs filed their lawsuits on behalf of their members.[283] An organization can assert the interests of its members.[284] Accordingly, Plaintiffs must demonstrate that at least one of their members has standing to sue.

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[285]

In environmental cases, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."[286] "While

---

[281] *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340-42 (2006).

[282] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

[283] Docket 1 at ¶¶ 17-19 (Case No. 3:23-cv-00058-SLG); Docket 1 at ¶ 17 (Case No. 3:23-cv-00061-SLG). ConocoPhillips argues that "SILA[] does not appear to have standing in its own right because it is not a separate legal entity but instead a 'program' of plaintiff Northern Alaska Environmental Center." Docket 141 at 42 n.142 (Case No. 3:23-cv-00058-SLG). However, SILA has alleged that it "is an Alaska-based grassroots organization made up of Iñupiat Peoples and community members." Docket 88 at ¶¶ 12, 18-20 (Case No. 3:23-cv-00058-SLG). ConocoPhillips has presented no contrary evidence regarding SILA's standing to bring claims on behalf of its members other than website links.

[284] *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

[285] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

[286] *Id.* at 181.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 64 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 64 of 109

generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."[287]  The other two requirements, "the 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'"[288]  "The two are distinct insofar as causality examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief."[289]

### i.  Injury-in-Fact

The State challenges Plaintiffs' standing to contest FWS's BiOp regarding the incidental harassment of polar bears.[290]  Specifically, the State asserts that Plaintiffs fail to show an injury-in-fact because "Plaintiffs' hopes to see a polar bear in the Petroleum Reserve (at times and locations where the presence of polar bears would be an anomaly) are conjectural[,] Plaintiffs' members have never

---

[287] *Summers*, 555 U.S. at 494.  *See also Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("[A]n individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.").

[288] *Bellon*, 732 F.3d at 1146 (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

[289] *Id.*

[290] Docket 145 at 9-22 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 65 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 65 of 109

reported seeing a polar bear anywhere near the Willow Project, and [they] provided no evidence that seeing one in the future is even remotely likely or planned."[291]

## 1. Plaintiffs' Declarations

SILA Plaintiffs point to the declarations of Robert Thompson and Daniel Ritzman to establish injury-in-fact.[292] SILA Plaintiffs argue that the Southern Beaufort Sea ("SBS") polar bear population will be harmed by the Willow Project and that Thompson and Ritzman have enjoyed viewing that same population in the past and they plan to enjoy doing so in the future.[293] And SILA Plaintiffs contend that they "do[] not need to show that members view polar bears at the Willow site; impacts to these polar bears will harm members' ability to continue enjoying them across their range," as polar bears are a migratory species.[294]

Mr. Ritzman has visited the Reserve several times, beginning in 1996 when he floated the Colville River to Nuiqsut. He has traveled to the TLSA and has floated other rivers where he saw wolverines, caribou, muskox, grizzly bears, wolves, and birds. He has also seen the site of the Willow Project and oil and gas

---

[291] Docket 145 at 22 (Case No. 3:23-cv-00058-SLG).

[292] Docket 155 at 29-30 (Case No. 3:23-cv-00058-SLG) (citing Dockets 105-7 (Thompson Decl.) and 105-3 (Ritzman Decl.) (Case No. 3:23-cv-00058-SLG)).

[293] Docket 155 at 30 (Case No. 3:23-cv-00058-SLG).

[294] Docket 155 at 30 (Case No. 3:23-cv-00058-SLG) (citing FWS_AR032465 (figure showing global distribution of polar bear subpopulations, with the Southern Beaufort Sea population distributed across northern Alaska and east into northern Canada)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 66 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 66 of 109

development near the Colville River from an airplane. Mr. Ritzman had plans to return to the area in August 2023 and again in 2025 to float the Colville River to Nuiqsut, and to return to Utqiaġvik in 2024. On those trips, he "hope[s] to experience raptors, wolves, bears, wolverines, and caribou along with other wildlife."[295]

Mr. Thompson lives in Kaktovik and "own[s] and operate[s] [his] own business, Kaktovik Arctic Adventures." He "was licensed and permitted to guide, and [he was] planning on applying for a permit to guide again. The majority of [his] business has been to guide polar bear viewing trips in the Arctic Refuge." He states that "[i]t used to be unusual to see [polar] bears onshore" but that "more [polar bears] are denning onshore due to sea ice loss."[296]

CBD Plaintiffs also rely on a declaration by Mr. Ritzman; they also point to the declarations of Rosemary Ahtuangaruak and Jeffrey Fair, and a corrected declaration by Richard Steiner, among others.[297] Ms. Ahtuangaruak lives in Nuiqsut, and her declaration describes living in Nuiqsut, subsistence activities, traditional sharing practices, and the changes to her traditional way of life brought by increased oil and gas development to hunting, fishing, and whaling. She states

---

[295] Docket 105-3 at ¶¶ 25-31, 33 (Case No. 3:23-cv-00058-SLG).

[296] Docket 105-7 at ¶¶ 2-3, 11-12 (Case No. 3:23-cv-00058-SLG).

[297] Docket 170 at 38 n.17, 48-49 (Case No. 3:23-cv-00061-SLG) (citing Dockets 115-1, 115-2, 115-3, and 170-1 (Case No. 3:23-cv-00061-SLG)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 67 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 67 of 109

that her "extended family hunts polar bears, which range across the North Slope, from Canada to past Barrow in the West."[298]

Mr. Fair lives near Palmer, Alaska, and has conducted extensive research on loons in northern Alaska. He has also "seen polar bears in the Arctic National Wildlife Refuge and in Kaktovik and hope[s] to see one in the Reserve." He "plan[s] to return to the Reserve for research purposes sometime in the next couple years," and he "plan[s] to take personal trips into the Reserve at the earliest opportunity and hopefully by 2025."[299]

Mr. Steiner lives in Anchorage, Alaska. In the 1970s, he "organized and joined an Arctic expedition across more than two thousand miles of Arctic terrestrial and river habitat, from the Northwest Territories of Canada across to Alaska and down the Yukon River to the Bering Sea." He has "floated (solo) down the Utukok River through the NPR[-]A to Kasegaluk Lagoon and Point Lay, and spent time on the south side of [the] NPR[-]A." On his visits to the Reserve, Mr. Steiner saw polar bears. In 2008 and 2009, he "organized" and "took" flights along the northern coast of Alaska "to examine the condition of sea ice when it [was] at its minimum level, and to observe the behavior and distribution of polar bears." Mr. Steiner "plan[s] to visit the coastal plain and offshore areas in the Chukchi and

---

[298] Docket 115-1 at ¶¶ 7-50, 90 (Case No. 3:23-cv-00061-SLG).

[299] Docket 115-3 at ¶¶ 1-17 (Case No. 3:23-cv-00061-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 68 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 68 of 109

Beaufort Seas again later this year to observe marine and coastal wildlife, including . . . polar bears."[300]

## 2. Analysis

The Court concludes that Plaintiffs have sufficiently shown injury-in-fact for their ESA claims. "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."[301] "The interest that individuals have in observing a species or its habitat, 'whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species' is sufficient to confer standing."[302]

In *Center for Biological Diversity v. Kempthorne*, the Ninth Circuit held that the environmental plaintiffs had standing to maintain their MMPA and NEPA claims challenging incidental take regulations authorizing oil and gas activities in and along the Beaufort Sea, because their "members allege[d] that they ha[d] viewed polar bears and walrus in the Beaufort Sea region, enjoy[ed] doing so, and ha[d] plans to return."[303] Accordingly, "[i]f the plaintiffs' allegations are true," FWS's

---

[300] Docket 170-1 at ¶¶ 2, 9, 15-17 (Case No. 3:23-cv-00061-SLG).

[301] *Lujan*, 504 U.S. at 562-63 (citation omitted).

[302] *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (quoting *Lujan*, 504 U.S. at 582).

[303] *Id.* at 707-08. Note that this is a different case than the one by the same name discussed in the alternatives analysis section of this order *supra* Section I.a.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 69 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 69 of 109

"incidental take regulations threaten imminent, concrete harm to these interests by destroying polar bears and walrus in the Beaufort Sea."[304]

The same is true for Plaintiffs here. Several of Plaintiffs' members have "allege[d] that they ha[d] viewed polar bears . . . in the Beaufort Sea region, enjoy[ed] doing so, and ha[d] plans to return."[305] They have demonstrated the requisite injury-in-fact to their interest in viewing polar bears in the region encompassing the Willow Project.[306]

### ii. Causation and Redressability

---

[304] *Id.* at 708.

[305] *Id.* at 707-08. *See* description of Action Area and polar bears' migratory nature *infra* Sections V.c.i.1-3. *See also Melone v. Coit*, Case No. 1:21-cv-11171-IT, 2023 WL 5002764, at *4 (D. Mass. Aug. 4, 2023) ("Whether Melone observes right whales off the coast of . . . Massachusetts, or . . . Florida, is irrelevant where it is the same population . . . that migrate[s] from one location to the other, and it is the same population" that will be impacted.).

