Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
sbostrom@trustees.org
bbrisson@trustees.org

*Attorneys for Plaintiffs*

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>Defendants,<br><br>and<br><br>CONOCOPHILLIPS ALASKA, INC., *et al.*,<br><br>Intervenor-Defendants. | Case No. 3:23-cv-00058-SLG |

**PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL**

**EXPEDITED CONSIDERATION REQUESTED**
Ruling Requested by November 29, 2023 at 5:00 p.m.

ConocoPhillips Alaska, Inc. (ConocoPhillips) is poised to begin winter construction activities that will result in a significant amount of the gravel infrastructure for the Willow Master Development Plan (Willow) being built in the coming months, including over 8 miles of road, the project airstrip, and the 30+ acre pad for the Willow Operations Center, with continued gravel mining to support construction.[1] This is far more extensive than the limited construction activity carried during the prior winter construction season.

Pursuant to Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1)(C), Plaintiffs Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Environment America, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society (collectively SILA), ask this Court to issue an injunction pending appeal of the Court's Decision and Order,[2] and Judgment in a Civil Action,[3] entered on November 9, 2023. Plaintiffs move to enjoin implementation of Defendants' approvals of Willow during the pendency of this appeal. Imminent ground-disturbing construction activities are scheduled to start December 21, 2023.[4] As such, SILA respectfully requests that a ruling on this motion be expedited, as explained in the forthcoming motion to expedite.

---

[1] *See* Decl. of Connor A. Dunn ¶ 9, ECF No. 141-2.
[2] ECF No. 166 [hereinafter Order].
[3] ECF No. 167.
[4] *See* Dunn Decl. ¶ 7.

Following this Court's decision, counsel for ConocoPhillips confirmed on November 9, 2023 that, as set out in Connor A. Dunn's August 29, 2023 declaration, ConocoPhillips expects surface-disturbing winter construction activities to commence on December 21, 2023.[5] According to the Dunn declaration, there will be major construction activities this winter, including the construction of gravel roads, the Willow Operations Center gravel pad, the airstrip access road and apron, pipeline installation, and more.[6] As a result, irreparable harm to the lands, waters, subsistence resources and users, and other values within the National Petroleum Reserve–Alaska (Reserve) is imminent. SILA requests the Court enjoin all construction activities related to Willow to ensure the *status quo* is maintained while the Ninth Circuit Court of Appeals has the opportunity to review SILA's appeal.

SILA requests that this Court issue the requested Injunction Pending Appeal by November 29, 2023, at 5:00 p.m. If the Court does not rule by that time, SILA will assume this motion is denied and file an expedited motion for injunctive relief in the Ninth Circuit pursuant to Federal Rule of Appellate Procedure 8(a)(2)(A)(ii) and Circuit Rule 27-3.

[5] *See* Ex. 1.
[6] Dunn Decl. ¶¶ 7, 9.

Intervenor-Defendants ConocoPhillips opposes this motion. Federal Defendants, the North Slope Borough, Kuukpik Corporation, Arctic Slope Regional Corporation, and the State of Alaska did not respond with a position on this motion prior to filing.

## LEGAL STANDARDS

The standard for an injunction pending appeal is essentially the same as that for a preliminary injunction.[7] Plaintiffs must establish: (1) likely success on the merits; (2) likely irreparable harm without preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.[8] A plaintiff can obtain an injunction by showing "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," as long as the other factors are met.[9] Serious questions are "substantial, difficult, and doubtful," and require "more deliberative investigation."[10] This is a lower bar than demonstrating likely success on the merits.[11]

Courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if adopted "without observance of procedure required by law."[12] Courts

---

[7] *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983) (citation omitted).

[8] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[9] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

[10] *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (citation omitted).

[11] *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014); *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 413 F. Supp. 3d 973, 979 (D. Alaska 2019).

[12] 5 U.S.C. § 706(2)(A), (D).

undertake a "thorough, probing, in-depth review" to ensure that the agency made a "rational connection between the facts found and the conclusions made."[13]

## ARGUMENT

Because of the Court's familiarity with this case, SILA incorporates by reference the factual background provided in its opening brief.[14] This Court issued a ruling denying SILA's motion for summary judgment and its judgment dismissing all claims on November 9, 2023. *See generally* Order; Judgment in a Civil Case. SILA appealed and now seeks a motion for injunction pending appeal to prevent ConocoPhillips' imminent construction activities from causing irreparable harm to the Reserve during the course of that appeal.