The State relies on *Kunaknana v. U.S. Army Corps of Eng'rs*, 23 F. Supp. 3d 1063 (D. Alaska 2014), in support of its assertion that Plaintiffs' declarations are insufficient because they do not assert that they have seen polar bears near the site of the Willow Project or that they hope to return to the area of the Willow Project to see polar bears. Docket 145 at 16-19 (Case No. 3:23-cv-00058-SLG). However, *Kunaknana* is distinguishable. In *Kunaknana*, the plaintiffs, pursuant to the Clean Water Act and NEPA, challenged a permit given to ConocoPhillips to fill particular wetlands to develop a drill site. 23 F. Supp. 3d at 1067-68. The Court determined that plaintiffs lacked standing because none of the declarations showed that a member had visited the site and intended to return to the site. *Id.* at 1082-83. Here, Plaintiffs' members have visited and have demonstrated an intent to return to the region in the near future, including in the NPR-A. And considering the migratory nature of polar bears, the geographic scope of the potential injury is greater than just the Willow Project site. *See* FWS_AR032490 (map showing overlap between action area and denning critical habitat, and nearby historical den sites); *Melone*, 2023 WL 5002764, at *4.

[306] Although the State challenges injury-in-fact only as to a subset of Plaintiffs' ESA claims, the Court finds that Plaintiffs' declarations adequately allege injury-in-fact as to all of Plaintiffs' challenges pursuant to the ESA.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 70 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 70 of 109

Plaintiffs challenge the adequacy of the Section 7 consultations under the ESA and FWS's BiOp. They seek vacatur of the "ESA consultation documents," including the BiOp.[307] Vacatur of the BiOp could lead to changes to the Willow Project that would better protect Plaintiffs' interests in viewing polar bears. Plaintiffs, therefore, have established causation and redressability to maintain their ESA claims.[308]

ConocoPhillips argues that Plaintiffs must separately establish standing for their ESA claim regarding the Services' consultation on Willow's GHG emissions.[309] ConocoPhillips maintains that Plaintiffs cannot establish causation and redressability with respect to that particular claim because "[w]hether Plaintiffs suffer global climate change impacts in the future that affect their interests in Arctic species is a function of many factors, including total global GHG emissions (past, present, and future) and global policy choices."[310]

However, the Court has concluded that Plaintiffs have standing to seek vacatur of the BiOp and the ESA consultation documents. As such, Plaintiffs may

---

[307] Docket 115 at 50 (Case No. 3:23-cv-00061-SLG); Docket 105 at 47 (Case No. 3:23-cv-00058-SLG) (seeking vacatur of "the ROD, final SEIS, BiOp, and all decisions that rely on these documents").

[308] *See Kempthorne*, 588 F.3d at 708 ("[The] injury is geographically specific, is caused by the regulations at issue, and is imminent. The plaintiffs do not challenge the 'regulation in the abstract.' The plaintiffs have standing.").

[309] *See* Docket 141 at 42-50 (Case No. 3:23-cv-00058-SLG).

[310] Docket 141 at 49-50 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 71 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 71 of 109

raise a full range of challenges to BLM's and the Services' compliance with the ESA.[311]  "[O]nce a litigant has standing to request invalidation of a particular agency action, it may do so by identifying all grounds on which the agency may have failed to comply with its statutory mandate."[312]  Additionally, in *Natural Resources Defense Council v. Jewell*, the Ninth Circuit held that "to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests."[313]  Plaintiffs have shown as much here.  Accordingly, the Court finds that Plaintiffs have standing to raise all ESA claims associated with the Willow Project.[314]

### c. FWS's Incidental Take Finding for Polar Bears

#### i. The BiOp

---

[311] *See DaimlerChrysler Corp.*, 547 U.S. at 353 n.5.

[312] *DaimlerChrysler Corp.*, 547 U.S. at 353 n.5 (internal quotation marks omitted).

[313] *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (emphasis in original) (citing *Defs. of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005), *rev'd and remanded on other grounds sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)).  *See All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 599 (9th Cir. 2014) (holding that plaintiffs had standing to bring ESA claim asserting that federal defendants failed to comply with Section 7 of the ESA as there was "a direct causal connection between these claims of procedural injury and the federal defendants' actions concerning [a federal management plan]").

[314] The Court has reviewed the supplemental authority recently filed by ConocoPhillips: *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, Case No. 1:22-cv-01716-TSC (D.D.C. Nov. 1, 2023).  Docket 164 at 2 (Case No. 3:23-cv-00058-SLG); Docket 164-1 (Case No. 3:23-cv-00058-SLG) (slip opinion).  The Court also considered Plaintiffs' responses.  Docket 165 (Case No. 3:23-cv-00058-SLG); Docket 182 (Case No. 3:23-cv-00061-SLG).  The out-of-circuit case did not alter the Court's decision here.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 72 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 72 of 109

## 1. Action Area

FWS's BiOp for the Willow Project described "[t]he terrestrial Action Area [as] the area within 1 mile (1.6 km) of Project activities . . . because it encompasses the area of physical disturbance coupled with a one mile buffer within which disturbance to polar bear dens could occur from noise, vibration, physical presence, and human activity associated with the Project."[315]

> The offshore Action Area is the area within 1.5 miles (2.4 km) of offshore Project components: the marine transit route (MTR) for barge transit from Dutch Harbor in the southern Bering Sea to the offshore barge lightering area, the screeding area for barge lightering, the barge and support vessel route from the lightering area to Oliktok Dock, and the area encompassing construction, screeding, and offloading activities at Oliktok Dock . . . .[316]

"Apart from activities at and around Oliktok Dock, activities associated with the Proposed Action would occur primarily between approximately 7.8 to 26.0 miles (12.6 to 42.0 km) inland from the Beaufort Sea coast."[317]

NMFS identified the Action Area in its Letter of Concurrence as identical to the offshore Action Area in the BiOp: "the area within 2.4 km (1.5 mi) on both sides of the barge delivery route (total width of 4.8 km (3 mi) . . . ) and 2.4 km (1.5 mi)

---

[315] FWS_AR032437.  *See* FWS_AR032438 (map of action area).

[316] FWS_AR032437.  *See* FWS_AR032439 (map of MTR).

[317] FWS_AR032509.  Oliktok Dock "existed at the time critical habitat was designated and [is] therefore not part of critical habitat."  FWS_AR032531.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 73 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 73 of 109

along the lightering route for support vessels and barges to and from Oliktok Dock."[318]

## 2. Denning Polar Bears

Southern Beaufort Sea polar bears have increasingly used land for denning due to the decline in sea ice.[319] "The majority of the Action Area is farther inland than where most polar bear dens occur, with the exception of the coastal area near Oliktok Dock . . . . [I]n northern Alaska, west of the Kavik River, 95% of all historical confirmed and probable dens occurred within 4.5 km (2.8 mi) of the Beaufort Sea coast."[320] However, "[t]he majority of the proposed Project infrastructure would be greater than 10 km from the coast. For example, BT2, the closest permanent Project infrastructure to the coast[,] would be roughly 21 km inland. The Tiŋmiaqsiuġvik mine site would also be roughly 15 km from the coast . . . ."[321]

Nevertheless, "small numbers of dens have been documented within or just beyond the discrete boundary of the Action Area within the last 100 years; almost all were concentrated in coastal areas, near Oliktok Dock, and nearby barrier

---

[318] NMFS_AR000146. *See* NMFS_AR000147 (map of action area).

[319] FWS_AR032470; FWS_AR032484.

[320] FWS_AR032518.

[321] FWS_AR032518.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 74 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 74 of 109

islands."[322]  "This history suggests that it is possible that one or more polar bears could attempt to den within the Action Area over the 30-year life of the project."[323]

In the Effects section of the BiOp, FWS explained that it had used a model to "derive[] an estimate of the number of dens that may be disturbed and hence the number of cubs that could experience potential injury or mortality because of this disturbance."[324]  The model estimated that, during the life of the project, an estimated median of zero cubs could experience MMPA harassment with the potential to cause injury or mortality annually as a result of the disturbance by Willow activity.[325]  And "there is a 70% probability of [zero] potential injuries or mortalities to denning polar bears over the 30-year life of the Project."[326]

---

[322] FWS_AR032518.

[323] FWS_AR032518.

[324] FWS_AR032518.  *See* FWS_AR032575-82 (Appendix B detailing model methodology).

[325] FWS_AR032519.  The model determined the amount of MMPA Level A or Level B harassment—a lower bar compared to harassment under the ESA.  As FWS explained,

> there are several important differences in how various forms of "take" are defined under the MMPA and ESA, and that in many instances MMPA take does not equate to any form of ESA take.  This is largely due to different standards concerning both the probability and the extent of impacts.  Whereas acts causing a "potential to disturb" or "potential to injure" a marine mammal could qualify as MMPA "Level B harassment" or MMPA "Level A harassment[,"] respectively, no ESA take can occur unless the act creates a "likelihood of injury" (an element of "harass" under the ESA) or "actually kills or injures" a marine mammal (an element of "harm" under the ESA).