### I. SILA WILL SUFFER IRREPARABLE HARM.

SILA's members' and supporters' uses and interests in the northeastern Reserve will be irreparably harmed by the significant gravel infrastructure and pipeline construction activities that are scheduled to begin imminently and continue through the winter. Last winter, because ConocoPhillips had only a shortened, 21-day construction season, ConocoPhillips only started opening the gravel mine and built two miles of gravel road.[15] This winter, ConocoPhillips is poised to begin "[m]ajor construction work" and

---

[13] *Native Ecosystems Council v. U.S.*, 418 F.3d 953, 960 (9th Cir. 2005) (citations omitted).

[14] SILA Opening Br. for Summ. J. at 10–15, ECF No. 105 [hereinafter Opening Br.].

[15] Dunn Decl. ¶ 3.

ground-disturbing activities on December 21, 2023, which will last into the spring.[16] ConocoPhillips plans to complete construction of significant gravel infrastructure, including eight miles of gravel road, the 31.3-acre operations center pad, an additional spur road and pad for water access, an access road to the airstrip and the airstrip apron, with gravel mining ongoing to support these activities, as well as install a bridge and over 1,600 pipeline vertical and horizontal support members along with 12.6 miles of various pipelines.[17] While this Court previously denied SILA's initial preliminary injunction motion in this case for activities last winter, ConocoPhillips' planned 2023–24 winter activities are significantly broader in scope and will be far more impactful than the limited construction that occurred last winter.[18]

SILA's members' and supporters' interests in subsistence hunting, gathering, and fishing; recreation; research; wildlife viewing and protection; and aesthetic enjoyment of the area's natural setting face imminent, irreparable harm from these activities.[19] As Sam Kunaknana explains, he relies heavily on subsistence hunting and fishing, and he hunts

---

[16] Dunn Decl. ¶¶ 7, 9.

[17] Dunn Decl. ¶ 9.

[18] Order re Mots. for TRO and Prelim. Inj. at 18–19, 24, ECF No. 74; *see also* id. at 29 ("To be clear, the Willow Project in its entirety would have a large environmental impact, but the Court's consideration at this time is limited to the environmental consequences of approximately 21 days of construction at the end of the Winter 2023 Construction Season.").

[19] *See generally* Brown Decl. ¶¶ 9, 17–21; Dabney Decl. ¶¶ 13, 19, 22–24; Greuel Decl. ¶¶ 22–23, 25–29, 31–36, 39–41; Montgomery Decl. ¶¶ 14–15; Miller Decl. ¶¶ 21–23, 25–29, 31–32; Ritzman Decl. ¶ 39; Thompson Decl. ¶¶ 7–11, 13, 16.

and fishes in the vicinity of Willow.[20] Mr. Kunaknana explains that his ability to hunt and fish in the area he currently relies on will be irreparably harmed by Willow.[21] Mr. Kunaknana's identity and way of life as an Iñupiat are inextricably tied to his ability to hunt and fish in the remaining infrastructure-free areas around his home, and he has already experienced his traditional hunting and fishing areas being taken away by oil development.[22] As he explains, he has directly observed impacts to caribou from infrastructure being built in his traditional hunting and fishing areas, as well as from gravel mining and construction activities.[23] Allowing ConocoPhillips to proceed with building significant components of this project during this appeal will cause him irreparable harm by permanently converting areas that are important to him for hunting and fishing into industrial zones where he can no longer hunt and fish.[24] As Siqiñiq Maupin explains, the infrastructure and activities would be located in important subsistence use areas, including for caribou, and threaten people's ability to hunt and obtain traditional foods and engage in cultural practices.[25] As Daniel Ritzman explains, he has traveled to the Reserve many times to recreate and view wildlife, including the area near Willow.[26] However, the development of Willow will impact his recreational use