FWS_AR032540 (first citing 16 U.S.C. § 1362(18); and then citing 50 C.F.R. § 17.3).

[326] FWS_AR032519.  FWS found, based on the model, "that impacts to denning or post-emergence polar bear cubs are not anticipated or reasonably certain to occur over the 30-year

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 75 of 109

### 3. Non-Denning Polar Bears

FWS noted that "[w]hile on shore, the distribution of polar bears is largely influenced by the opportunity to feed on the remains of subsistence-harvested bowhead whales. Most polar bears are aggregated at three sites along the coast, Utqiaġvik, Cross Island, and Kaktovik."[327] "[R]ecords of [i]ndustry encounters during activities on the North Slope between 2014 – 2018[] indicate the number of polar [bear] encounters significantly decreases with distance from the coast . . . . Few encounters occur [greater than] 1.2 miles from the coast . . . and more encounters occur during the open-water season than the ice season."[328]

FWS noted that Willow will generate noise and other disturbance and that "[p]ossible impacts on transient polar bears exposed to project related disturbance potentially include disruption of normal activities, displacement from foraging and resting areas, and interruption of movement patterns."[329] However, FWS concluded in its Effects section of the BiOp that,

> although small numbers of non-denning polar bears could be disturbed by activities associated with the proposed Project, project-specific disturbance would not result in injury to these bears because 1) polar bears occur at low density in the Action Area, 2) transient bears can move away from disturbance if necessary, such that

---

life of the Project (i.e., cumulative probability of 0 MMPA Level A + lethal takes = 70%; Appendix B, Table B.2)." FWS_AR032529.

[327] FWS_AR032486. *See* FWS_AR032508.

[328] FWS_AR032510.

[329] FWS_AR032513.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 76 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 76 of 109

disturbance would be limited to short-term changes in behavior that would not be biologically significant, 3) following the construction phase, most activities would take place well inland from the coast where polar bears are less likely to occur, and 4) existing coastal infrastructure most likely to be encountered by polar bears is subject to on-going existing levels of human activities and disturbance, and 5) [ConocoPhillips'] adherence to minimization measures, such as [required operating procedures] A-8, M-1 and Design features 46, 60, 66, and 81 would minimize impacts of disturbance to non-denning bears.[330]

### 4. Mitigation Measures

The BiOp included several "Lease Stipulations (LSs) and required operating procedures (ROPs)" aimed at mitigating impacts to listed species and critical habitat.[331]  For example, ROP M-1 provides, "Chasing wildlife with ground vehicles is prohibited.  Particular attention will be given to avoid disturbing caribou."[332]  FWS also identified measures included by ConocoPhillips in the Willow Project proposal that would minimize the Project's impacts to listed species and critical habitat.[333]

### 5. No Jeopardy Determination

Ultimately, FWS concluded that "the Action, as proposed, is not likely to jeopardize the continued existence of polar bears by reducing appreciably the

---

[330] FWS_AR032516-17.

[331] FWS_AR032409-21.

[332] FWS_AR032420.

[333] FWS_AR032421-26.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 77 of 109

likelihood of survival and recovery in the wild by reducing reproduction, numbers, or distribution of this species."[334]

### 6. Incidental Take Finding

FWS included an Incidental Take Statement ("ITS") for polar bears in the BiOp.[335] In the ITS, FWS stated that it did "not anticipate the proposed action would result in any incidental take of polar bears."[336] Nevertheless, FWS included an explanation to "contextualize" its no-take finding and to address the relationship between the BiOp and take authorizations issued under the MMPA.[337] MMPA Level B harassment constitutes acts causing a "potential to disturb" and Level A harassment includes acts causing a "potential to injure."[338] In contrast, "no ESA take can occur unless the act creates a 'likelihood of injury' (an element of 'harass' under the ESA) or 'actually kills or injures' a marine mammal (an element of 'harm' under the ESA)."[339] Accordingly, MMPA Level B harassment is generally not ESA

---

[334] FWS_AR032538. FWS also concluded that Willow was "not likely to result in the destruction or adverse modification of any unit of designated critical habitat for the polar bear." FWS_AR032539.

[335] FWS_AR032539-46.

[336] FWS_AR032540.

[337] FWS_AR032540.

[338] FWS_AR032540. *See* 16 U.S.C. § 1362(18)(A)(i)-(ii), (C), (D).

[339] FWS_AR032540 (first citing 16 U.S.C. § 1362(18); and then citing 50 C.F.R. § 17.3).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 78 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 78 of 109

take, and "not all instances of MMPA Level A harassment rise to the level of ESA harm."[340]

As to non-denning polar bears, the ITS stated that FWS

[did] not anticipate any incidental disturbances resulting from the proposed action would "harass" any polar bears per the applicable definition of that term. Two concepts separately and independently support this finding. First, for the reasons explained in the Effects section, none of the incidental disturbances to non-denning (i.e., transient) polar bears anticipated to result from this proposed action would create a "likelihood of injury" to any polar bears, and thus none of these incidental disturbances would "harass" any polar bears per the ESA. Second, incidental disturbances resulting from this proposed action would not occur intentionally or negligently.[341]

In support of its second conclusion in the ITS—that any incidental disturbances would not occur intentionally or negligently to non-denning polar bears and therefore did not constitute harassment under the ESA—FWS defined "harass" as requiring an intent to harass.[342] Because Willow "would be conducted with the intent of developing and producing oil and gas and without any intent to annoy, disturb, or harass polar bears," and because the project incorporated

_____

[340] FWS_AR032540 (internal quotation marks omitted).

[341] FWS_AR032541 (citing 50 C.F.R. § 17.3).

[342] FWS_AR032541. FWS cited to a 1981 FWS proposed rulemaking that would redefine "harm," which cited to 50 C.F.R. § 17.3, and stated that, under this definition, "two elements must be shown before a finding of harassment can be made: (1) likelihood of injury to wildlife, and (2) some degree of fault, either intentional or negligent. Because the definition contains an element of fault, it will not result in criminal liability for habitat modifications unless it is shown that the defendant knew or reasonably should have known that his actions would be likely to injure wildlife." FWS_AR032541 (quoting Endangered and Threatened Wildlife and Plants; Proposed Redefinition of "Harm," 46 Fed. Reg. 29490, 29490-92 (June 2, 1981)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 79 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 79 of 109

"numerous additional minimization measures . . . to further protect polar bears," FWS concluded that Willow "would be conducted in accordance with 'reasonable measures to avoid injury to' . . . polar bears and that any incidental (*i.e.*, not intentional) disturbance of polar bears that nevertheless results from the proposed action would not entail any 'degree of fault, either intentional or negligent', and thus would not constitute 'harassment'" under the ESA.[343]

Regarding denning polar bears, the ITS again referenced the model FWS had relied on, which predicted that "the anticipated number of all MMPA Level A Harassments (even when combined with the anticipated number of lethal takes) is zero," to conclude "that no incidental ESA take of denning bears is anticipated to result from [Willow]."[344]

### ii. Plaintiffs' Claims

### 1. Non-Denning Polar Bears

### a. The BiOp's Definition of "Harassment"

Plaintiffs argue that FWS improperly defined "harassment" "to require specific intent directed toward the listed animal, rather than general intent to

---

[343] FWS_AR032541.  In the BiOp, FWS "acknowledge[d] that it has not consistently given effect to the 'intentional or negligent' language of its ESA definition of 'harass' when developing biological opinions for polar bears.  It [did] so here to give proper effect to all elements of the definition of 'harass,' reflect the comprehensiveness of mitigation measures already incorporated into this Proposed Action, provide a more precise estimate of the amount or extent of ESA take anticipated to result from this proposed action, and better satisfy its responsibilities under the ESA."  FWS_AR032542.

[344] FWS_AR032542.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 80 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 80 of 109

commit acts that create a likelihood for injury," in contravention of FWS regulations and the ESA's definition of incidental take.[345]

Federal Defendants respond that its definition of harassment is lawful because "the plain language and regulatory history show that FWS applies 'harass' only to (1) intentional harassment of animals and (2) unintentional harassment traceable to a negligent act[] or omission."[346] They rely on the proposed 1981 rulemaking cited in the BiOp and an earlier 1975 final rulemaking that explained that "the definition of 'harass' has been modified by restricting its application to acts or omissions which are done intentionally or negligently. In the proposal, 'harass' would have applied to any action, regardless of intent or negligence."[347] As to the purported conflict between FWS's definition of harass and the ESA's incidental take provision, ConocoPhillips responds that "both 'harass[ment]' and 'harm' can occur incidentally" because "[a] negligent act that incidentally causes the likelihood

---

[345] Docket 105 at 39-41 (Case No. 3:23-cv-00058-SLG); Docket 115 at 41 (Case No. 3:23-cv-00061-SLG) (arguing that FWS's "interpretation—that there is no incidental take where the activity is not undertaken with the *intent* to harass the species—is contrary to the ESA's plain language, legislative history, implementing regulations, and FWS's past practices" (emphasis in original) (citation omitted)).

[346] Docket 137 at 60 (Case No. 3:23-cv-00058-SLG).