---

[20] Kunaknana Decl. ¶¶ 7–9.
[21] Kunaknana Decl. ¶¶ 9–10, 18, 27–28, 35.
[22] Kunaknana Decl. ¶¶ 11–14, 16–17, 20–22, 25–26, 32.
[23] Kunaknana Decl. ¶ 16.
[24] Kunaknana Decl. ¶ 16–18, 20, 27.
[25] Maupin Decl. ¶¶ 18–24.
[26] Ritzman Decl. ¶¶ 25–31, 34.

of the area and deter him from ever returning.[27] Robert Thompson, who lives in Kaktovik and guides polar bear viewing trips, further describes how Willow's infrastructure, disturbance, and greenhouse gas emissions will harm polar bears and the region that he and his family have called home for generations.[28] SILA and its members' specific allegations of irreparable harm from ConocoPhillips' imminent winter construction activities warrant an injunction.[29]

It is undeniable that the damage to the Reserve's physical resources and to subsistence use and access from the gravel mining and gravel placement for roads and pads as well as pipelines will be permanent.[30] Indeed, the U.S. Bureau of Land Management (BLM) acknowledged in the final supplemental environmental impact statement (SEIS) that gravel placement will cause permanent impacts. BLM specifically explained that "[g]ravel fill will cover soil and kill existing vegetation, altering the thermal active layer indefinitely" and stated impacts to the permafrost from the gravel

---

[27] Ritzman Decl. ¶¶ 35–38, 47.

[28] Thompson Decl. ¶¶ 2–4, 6–11, 16 (describing impacts to the polar bear population he uses and guides people to view).

[29] *See M.R. v Dreyfus*, 697 F.3d 706, 729–32 (9th Cir. 2012) (explaining irreparable injury established when plaintiffs submitted detailed evidence of how challenged action individually impacts them).

[30] *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, … is often permanent or at least of long duration, *i.e.*, irreparable."); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) ("[O]nce the desert is disturbed, it can never be restored.").

mine "would be irreversible" and "permanent."[31] BLM also found that Willow is "likely to deflect . . . caribou from where Nuiqsut hunters harvest them" and that the altered distribution and deflection could have "large impacts to hunter success."[32] In its subsistence analysis, BLM explained that roads will harm subsistence use access.[33] BLM specifically found that Willow "would constitute a substantial restriction on subsistence access for Nuiqsut residents," particularly during construction.[34] These findings reinforce the evidence of irreparable harm demonstrated by SILA's members. As the Ninth Circuit has explained, "[w]hen a project may significantly degrade some human environmental factor, injunctive relief is appropriate."[35]

## II. SILA IS LIKELY TO SUCCEED ON THE MERITS.

SILA is likely to prevail on its claims that BLM failed to comply with the Naval Petroleum Reserves Production Act (NPRPA) and National Environmental Policy Act

---

[31] AR820811, AR820817, AR820855; *see also* AR820878, AR820883 (acknowledging gravel fill "will permanently remove or alter wetlands and wetlands functions").

[32] AR824340; *see also* AR820959–60 (finding that roads deflect caribou and that female caribou do not habituate to roads during calving).

[33] AR824340, AR824334.

[34] AR824341.

[35] *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (citation omitted); *see also All. for the Wild Rockies*, 632 F.3d at 1135 (explaining harm to members' "ability to view, experience, and utilize the areas in their undisturbed state" is irreparable harm (internal quotation marks omitted)); *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) ("[I]rreparable harm to the environment necessarily means harm to the plaintiffs' specific aesthetic, educational, and ecological interests.").

(NEPA) by failing to consider a reasonable range of alternatives sufficient to protect surface resources and mitigate impacts to subsistence uses and resources. At a minimum, SILA raised serious questions regarding BLM's compliance with these statutes sufficient to warrant an injunction.

In approving Willow, BLM impermissibly limited its consideration of alternatives to only those that would provide for full-field development of ConocoPhillips' leases.[36] This approach is inconsistent with BLM's legal authority and obligations under the NPRPA and led the agency to unlawfully constrain its consideration of a reasonable range of alternatives under NEPA.[37]

The NPRPA mandates that BLM "shall include or provide for such conditions, restrictions, and prohibitions" on activities throughout the Reserve as it determines necessary or appropriate to protect surface resources and requires "maximum protection" of surface values in Special Areas.[38] This authority is very broad and includes the power to prohibit activities or suspend operations on existing leases to mitigate adverse

---

[36] AR820732; AR820745; AR821957–60.