[347] Docket 137 at 59-60 (Case No. 3:23-cv-00058-SLG) (quoting Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44412, 44413 (Sept. 26, 1975)). *See* Proposal to Reclassify the American Alligator, 40 Fed. Reg. 28712, 28714 (July 8, 1975) ("'Harass' in the definition of 'take' in the Act means an act which either actually or potentially harms wildlife by killing or injuring it, or by annoying it to such an extent as to cause serious disruption in essential behavior patterns, such as feeding, breeding or sheltering; significant environmental modification or degradation which has such effects is included within the meaning of 'harass[.]'").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 81 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 81 of 109

of injury to a listed animal is not done for the purpose of harassing the animal."[348] In any event, Federal Defendants emphasize that FWS relied on two separate and independent reasons for its no-take finding: that there was no likelihood of injury to listed species, and that, pursuant to its definition of "harass," any disturbance would not be intentional or negligent.[349]

The ESA does not define "harass"; FWS regulations define it as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."[350] In evaluating a challenge based on a regulation, courts first determine whether a regulation is "genuinely ambiguous," by "carefully consider[ing] the text, structure, history, and purpose" of the regulation.[351] If the regulation is not ambiguous, "[t]he regulation then just means what it means—and the court must give it effect, as the court would any law."[352]

Plaintiffs are correct that the definition of "harass" that FWS applied to non-denning polar bears is inconsistent with the regulation. The regulation's text is

---

[348] Docket 141 at 61 (Case No. 3:23-cv-00058-SLG).

[349] Docket 137 at 57 (Case No. 3:23-cv-00058-SLG).

[350] 50 C.F.R. § 17.3.

[351] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (plurality opinion) (citation and internal quotation marks omitted).

[352] *Id.*

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 82 of 109

unambiguous. "Harass" means an "intentional or negligent act or omission which creates [a] likelihood of injury,"[353] not an intentional or negligent act or omission which *intentionally or negligently* creates a likelihood of injury. "Intentional or negligent" modifies "act," not "likelihood of injury."[354] This interpretation is bolstered by the legislative history of the ESA.

> The House Report [on the ESA] underscored the breadth of the "take" definition by noting that it included "harassment, *whether intentional or not*." The Report explained that the definition "would allow, for example, the Secretary to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young." These comments . . . support the Secretary's interpretation that the term "take" in § 9 reached far more than the deliberate actions of hunters and trappers.[355]

Because the regulation is unambiguous, the Court does not defer to FWS's definition of "harass" in the BiOp or the proposed 1981 rulemaking commentary on which the BiOp and Federal Defendants rely for non-denning polar bears.[356] However, as explained below, FWS's second, independent basis for finding that non-denning polar bears would not be harassed by the Willow Project was not

---

[353] 50 C.F.R. § 17.3.

[354] *See id.*

[355] *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704-05 (1995) (emphasis in original) (quoting H. Rep. No. 93-412, at 11 (1973)).

[356] *See Kisor*, 139 S. Ct. at 2415 ("[I]f there is only one reasonable construction of a regulation[,] then a court has no business deferring to any other reading . . . .").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 83 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 83 of 109

arbitrary and capricious, such that the agency's misinterpretation of its regulation is harmless error.

### b. No Likelihood of Injury

CBD Plaintiffs argue that "Willow will involve substantial activity in polar bear habitat," including "over three million ground transportation trips, . . . gravel mining and blasting, pile driving, new roads, and hundreds of boat trips."[357] "Such activities can significantly disrupt polar bears' normal behaviors[,]" considering their sensitivity to noise and "high energy demands," as well as polar bears' "declining reproductive and survival rates, and poor body condition."[358] CBD Plaintiffs contend that FWS's determination "that *none* of the disturbances from Willow over the next three decades would significantly disrupt the normal behavioral patterns of any polar bear . . . rests on several arbitrary rationales contradicted by the record."[359]

Specifically, CBD Plaintiffs contend that FWS "relied on the fact that polar bears occur in 'low density' in the Project area, especially 'inland' where bears are 'less likely to occur[,]' [b]ut this acknowledges that bears do occur in the Project area, including inland, and a lower density does not preclude Willow from

---

[357] Docket 115 at 44 (Case No. 3:23-cv-00061-SLG) (first citing AR820708; then citing FWS_AR032516; and then citing FWS_AR032512-13, 16).

[358] Docket 115 at 44-45 (Case No. 3:23-cv-00061-SLG) (first citing FWS_AR032513; then citing AR515923; then citing AR523622; then citing AR517712-30; and then citing AR517731-72).

[359] Docket 115 at 45 (Case No. 3:23-cv-00061-SLG) (emphasis in original).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 84 of 109

harassing individual bears."[360]  Next, CBD Plaintiffs assert that FWS concluded "that non-denning bears 'can move away from disturbance if necessary[,]' [b]ut such movements can themselves constitute harassment, particularly for females."[361]  Third, CBD Plaintiffs maintain that FWS's recognition that "'on-going existing levels of human activities and disturbance' in some polar bear habitat . . . contradicts, without explanation, the available evidence showing that the more disturbances a bear experiences, the more negative impacts that bear will suffer."[362]  Lastly, CBD Plaintiffs assert that "FWS assumed that various Project design features would minimize the impacts of any disturbance[,] . . . includ[ing] disturbance from all vehicle traffic."[363]  Although FWS cited a mitigation measure prohibiting chasing wildlife with vehicles, CBD Plaintiffs argue that the measure "does not require anything that will prevent incidental harassment to polar bears from vehicle traffic."[364]

---

[360] Docket 115 at 45 (Case No. 3:23-cv-00061-SLG) (quoting FWS_AR032516).

[361] Docket 115 at 45-46 (Case No. 3:23-cv-00061-SLG) (quoting FWS_AR032516) ("Studies have shown, for example, that '[w]hen energetically stressed, female polar bears may forego reproduction,' and that 'females with small cubs . . . have higher energetic demands due to lactation' and increased movements require them 'to expend additional energy.'" (first quoting AR522160; then quoting AR523622; and then citing AR521546-56)).

[362] Docket 115 at 46 (Case No. 3:23-cv-00061-SLG) (first quoting FWS_AR032516-17; and then citing AR523622 (noting the harms to polar bears "from increased movements")).

[363] Docket 115 at 46 (Case No. 3:23-cv-00061-SLG) (first citing FWS_AR032517; and then citing FWS_AR032516).

[364] Docket 115 at 46 (Case No. 3:23-cv-00061-SLG) (first citing FWS_AR032420, 512; and then citing *Cook Inletkeeper v. Raimondo*, 533 F. Supp. 3d 739, 754-55 (D. Alaska 2021)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 85 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 85 of 109

SILA Plaintiffs similarly argue that FWS erroneously "failed to explain why" "impacts on transient polar bears exposed to project-related disturbance potentially includ[ing] disruption of normal activities, displacement from foraging and resting areas, and interruption of movement patterns," "do not qualify as harassment."[365]

Federal Defendants respond that FWS recognized that "small numbers of transient bears could be exposed to project-related disturbance," but "FWS also [made] clear that such exposures would be brief and would only result in short-term changes in behavior that are not biologically significant."[366] And ConocoPhillips asserts that FWS did not rely on only one mitigation measure to find vehicle traffic would not harass any polar bears; rather, FWS also explained that traffic would occur inland where polar bears are less likely to be, that Oliktok Dock is already heavily used so any additional use caused by Willow would not meaningfully add to disturbances there, and that vehicle traffic is regulated at industry sites.[367]

Plaintiffs' arguments are unpersuasive. First, FWS recognized that polar bears could transit through the Action Area and, contrary to CBD Plaintiffs'

---

[365] Docket 105 at 43-44 (Case No. 3:23-cv-00058-SLG) (quoting FWS_AR032513).

[366] Docket 137 at 64 (Case No. 3:23-cv-00058-SLG) (citing FWS_AR032516-17).

[367] Docket 141 at 63 (Case No. 3:23-cv-00058-SLG) (first citing FWS_AR032516; then citing FWS_AR032509-10; then citing AR512218; and then citing FWS_AR032520).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 86 of 109

assertion, did not rest its finding that those bears would not experience harassment solely on their low density in the Action Area.[368]  Next, FWS's statement that transient bears could move away from disturbances was in the context of disturbance from aircraft operations, and FWS provided additional reasons for finding that aircraft disturbance was unlikely to result in "measurable effects or injury."[369]  Third, FWS's recognition that "existing coastal infrastructure most likely to be encountered by polar bears is subject to on-going existing levels of human activities and disturbance" was one of five reasons FWS gave for finding that non-denning polar bears would not suffer harassment from Willow's activities.[370]  Contrary to CBD Plaintiffs' assertion, the statement does not contradict anything—it is a fact.  Lastly, regarding mitigation of vehicle disturbances, as ConocoPhillips points out, this mitigation measure was not the only reason FWS gave for finding that vehicles would not cause ESA harassment.

---

[368] FWS_AR032516-17.  *See* FWS_AR032504, FWS_AR032508-17, FWS_AR032520-29 (BiOp analysis on the effects of Willow to non-denning polar bears); FWS_AR032530-32 (BiOp analysis on the effects of Willow to polar bear critical habitat).