[37] 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1508.1(z); 42 U.S.C. §§ 6506a(b), 6504(a); *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) ("An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." (internal quotation marks omitted) (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995))); *Morongo Band of Mission Indians v. Fed. Aviation Admin*., 161 F.3d 569, 575 (9th Cir. 1998) ("The 'existence of a viable but unexamined alternative renders an [EIS] inadequate.'" (quoting *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1994))).

[38] 42 U.S.C. §§ 6506a(b), 6504(a).

effects.[39] Thus, while Congress provided for an oil and gas program in the NPRPA, it also vested BLM with the authority and mandate to take a broad range of actions — including outright prohibitions — to ensure surface resources would be protected from any such activities. While the NPRPA may also contemplate some development in Special Areas, it does not mandate that development.

Because of those fundamental flaws in the agency's reasoning about the scope of its own authority and mandates, BLM violated its obligation under NEPA to consider a reasonable range of alternatives. In developing the SEIS, BLM screened alternatives based on the assumption that it must not strand economically viable quantities of recoverable oil and must allow "full development of the Willow Reservoir."[40] BLM defined "full development" to mean it could not consider any alternatives that would strand an economically viable quantity of oil — meaning, a quantity that warrants an additional drilling pad.[41] As a result, the agency rejected alternatives that kept infrastructure out of the Teshekpuk Lake Special Area (TLSA) or reduced the project's greenhouse gas emissions, among other reasonable alternatives. BLM therefore improperly limited its consideration of a reasonable range of alternatives, contrary to its mandates under NEPA and the NPRPA.[42]

---

[39] *Id.* § 6506a(k)(2); 43 C.F.R. § 3135.2(a)(1), (3).

[40] AR820732; AR820745.

[41] AR821709–10; AR821740.

[42] Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt. (SILA), 555 F. Supp. 3d 739, 769 (D. Alaska 2021).

BLM's approach, condoned by the District Court, has the effect of limiting BLM's authority to adopt prohibitions or other mitigation measures to only those that will still provide for full-field development.[43] However, nothing in the plain language of the NPRPA limits BLM's authority to only those measures that would not infringe on a lessee fully developing a reservoir. Such an interpretation would have the effect of tying the agency's hands where, as here, the project is likely to have significant adverse impacts to surface resources and Special Areas. Such an approach is contrary to the statutory mandate that BLM adopt mitigation measures to protect surface resources and provide maximum protective measures within Special Areas.[44]

Under the plain language of the NPRPA and its regulations, BLM may restrict and prohibit activities on existing leases,[45] including by denying drilling permits.[46] As the Ninth Circuit recognized in *Northern Alaska Environmental Center v. Kempthorne*, even after issuing leases, the government can still "condition permits for drilling on implementation of environmentally protective measures" and the court presumed the

[43] Order at 20–22.

[44] 42 U.S.C. §§ 6506a(b), 6504(a).

[45] 42 U.S.C. § 6506a(n)(2); 43 C.F.R. § 3135.2(a)(1), (3); *see id.* § 3162.3-1(h)(2); *see also* Opening Br. at 18–19.

[46] 42 U.S.C. § 6506a(k)(2); *see also Alaska Indus. Dev. & Exp. Auth. v. Biden*, 2023 U.S. Dist. LEXIS 136474, at *23 (D. Alaska Aug. 7, 2023) (acknowledging NPRPA grants Secretary broad authority, notwithstanding the oil and gas program).

agency could "deny a specific application altogether if a particularly sensitive area is sought to be developed and mitigation measures are not available."[47]

The terms of the leases themselves also do not grant ConocoPhillips a right to full-field development. To the extent BLM grants the right to drill for oil and gas when issuing leases, that right is still subject to all applicable laws and regulations.[48] This includes BLM's ability to adopt prohibitions and impose mitigation measures to protect the Reserve and, as the Ninth Circuit recognized, to deny permits.[49] Nothing in the terms of the leases indicates BLM waives its authority to impose mitigation and other measures or otherwise diminishes the agency's responsibility to ensure against significant impacts to surface resources after issuing a lease.[50] Therefore, the Court's conclusion that ConocoPhillips has a right to full-field development and that BLM may no longer prohibit significant impacts after lease issuance was in error.[51]