[369] FWS_AR032516 ("[A]lthough small numbers of non-denning polar bears could be disturbed by aircraft operations associated with the proposed Project, measurable effects or injury would be unlikely because 1) polar bears occur at low density in the Action Area, 2) transient bears can move away from disturbance if necessary, and this level of disturbance is expected to be minor and temporary without the likelihood of injury, 3) most activities requiring summer helicopter operations would take place along winter routes well inland from the coast, and 4) adherence to minimization measures, such as maintaining a flight altitude of 1,500 feet (ROP F-1) would minimize impacts of disturbance to non-denning bears.").

[370] *See* FWS_AR032516-17.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 87 of 109

In the BiOp, FWS determined that the probability that polar bears would enter the Action Area was low, considering the inland location of most of Willow's new infrastructure.  For bears that might enter the Action Area, FWS considered various types of disturbances that might occur and the associated mitigation measures Willow would implement.  Upon consideration of those facts, FWS determined that Willow "would intermittently incidentally expose small numbers of polar bears of the SBS stock to disturbance, and that effects from these exposures would be limited to temporary changes in behavior that would not be biologically significant."[371]  Plaintiffs have not shown that FWS's determination that there was no likelihood of injury to non-denning (i.e. transient) polar bears was arbitrary and capricious.

In sum, the Court finds that FWS's conclusion that Willow's disturbances would not create a likelihood of injury to non-denning polar bears and that, therefore, there would be no ESA harassment or take, is "within the bounds of reasoned decisionmaking."[372]  FWS "considered the relevant factors and articulated a rational connection between the facts found and the choice made."[373]  Accordingly, because FWS's no-take determination for non-denning polar bears

---

[371] FWS_AR032537.

[372] *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

[373] *Id.* (citations omitted).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 88 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 88 of 109

relies on this lawful, separate, and independent basis, FWS's erroneous definition of harassment is not prejudicial error.[374]

## 2. Denning Polar Bears

Plaintiffs also challenge FWS's conclusion that disturbance to denning polar bears would not result in a likelihood of injury. Specifically, SILA Plaintiffs argue that "FWS acknowledged that Willow 'could affect denning polar bears,'" but it "largely limited its discussion to its modeling assessment's finding of Willow's low risk of cub injury or mortality" and did not consider impacts to adult female denning bears.[375]

Federal Defendants respond that "the BiOp explain[s] why disturbance of denning or prospecting bears is unlikely to occur given the location and timing of Project activities."[376] For polar bears that might den in the project area, FWS modeled the impact of disturbances using the MMPA standard.[377] Federal

---

[374] *See PDK Lab'ys Inc.*, 362 F.3d at 799.

[375] Docket 105 at 43 (Case No. 3:23-cv-00058-SLG) (fist quoting FWS_AR032517; then citing FWS_AR032518-19; and then citing FWS_AR032580).

[376] Docket 137 at 62 (Case No. 3:23-cv-00058-SLG) (first citing FWS_AR032509 ("The majority of the Action Area is farther inland [than] polar bears typically occur, including transient (non-denning) individuals and females prospecting for den sites and/or establishing dens[.]"); then citing FWS_AR032517 ("[W]e anticipate impacts to denning polar bears associated with activities at Oliktok Dock would be discountable due to lack of temporal overlap with the denning period[.]"); then citing FWS_AR032520 (noting the inland location of the "vast majority of Project infrastructure and activities" and the fact that "Project-related activities occurring closer to shore would utilize existing infrastructure already subject to disturbance"); and then citing FWS_AR032518 (discussing the scarcity of historical dens occurring even a few miles inland of the coast)).

[377] Docket 137 at 62 (Case No. 3:23-cv-00058-SLG); FWS_AR032581 (model results).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 89 of 109

Case 3:23-cv-00058-SLG    Document 166    Filed 11/09/23    Page 89 of 109

Defendants note that Plaintiffs do not dispute "FWS's assumption that any denning adult females subjected to Project-related disturbance could experience MMPA 'Level B harassment' (which requires only a disruption of behavioral patterns) but would not experience any MMPA 'Level A harassment' (which requires a potential to injure)."[378]  Given that assumption, Federal Defendants contend that "the notion espoused by Plaintiffs that a 'likelihood of injury' . . . could accrue to the adult bear herself is unsupported, speculative at best, and contradicted by the well-reasoned and undisputed assumptions underpinning FWS's peer-reviewed model as well as by FWS's express conclusions reported in the BiOp."[379]

With respect to adult female bears, FWS found that the probability that polar bears would den within the Action Area was low.  For those polar bears that might enter the Action Area to den, FWS modeled whether there would be any MMPA harassment, including to the adult female prior to cub birth during den establishment.[380]  The model assigned MMPA Level B harassment to any potential disturbance experienced by denning adult polar bears; the results showed a 0.60 probability of MMPA Level B harassment during den establishment and a 0.267

---

[378] Docket 137 at 62-63 (Case No. 3:23-cv-00058-SLG) (first citing 16 U.S.C. § 1362(18); and then citing FWS_AR032580).

[379] Docket 137 at 63 (Case No. 3:23-cv-00058-SLG) (citation omitted).

[380] FWS_AR032581 ("Level B harassment was applicable to both adults and cubs, if present; Level A harassment and lethal take were applicable to cubs only and were not possible during the den establishment period, which ended with the birth of cubs.").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 90 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 90 of 109

probability of MMPA Level B harassment after the polar bear and her cub emerged from the den.[381]  The BiOp then explained that

> in many instances MMPA take does not equate to any form of ESA take.  This is largely due to different standards concerning both the probability and the extent of impacts.  Whereas acts causing a "potential to disturb" or "potential to injure" a marine mammal could qualify as MMPA "Level B harassment" or MMPA "Level A harassment[,"] respectively, no ESA take can occur unless the act creates a "likelihood of injury" (an element of "harass" under the ESA) or "actually kills or injures" a marine mammal (an element of "harm" under the ESA).[382]

In sum, FWS considered non-lethal disturbances to adult denning polar bears in its model as MMPA Level B harassment and determined that Willow's activities did not have any likelihood of actually injuring an adult denning bear.  The Court finds that FWS "considered the relevant factors" in its analysis of project disturbances to denning polar bears and "articulated a rational connection between the facts found" and its conclusion that Willow would not cause ESA harassment of any denning polar bears.[383]  Accordingly, Plaintiffs have not shown that FWS's consideration of ESA harassment as to denning polar bears was arbitrary and capricious.

---

[381] FWS_AR032580 ("Adult females received MMPA Level B harassment for any disturbance."); FWS_AR032581 (Table B.1 showing a 0.600 probability of MMPA Level B harassment during the den establishment period due to discrete exposure and a 0.267 probability of MMPA Level B harassment in the post-emergence period due to repeated exposure).

[382] FWS_AR032540 (first citing 16 U.S.C. § 1362(18); and then citing 50 C.F.R. § 17.3).

[383] See Balt. Gas & Elec. Co., 462 U.S. at 105.

Case No. 3:23-cv-00058-SLG, Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.
Case No. 3:23-cv-00061-SLG, Ctr. for Biological Diversity, et al. v. BLM, et al.
Decision & Order
Page 91 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 91 of 109

Because the BiOp was not arbitrary and capricious in its incidental take analysis of polar bears, the Court also concludes that BLM's reliance on FWS's BiOp did not violate its duties pursuant to Section 7.

### d. Section 7 Consultation on Willow's GHG Emissions

Plaintiffs contend that BLM, FWS, and NMFS violated Section 7(a)(2) of the ESA by failing to consider the effects of Willow's carbon emissions on protected species.[384]

### i. Consultation

Federal agencies fulfill their consultation responsibilities under Section 7 of the ESA by consulting with FWS or NMFS, depending on the species potentially affected.[385] If an action agency determines that an action "may affect listed species or critical habitat," then generally "formal consultation is required."[386] However, if an action agency determines that an action "may affect," but "is not likely to adversely affect" endangered species, threatened species, or designated critical habitat, and the consulting service (FWS or NMFS) concurs, consultation can

---

[384] Docket 105 at 34-39 (Case No. 3:23-cv-00058-SLG) (raising claim against BLM and FWS and identifying polar bears as protected species); Docket 115 at 34-41 (Case No. 3:23-cv-00061-SLG) (raising claim against BLM, FWS, and NMFS and identifying polar bears, ringed seals, and bearded seals as protected species).

[385] 50 C.F.R. § 402.14(a).

[386] *Id.*

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 92 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 92 of 109

conclude informally.[387]  "An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat."[388]

After this Court vacated FWS's prior BiOp for the Willow Project, BLM issued a new BA "to support USFWS' efforts to prepare a new [BiOp]."[389]  The revised BA prepared for FWS concluded that the Willow Project may affect and was likely to adversely affect polar bears.[390]  The BA prepared for NMFS concluded that Willow may affect but was not likely to adversely affect ringed and bearded seals.[391]  Accordingly, BLM initiated formal consultation with FWS regarding Willow's impact on polar bears[392] and, through informal consultation, secured a letter of concurrence from NMFS agreeing that Willow was not likely to adversely affect any listed species or critical habitat.[393]

---

[387] 50 C.F.R. § 402.14(a), (b)(1).