Further, nothing in BLM's purpose and need precluded the agency from considering alternatives that would shift infrastructure out of the TLSA or other sensitive ecosystems like the Fish Creek setback.[52] BLM never explained why alternatives that would reduce infrastructure or locate it outside of sensitive areas would be inconsistent

---

[47] 457 F.3d 969, 976 (9th Cir. 2006).
[48] AR950259.
[49] *N. Alaska Env't Ctr.*, 457 F.3d at 976.
[50] *See* AR950259–61.
[51] Order at 20–21.
[52] AR820723–24 (purpose and need statement).

with the purpose and need of providing maximum protection; BLM's explanation focused only on the goal of providing for full-field development.[53] The purpose of allowing oil production and transportation cannot override BLM's statutory obligations under the NPRPA to provide maximum protection for areas like the TLSA. Thus, the Court's conclusion that only full-field development was consistent with the purpose and need is also flawed.[54]

BLM's inclusion of Alternative E in the final SEIS and adoption of it as modified did not render its range of alternatives sufficient. Even to the extent Alternative E might have slightly reduced the impacts from ConocoPhillips' proposal, it did not alter that BLM improperly limited the alternatives to only those allowing for full-field development.[55] That self-limitation precluded BLM from considering a range of alternatives that were meaningfully different and instead led the agency to adopt an alternative that only reduced the oil recovered by a mere 2.45%.[56] Only considering alternatives that would provide for full-field development was not adequate for purposes

---

[53] AR821927 (stating purpose and need is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir … while providing maximum protection to significant surface resources within the NPR-A"); *cf.* Order at 26–27.

[54] Order at 21–23.

[55] *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (rejecting alternative analysis where agency "uncritically assumes that a substantial portion of the [] areas should be developed and considers only those alternatives with that end result").

[56] Order at 25.

of NEPA and was inconsistent with the agency's authority and obligations under the NPRPA.[57]

Overall, BLM's flawed screening criteria severely curtailed the agency's consideration of reasonable alternatives that could have addressed Willow's significant impacts to climate, wildlife, subsistence, and other natural values. As a result, BLM's framework for considering and rejecting alternatives was inconsistent with its statutory obligations to mitigate adverse effects on surface resources under the NPRPA.[58] In sum, SILA has demonstrated likely success, or at least serious questions, regarding the merits of this claim.

## III. THE PERMANENT HARM TO SILA AND THE RESERVE TIPS THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY IN FAVOR OF AN INJUNCTION.

The balance of equities and public interest strongly favor protecting the Reserve from significant gravel mining and road and infrastructure construction while the Ninth Circuit reviews the agencies' deficient decisions. In cases against the government, the balance of equities and public interest factors merge.[59] Where environmental injury is "sufficiently likely, the balance of harms will usually favor" an injunction.[60] The "public interest in preserving nature and avoiding irreparable environmental injury" is well-

[57] *Block*, 690 F.2d at 767.

[58] *SILA*, 555 F. Supp. 3d at 769.

[59] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[60] *Save Our Sonoran, Inc.*, 408 F.3d at 1125 (quoting *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988)).

established.[61] Additionally, the proper scope to evaluate the balance of equities and public interest is the timeframe that the injunction will be in place, i.e., while the Ninth Circuit decides the appeal.[62]

ConocoPhillips' extensive winter construction will irreparably harm vital habitat for fish and wildlife, including important subsistence resources, and permanently impact subsistence users. Polar bears, caribou, and wildlife of the northeastern Reserve are resources used and enjoyed by SILA's members and supporters, as well as Alaskans and citizens across the United States.[63] The NPRPA reflects that there is a strong public interest in the protection of land and resources; while allowing for leasing, Congress mandated protection of the Reserve's surface resources and uses.[64] There is a significant public interest in protecting the Reserve while this case is decided.[65] The Ninth Circuit also recognizes the public interest complying with the law.[66]

---

[61] *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc).

[62] League of Wilderness Defs./Blue Mountain Biodiversity Project v. Connaughton (Connaughton), 752 F.3d 755, 765–66 (9th Cir. 2014).