[388] *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (citation omitted).

[389] FWS_AR030552.

[390] FWS_AR030118.

[391] AR525026-27.

[392] FWS_AR032388.

[393] *See* NMFS_AR000143-94.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 93 of 109

The BA provided to each Service did not analyze Willow's GHG emissions as an effect of the action.[394]  In July 2022, BLM release a revised Draft SEIS and solicited public comment for the Willow Project.[395]  CBD submitted a comment asserting that BLM's consultation with the Services under Section 7 "must consider the impacts from the direct, indirect, and cumulative greenhouse gas emissions caused by the project."[396]  In light of CBD's comment, on January 10, 2023, BLM prepared a detailed memorandum assessing whether Willow's GHG emissions should be included in the scope of the agency's Section 7 consultation with the Services.[397]  BLM concluded that "the additional climate change-related information [did] not alter" its initial analysis.[398]  BLM transmitted the memorandum to both Services for review.  On January 12, 2023, FWS responded to BLM's

---

[394] *See* FWS_AR030542-666 (revised BA to FWS); NMFS_AR000003-142 (BA to NMFS); 50 C.F.R. § 402.12(a) ("A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action . . . .").

[395] AR511580-81.

[396] FWS_AR032349-50.  See FWS_AR032348-70 for CBD's entire comment.

[397] *See* FWS_AR032344-47 (Memorandum from BLM Wildlife Biologist Craig Perham to Willow Master Development Plan Supplemental EIS Decision File, Re: Scope of Ongoing Section 7 Consultations for Willow MDP (Jan. 10, 2023)).

[398] FWS_AR032347 ("BLM's evaluation of the additional climate change-related information does not alter its list of species or designated critical habitat that could be affected by an approval of the Willow MDP, the BLM's delineation of the Action Area, or the BAs' analysis of effects to any listed species or designated critical habitat.").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 94 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 94 of 109

memorandum via email, concurring in BLM's conclusion.[399]  On January 13, 2023, FWS issued the BiOp, which did not include Willow's GHG emissions as an "effect of the action."[400]  Ten days later, NMFS also concurred in BLM's conclusion that Willow's GHG emissions were outside the scope of the Section 7 consultation.[401]

### ii. Willow's GHG Emissions

CBD Plaintiffs argue that BLM violated the ESA by failing to assess Willow's GHG emissions in the BA and that BLM's memorandum—concluding that Willow's GHG emissions were not an effect of the action—did not remedy that omission because it applied the wrong standard.[402]  That is so, they assert, because Willow's GHG emissions "may affect" a listed species and therefore consultation on Willow's GHG emissions was required.[403]  Accordingly, CBD Plaintiffs also argue that NMFS's and FWS's concurrences with BLM's conclusion in its memorandum were unlawful.[404]

---

[399] FWS_AR032341 (FWS email "agree[ing] that the current state of climate science does not allow us to draw causal links between contributions from project-specific GHG emissions to global climate change, and subsequent project-specific effects on listed species and designated critical habitat").

[400] *See generally* FWS_AR032380-582.

[401] NMFS_AR000495 (January 23, 2023, NMFS email "agree[ing] that the scope of the ESA Section 7 consultation with respect to GHG emissions is appropriate").

[402] Docket 115 at 35-37 (Case No. 3:23-cv-00061-SLG).

[403] Docket 115 at 37-39 (Case No. 3:23-cv-00061-SLG).

[404] Docket 115 at 36-39 (Case No. 3:23-cv-00061-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 95 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 95 of 109

SILA Plaintiffs contend that FWS violated the ESA because the BiOp failed to consider Willow's GHG emissions as an "effect" of the action and to "acknowledge or explain how Willow's emissions could further reduce sea ice extent or otherwise reduce the survival and recovery of polar bears."[405] They argue that "Willow's additive direct and indirect GHG emissions are 'effects' under the ESA because these emissions would not occur 'but for' BLM's action approving Willow and are 'reasonably certain to occur.'"[406] SILA Plaintiffs contend that, "[a]t a minimum, Willow's GHG emissions 'may affect' polar bears and meet the threshold requirement for being considered during consultation."[407]

Federal Defendants respond that "BLM fully grappled with climate-change related issues in its ESA Section 7 consultations."[408] They point to portions of BLM's BAs to FWS and NMFS that included climate change as a cumulative effect and noted that warming global temperatures and the associated loss of sea ice "may have serious implications for polar bears and their ice-dependent marine prey."[409] Federal Defendants assert that, "[w]hile BLM did not specifically consider

---

[405] Docket 105 at 34-35 (Case No. 3:23-cv-00058-SLG).

[406] Docket 105 at 35 (Case No. 3:23-cv-00058-SLG) (first citing 50 C.F.R. § 402.02; and then citing *Conner*, 848 F.2d at 1453).

[407] Docket 105 at 35 (Case No. 3:23-cv-00058-SLG) (citing *Ctr. for Biological Diversity*, 698 F.3d at 1122-25).

[408] Docket 137 at 46 (Case No. 3:23-cv-00058-SLG).

[409] FWS_AR030115. *See* FWS_AR030115-20 (portion of BLM's BA to FWS regarding climate change cumulative effects and polar bears); NMFS_AR000073 (BLM's BA sent to NMFS noting

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 96 of 109

Case 3:23-cv-00058-SLG    Document 166    Filed 11/09/23    Page 96 of 109

Willow's GHG emissions as part of its initial ESA 'effects' analysis, this is immaterial because it determined the Willow Project 'may affect' listed species and their designated critical habitat."[410] Federal Defendants maintain that "the 'may affect' threshold is only applied by action agencies in determining whether ESA consultation must be initiated in the first place" and "an action agency's 'may affect' determination addresses the entirety of the proposed action, not specific subcomponents in isolation like GHG emissions."[411] "[O]nce consultation is underway, the only potential consequences that must be evaluated and described are 'effects of the action.'"[412]

Regarding BLM's January 2023 memorandum, Federal Defendants assert that BLM's conclusion—that "BLM [did] not identif[y] any additional effects to listed

---

that nonfederal "actions could contribute to cumulative effects on marine mammals, particularly ringed and bearded seals, which are closely associated with sea ice" and "[w]arming global temperatures and the associated reductions in extent and duration of sea ice that are predicted to occur in the future may have substantial implications for these species"). *See also* FWS_AR030116 (BLM's BA to FWS noting that "the ability of federal agencies to influence the processes thought to be responsible for climate change (such as global greenhouse gas emissions) is extremely limited at present, absent an effective worldwide response to the problem); NMFS_AR000073 (same).

[410] Docket 137 at 48 (Case No. 3:23-cv-00058-SLG).

[411] Docket 137 at 53 (Case No. 3:23-cv-00058-SLG) (quoting 50 C.F.R. § 402.14(a)).

[412] Docket 137 at 53 (Case No. 3:23-cv-00058-SLG) (first citing 50 C.F.R. § 402.14(c)(iv) (describing required contents of a biological assessment); then citing 50 C.F.R. § 402.14(g)(3) (describing what the Services must evaluate); and then citing 50 C.F.R. § 402.14(h) (describing required contents of a BiOp)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 97 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 97 of 109

species or designated critical habitat within the Action Area stemming from [Willow's] GHG emissions"[413]—was proper because

> quantifying a marginal decrease in seasonal sea ice in unknown spots somewhere in the millions of square miles of the circumpolar Arctic does not enable the Agencies' expert biologists to identify any "reasonably certain to occur" consequences to any listed species or critical habitat, and thus fails to reveal any additional "effects of the action."[414]

As an initial matter, the Court addresses what constitutes an "effect of the action" and therefore must be considered by BLM in the BA and by the Services in their consultations. As noted above, "may affect" is the standard that triggers some level of consultation between the action agency—here BLM—and the Services.[415] In contrast, in their substantive analysis, the BA and the BiOp must assess "the effects of the action on listed species or critical habitat."[416]

> Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the

---

[413] FWS_AR032346-47.

[414] Docket 137 at 50 (Case No. 3:23-cv-00058-SLG) (first citing FWS_AR032341 (FWS concurrence email); then citing FWS_AR032345-46 (BLM's memorandum); and then citing NMFS_AR000495 (NMFS's concurrence email).

[415] 50 C.F.R. § 402.14(a) ("Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required except as noted in paragraph (b) of this section."); id. § 402.14(b)(1) ("A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat").

[416] Id. §§ 402.14(h)(1)(iii), 402.12(a) ("A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat . . . .").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 98 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 98 of 109

consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action.[417]

Accordingly, because BLM concluded in the BA that Willow "may affect" polar bears and bearded and ringed seals, it consulted with FWS and NMFS regarding those species. During consultation, the Services analyze the "effects of the action," as determined by applying the above definition, not by applying the "may affect" standard.[418]

BLM applied the correct standard to determine whether Willow's GHG emissions were an effect of the action and provided a reasoned basis for concluding that they were not. While BLM's BAs generally discuss climate change and global warming, and that a loss of sea ice may threaten polar bears and other

---

[417] *Id.* § 402.02.