[63] *See supra* Argument Part I at 6–7 and nn.19–28.

[64] 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b).

[65] *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1033–34 (9th Cir. 2007) (explaining public interest in preserving environment and resources).

[66] *S. Fork Band Council of W. Shoshone v. U.S. DOI*, 588 F.3d 718, 728 (9th Cir. 2009) (explaining public interest under NEPA requires careful consideration of environmental impacts before projects proceed).

Economic interests do not overcome the irreparable environmental harm favoring an injunction.[67] Any economic benefits to the government or permittees based on violations of the law are outweighed by environmental concerns.[68] While winter construction supports jobs, those jobs will still be available in the future should SILA not prevail on its appeal.[69] Additionally, to the extent that ConocoPhillips continued to invest money and enter into procurement or service contracts for this winter's work, that is a business risk it knowingly took that should not overcome the harm to Plaintiffs.[70] Further,

---

[67] *Lands Council*, 537 F.3d at 1005; *Connaughton*, 752 F.3d at 765–66 (describing delay in moving revenues and jobs to future year as "marginal harm" and concluding irreparable injury to plaintiffs outweighs temporary delay in achieving economic benefits of project); *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006) ("Although the public has an economic interest in the mine, there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the mine's operation."); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (finding economic injury to cruise industry "does not outweigh" irreparable environmental harm); *Indigenous Env't Network v. U.S. Dep't of State*, 369 F. Supp. 3d 1045, 1051–52 (D. Mont. 2018) (finding environmental harms outweigh "pecuniary interest" and citing Ninth Circuit cases that hold that environmental injury outweighs economic interests).

[68] *See Or. Natural Res. Council v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2007) ("[T]he risk of permanent ecological harm outweighs the temporary economic harm that [the permittee] may suffer."); *Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (describing delay in revenues and jobs as "marginal harm").

[69] *See Connaughton*, 752 F.3d at 765–67 (explaining seasonable jobs can be realized in the future if project is upheld and moving jobs from one year to the following is slight harm); *S. Fork Band Council of W. Shoshone*, 588 F.3d 728 (explaining economic harm of lost employment mostly temporary harm).

[70] *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014) (explaining companies that presume permitting outcomes assume the risk); *Env't Democracy Project v. Green Sage Mgmt., LLC*, 2022 U.S. Dist. LEXIS 183387, at *9–10

cont…

ConocoPhillips still has yet to make final investment decisions,[71] rendering economic interests speculative.

## IV. THE COURT SHOULD WAIVE ANY BOND REQUIREMENT.

There is a well-established "public interest" exception to imposing a bond; courts can decline to impose bonds to avoid frustrating public interest litigation. Plaintiff groups are non-profit organizations that seek to further the strong public interest in preventing irreparable harm and ensuring compliance with the law.[72] SILA meets the criteria for bond waiver.

## CONCLUSION

The Court should grant SILA's motion for an injunction pending appeal. To safeguard the important public rights at issue in this case and because SILA meets the criteria for bond waiver, the Court should waive the bond requirement.

Respectfully submitted this 15th day of November, 2023,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
TRUSTEES FOR ALASKA

(N.D. Cal. 2022) ("Regardless of [the magnitude of economic harm], the Court would still find the balance of equities favors Plaintiff because Defendant's alleged harms are self-inflicted.").

[71] Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. Exs. 6 at 1 (ECF No. 23-18) & 8 at 1 (ECF No. 23-20); *see also* Dunn Decl. (failing to state that ConocoPhillips has made a final investment decision).

[72] Dabney Decl. ¶ 27; Isherwood Decl. ¶¶ 4–11; Miller Decl. ¶ 34; Greuel Decl. ¶ 42; Maupin Decl. ¶ 28; Montgomery Decl. ¶ 26.

Attorneys for Plaintiffs

## Certificate of Compliance

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) because it contains 18 pages, excluding the parts of the brief exempted by Local Civil Rule. 7.4(a)(4).

s/ Bridget Psarianos
Bridget Psarianos

## Certificate of Service

I certify that on November 15, 2023, I caused a copy of the PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL and [PROPOSED] ORDER to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system, which will send electronic notification of such filings to the attorneys of record in this case.

s/ Bridget Psarianos
Bridget Psarianos