[418] *Id.* § 402.14(c)(1)(iv) (formal consultation); *id.* § 402.13(c)(1) (during informal consultation, "[a] written request for concurrence with a Federal agency's not likely to adversely affect determination shall include information similar to the types of information described for formal consultation at § 402.14(c)(1) sufficient for the Service to determine if it concurs.").

Plaintiffs rely on *Center for Biological Diversity v. Bureau of Land Management*, 698 F.3d at 1122-25, in support of their assertion that the "may affect" standard applies to the BiOp's effects analysis. Docket 105 at 36 (Case No. 3:23-cv-00058-SLG); Docket 115 at 37 (Case No. 3:23-cv-00061-SLG). However, that case equated the standard for initiating consultation, "may affect," with the standard that an agency action "is arbitrary and capricious if it fails to 'consider[] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made.'" *Ctr. for Biological Diversity*, 698 F.3d at 1121-22 (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001)). *See also Karuk Tribe of Cal.*, 681 F.3d at 1027 ("We have previously explained that 'may affect' is a 'relatively low' threshold *for triggering consultation*." (emphasis added) (quoting *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 99 of 109

ice-dependent species, the BAs do not discuss how Willow's GHG emissions may affect these species.[419]  However, BLM's memorandum, issued after the BAs but before the BiOp and Final SEIS were complete, responded to CBD's comment on the Draft SEIS "that suggested that Federal agencies establish causal links between project-specific GHG emissions and climate change-related effects to listed species (with an emphasis on marine mammals, highlighting polar bears) and/or their designated critical habitat."[420]  In the memorandum, BLM

> acknowledge[d] that [Willow] is anticipated to result in a marginal increase in global GHG emissions that would contribute to climate change and, potentially, a marginal seasonal decrease in sea ice extent somewhere in the Arctic.  Further, while a suite of polar bear impacts as a result of sea ice loss is known, any generalized calculations of GHG impacts, such as sea ice loss, at this time would not be able to determine precise effects to individual animals and such consequences would not be reasonably certain to occur.[421]

That was, in part, because "the sea-ice calculation [provided in CBD's comment] is too broad to quantify potential impacts to listed species already addressed in the Section 7 consultations or their critical habitat with additional precision beyond that which has already occurred."[422]  The memorandum concluded that Willow's GHG

_____

[419] *See* FWS_AR030662 (BA to FWS noting that "the ability of federal agencies to influence the processes thought to be responsible for climate change (such as global greenhouse gas emissions) is extremely limited at present, absent an effective worldwide response to the problem)."); NMFS_AR000073 (BA to NMFS noting same).

[420] FWS_AR032344.  *See* FWS_AR032348-70 (CBD's comment).

[421] FWS_AR032345.

[422] FWS_AR032345.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 100 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 100 of 109

emissions were not an effect of the action and the "BAs' effects analysis [was] sufficient."[423] Both FWS and NMFS agreed.[424]

CBD Plaintiffs argue that BLM's memorandum improperly required "'precision' or 'granularity' in the ability to predict effects from [Willow's] emissions."[425] But "[t]o be considered an effect of a proposed action, a consequence must be caused by the proposed action (i.e., the consequence would not occur but for the proposed action and is reasonably certain to occur)."[426] "A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available."[427] BLM determined that "generalized calculations of GHG impacts . . . would not be able to determine precise effects to individual animals and such consequences would not be reasonably certain to occur."[428] As such, BLM concluded that Willow's GHG

---

[423] FWS_AR032346-47.

[424] FWS_AR032341 (FWS email); NMFS_AR000495 (NMFS email).

[425] Docket 115 at 38 (Case No. 3:23-cv-00061-SLG) (quoting FWS_AR032345-46 (BLM memorandum noting that "more granular information" was needed "to establish a relationship between a marginal sea ice loss and resulting consequences to marine mammals" and "[a] simple calculation of sea ice loss would not be adequate to further help the analysis of polar bear food resources or seal impacts to a level of precision that has not already been addressed in the SEIS and BAs") and FWS_AR032341 (FWS email providing that "[a]lthough climate science has advanced since [2008], the level of reliability and granularity provided by existing models is still insufficient to identify project-specific effects to listed species or designated critical habitat")).

[426] 50 C.F.R. § 402.17(b).

[427] *Id.* § 402.17(b).

[428] FWS_AR032345.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 101 of 109
Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 101 of 109

emissions were not an effect of the action by evaluating whether Willow's GHG emissions were "reasonably certain" to "cause" a "consequence to listed species or critical habitat" in the Action Area, the proper regulatory standard.[429]  BLM and FWS used "precision" and "granularity" as characterizations of the causation issues with the scientific data: the evidence was not clear and substantial enough to render the impact of Willow's GHG on listed species an "effect of the action." Accordingly, the memorandum applied "effects of the action" to conclude that Willow's GHG emissions fell outside the regulatory definition.[430]  Therefore, the BAs and BLM memorandum were not arbitrary and capricious, and FWS's and NMFS's concurrences with BLM's conclusion were also not arbitrary and capricious.

---

[429] 50 C.F.R. § 402.02 (defining "effects of the action"); 50 C.F.R. § 402.02 (defining BA as "the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat."); 50 C.F.R. § 402.12(c) (requiring the action agency to solicit "a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area" or to provide such a list of species or habitat to the Service for inclusion in the BA).

[430] CBD Plaintiffs characterize BLM's conclusion—and the Services concurrences—that Willow's GHG emissions were not an effect of the action as akin to a determination that Willow's GHG emissions will have "no effect" on polar bears or bearded and ringed seals.  Docket 115 at 36 (Case No. 3:23-cv-00061-SLG).  However, as noted above, if an agency determines that an action will have "no effect" on listed species or critical habitat, then no consultation with the Services under Section 7 is required.  Here, BLM did not make a "no effect" finding as to Willow.  Rather, it concluded that Willow "may affect" polar bears and bearded and ringed seals and initiated consultation with the Services on the "effects" of Willow.  Willow's GHG emissions are not a standalone "agency action" that requires a standalone determination of "no effect" or "may affect."  *See* Docket 137 at 53 (Case No. 3:23-cv-00058-SLG) ("[A]n action agency's 'may affect' determination addresses the entirety of the proposed action, not specific subcomponents in isolation like GHG emissions.").

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 102 of 109
Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 102 of 109

SILA Plaintiffs' similar arguments as to FWS's BiOp also fail. Just as BLM's determination that Willow's GHG emissions did not constitute an "effect of the action" under the ESA was not arbitrary and capricious, FWS's failure to specifically address Willow's GHG emissions in the BiOp was similarly not arbitrary and capricious. In any event, FWS recognized the impacts of GHGs on climate change and climate change's impacts on polar bears and their habitat. In evaluating the baseline of polar bears, the BiOp noted that, "[i]n the Action Area, the greatest impact to polar bears is loss of sea ice resulting from climate change" and that "the decline of sea ice habitat due to changing climate [is] driven primarily by increasing atmospheric concentrations of greenhouse gases."[431] The BiOp then explained how reductions in sea ice are impacting or could impact polar bears and their habitat.[432] In the BiOp's conclusion, FWS

> acknowledge[d that] the Proposed Action could affect an increasingly higher proportion of the SBS stock of polar bear in the future (due to polar bears' increased use of terrestrial areas as sea ice decreases, a decline in the SBS stock population, or other factors). [FWS] also acknowledge[d] that polar bears in the Action Area could become increasingly sensitive to disturbance or other impacts due to food stress or other factors indirectly associated with climate change. However, [FWS did] not have sufficient data to reliably predict how the effects of the proposed Action may or may not contribute to increased sensitivity.[433]

---

[431] FWS_AR032485.

[432] FWS_AR032485-87; FWS_AR032491.

[433] FWS_AR032537.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 103 of 109

Further, in the FWS email concurring in BLM's conclusion that Willow's GHG emissions were outside the scope of the Section 7 consultation, FWS

> agree[d] that the current state of climate science does not allow us to draw causal links between contributions from project-specific GHG emissions to global climate change, and subsequent project-specific effects on listed species and designated critical habitat. The Service has consistently held this position since at least 2008, when it listed polar bears as threatened. Although climate science has advanced since then, the level of reliability and granularity provided by existing models is still insufficient to identify project-specific effects to listed species or designated critical habitat.
> . . .
> Here, we agree that an estimate of a project-caused decrease in sea ice occurring somewhere in the Arctic, without more specific information (e.g., location and type of affected sea ice, use [if any] of that sea ice by listed species and their prey/forage, etc.), does not enable us to predict any "effects of the action" to listed species or designated critical habitat per section 7 and its implementing regulations.[434]

In sum, BLM and the Services "considered the relevant factors" and "articulated a rational connection between the facts found and" their conclusions that Willow's GHG emissions did not constitute an effect of the action under the ESA.[435] While NMFS's email "agreed that the scope of the ESA Section 7 consultation with respect to GHG emissions is appropriate" "[w]ithout commenting on the conclusions that BLM has drawn," because the underlying BLM conclusion was not arbitrary and capricious, any deficiency on NMFS's part in explaining its

---

[434] FWS_AR032341.

[435] *Balt. Gas & Elec. Co.*, 462 U.S. at 105.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 104 of 109

agreement with BLM's conclusion would be harmless error. Because FWS's BiOp was not arbitrary or capricious, the Court also finds that BLM's reliance on the BiOp did not violate the ESA.[436]

### iii. Best Scientific Data Available

Plaintiffs argue that, by failing to consult on or consider Willow's GHG emissions, FWS did not consider the best available scientific and commercial data as required by the ESA.[437] Federal Defendants respond that "[they] did not ignore the studies cited by Plaintiffs. Rather, they comprehensively described key overarching issues like the contribution of GHG emissions to climate change and the projected impacts to sea ice and ice-dependent species."[438]

"The ESA requires an agency to use 'the best scientific and commercial data available' when formulating a BiOp."[439] "Under this standard, an agency must not 'disregard[] available scientific evidence that is in some way better than the evidence [it] relies on.'"[440] "The standard does not, however, require an agency to

---

[436] Docket 105 at 34 (Case No. 3:23-cv-00058-SLG); Docket 115 at 47 (Case No. 3:23-cv-00061-SLG).

[437] Docket 105 at 36-39 (Case No. 3:23-cv-00058-SLG); Docket 115 at 39-41 (Case No. 3:23-cv-00061-SLG).

[438] Docket 137 at 56 (Case No. 3:23-cv-00058-SLG) (first citing AR820758-59; then citing FWS_AR030115-20; and then citing NMFS_AR000073).

[439] *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (quoting 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(g)(8)).

[440] *Id.* (quoting *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (internal quotation marks omitted)).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 105 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 105 of 109

conduct new tests or make decisions on data that does not yet exist."[441]  "Finally, what constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference."[442]

CBD Plaintiffs claim that "[t]he current science substantially develops information about sea ice trends in all polar bear subpopulation regions, and other information estimating the extent and timing of projected Arctic sea ice loss" and Plaintiffs cite several studies in the record.[443]  They also claim that "science also shows that significant emissions reductions will allow substantially more sea ice to persist and increase the chances that polar bears will survive in Alaska and across their range."[444]  Plaintiffs also rely on a 2016 study quantifying that every metric

---

[441] *Id.* (citing *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998-99 (D.C. Cir. 2008)).

[442] *Id.* (citing *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1265 (11th Cir. 2009)).

[443] Docket 115 at 40 (Case No. 3:23-cv-00061-SLG) (first citing AR522799-813 (2016 Stern and Laidre study finding "a trend toward earlier sea-ice retreat and later sea-ice advance" and a decline in the "number of ice-covered days"); then citing AR752368 (report noting that "[s]ince the early 1980s, annual average arctic sea ice has decreased in extent between 3.5% and 4.1% per decade" and that "[i]t is very likely that human activities have contributed to observed arctic surface temperature warming [and] sea ice loss" (emphasis omitted)); then citing AR752642 and AR752646 (report noting same); then citing AR725580 (2018 Arctic Report Card noting that surface air temperatures in the Arctic are warming and 2018 Arctic sea ice was "younger, thinner, and covered less area than in the past"); and then citing AR644960, AR644993-5000 (2021 Arctic Report Card excerpts noting that "the 15 lowest [sea ice] minimum extents have all occurred in the last 15 years" and "[t]he amount of multiyear sea ice, based on available data since 1985, reached its second lowest level by the end of summer 2021, sea ice thickness was lower than recent years, and volume was at record low (since at least 2010) in April 2021")).

[444] Docket 115 at 40 (Case No. 3:23-cv-00061-SLG) (first citing AR725265-70 (2010 study showing "substantially more sea-ice habitat would be retained if greenhouse gas rise is mitigated" and that "mitigating greenhouse gas emissions to improve polar bear status would have conservation benefits throughout and beyond the Arctic"); then citing AR736462-66 (2016 study modeling the response of polar bears to sea ice loss); then citing AR725322-28 (2020

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 106 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 106 of 109

ton of carbon emissions results in a loss of three, plus or minus three-tenths, square kilometers of sea ice and maintain this study should have been used to quantify the impact of Willow's GHG emissions on polar bears and seals.[445]

FWS cited the Stern and Laidre study identified by CBD Plaintiffs in the BiOp for the proposition that "over the last two decades, the Southern Beaufort Sea subpopulation has experienced a marked decline in summer sea-ice extent, along with pronounced lengthening of the open-water season."[446]  The other studies Plaintiffs identify indicate that Arctic sea ice is decreasing, that greenhouse gases contribute to the loss of sea ice, and that a loss of sea ice could adversely affect polar bears.  FWS acknowledged all of this in the BiOp: "[T]he decline of sea ice

---

study noting "that, with high greenhouse gas emissions, steeply declining reproduction and survival will jeopardize the persistence of all but a few high-Arctic subpopulations by 2100"); and then citing AR523567 (FWS Polar Bear Conservation Management Plan noting that "[i]t cannot be overstated that the single most important action for the recovery of polar bears is to significantly reduce the present levels of global [GHG] emissions, which are the primary cause of warming in the Arctic")).  *See* Docket 105 at 40 (Case No. 3:23-cv-00058-SLG) (first citing same 2010 study above; and then citing FWS_AR371710 (2015 study noting "two-thirds of the world's polar bears could disappear if greenhouse gas emissions continue as predicted")).

[445] Docket 105 at 37 (Case No. 3:23-cv-00058-SLG) (citing AR751166-70 (2016 Notz and Stroeve study)); Docket 115 at 39-41 (Case No. 3:23-cv-00061-SLG) (citing AR736154-58 (same)).  ConocoPhillips asserts that "BLM evaluated [the Notz study]" in the memorandum.  Docket 141 at 55 (Case No. 3:23-cv-00058-SLG) (citing AR811704 and FWS_AR032345).  The BLM memorandum cites two studies, neither of which is the Notz study; but both the memorandum and FWS's response discuss that it is possible to estimate a "project-caused decrease in sea ice," which was the conclusion of the Notz study.  FWS_AR032341.  BLM also referred to the Notz study and its finding regarding sea ice loss in the Final SEIS.  *See* AR820758.

[446] FWS_AR032470; FWS_AR032484; FWS_AR032564.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 107 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 107 of 109

habitat due to changing climate, driven primarily by increasing atmospheric concentrations of greenhouse gases, is the primary threat to polar bears."[447]

The 2016 Notz study that Plaintiffs rely on concludes that a defined increase in global GHG emissions will result in a measurable quantity of Arctic sea ice loss. The agencies considered that this scientific evidence was available in their ESA analysis.[448] But Plaintiffs have not shown any available scientific evidence that links Willow's projected GHG emissions to a reasonably certain decrease in sea ice impacting polar bears in the Action Area.[449] As BLM acknowledged, Willow "is anticipated to result in a marginal increase in global GHG emissions that would contribute to climate change and, potentially, a marginal seasonal decrease in sea ice extent somewhere in the Arctic."[450] But as FWS explained, "an estimate of a project-caused decrease in sea ice occurring somewhere in the Arctic, without more specific information (e.g., location and type of affected sea ice, use [if any] of that sea ice by listed species and their prey/forage, etc.,) does not enable us to predict any 'effects of the action' to listed species or critical designated habitat."[451] Accordingly, Plaintiffs have not shown that FWS "disregarded available scientific

---

[447] FWS_AR032485.

[448] FWS_AR032341.

[449] *See* description of Action Area *supra* Section V.c.i.1.

[450] FWS_AR032345.

[451] FWS_AR032341.

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 108 of 109

Case 3:23-cv-00058-SLG   Document 166   Filed 11/09/23   Page 108 of 109

evidence" "better than the evidence it relied on,"[452] and FWS's use of the available scientific and commercial data was not arbitrary and capricious.

## CONCLUSION

In light of the foregoing, IT IS ORDERED that:

- SILA Plaintiffs' Motion to Strike at Docket 150 in Case No. 3:23-cv-00058-SLG is GRANTED in part and DENIED in part as follows: the Court strikes only the 2008 Lecky letter and the portion of NSB's response in opposition that relies on the letter,[453] as set forth above;

- SILA Plaintiffs' request for vacatur at Docket 105 in Case No. 3:23-cv-00058-SLG and CBD Plaintiffs' request for vacatur at Docket 115 in Case No. 3:23-cv-00061-SLG are each DENIED; and

- SILA Plaintiffs' and CBD Plaintiffs' claims are DISMISSED with prejudice. The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 9th day of November 2023, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[452] *See San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995.

[453] Docket 143-1 at 18-19 (Case No. 3:23-cv-00058-SLG); Docket 143 at 33 & n.8 (Case No. 3:23-cv-00058-SLG).

Case No. 3:23-cv-00058-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:23-cv-00061-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Decision & Order
Page 109 of 109